UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE: INDYMAC MORTGAGE-BACKED                    Master Docket
SECURITIES LITIGATION                             No. 09 Civ. 4583 (LAK)

This document relates to:          *All Actions*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OPINION


Appearances:

Joseph J. Tabacco, Jr.
Nicole Lavallee
Patrick T. Egan
Kristen D. Tremble
Jason M. Leviton
BERMAN DEVALERIO
*Attorneys for Lead Plaintiffs.*

Jonathan C. Dickey
Robert F. Serio
Aric H. Wu
Eric M. Creizman
Dean J. Kitchens
GIBSON, DUNN & CRUTCHER LLP
*Attorneys for defendants Bank of America Corporation, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Goldman Sachs & Co., HSBC Securities (USA) Inc., J.P. Morgan Securities Inc., Morgan Stanley & Co., Incorporated, RBS Securities, Inc., and UBS Securities LLC.*

Eric R. Levine
Eric Aschkenasy
EISEMAN LEVINE LEHRHAUPT & KAKOYIANNIS
*Attorneys for defendants Lynnette Antosh, Raphael Bostic, S. Blair Abernathy, John Olinski, Samir Grover, Simon Heyrick, and Victor Woodworth.*

John W. Spiegel
Kathleen M. McDowell
James C. Rutten
MUNGER, TOLLES & OLSON LLP
*Attorneys for defendants Lynnette Antosh and Raphael Bostic.*

Robert L. Corbin
Joel M. Athey
Corbin, Fitzgerald & Athey LLP
*Attorneys for defendants John Olinski, Samir Grover, Simon Heyrick and Victor Woodworth.*

Robert H. Fairbank
Richard D. Gluck
Michael B. Norman
FAIRBANK & VINCENT
*Attorneys for defendant S. Blair Abernathy.*

William R. Stein
Scott H. Christensen
Kenneth M. Katz
HUGHES HUBBARD & REED LLP
*Attorneys for defendants IndyMac MBS, Inc. and IndyMac Securities Corporation.*

Benjamin J. Razi
D. Jean Veta
Pamela A. Carter
COVINGTON & BURLING LLP
*Attorneys for defendant Michael W. Perry.*

LEWIS A. KAPLAN, *District Judge.*

This case arises from the collapse of the United States residential mortgage market and its alleged effect on a type of mortgage-backed security. The securities, known as mortgage-pass through certificates ("Certificates"), were issued by IndyMac MBS, Inc. ("IndyMac MBS") in 106 different offerings pursuant to three registration statements and the related prospectuses and prospectus supplements (the "Offering Documents"). Lead Plaintiffs, the Wyoming State Treasurer and the Wyoming Retirement System, purchased Certificates in fifteen of the approximately 106

offerings.  They bring claims on behalf of a purported class of Certificate holders for violations of Sections 11, 12, and 15 of the Securities Act of 1933[1] ("Securities Act") and allege that the Certificates' offering documents contained false and misleading statements regarding IndyMac Bank's (1) underwriting standards, (2) real estate appraisal practices, and (3) the process by which the ratings agencies determined the Certificates' ratings.  The matter is before the Court on the motions of the remaining defendants[2] to dismiss the amended consolidated class action complaint ("ACC") for failure to state a claim upon which relief may be granted.

*Facts*

*Plaintiffs*

The Wyoming State Treasurer manages over $10 billion in non-pension fund assets, and allegedly purchased or acquired Certificates in thirteen offerings pursuant and/or traceable to the 2005, 2006, and 2007 IndyMac registration statements.[3]  The Wyoming Retirement System administers eight retirement programs, and purchased or acquired Certificates in three offerings pursuant and/or traceable to the 2005, 2006, and 2007 IndyMac registration statements.[4]

---

[1]

15 U.S.C. §§ 77k, *l*, *o.*

[2]

The Court already has granted the Ratings Agency Defendants' motion to dismiss.  *In re IndyMac Mortgage-Backed Sec. Litig.*, No. 09 Civ. 4583 (LAK)(S.D.N.Y. Feb. 5, 2010), docket item 195 .

[3]

ACC ¶ 19.

[4]

*Id.* ¶ 20.  Each lead plaintiff purchased the IndyMac INDA Mortgage Loan Trust Series 2007-AR7 Class 1A1 Certificate.

One of the Certificates listed in the Wyoming Retirement System's Private Securities Litigation Reform Act ("PSLRA") Certification (IndyMac Residential Asset Backed Trust

4

*Defendants*

There are four broad categories of defendants remaining in this lawsuit – the IndyMac Defendants, the Individual Defendants, the Underwriter Defendants, and Defendant Michael W. Perry.

The IndyMac Defendants include IndyMac MBS, Inc. ("IndyMac MBS"), and IndyMac Securities Corporation ("IndyMac Securities").[5]   The IndyMac Defendants were the wholly-owned subsidiaries of IndyMac Bank, F.S.B. ("IndyMac Bank"), which was closed by the Federal Deposit Insurance Corporation on July 11, 2008, and is not a party to this lawsuit.[6]

The Individual Defendants[7] are the former officers and directors of IndyMac MBS.  Each signed at least one of the registration statements at issue in this case.[8]

The Underwriter Defendants include thirteen financial institutions who were named as underwriters in the Offering Documents and allegedly participated in their drafting and dissemination.[9]

---

Series 2006-D Class 2A2) is not listed in the tables set out in ACC Exhibits C-E, which plaintiffs allege contain the universe of offerings at issue in this action.  ACC ¶ 33 n.8.  As such the claims based on this Certificate should be dismissed.

[5]     *Id.*  ¶ 23.

[6]     *Id.* ¶ 21.

[7]     The Individual Defendants include John Olinski, S. Blair Abenathy, Lynette Antosh, Raphael Bostic, Samir Grover, Simon Heyrick, and Victor H. Woodworth.

[8]     *Id.*  ¶¶ 25-31.

[9]     *Id.* ¶¶  33-45.  The Underwriter Defendants include Bank of American Corp., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Goldman, Sachs & Co., HSBC Securities (USA), Inc., J.P. Morgan Securities, Inc., Morgan

Michael W. Perry at all relevant times allegedly was chairman of IndyMac Bank's board of directors and its chief executive officer.[10]

*The Certificates*

A Certificate is a type of mortgage-backed security that entitles its owner to a portion of the revenue stream generated by an underlying pool of residential mortgage loans.[11]  IndyMac Bank originated or acquired the individual mortgage loans that underlie the Certificates.[12]  The loans then were transferred to IndyMac MBS, which bundled them into mortgage pools.[13]  The pools were transferred to issuing trusts, which created the Certificates.[14]  The issuing trusts then transferred the Certificates back to IndyMac MBS[15] which, in turn, sold the Certificates to the specific Underwriter

---

Stanley & Co., Incorporated, RBS Securities Inc. (f/k/a Greenwich Capital Markets, Inc.), and UBS Securities LLC.

Bank of American Corp. is named as a defendant solely in its alleged capacity as a successor-in-interest to Countrywide Securities Corporation and Merrill, Lynch, Pierce, Fenner, & Smith, Inc.  ACC ¶¶ 33-34.

[10] *Id.* ¶ 24.

[11] *Id.* ¶ 60.

[12] *Id.*

[13] *Id.* ¶ 63.

[14] *Id.* ¶ 73.

[15] *Id.*

Defendant(s) for each offering.[16]   The Underwriter Defendants offered the Certificates to investors,[17] after they were rated by rating agencies.

*The Complaint*

Before its collapse, IndyMac Bank and its subsidiaries were major participants in the mortgage-backed security market.   The ACC alleges that IndyMac MBS issued mortgage pass-through certificates in over 106 offerings pursuant to an August 15, 2005 registration statement ("2005 Registration Statement"), a February 24, 2006 registration statement ("2006 Registration Statement"), and a February 14, 2007 registration statement ("2007 Registration Statement") and the prospectuses and prospectus supplements that they incorporated.[18]

Plaintiffs allege that the Offering Documents violated Sections 11, 12, and 15 of the Securities Act[19] because they contained four categories of misstatements or omissions.   First, plaintiffs allege that the Offering Documents' description of IndyMac Bank's underwriting standards was misleading because IndyMac Bank originated or acquired loans for the mortgage pools without regard to those requirements.   Second, they allege that the appraisal practices used to evaluate the loans' real estate collateral did not comply with the Uniform Standards of Professional Appraisal Practice ("USPAP") as stated in the Offering Documents, resulting in misstated loan-to-

---

[16]    *Id.* ¶ 74.

[17]    *Id.*

[18]    *Id.* ¶¶ 1, 6.

[19]    15 U.S.C. §§ 77k, *l*, *o*.

value rations.  Third, they assert that the Offering Documents failed to disclose that the ratings process was "highly compromised," as the agencies used "outdated" models to evaluate the Certificates, suffered from conflicts of interest, and did not verify independently the loan data provided to them.[20]

The defendants all have moved to dismiss the ACC for failure to state a claim upon which relief may be granted, as barred by the statutes of limitations, and for lack of standing.

## Discussion

A.    *Legal Standard and Applicable Law*

In deciding a motion to dismiss, a court ordinarily accepts as true all well pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor.[21]  In order to survive such a motion, however, "the plaintiff must provide the grounds upon which [its] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level,'"[22] and to "'state a claim to relief that is plausible on its face.'"[23]  Although such motions are addressed to the face of the pleadings, the court may consider also documents attached to or incorporated by reference in the amended complaint as well as legally required public disclosure documents and documents

---

[20]

ACC ¶ 8.

[21]

*See Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001).

[22]

*ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (declining to limit *Twombly* to antitrust cases).

[23]

*Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570).

possessed by or known to the plaintiff upon which it relied in bringing the suit.[24]

Sections 11 and 12(2) are "Securities Act siblings with roughly parallel elements" and may impose liability if a relevant communication contains a material misstatement or omission.[25]  Section 11 applies to registration statements while Section 12 applies to prospectuses or oral communications connected with a sale.[26]  An appropriate defendant may be liable if the relevant communication contains (1) a misrepresentation, (2) an omission in breach of an affirmative legal disclosure obligation, or (3) an omission necessary to prevent existing disclosures from being misleading.[27]

A misrepresentation or omission is actionable only if material.  A statement or omission is material if "taken together and in context, [it] would have misled a reasonable investor."[28]  As materiality is a mixed question of law and fact, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the

---

[24]

       *ATSI Commc'ns, Inc.*, 493 F.3d at  98; *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).

[25]

       *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358-59 (2d Cir. 2010).

[26]

       *Id.*

[27]

       *Id.* at 360-61.

[28]

       *Id.* at 360 (quoting *Romach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004)); *see also DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003).

question of their importance.'"[29]

**B.     Standing**

    Defendants first argument for dismissal is that the plaintiffs lack constitutional and statutory standing for many of their claims.

    *1.     Constitutional standing*

    Named plaintiffs allegedly have purchased securities in fifteen of the approximately 106 offerings listed in Exhibits C, D, and E attached to the ACC.  For the reasons stated in *In re Lehman Brothers Mortgage-Backed Securities Litigation*,[30] named plaintiffs have standing only with respect to the offerings in which they purchased securities.[31]  In consequence, the claims based on the offerings in which named plaintiffs have not purchased are dismissed.  This includes all claims against UBS Securities LLC, HSBC Securities (USA) Inc., Goldman Sachs & Co., Citigroup Global Markets Inc., and IndyMac Securities Corp., as there are no allegations that they were involved in any of the offerings from which named plaintiffs purchased their securities.

    *2.     Section 12(2) standing*

    The defendants next move to dismiss the Section 12 claims on the grounds that the

---

[29]

    *ECA v. JP Morgan Chase*, 553 F.3d 187, 197 (2d Cir. 2009) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)).

[30]

    684 F. Supp.2d 485, 490-91 (S.D.N.Y. 2010).

[31]

    The Certificates for which plaintiffs have constitutional standing are listed in Schedule A.

plaintiffs lack statutory standing to sue.[32]  A plaintiff has standing to bring a Section 12 claim only against a "statutory seller" from which it has purchased a security.[33]  A "statutory seller" is one who, in an initial public offering, either transferred title to the purchaser or successfully solicited it for financial gain.[34]  The defendants argue that the ACC fails to allege adequately that any of the defendants sold lead plaintiffs the Certificates or solicited them for profit.

Plaintiffs likely would not have standing had they alleged only that they had purchased the Certificates "pursuant and/or traceable to" the Offering Documents.[35]  Plaintiffs here, however, have alleged that they purchased the Certificates "pursuant to" the relevant Offering Documents,[36] that is, in the relevant offerings.[37]  They have alleged also that defendants "solicited,

---

[32]

See, e.g., IndyMac Def. Br. at 33-34; Underwriter Def. Br. at 11-12.

[33]

See Akerman v. Oryx Commc'ns, Inc., 810 F.2d 336, 344 (2d Cir. 1987) ("Section 12(2) imposes liability on persons who offer or sell securities and only grants standing to 'the person purchasing such security' from them.").

[34]

Pinter v. Dahl, 486 U.S. 622, 642 (1988); Wilson v. Saintine Exploration & Drilling Corp., 872 F.2d 1124, 1126 (2d Cir. 1988); see also Yung v. Lee, 432 F.3d 142, 147-48 (2d Cir. 2005).

[35]

See In re Cosi, Inc. Sec. Litig., 379 F. Supp. 2d 580, 588-89 (S.D.N.Y. 2005) (collecting cases).

[36]

See, e.g., ACC ¶¶ 235-37.  While other paragraphs allege that plaintiffs purchased the Certificates "pursuant and/or traceable to" the Offering Documents, see, e.g., id. ¶¶ 19-20, the "pursuant to" language appears specifically in the Section 12(2) section of the ACC. See In re Ultrafem Inc. Sec. Litig., 91 F.Supp.2d 678, 694 n.11 (S.D.N.Y. 2000).

[37]

See Tsereteli v. Residential Asset Securitization Trust 2006-A8, No. 08 Civ. 10637 (LAK), 2010 WL 816623, at * 2 (S.D.N.Y. Mar. 11, 2010);  In re Ultrafem Inc. Sec. Litig., 91 F. Supp. 2d at  694 (S.D.N.Y. 2000) (finding claim based on purchase made "pursuant to the Offering" could be brought under § 12 while claim based on purchases made "pursuant or traceable to" offering could not be).

sold and distributed" the Certificates,[38] that they purchased a specified number of Certificates on specified dates (some of which corresponded to the initial offering dates) at specified prices, that specific Underwriter Defendants were associated with each individual offering, and that IndyMac MBS and the Underwriter Defendants "promoted and sold" the Certificates for their own personal gain.[39]  These allegations are sufficient at this stage to support a plausible inference that the lead plaintiffs purchased their Certificates from the specific Underwriter Defendants involved in the fifteen offerings for which they have constitutional standing and have named an underwriter as a defendant.[40]

C.    *Statute of Limitations*

Defendants next move to dismiss the ACC as barred by the statute of limitations.

To be timely, claims under Sections 11 and 12(2), and 15 of the Securities Act must be "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."[41]  The limitations period

---

[38]

*Id.* ¶¶ 6, 81-83.

[39]

*Id.* ¶¶ 6, 228, 234, 237 & Exs. A- B.

[40]

Three of the offerings listed in Schedule A for which plaintiffs have constitutional standing allegedly were underwritten only by Lehman Brothers Inc., an entity not named as a defendant in this lawsuit.  ACC Exs. C-E.  Consequently, plaintiffs have not alleged standing to assert a Section 12 claim based on the following three offerings: (1) IndyMac INDX Mortgage Loan Trust Series 2006-AR2 Class 1A1A, (2) IndyMac INDX Mortgage Loan Trust Series 2006-AR4 Class A1A, and (3) IndyMac INDX Mortgage Loan Trust Series 2006-AR14 Class 1A1A.  The offerings for which named plaintiffs have standing to sue under Securities Action Section 12(2) are listed in Schedule B.

[41]

15 U.S.C. § 77m; *Dodds v. Cigna Sec. Inc.*, 12 F.3d 346, 349. & n.1 (2d Cir. 1993).

begins to run "after the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge."[42] Plaintiffs have a duty to inquire when they are put on "inquiry notice" – that is, when the circumstances would suggest to an investor of ordinary intelligence the probability that a cause of action existed.[43] The duty to inquire can be triggered by information contained in the financial press, mainstream media, and publicly filed documents.[44] Once the duty to inquire arises, if the investor makes an inquiry, the court imputes knowledge of what an investor would have discovered in the exercise of reasonable diligence as of the date a reasonable investor would have discovered it.[45] If the investor makes no inquiry, the court imputes knowledge as of the date the duty to inquire arose.[46]

1. *The relevant complaint*

    In order to determine whether plaintiffs' claims are timely, the Court must first determine the date on which the statute of limitations was tolled. Plaintiffs argue that the relevant

---

[42]

 *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 167 (2d Cir. 2005) (quoting *LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 154 (2d Cir. 2003)).

[43]

 *Dodds*, 12 F.3d at 350.

[44]

 *See*, *e.g.*, *LC Capital Partners, LP*, 318 F.3d at 151-53; *Lentell*, 396 F.3d at 169-72.

[45]

 *LC Capital Partners, LP*, 318 F.3d at 154.

[46]

 *Id.*

date under the rule of *American Pipe & Constr. Co. v. Utah*[47] was January 21, 2009, the date the class action complaint in *IBEW Local 103 v. IndyMac MBS, Inc.* ("*IBEW*")[48] was filed.[49]   Defendants contend that the *American Pipe* rule does not apply to subsequently filed class action complaints and, in any event, does not apply where the initial complaint was dismissed voluntarily.[50]   They argue that the May 14, 2009 complaint in this action therefore is the relevant filing for tolling purposes.

In *American Pipe*, the Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action."[51]  It noted that, were the rule otherwise, potential class members "would be induced to file protective motions to intervene or join in the event that the class was later found unsuitable," denying Rule 23 class actions of the "efficiency and economy of litigation which is a principal purpose of the procedure."[52]   The

---

[47]

414 U.S. 538 (1974).

[48]

No. BC405843 (Cal. Super. Ct., Los Angeles Cty. filed Jan. 21, 2009).  The parties do not dispute that the *IBEW* complaint was filed on January 21, 2009 and asserted claims virtually identical to those asserted in the instant action.  IndyMac Def. Br. At 12 n.10; Pl. Br. at 62-63.

[49]

Pl. Br. at 62-64.

[50]

IndyMac Def. Br. at 12 n.10.

[51]

*Id.* at 766; *see also Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 349-50 (1983) ("The filing of a class action tolls the statute of limitations 'as to all asserted members of the class'"); *In re Worldcom Sec. Litig.*, 496 F.3d 245, 255 (2d Cir. 2007).

[52]

*American Pipe*, 414 U.S. at 553.

limitations period begins to run again if and when class certification is denied.[53]  Plaintiffs argue that

the *IBEW* complaint tolled the statute of limitations for the plaintiffs in this action.

Relying on *Korwek v. Hunt*,[54] defendants argue that the *American Pipe* rule does not

toll the statute of limitations for subsequently filed class action complaints.  But defendants read

*Korwek* too broadly.  The Second Circuit there held that the *American Pipe* rule does not apply to

the filing of a "subsequent class action *following a definitive determination of the inappropriateness*

*of class certification*."[55]  It ruled that such filings abuse the careful balance struck in *American Pipe*

between the values underlying statutes of limitation and the economies and efficiencies of the Rule

23 class action procedure by permitting successive class representatives to relitigate endlessly the

district judge's class certification denial.[56]  The concerns about repose, inefficiency, and wasteful

litigation expressed in *Korwek*, however, are inapposite where, as here, there never has been a

definitive class certification determination.  Consequently, the *Korwek* limitation on *American Pipe*

does not apply.[57]

Defendants argue that, even if the *American Pipe* tolling rule applies, plaintiffs can

---

[53]

    *Crown, Cork & Seal Co., Inc.*, 462 U.S. at 353-54.

[54]

    827 F.2d 874 (2d Cir. 1987).

[55]

    *Id.* at 879.

[56]

    *Id.*  (permitting a subsequent class action to be filed after a definitive determination that a class action was inappropriate would be "inimical to the purposes behind statutes of limitations and the class action procedure."); *see also Salazar-Calderon v. Presidio Valley Farmers Ass'n*, 765 F.2d 1334 (5th Cir. 1985).

[57]

    *See Catholic Social Servs. v. INS*, 232 F.3d 1139, 1149 (9th Cir. 2000); *In re IPO Sec. Litig.*, 617 F. Supp.2d 195, 199 (S.D.N.Y. 2007).

not claim the benefit of the *IBEW* complaint because it was dismissed voluntarily.  The general rule, as plaintiffs acknowledge,[58] is that a voluntarily dismissed complaint does not toll the statute of limitations.[59]  This is because the law treats a voluntarily dismissed complaint as if it never had been filed.[60]

Relying on *Guitierrez v. Vergari,*[61] plaintiffs contend that the general rule does not apply in situations, like the one here, where the first complaint was dismissed voluntarily only after the second complaint was filed.[62]  In *Guitierrez*, the *pro se* plaintiffs filed a timely complaint on May 2, 1979 and a second complaint in a different action alleging essentially the same conduct on July 10, 1979, after the limitations period had expired.[63]  Judge Ward urged the plaintiffs to dismiss one complaint voluntarily under Rule 41(a)(2) for the "convenience of the parties and of the Court," and they subsequently dismissed the earlier-filed one.[64]  Thereafter, two of the defendants named in the second complaint moved to dismiss it as untimely.

Judge Ward denied the motion.  Citing "factors unique to the present case," he

---

[58]

Pl. Br. at 62.

[59]

*E.g.*, *Elgendy v. City of New York*, No. 00 Civ. 5196 (JGK), 2000 WL 1119080, at *5 (S.D.N.Y. Aug. 7, 2000).

[60]

*Id.* (citing CHARLES ALAN WRIGHT & ARTHUR R. MILLER, 9 FEDERAL PRACTICE & PROCEDURE: CIVIL 2D § 2367 (1995)).

[61]

499 F. Supp. 1040 (S.D.N.Y. 1980)

[62]

Pl. Br. at 62.

[63]

*Guitierrez*, 499 F. Supp. at 1043-44.

[64]

*Id.* at 1049.

concluded that the policy behind the general rule that a voluntarily dismissed complaint has no tolling effect was "not significantly implicated" where the plaintiffs had dismissed the earlier-filed complaint at the court's urging and where neither they nor the court anticipated that dismissal of the "first complaint instead of the second might create a statute of limitations problem."[65] He noted in *dictum* that he was "fortified . . . by the absence of any apparent unfairness to the defendants" because "the second action was brought before the Rule 41(a)(2) dismissal of the first action" and consequently the defendants were "continually on notice that plaintiffs were actively pursuing a claim against them."[66]

Plaintiffs have cited a handful of cases that have noted *Guitierrez*'s existence and outcome.[67] None of those cases, however, has adopted the holding, and each ultimately followed the general rule that a voluntarily dismissed complaint does not toll the statute of limitations.[68] Plaintiffs have pointed to no case adopting the *Guitierrez* approach, let alone one that has done so absent the "unique" factors that were present there. This Court declines to be the first to do so. Consequently, the relevant complaint for purposes of the statutes of limitations and repose is that filed in this action on May 14, 2009.

---

[65]

    *Id.*

[66]

    *Id.* at 1050 n.9.

[67]

    *See*, *e.g.*, *Elgendy v. City of New York*, No. 99 Civ. 5196 (JGK), 2000 WL 1119080, at *5 (S.D.N.Y. Aug. 7, 2007); *Warren v. Gavin*, No. 97 Civ. 3243 (RPP), 1999 WL 494117, at *3 n.4 (S.D.N.Y. Jul. 13, 1999); *Smith v. Mt. Sinai Hosp. & Med. Ctr.*, No. 88 Civ. 3472 (CSH), 1990 WL 33576, at *2 (S.D.N.Y. Mar. 22, 1990).

[68]

    *Elgendy*, 2000 WL 1119080, at *5; *Warren*, 1999 WL 494117, at *3 n.4; *Smith*, 1990 WL 33576, at *3.

2.      *Statute of limitations for defendants other than defendant Perry*

The defendants other than defendant Perry argue that public information from multiple sources was sufficient to put plaintiffs on notice of their claims long before the initial complaint in this case was filed.  After a review of the relevant documents, the Court cannot conclude as a matter of law that the publicly available information was sufficiently specific to put the plaintiffs on actual or inquiry notice that a cause of action was probable.[69]  Accordingly, dismissal based on the statute of limitations is inappropriate.

3.      *Statute of limitations for defendant Perry*

Defendant Perry separately moves to dismiss the Section 15 control person claim against him as untimely.[70]  The claim against Perry first was added to the complaint on October 9, 2009.[71]  Thus, the claim against him is time-barred if the plaintiffs were on actual or inquiry notice of its probable existence before October 9, 2008.

If Perry's argument for dismissal relied only on the same publicly available information as the other defendants, then his statute of limitations arguments would be similarly deficient.  The claims against Perry, however, were added to the ACC over one year after specific information concerning the issues at the heart of the complaint became public in the June 30, 2008 Center for Responsible Lending ("CRL") Report.  The Court therefore must  determine whether the

---

[69]

 *Dodds*, 12 F.3d at 350.

[70]

 Perry Br. at 1.

[71]

 *Compare* Consolidated Class Action Complaint, docket item 127 (asserting claim against Perry) *with* Complaint, docket item 1 (not asserting claim against Perry).

facts in the CRL Report were sufficient to put plaintiffs on inquiry notice.[72]

In *Shah v. Meeker*,[73] the Court of Appeals affirmed the district court's dismissal of a putative class action based on the statute of limitations.[74]  The plaintiff there alleged that Morgan Stanley violated the securities laws by promoting their securities analysts and the reports they produced as unbiased and objective when, in fact, the analysts were subject to conflicts of interest and the firm used the analysts to win business for its investment bank.[75]  The Court of Appeals found that a single article in *Fortune* magazine was sufficient to put the plaintiffs on inquiry notice because it (1) specified the lack of objectivity and independence in an analysts's reports and (2) identified the improper practices alleged in the complaint.[76]  It contrasted the *Fortune* article to others that only "report[ed] the mere existence of a conflict of interest."[77]

The CRL Report – which plaintiffs describe as a "Major Report" containing "detailed information" – contains similarly specific facts concerning the allegations at the heart of the ACC and the complaint relies extensively on it.  According to the ACC, the CRL Report "found many underwriting failures" at IndyMac Bank, including "the abandonment of . . . underwriting standards

---

[72]

     *Dodds*, 12 F.3d at 350.

[73]

     435 F.3d 244 (2d Cir. 2006).

[74]

     *Id.* at 251-52.

[75]

     *Id.* at 245-46.

[76]

     *Id.* at 250-51.

[77]

     *Id.* at 250.

in an effort to produce as many loans as possible,"[78] that IndyMac Bank "routinely . . . [made] loans without regard to borrowers' ability to repay,"[79] and specifically noted that Perry himself "admitted" that IndyMac Bank had "gotten a little bit laxed" about underwriting and fraud detection.[80]  As the claim against Perry is predicated on allegations of this sort and was filed more than one year after the detailed allegations in the CRL Report were published, it is barred by the statute of limitations unless it "relates back" to a timely filed complaint.

       Under Rule 15, a party added to a complaint after the statute of limitations has run "relates back" to the timely filed complaint if (1) the applicable statute of limitations permits relation back, (2) the amendment asserts a claim arising from the "conduct, transaction or occurrence" in the original pleading, and (3) the party to be added (I) received timely notice of the action and (ii)  "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity."[81]   The final criterion is the heart of the question whether relation back is appropriate here.

       Perry argues that there was no mistake concerning his identity because the plaintiffs knew of his existence at the time the earlier complaints were filed.  The decision not to name him as a party, he argues, therefore was deliberate.  He relies in large part on *Cornwall v. Robinson,*[82]

---

[78]     ACC ¶ 118.

[79]     *Id.* ¶ 119.

[80]     *Id.* ¶ 123.

[81]     FED. R. CIV. P. 15(C)(ii).

[82]     23 F.3d 694 (2d Cir. 1994).

a case in which the Court of Appeals held that there had been no mistake for purposes of Rule 15 if the plaintiff knew the omitted party's identity, made allegations about it, and was not required to sue it in order to bring the lawsuit.[83]

The Supreme Court recently rejected this plaintiff-centered approach in *Krupski v. Costa Crociere S.p.A.*[84]  It there held that the question under Rule 15(c)(1)(C)(ii) is "not whether [the plaintiff] knew or should have known the identity of the [party it seeks to add by amendment], but whether the [party the plaintiff seeks to add] knew or should have known that it would have been named as a defendant but for an error."[85]  It specifically rejected the idea that plaintiff's "knowledge of a party's existence" constitutes an "absence of mistake."[86]

The requisite knowledge typically is established by allegations respecting a named party that, in fact, concern the originally unnamed party plaintiff seeks to add.  The plaintiff in *Krupski* for instance sued Costa Cruise Lines, N.V. for an injury she suffered on board a cruise ship. Costa Cruise Lines, N.V. however was only the "sales and marketing agent" for Costa Crociere S.p.A., the entity that actually owned, chartered, and operated the ship on which the plaintiff was injured.[87]  Similarly, in *VKK Corp v. Nat'l Football League* the Court of Appeals found a Rule 15 mistake where the plaintiff sued Touchdown Jacksonville, Ltd. even though the complaint described

---

[83]
    *Id.* at  705.

[84]
    No. 09-337, slip op., 2010 WL 2243705 (June 7, 2010).

[85]
    *Id.* at 8, 2010 WL 2243705, at *7.

[86]
    *Id.* at 9, 2010 WL 2243705, at *7.

[87]
    *Id*, slip op. at 2-3, 2010 WL 2243705, at *4-5.

the plaintiff's interactions with Touchdown Jacksonville Inc., and Touchdown Jacksonville Ltd. did not exist at the time the alleged conduct occurred.[88]  The history of Rule 15 itself indicates that it was enacted to respond to mistakes of this kind – i.e., wrongful identification of the party whose conduct is described in the complaint.  It had particular relevance in the Social Security context where individuals "who had filed timely lawsuits challenging the administrative denial of benefits" often failed to name the then-current Secretary of the appropriate government department and instead named the United States, the department of Health, Education, and Welfare, the Federal Security Administration, or a recently retired Secretary as defendants.[89]

　　　　　These examples are unlike the present case.  Here, plaintiffs do not argue that any allegations in the earlier complaint actually related to Perry rather than to the entities or individuals to which they were attributed.  Instead, they argue principally that he was "the subject of multiple lawsuits and news articles questioning his leadership and responsibility for the IndyMac business practices" and therefore should have known that he would have been sued.[90]  Such allegations, however, are insufficient to show that Perry knew or should have known, based on the allegations in the other complaints, that his absence from the complaint was the result of a mistake as to the identity of a proper party.  In consequence, the October 9, 2009 complaint does not relate back to the earlier filed complaints.  The claims against Perry are barred by the statute of limitations.

---

[88]

　　　　　*VKK Corp v. Nat'l Football League*, 244 F.3d 114, 128 (2d Cir. 2001).

[89]

　　　　　*Krupski*, slip op. at 11, 2010 WL 2243705, at *8.

[90]

　　　　　Pl. Br. at 75.

D.      *Statute of Repose*

In addition to the one year statute of limitations period, the Securities Act contains a three year statute of repose.  No Section 11 claim may be brought "more than three years after the security was bona fide offered to the public," and no Section 12(2) claim may be brought "more than three years after the sale."[91]   For Section 11 claims based on registered securities, the date of registration has been treated as the date that begins the running of the repose period.[92]  For Section 12(2) claims, a sale occurs when the parties become obligated to perform.[93]  The statute of repose is "an absolute limitation which applies whether or not the investor could have discovered the violation."[94]

For the reasons discussed above, the relevant complaint in this case is the one filed on May 14, 2009.  Consequently, the (1) Section 11 and derivative Section 15 claims based on Certificates with prospectus supplements dated earlier than May 14, 2006, and (2) the Section 12(2) and derivative Section 15 claims based on Certificates sold to lead plaintiffs earlier than that date are untimely.

E.      *Defendant Bank of America*

Bank of America Corp. ("BoA") moves to dismiss the complaint against it for

---

[91]

15 U.S.C. § 77m; *see Dodds v. Cigna Sec. Inc.*, 12 F.3d 346, 349. & n.1 (2d Cir. 1993).

[92]

*P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 98-99 (citing *Finkel v. Stratton Corp.*, 962 F.2d 169, 173 (2d Cir. 1992)).

[93]

*P. Stolz Family P'ship L.P.*, 355 F.3d at 98; *Finkel*, 962 F.2d at 173.

[94]

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 32 F.3d 697, 704 (2d Cir. 1994)

failure to state a claim upon which relief may be granted.  There ACC fails to allege any action or omission by BoA directly.  It instead predicates BoA's liability solely on an allegation that it is a "*successor-in-interest*" to two entities – Countrywide Securities Corporation ("CSC") and Merrill, Lynch, Pierce, Fenner & Smith ("ML") – that served as underwriters for particular classes of Certificates.[95]

As a general rule, "a parent corporation . . . is not liable for the acts of its subsidiaries."[96]  Although there are exceptions to this rule,[97] plaintiffs have failed to allege any facts from which to infer that these exceptions apply.  With respect to BoA they have alleged only that it is "named in its capacity as *successor-in-interest*" to CSC and ML, and that it is a Delaware corporation with headquarters in North Carolina.[98]  The successor-in-interest allegation, however, is nothing more than a legal conclusion without any factual amplification and so is "not entitled to the assumption of truth."[99]  In consequence, the ACC is completely devoid of any factual allegations

---

[95]     ACC ¶¶ 33-34 (emphasis in original).

[96]     *United States v. Bestfoods*, 524 U.S. 51, 61 (1998).

[97]     *See, e.g., Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 46 n.4 (2d Cir. 2003) (recognizing *de facto* merger doctrine as one avenue for imposing successor liability under New York law); *In re NYSE Specialists Sec. Litig.*, 405 F. Supp.2d 281, 316 (S.D.N.Y. 2005) (listing exceptions, under New York law, to the general non-liability rule, including an agreement to assume liability, continuity of ownership and corporate structure, and a fraudulent transaction arranged to evade debts); *American Buying Ins. Servs., Inc. v. Kornreich & Sons, Inc.*, 944 F. Supp. 240, 249 (S.D.N.Y. 1996) (describing circumstances under which successor liability will lie under Racketeering Influenced and Corrupt Organizations Act).

[98]     ACC ¶¶ 33-34.

[99]     *Iqbal*, 129 S. Ct. at 1950; *Twombly*, 550 U.S. at 555.

against Bank of America and fails to state a plausible claim for relief against it.

F.      *Existence of actionable misstatements or omissions*

Plaintiffs contend that the Offering Documents contain misstatements and omissions concerning IndyMac Bank's (1) abandonment of its stated underwriting guidelines, (2) use of non-USPAP compliant appraisal practices and resulting misstated loan-to-value rations, and (3) that the Certificates ratings were derived from a "highly compromised" ratings process.

1.      *Abandonment of underwriting standards*

The Offering Documents stated that IndyMac Bank originated or acquired loans according to IndyMac Bank's stated underwriting guidelines.[100]   To that end, the underwriting standards examined whether the "prospective borrower has sufficient monthly income available . . . to meet the borrowers' monthly obligations on the proposed mortgage loan" and considered factors like "loan-to-value ratios, debt-to-income ratio, FICO Credit Score, loan amount, and the extent to which IndyMac Bank can verify the mortgagor's application and supporting documentation."[101]   The Offering Documents stated also that loans might be made "pursuant to an exception" to the underwriting standards.[102]

Plaintiffs allege that these statements were false and misleading because IndyMac Bank had abandoned its underwriting standards completely and ignored the borrower's ability to

---

[100]
        *See*, *e.g.*, ACC ¶¶ 109-111.

[101]
        *Id.* ¶¶ 114-16; *see also id.* ¶¶ 163-65.

[102]
        *See*, *e.g.*, *id.* ¶¶ 109, 111; *see also id.* ¶¶166-67.

meet the monthly obligations in order to produce as many loans as possible. They allege that IndyMac Bank "embarked on a path of aggressive growth," and "routinely [made] loans without regard to borrowers' ability to repay" and with "little, if any, review of borrower qualifications, including income, assets, and employment."[103] Several confidential witnesses also allegedly spoke of the company's push for increased loan volume and stated that they occasionally witnessed loan approvals that they believed were inconsistent with the underwriting guidelines.[104] Moreover, the delinquency and foreclosure rates of the mortgages underlying at least some of the Certificates purchased by the lead plaintiffs have increased dramatically since the Certificates were issued, and the ratings agencies have downgraded their ratings.[105]

Defendants make essentially two arguments for dismissal of the claims based on the underwriting standard statements. They argue first that the Offering Documents disclosed the risks of which plaintiffs complain, namely that the loans in the pools underlying the Certificates "could have been issued pursuant to lending program that reduced or eliminated documentation and verification requirements" or even pursuant to exceptions to those guidelines.[106] The Offering Documents did contain extensive disclosures about IndyMac Bank's "low-doc" and "no-doc" loan programs, and the exceptions that may have been made to these non-traditional underwriting guidelines. The crux of plaintiffs' claims, however, is that IndyMac Bank ignored even those

---

[103]

    *Id.* ¶¶ 119-21.

[104]

    *Id.* ¶¶ 125-131.

[105]

    *Id.* ¶¶ 211-213.

[106]

    Underwriter Def. Br. at 13; Ind. Def. Br. at 9; IndyMac Def. Br. at 29.

watered-down underwriting standards, including the standards for granting exceptions to the guidelines, in order to originate as many loans as possible.[107]   Disclosures regarding the risks stemming from the allegedly abandoned standards do not adequately warn of the risk the standards will be ignored.

The defendants next argue that the ACC is insufficient because it "fails to offer any factual allegations about any of the *actual* loans held" in the pools underlying the Certificates that plaintiffs purchased and, for essentially the same reason, fails to allege materiality.[108]   As in the closely related case of *Tsereteli v. Residential Asset Securitization Trust 2006-A8*,[109] however, the ACC sufficiently alleges a IndyMac Bank's widespread abandonment of its underwriting guidelines during the relevant time period and alleges also that the percentage of defaulting loans rose after the Certificates were issued.[110]   These allegations create a sufficient nexus between the alleged underwriting standard abandonment and the loans underlying the Certificates.[111]   Moreover, as in *Tsereteli*, the Court can not conclude that the alleged misstatements were immaterial as a matter of law.[112]

---

[107]

    *See* ACC ¶¶ 8, 107, 117.

[108]

    *See*, *e.g.*, Underwriter Def. Br. at 15, 20-21; IndyMac Def. Br. at 30-31.

[109]

    No. 08 Civ. 10637 (LAK), 2010 WL 816623 (S.D.N.Y. Mar. 11, 2010).

[110]

    *Id.* at *3.

[111]

    *Id.* (citing *In re Lehman Brothers Sec. & Erisa Litig.*, 684 F.Supp.2d 485, 493 (S.D.N.Y. 2010).

[112]

    *Id.*

2.    *Appraisal Practices and Loan-to-Value ratios*

The Offering Documents disclosed that appraisals of the property securing the mortgages in the pools underlying the Certificates would be conducted "in accordance with the Uniform Standards of Profession[al] Appraisal Practice" and that the appraiser "generally inspects the property, analyzes data including the sales prices of comparable properties and issues an opinion of value . . . .   In some cases, an automated valuation model (AVM) may be used in lieu of an appraisal."[113]   Plaintiffs allege that these statements were false and misleading because IndyMac Bank's appraisals did not comply with the USPAP standards.[114]

Plaintiffs rely on (1) congressional testimony by Alan Hummel, chair of the Appraisal Institute's Government Relations Committee that the mortgage appraisal industry was subject to "terrible conflict[s] of interest" and "experience[d] systematic problems with coercion,"[115] (2) bald allegations that sales personnel and account executives "would pressure" appraisers to appraise properties at artificially high levels,[116] (3) two confidential witnesses, one of whom allegedly opined that there were "shoddy appraisals" and another who noted that the brokers who made the loans chose the appraisers,[117] and (4) statements in the OIG Report that IndyMac Bank "accepted appraisals that were not in compliance with" USPAP, contained "weaknesses" and were

---

[113]
    ACC ¶¶ 144-45.

[114]
    *Id.*  ¶¶ 146-54.

[115]
    *Id.*  ¶ 151.

[116]
    *Id.*  ¶ 149.

[117]
    *Id.*  ¶ 154.

"questionable."[118]

The first allegation is nothing more than one man's opinion about the state of the appraisal industry generally at the time of his testimony on June 26, 2007.  It not only says nothing about the USPAP standards, but also does not support any inference about the appraisals used to originate the mortgages underlying the Certificates.

The second allegation contains insufficient factual amplification to support a plausible inference that the appraisers of the properties underlying the Certificates were subjected to pressure or that they succumbed to it in a way that violated USPAP.  The alleged confidential witness statements are insufficient as well.  The fact that one IndyMac Bank employee believed that appraisals were "shoddy" says nothing at all about whether the appraisals were made in accordance with USPAP.  Similarly, the allegation that the mortgage brokers chose the appraisers does not, by itself, violate USPAP.[119]

That leaves plaintiffs with the allegations lifted from the OIG Report that, among other things, IndyMac Bank's appraisals were "questionable," contained "weaknesses" and were "not in compliance with" USPAP.  The Court already has noted that the OIG Report is insufficient to support a Securities Act claim based on almost identical allegations.[120]  They fail here for the same reasons.

The Offering Documents contained also statistical information about the loan-to-

---

[118]

Id. ¶¶ 152-53.

[119]

See generally, APPRAISAL STANDARDS BD., UNIFORM STANDARDS OF PROF'L APPRAISAL PRACTICE (2010-2011 ed.), available at http://www.uspap.org/2010USPAP/toc.htm.

[120]

Tsereteli, 2010 WL 816623, at *4.

value ("LTV") ratios of the mortgages underlying the Certificates.[121]  Loan-to-value ratios describe the relationship between a loan's principal balance and the collateral property's value.[122] Plaintiffs contend that the LTV ratio statements were false or misleading because they were based on flawed and inflated appraisals.[123]  The claim based on the LTV ratios therefore is dependent on the sufficiency of the ACC's allegations that the appraisals were flawed or inflated.

As the Court noted in *Tsereteli*[124] however, real estate appraisals are not statements of fact but rather statements of opinion or belief.  They are actionable under the Securities Act only if the complaint alleges that the appraiser did not truly believe the appraisal at the time it was issued.[125]  There are no such allegations in the ACC.  Consequently, there are no allegations from which to infer that the appraisals were inflated or that the derivative LTV ratios were false or misleading.

3.    *Ratings and ratings process*

The ratings agencies provided ratings for the Certificates.  The Offering Documents

---

[121]    *See*, *e.g.*, ACC ¶¶ 157-58.

[122]    *Id.* ¶ 157.

[123]    *Id.* ¶ 156.

[124]    2010 WL 816623, at *4.

[125]    *See Shields v. Citytrust Bancorp.*, 25 F.3d 1124, 1131 (2d Cir. 1994) ("A statement of reasons, opinion or belief by such a person when recommending a course of action to stockholders can be actionable under the securities laws if the speaker knows the statement to be false.") (citing *Va. Bankshares v. Sandberg*, 501 U.S. 1083, 1094-96); *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 210 (S.D.N.Y. 2003).

stated that the "ratings . . . address the likelihood of receipt by security holders of all distributions on the underlying mortgage loans" and were issued after the ratings agencies considered several factors, including "the credit quality of the mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates."[126] Plaintiffs contend that these statements were misleading because the Offering Documents failed to disclose that (1) the ratings process relied on outdated models and data and (2) the ratings process was "unreliable and highly compromised" because the rating agencies had conflicts of interest and did not verify the loan data provided to them.[127]  These allegations are insufficient to state a claim for three reasons.

First, there are no factual allegations as to why the statements in the Offering Documents were false or misleading.  The only factual assertions in the allegedly misleading statements are that (1) the ratings express each ratings agencies' judgment about the likelihood that the Certificate holders would receive their promised distributions and (2) the ratings agencies would consider certain factors in making that determination.  The complaint lacks any factual allegations that call the accuracy of these statements into question. There are no allegations that, for example, the rating agencies did not consider the enumerated factors or that the ratings did not express the agencies' judgment about the likelihood of investors receiving that which they were owed. Consequently, the allegations do not state a plausible claim for relief.

The closest plaintiffs come are their allegations that the ratings were based on

---

[126]

ACC ¶¶ 169-70.

[127]

*Id.* ¶ 171.

outdated models, unverified loan information, and that the ratings agencies "failed to properly consider the credit quality of the mortgage loans."[128]  These allegations, however, do not support a plausible inference that the ratings did not express each rating agency's judgment at the time they were issued about the likelihood that each Certificate's holders would be paid.  At most they are a challenge to the accuracy of the ratings themselves, as they suggest that a different set of models based on a different set of assumptions using different loan data might have resulted in a different rating.[129]  But the ACC's allegations are insufficient to state a claim on this theory also.  Ratings are opinions and therefore actionable under the Securities Act only if not truly held by the ratings agencies when issued.[130]  The ACC is completely devoid of any such allegations.

Second, there was no duty to disclose the ratings agencies conflicts of interest, as the information was known widely.[131]  The ACC alleges that the rating agencies were conflicted because they were paid by the Certificates' issuers and helped to structure the Certificates.  But "the risk that the ratings agencies operated under a conflict of interest because they were paid by the issuers had been known publicly for years."[132]  Moreover, the ACC itself states that the Offering Documents

---

[128]

    *Id.* ¶¶ 172-77, 187.

[129]

    *See*, *e.g.*, *id.* ¶¶ 178,

[130]

    *Tsereteli*, 2010 WL 816623, at *4.

[131]

    *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993); *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978) ("Although the underlying philosophy of federal securities regulations is that of full disclosure, there is no duty to disclose information to one who reasonably should already be aware of it.") (internal citations and quotation marks omitted).

[132]

    *In re Lehman Brothers Sec. & ERISA Litig.*, 684 F. Supp. 2d at 492.

disclosed that IndyMac Bank "works with underwriters and rating agencies in structuring their securitization transactions" and that "the amount, type, and nature of credit enhancement established for a class of securities will be determined on the basis of criteria established by each rating agency rating classes of securities."[133]   Consequently, there was no duty to disclose the allegedly omitted information.

Third, the rating agencies' role in structuring the Certificates is immaterial as a matter of law for the reasons stated in *In re Lehman Brothers Sec. & ERISA Litig.*[134]

\* \* \*

The Court has considered the defendants remaining arguments and finds them to be without merit.

*Conclusion*

For the foregoing reasons, the motions of defendants Perry, BoA, UBS Securities LLC, HSBC Securities (USA) Inc., Goldman Sachs & Co., Citigroup Global Markets Inc., and IndyMac Securities Corp. to dismiss the complaint against them [DIs 156 and 158] are granted in all respects.   The motions to dismiss of all other defendants [DIs 145, 152, and 158] are granted except to the extent that the ACC asserts claims under Sections 11 and 15 of the Securities Act based on the Certificates listed in Schedule A and claims under Sections 12 and 15 of the Securities Act

---

[133]
        ACC ¶¶ 89, 93.

[134]
        *In re Lehman Brothers Sec. & ERISA Litig.*, 684 F. Supp.2d at 492-93.

33

based on the Certificates listed in Schedule B in each case related to the alleged abandonment of

underwriting standards.   To that limited extent they are denied.

        SO ORDERED.

Dated:      June 21, 2010

_____

Lewis A. Kaplan

United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

**SCHEDULE A**
(Certificates for which named plaintiffs have Constitutional standing)

1.   IndyMac INDA Mortgage Loan Trust Series 2006-AR2 Class 1A1
2.   IndyMac INDA Mortgage Loan Trust Series 2007-AR7 Class 1A1
3.   IndyMac INDX Mortgage Loan Trust Series 2006-AR 29 Class A1
4.   IndyMac INDX Mortgage Loan Trust Series 2006-AR11 Class 2A1
5.   IndyMac INDX Mortgage Loan Trust Series 2006-AR14 Class 1A1A
6.   IndyMac INDX Mortgage Loan Trust Series 2006-AR15 Class A1
7.   IndyMac INDX Mortgage Loan Trust Series 2006-AR2 Class 1A1A
8.   IndyMac INDX Mortgage Loan Trust Series 2006-AR3 Class 2A1A
9.   IndyMac INDX Mortgage Loan Trust Series 2006-AR35 Class 2A1A
10.  IndyMac INDX Mortgage Loan Trust Series 2006-AR4 Class A1A
11.  IndyMac INDX Mortgage Loan Trust Series 2006-AR7 Class 3A1
12.  IndyMac INDX Mortgage Loan Trust Series 2006-AR7 Class 4A1
13.  IndyMac INDX Mortgage Loan Trust Series 2006-FLX1 Class A1
14.  IndyMac Residential Mortgage Backed Trust Series 2006-L2 Class A1
15.  Residential Asset Securitization Trust Series 2006-A2 Class A3


**SCHEDULE B**
(Certificates for which named plaintiffs have Securities Act Section 12 standing)

1.   IndyMac INDA Mortgage Loan Trust Series 2006-AR2 Class 1A1
2.   IndyMac INDA Mortgage Loan Trust Series 2007-AR7 Class 1A1
3.   IndyMac INDX Mortgage Loan Trust Series 2006-AR 29 Class A1
4.   IndyMac INDX Mortgage Loan Trust Series 2006-AR11 Class 2A1
5.   IndyMac INDX Mortgage Loan Trust Series 2006-AR15 Class A1
6.   IndyMac INDX Mortgage Loan Trust Series 2006-AR3 Class 2A1A
7.   IndyMac INDX Mortgage Loan Trust Series 2006-AR35 Class 2A1A
8.   IndyMac INDX Mortgage Loan Trust Series 2006-AR7 Class 3A1
9.   IndyMac INDX Mortgage Loan Trust Series 2006-AR7 Class 4A1
10.  IndyMac INDX Mortgage Loan Trust Series 2006-FLX1 Class A1
11.  IndyMac Residential Mortgage Backed Trust Series 2006-L2 Class A1
12.  Residential Asset Securitization Trust Series 2006-A2 Class A3