# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
IN RE INDYMAC MORTGAGE-BACKED                       :
SECURITIES LITIGATION                               :        Master Docket No.
                                                    :        09-CIV-04583 (LAK)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :
                                                    :
THIS DOCUMENT RELATES TO:                           :
ALL ACTIONS                                          :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**REPORT OF WALTER N. TOROUS, PH.D.**

**November 15, 2013**


**[REDACTED]**

## TABLE OF CONTENTS

I.      QUALIFICATIONS .......................................................................................... 1

II.     CASE BACKGROUND ................................................................................... 2

III.    ASSIGNMENT................................................................................................. 4

IV.     SUMMARY OF OPINIONS............................................................................ 5

V.      INDIVIDUALIZED ISSUES OF LIABILITY................................................ 7

        A.      Plaintiffs Mischaracterize My Prior Opinions And Testimony Regarding
                Differences In Underwriting Guidelines.................................................12

        B.      Different Underwriting Guidelines Applied To The 78,705 Loans And 109
                Individual Loan Groups Underlying The 51 Offerings And 629
                Certificates At-Issue................................................................................15

                1.      Different Underwriting Guidelines Applied For Different Time
                        Periods........................................................................................ 16

                2.      Different Underwriting Guidelines Applied For Different Loan
                        Collateral Types ......................................................................... 19

                3.      Different Underwriting Guidelines Applied For Different Channels ....... 21

                4.      Different Underwriting Guidelines Applied For Different
                        Documentation Programs............................................................. 25

                5.      Different Underwriting Exceptions Applied To Different Loans............. 27

                6.      Professor Feinstein Failed To Review Any Underwriting
                        Guidelines That Applied To The At-Issue Certificates ........................... 28

        C.      Differences In Loan And Borrower Characteristics Underscore That
                Different Sets Of Underwriting Guidelines Applied To Different Loan
                Groups And Different Offerings................................................................30

        D.      Other Differences Among And Within The 51 Offerings Encompassed By
                The Proposed Expanded Class................................................................37

                1.      Different Loan Groups ......................................................... 37

                2.      Resecuritization.................................................................... 40

                3.      Note Guaranty Insurance ..................................................... 41

E.    Implications For Falsity And The Incorrectness Of Professor Feinstein's Conclusions...........................................................................................42

VI.    **INDIVIDUALIZED ISSUES OF DAMAGES AND CAUSATION............................ 43**

A.    The Performance Of The At-Issue Certificates Is Affected By Many Factors That Are Distinct From Underwriting........................................44

B.    Even Ignoring All The Factors Other Than Underwriting That Impact The Performance Of The At-Issue Certificates, Professor Feinstein's Damages Methodology Is Unable To Compute Damages On A Classwide Basis And Ignores Conflicts Of Interest Among Putative Class Members..........................47

C.    Professor Feinstein's Damages Methodology Ignores Loss Causation And Fails To Disambiguate What Loss, If Any, Was Caused By The Alleged Misstatements And Omissions.............................................................51

VII.    **INDIVIDUAL ISSUES OF INVESTOR KNOWLEDGE ............................................ 55**

VIII.    **CONCLUSIONS ........................................................................................ 56**

## I.    QUALIFICATIONS

1.      I am currently a Senior Lecturer at the Massachusetts Institute of Technology with a joint position at the Center for Real Estate and the Sloan School of Management.  I am also a Professor Emeritus and the former Lee and Seymour Graff Endowed Professor at the John E. Anderson School of Management at the University of California at Los Angeles.  I previously served as the Director of the Richard S. Ziman Real Estate Center at the Anderson School.  I received my Ph.D. degree in economics from the University of Pennsylvania in 1981.  I have taught courses in securitization and managerial finance at the master's level and empirical methods in finance at the doctoral level.

2.      My areas of research include real estate markets, mortgage financing generally and mortgage-backed securities ("MBS").  I have published a number of articles and book chapters on the valuation and pricing of MBS and interest rate behavior including articles on the effects of homeowner prepayment and default decisions on the valuation of residential mortgages and residential MBS.  I have also published articles investigating the valuation of commercial mortgages and the risk and return tradeoffs prevailing in the commercial real estate market.  My paper, "Commercial Office Space:  Testing the Implications of Real Options Models with Competitive Interactions," which investigates the real options approach to valuing commercial real estate, was awarded the American Real Estate and Urban Economics Association's 2007 Edwin S. Mills Prize for Best Paper.  I am currently, or have been, the editor or associate editor of a number of finance and real estate finance journals, including the *Journal of Housing Economics*, the *Journal of Real Estate Finance and Economics*, and *Real Estate Economics*, the official publication of the American Real Estate and Urban Economics Association.

3.      My curriculum vitae, which includes a list of my publications as well as testimony in the past four years, is attached as Appendix A to this report.

## II.      CASE BACKGROUND

4.      I was retained previously by the remaining Underwriter Defendants[1] in this matter and submitted an expert report on February 28, 2011 (my "Prior Report") (Dkt. 289-1).[2]  Among other conclusions, I opined in my Prior Report that "liability to the proposed class cannot be established by 'generalized proof'" and that "recoverable damages, if any, cannot be computed through a 'straightforward arithmetic function.'"[3]  I was deposed by Plaintiffs on March 15, 2011.[4]

5.      Following the submission of my Prior Report, the Court certified a class of investors in nine offerings, in part relying on Plaintiffs' mischaracterization of my deposition testimony, which I discuss below.  Plaintiffs have since moved to certify a vastly expanded proposed class ("Proposed Expanded Class") that includes an additional 42 offerings.  Plaintiffs have defined the Proposed Expanded Class as follows:

> All persons or entities who purchased or otherwise acquired beneficial interests in Certificates offered to the public in 51 offerings[5] (the

---

[1]      Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., J.P. Morgan Securities LLC (f/k/a J.P. Morgan Securities Inc.), Morgan Stanley & Co. Incorporated, RBS Securities Inc. (f/k/a Greenwich Capital Markets, Inc.) and UBS Securities LLC.

[2]      Report of Walter N. Torous. Ph.D, *In re IndyMac Mortgage-Backed Securities Litigation*, Master Docket No. 09-CIV-04583 (LAK), February 28, 2011 ("Prior Report").

[3]      Prior Report, p. 5.

[4]      Transcript of Deposition of Walter N. Torous, Ph.D., *In re IndyMac Mortgage-Backed Securities Litigation*, Master Docket No. 09-CIV-04583 (LAK), March 15, 2011 ("Torous Deposition").

[5]      "Plaintiffs refer to the nine offerings currently included in the Class definition as the 'Certified Offerings,' the ten offerings that were included in the initial motion for class certification as the "Original Offerings," and the 42 offerings they now seek to include in the Class definition as the 'Additional Offerings.'  Plaintiffs refer to the Certified Offerings and Additional Offerings collectively as the 'Offerings.'" Memorandum of Law in Support of Lead Plaintiffs' Motion to Expand the Certified Class to Include Additional Offerings of Mortgage Pass-Through Certificates, *In re IndyMac Mortgage-Backed Securities Litigation*, Master Docket No. 09-CIV-04583 (LAK), August 30, 2013 ("Plaintiffs' Motion to Expand the Certified Class"), p. 1, footnote 1.

"Offerings") pursuant or traceable to IndyMac MBS Registration Statements dated February 24, 2006, as amended, and/or February 14, 2007, as amended (the "Registration Statements"), and the Prospectuses and Prospectus Supplements issued thereunder for the Offerings and incorporated by reference, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Defendants at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.[6]

6.      Plaintiffs allege that "statements in the Offering Documents were materially untrue or misleading because IndyMac did not adhere to its stated guidelines and procedures"[7] and that "IndyMac systematically failed to apply its underwriting standards and manage its origination channels as described in the Offering Documents."[8]  Plaintiffs contend that the existence of material misstatements and omissions for the Proposed Expanded Class can be determined through "common proof" and that the measurement of harm to any of the investors in the 629 publicly-offered certificates issued in the 51 offerings can be "computed by applying statutory arithmetic formulas."[9]

7.      In support of Plaintiffs' motion to certify the Proposed Expanded Class, Professor Feinstein submitted a report on August 30, 2013.[10]  In his report, Professor Feinstein reached a number of conclusions, including, among others:

- "The value of all the securities in each offering are interrelated such that the allegedly untrue statements and material omissions regarding compliance with underwriting

---

[6]     Plaintiffs' Motion to Expand the Certified Class, pp. 1-2.

[7]     Plaintiffs' Motion to Expand the Certified Class, p. 5.

[8]     Plaintiffs' Motion to Expand the Certified Class, p. 4.

[9]     "Class members will therefore utilize common proof to demonstrate the falsity of statements in the Offering Documents" and "damages suffered by Plaintiffs and other Class members 'can be computed by applying statutory arithmetic formulas.'"  Plaintiffs' Motion to Expand the Certified Class, pp. 6, 21.

[10]    Report of Professor Steven P. Feinstein, Ph.D., CFA, *In re IndyMac Mortgage-Backed Securities Litigation*, Master Docket No. 09-CIV-04583 (LAK), August 30, 2013 ("Feinstein Report").

3

standards in the offering documents would similarly affect the securities in each offering, albeit to varying extents."[11]

- "Damages suffered by the Plaintiffs and Class can be computed by applying statutory arithmetic formulas," and "the attribution of damages among the investors is a straightforward computational matter."[12]

## III.   <u>ASSIGNMENT</u>

8.     I  have been engaged to:

- Determine whether there are differences among the underwriting guidelines that applied to the 109 individual loan groups underlying the 629 publicly-offered certificates in the Proposed Expanded Class;

- Assess whether liability to the Proposed Expanded Class can be established by common proof and whether recoverable damages for individual members of the putative class, if any, can be computed formulaically through a statutory arithmetic formula;

- Review and respond to the analysis and conclusions of Plaintiffs' expert, Professor Feinstein; and

- Opine on other issues potentially relevant to class certification.

9.     In working on this assignment, I have relied upon the documents and data listed in Appendix B.  Others working under my supervision and direction have assisted me in this matter.  I am being compensated in this matter at a rate of $800 per hour.  My compensation is not contingent upon the outcome of this case.

---

[11] Feinstein Report, p. 5.

[12] Feinstein Report, p. 5.

IV.    **SUMMARY OF OPINIONS**

10.    Based on my review of Professor Feinstein's report and other materials submitted to the Court by Plaintiffs, the Court's initial class certification ruling,[13] and my assessment of data available to me, I have formed the following opinions in this matter.

- In previously certifying a class of investors in nine offerings, the Court, in part, relied upon Plaintiffs' mischaracterization of my deposition testimony.  In their reply submission to the Court, Plaintiffs represented that I "'presumed' the underlying underwriting standards would be the same across [the Previously Certified] Offerings."[14]  Plaintiffs' mischaracterization of my deposition testimony was subsequently adopted by the Court in finding that falsity in this case "will be one subject to generalized proof."[15]  My actual testimony, both at deposition and in my Prior Report, was that different sets of underwriting guidelines applied to the nine Previously Certified Offerings.  I have since been provided IndyMac underwriting guidelines obtained by the parties in discovery, and they confirm that the underwriting guidelines for the loans underlying the different at-issue certificates for both the nine Previously Certified Offerings and the 42 Additional Offerings were _not_ the same.

- Myriad differences exist among and within the underwriting guidelines that applied to the 109 individual loan groups underlying the 629 publicly-offered certificates in the Proposed Expanded Class.  In all, these 629 certificates were backed by over 78,000 mortgage loans originated over a 12-year period, and were acquired by IndyMac through multiple acquisition channels, and pursuant to many different documentation programs.  The disclosed characteristics of the different loans and loan groups demonstrate that different sets of underwriting guidelines applied to different loan groups.

- 

---

13    See *In re IndyMac Mortgage-Backed Securities Litigation*, 286 F.R.D. 226 (S.D.N.Y. Aug. 17, 2012) ("Memorandum Opinion").

14    Lead Plaintiffs' Reply Memorandum in Further Support of Their Motion for Class Certification, In re IndyMac Mortgage-Backed Securities Litigation, Master Docket No. 09-CIV-04583 (LAK), April 8, 2011 ("Lead Plaintiffs' Reply Memorandum"), p. 2, footnote 4.

15    See Memorandum Opinion, 286 F.R.D. at 241 ("Defendants' own expert, moreover, stated that he 'presumed' that the underwriting guidelines would be the same across different loans and offerings.").



- Falsity cannot be established through "common proof" because of the different underwriting guidelines that applied to the different loans and loan groups underlying the 629 publicly-offered certificates in the Proposed Expanded Class.

- An evaluation of falsity would be based on a distinct set of questions and answers particular to individual loans, loan groups, and offerings, and those questions and answers cannot be assumed to pertain to or be informative for other at-issue loans, loan groups, or offerings.  Moreover, a finding of falsity for a given loan or loan group does not necessarily indicate a finding of falsity for any other certificate supported by other loan groups in that offering, or other certificates in any other offering.

- Contrary to Professor Feinstein's presumption that falsity can be determined through "common proof," my detailed analyses herein of the different types of proof needed to evaluate individual loans, loan groups, and offerings shows that there is no "common proof" of liability for the Proposed Expanded Class.

- The performance of the at-issue offerings, and the underlying loans and certificates, varies widely.  The wide extent of variation in performance underscores that "common proof" of a "systematic failure" to apply underwriting standards does not exist, and instead will require individual inquiry of loans, loan groups, certificates, and offerings.  Professor Feinstein offers a flawed "damages computation methodology" that, among other things, fails to account for certificate-specific value determination factors that cannot be identified or assessed using a common method.  Rather, value determinations would need to be made for hundreds of certificates using models specific to each loan group or offering, and in many cases, each certificate.  Furthermore, Professor Feinstein

---

[16]

[17]

[18]   Feinstein Report, paragraph 4.

fails to consider potential conflicts of interest among putative class members due to their different preferences for foreclosure and modification practices based on the putative class member's position in the securitization seniority structure.

- Professor Feinstein also ignores the macroeconomic and other exogenous factors that would have affected loan defaults and certificate performance.  Because these factors affected loan default and any losses to certificate holders, and because the impact of adverse macroeconomic events on different certificates must be separately assessed based on the different characteristics of the collateral backing the certificates and the characteristics of the certificates themselves, recoverable damages cannot be computed through "statutory arithmetic formulas," as Professor Feinstein suggests.

- Professor Feinstein did not provide a common method that would account for any of these exogenous factors associated with damages or loss causation.  And with good reason; individualized inquiries of damages and loss causation will be required for individual certificates.

- Because of the broad scope of the Proposed Expanded Class, individualized inquiries of investor knowledge will be required.  During the more than seven-year period that the Proposed Expanded Class currently encompasses, different information about IndyMac's loan underwriting practices, the performance of the at-issue certificates, and the performance of the underlying loan collateral was available depending on the time at which a putative class member was considering purchasing certificates.  In addition, the Proposed Expanded Class is predominantly comprised of investors who were leading players in the MBS markets and whose advisors had distinct and proprietary methods of evaluating MBS investments and undertook *independent* research, investigation, and analyses beyond the review of offering documents and publicly available information, including private meetings with loan originators and issuers.  In light of the changing mix of information over time, the different research, analyses and due diligence undertaken by the different putative class members, and the indefinite time period for the Proposed Expanded Class, individualized inquiries of investor knowledge will be required.

11.     In the following sections, I expand upon the summary of opinions above and provide the bases for them.  My work in this matter is ongoing, and I reserve the right to supplement my analysis and opinions should more information become available to me.

## V.     INDIVIDUALIZED ISSUES OF LIABILITY

12.     Plaintiffs have proposed to certify a single class encompassing each and every individual or entity that purchased any of the 629 mortgage pass-through certificates at any point

in time.  As shown in Table 1 below, these certificates were initially offered in 51 different

offerings between May 2006 and December 2007, and were backed by over 78,000 loans spread

across 109 individual loan groups and 95 aggregate loan groups:

**Table 1**
**IndyMac Offerings At-Issue**

| No. | Offering | Closing Date | Certificates Publicly Offered | Individual Loan Groups | Aggregate Loan Groups | Total Loans[1] | Underwriter(s) |
|---|---|---|---|---|---|---|---|
| 1 | INDX 2006-AR15 | May 30, 2006 | 15 | 1 | 1 | 4,129 | Deutsche Bank Securities Inc. |
| 2 | RAST 2006-A7CB | May 30, 2006 | 21 | 3 | 3 | 2,326 | (i) Deutsche Bank Securities Inc. (ii) Lehman Brothers Inc. |
| 3 | INDX 2006-AR13 | May 30, 2006 | 10 | 1 | 1 | 969 | Deutsche Bank Securities Inc. |
| 4 | INDYL 2006-L2 | June 15, 2006 | 4 | 1 | 1 | 1,212 | (i) Bear, Stearns & Co. Inc. (ii) Credit Suisse Securities (USA) LLC (iii) Lehman Brothers Inc. |
| 5 | INABS 2006-H2 | June 27, 2006 | 1 | 1 | 1 | 6,535 | (i) Lehman Brothers Inc. (ii) Bear Stearns & Co. Inc. (iii) UBS Securities LLC (iv) IndyMac Securities Corporation |
| 6 | INDX 2006-AR21 | June 28, 2006 | 14 | 1 | 1 | 890 | Deutsche Bank Securities Inc. |
| 7 | INDA 2006-AR1 | June 29, 2006 | 10 | 1 | 1 | 377 | Deutsche Bank Securities Inc. |
| 8 | INDX 2006-AR23 | July 28, 2006 | 6 | 1 | 1 | 472 | Deutsche Bank Securities Inc. |
| 9 | INDX 2006-AR25 | July 28, 2006 | 24 | 6 | 6 | 3,667 | Morgan Stanley & Co. Inc. |
| 10 | INDX 2006-R1 | July 28, 2006 | 4 | 2 | 2 | Loan Group 1: 602 Loan Group 2: 528 | Credit Suisse Securities LLC |
| 11 | RAST 2006-A11 | August 29, 2006 | 17 | 3 | 3 | 745 | (i) Credit Suisse Securities LLC (ii) UBS Securities LLC |
| 12 | INDA 2006-AR2 | August 30, 2006 | 10 | 4 | 4 | 1,045 | Credit Suisse Securities (USA) LLC |
| 13 | INDX 2006-AR27 | August 30, 2006 | 18 | 2 | 2 | 2,839 | Deutsche Bank Securities Inc. |
| 14 | INABS 2006-D | September 13, 2006 | 15 | 2 | 2 | 3,398 | (i) UBS Securities LLC (ii) Lehman Brothers Inc. (iii) Credit Suisse Securities (USA) LLC (iv) Greenwich Capital Markets, Inc. (v) Morgan Stanley & Co., Inc |
| 15 | RAST 2006-A12 | September 27, 2006 | 10 | 1 | 1 | 611 | (i) Bear Stearns & Co. Inc. (ii) UBS Securities LLC (iii) Lehman Brothers Inc. |
| 16 | INDX 2006-AR29 | September 28, 2006 | 15 | 1 | 1 | 2,464 | J. P. Morgan Securities Inc. |
| 17 | INDX 2006-FLX1 | September 28, 2006 | 10 | 1 | 1 | 834 | Deutsche Bank Securities Inc. |

| No. | Offering | Closing Date | Certificates Publicly Offered | Individual Loan Groups | Aggregate Loan Groups | Total Loans[1] | Underwriter(s) |
|---|---|---|---|---|---|---|---|
| 18 | INABS 2006-H3 | September 29, 2006 | 1 | 1 | 1 | 6,735 | (i) Lehman Brothers, Inc. (ii) Bear Stearns & Co. Inc. (iii) Credit Suisse Securities LLC (iv) Goldman Sachs & Co. (v) IndyMac Securities Corporation |
| 19 | RAST 2006-A13 | October 27, 2006 | 7 | 1 | 1 | 674 | (i) Citigroup Global Markets Inc. (ii) UBS Securities LLC (iii) Lehman Brothers Inc. |
| 20 | INDX 2006-AR14 | October 31, 2006 | 16 | 2 | 2 | 3,123 | Lehman Brothers Inc. |
| 21 | RAST 2006-R2 | October 31, 2006 | 3 | 1 | 1 | 910 | Morgan Stanley & Co. Inc. |
| 22 | RAST 2006-A14CB | November 3, 2006 | 17 | 2 | 2 | 1,645 | (i) Greenwich Capital Markets Inc. (ii) Deutsche Bank Securities Inc. |
| 23 | RAST 2006-A15 | November 28, 2006 | 23 | 1 | 1 | 786 | (i) Countrywide Securities Corporation (ii) UBS Securities LLC |
| 24 | INDX 2006-AR35 | November 29, 2006 | 15 | 2 | 2 | 2,872 | Greenwich Capital Markets, Inc. |
| 25 | INDX 2006-AR33 | November 29, 2006 | 19 | 4 | 2 | Aggregate Loan Group I: 527 Aggregate Loan Group II: 389 | Credit Suisse Securities (USA) LLC |
| 26 | INDX 2006-AR37 | December 28, 2006 | 13 | 2 | 2 | Loan Group 1: 234 Loan Group 2: 482 | Credit Suisse Securities (USA) LLC |
| 27 | INDX 2006-AR41 | December 28, 2006 | 11 | 1 | 1 | 1,421 | Credit Suisse Securities (USA) LLC |
| 28 | INDA 2007-AR1 | January 30, 2007 | 11 | 3 | 3 | 675 | Credit Suisse Securities (USA) LLC |
| 29 | RAST 2007-A1 | January 30, 2007 | 16 | 1 | 1 | 636 | (i) HSBC Securities (USA) Inc. (ii) Deutsche Bank Securities Inc. |
| 30 | INDX 2007-AR5 | March 29, 2007 | 17 | 4 | 2 | Aggregate Loan Group I: 1,979 Aggregate Loan Group II: 946 | Credit Suisse Securities (USA) LLC |
| 31 | RAST 2007-A5 | March 29, 2007 | 19 | 2 | 2 | 1,275 | (i) Citigroup Global Markets, Inc. (ii) UBS Securities LLC |
| 32 | INDX 2007-AR9 | April 27, 2007 | 12 | 3 | 3 | 871 | Credit Suisse Securities (USA) LLC |
| 33 | INDA 2007-AR2 | April 27, 2007 | 6 | 1 | 1 | 337 | Morgan Stanley & Co. Inc. |
| 34 | INDX 2007-FLX3 | April 27, 2007 | 10 | 1 | 1 | 977 | Credit Suisse Securities (USA) LLC |
| 35 | IMSC 2007-F1 | May 29, 2007 | 10 | 2 | 2 | 488 | Credit Suisse Securities (USA) LLC |
| 36 | INDX 2007-AR17 | June 27, 2007 | 7 | 1 | 1 | 899 | Bear, Stearns & Co. Inc. |
| 37 | INDX 2007-AR15 | June 28, 2007 | 8 | 2 | 2 | 815 | Credit Suisse Securities LLC |
| 38 | IMSC 2007-AR1 | June 28, 2007 | 9 | 3 | 3 | 1,963 | Credit Suisse Securities LLC |

| No. | Offering | Closing Date | Certificates Publicly Offered | Individual Loan Groups | Aggregate Loan Groups | Total Loans[1] | Underwriter(s) |
|---|---|---|---|---|---|---|---|
| 39 | IMSC 2007-F2 | June 28, 2007 | 12 | 2 | 2 | 669 | Credit Suisse Securities LLC |
| 40 | IMJA 2007-A1 | June 28, 2007 | 14 | 1 | 1 | 407 | (i) UBS Investment Bank (ii) HSBC |
| 41 | RAST 2007-A8 | June 29, 2007 | 20 | 3 | 2 | Aggregate Loan Group I: 584 Aggregate Loan Group II: 306 | (i) Deutsche Bank Securities (ii) Bear, Stearns & Co. Inc |
| 42 | IMSC 2007-HOA1 | June 29, 2007 | 18 | 1 | 1 | 1,321 | UBS Securities LLC |
| 43 | INDX 2007-AR19 | July 30, 2007 | 10 | 3 | 3 | 643 | Credit Suisse Securities LLC |
| 44 | IMSC 2007-F3 | August 30, 2007 | 12 | 3 | 3 | 2,007 | Credit Suisse Securities LLC |
| 45 | IMJA 2007-A2 | August 30, 2007 | 13 | 3 | 3 | 535 | Credit Suisse Securities LLC |
| 46 | IMJA 2007-A3 | September 25, 2007 | 8 | 1 | 1 | 314 | (i) Credit Suisse Securities LLC (ii) Banc of America Securities LLC |
| 47 | INDA 2007-AR7 | September 27, 2007 | 13 | 3 | 2 | Aggregate Loan Group I: 401 Aggregate Loan Group II: 450 | Credit Suisse Securities (USA) LLC |
| 48 | INDX 2007-AR21IP | November 5, 2007 | 31 | 10 | 2 | Aggregate Loan Group I: 669 Aggregate Loan Group II: 3,368 | Credit Suisse Securities LLC |
| 49 | INDA 2007-AR8 | November 29, 2007 | 8 | 3 | 3 | 948 | Deutsche Bank Securities |
| 50 | INDA 2007-AR9 | December 27, 2007 | 8 | 3 | 3 | 508 | Deutsche Bank Securities |
| 51 | IMJA 2007-A4 | December 28, 2007 | 8 | 1 | 1 | 273 | Credit Suisse Securities LLC |
| | **TOTAL** | | **629** | **109** | **95 [2]** | **78,705** | |

**Notes:**

[1] There are certain offerings listed above for which the total number of loans in the offering is not provided.  For those offerings, the most aggregated statistics as reported by the respective prospectus supplement are provided.

[2] When an offering is backed by one or more individual loan groups that are not aggregated into an "Aggregate Loan Group," I treat that group as an "Aggregated Loan Group" for the purposes of my analysis.

13.     Plaintiffs argue that common questions of law and fact exist on a classwide basis

and predominate over any questions solely affecting individual members of the Proposed

Expanded Class.[19]  However, as I demonstrate below, different underwriting guidelines applied

to the 78,705 different loans and 109 different individual loan groups underlying the 629

certificates in the Proposed Expanded Class.[20]  That is, different underwriting guidelines and

exceptions to underwriting guidelines applied for different time periods, collateral types,

channels, and documentation programs.  The disclosed characteristics of the different loans and

loan groups also demonstrate that different sets of underwriting guidelines applied to different

loans and different loan groups among and within the at-issue offerings and certificates.

14.     As a result of these numerous points of substantial differentiation in underwriting

guidelines, assessments of falsity would be based on a distinct set of questions and answers

particular to individual loans, loan groups, and offerings.  Moreover, those questions and

answers would be distinct for other loans, loan groups, and offerings, thus necessitating loan-

level inquiry.  That is to say, the falsity of statements regarding the underwriting of the at-issue

loans cannot be established by common proof.

15.     In the following sections, I discuss Plaintiffs' mischaracterization of my

deposition testimony concerning underwriting guidelines; the many dimensions upon which

underwriting guidelines differ among the 78,705 loans, 109 individual loan groups, and 51

offerings underlying the 629 certificates; and the differences in loan, borrower, and other

certificate-specific characteristics that lead to the need to assess falsity separately at the loan,

loan group, and offering levels.

---

[19]     Memorandum Opinion, 286 F.R.D. at 235-236.

[20]     In this report, I use the term "underwriting guidelines" to refer to the specific documents and procedures used
by IndyMac to assess the eligibility of a particular mortgage loan for origination or acquisition.  This decision is
typically based on whether the loan and borrower met IndyMac's eligibility criteria as stated in the underwriting
guideline documents, which specify ranges of acceptable loan and borrower characteristics for a mortgage loan,
given, among other criteria, a particular collateral type, documentation program, and review process.

### A. Plaintiffs Mischaracterize My Prior Opinions And Testimony Regarding Differences In Underwriting Guidelines

16.     In their reply submission to the Court for their first motion for class certification, Plaintiffs represented that I testified at deposition that I "'presumed' the underlying underwriting standards would be the same across [the Previously Certified] Offerings."[21]  This is a grossly inaccurate mischaracterization.



Unfortunately, Plaintiffs' mischaracterization of my deposition testimony was subsequently cited by the Court in the class certification Memorandum Opinion for the proposition that the loan underwriting guidelines "would be the same across different loans and offerings" and that falsity would therefore be "subject to generalized proof."[23]

---

[21]   Lead Plaintiffs' Reply Memorandum, p. 2, footnote 4.

[22]   ███████████

[23]   Memorandum Opinion, 286 F.R.D. at 241.

17.    Because my deposition testimony has been significantly distorted, I want to be clear.  My expert opinion is that the underwriting guidelines for the loans underlying the different at-issue certificates were _not_ the same.  For example, my Prior Report stated the following:

- "There are different offerings, collateral, disclosures, mixes of information available at different times, underwriting guidelines, exceptions to underwriting guidelines, levels of investor knowledge, and due diligence being performed by different underwriters that must be assessed."[24]

- "Each offering is backed by a separate and distinct mortgage pool that was likely subject to distinct underwriting guidelines."[25]

- "Lot loans would be subject to different underwriting guidelines from residential mortgages, and the underwriting guidelines for subprime would differ from those for prime mortgages."[26]

- "Some of the mortgage pools for the ten offerings are primarily made up of first liens (_e.g._, INDX 2006-AR15), while other offerings include first and second liens (_e.g._, INABS 2006-D).  First and second liens are underwritten pursuant to different underwriting guidelines."[27]

- "***Different Documentation Programs.***  For each mortgage pool backing an offering, there is a different mix of loan documentation programs. … Given different documentation programs with unique underwriting guidelines for the loans in each mortgage pool, a certificate backed by the mortgage loans in INDX 2006-FLX1 may be exposed to more uncertainty than a certificate backed by the mortgage loans in INABS 2006-D because borrower characteristics, such as income and employment, may be less fully documented."[28]

- "***Different Underwriting Guidelines***.  For each loan group, there is a different mix of loans originated pursuant to different underwriting guidelines:  'Underwriting procedures vary by channel of origination.'… Given that underwriting guidelines

---

[24]    Prior Report, p. 5.

[25]    Prior Report, p. 14.

[26]    Prior Report, p. 15.

[27]    Prior Report, p. 16.

[28]    Prior Report, p. 17.

vary by origination channel and over time, these loans are subject to different underwriting practices and require loan-level inquiries."[29]

- "After generally easing from 2004 through 2006, underwriting guidelines for mortgage loans had not yet tightened in the beginning of 2006, when the first at-issue offering (INDX 2006-AR11) occurred.  However, guidelines tightened throughout the latter part of 2006 and into 2007, during which time the nine other at-issue offerings occurred (see Exhibit 11).  Because the loans underlying the first at-issue offering (INDX 2006-AR11) had been originated primarily in early 2006 and the loans underlying the last at-issue offering (INDA 2007-AR7) were originated primarily in mid-2007, they were likely subject to different underwriting guidelines."[30]

18.     In addition to these statements, a section of my Prior Report was entitled "Different Underwriting Guidelines."[31]  Given these statements, I concluded that falsity could not be established by common proof, which is entirely contradictory to the way in which my statements and opinions were characterized by Plaintiffs and subsequently adopted by the Court. I have since been provided IndyMac underwriting guidelines obtained by the parties in discovery, and they confirm that the underwriting guidelines for the loans underlying the different at-issue certificates for both the nine Previously Certified Offerings and the 42 Additional Offerings were _not_ the same.

---

[29]    Prior Report, p. 23.

[30]    Prior Report, p. 28.

[31]    Prior Report, p. 46:  "Different underwriting guidelines apply to different loans.  IndyMac's 'underwriting procedures' varied by channel of origination.  Thus, different loans will have to be assessed in accordance with the underwriting guidelines applicable to their channel of origination.  Furthermore, different types of proof also will be required for different loan types.  For example, the INABS 2006-D mortgage pool consists of subprime mortgage loans, whereas the INDA 2007-AR7 mortgage pool consists of prime jumbo mortgage loans.  The underwriting guidelines for prime jumbo mortgages and subprime mortgage loans are likely to be different, as are those for mortgage loans conforming to Fannie Mae underwriting guidelines.

In addition, there will have to be a determination of when the loans were underwritten and which guidelines applied at the time.  The offering documents described IndyMac's underwriting guidelines in general terms only; the specific underwriting guidelines used to originate the loans do not appear in the offering documents.  As discussed above, the specific underwriting guidelines of lenders such as IndyMac changed over time.  There also will have to be a determination of whether applicable exceptions to underwriting guidelines applied as the offering documents stated that mortgage loans were underwritten 'according to IndyMac Bank's underwriting guidelines. . . or pursuant to an exception to those guidelines.'"

**B.**   **Different Underwriting Guidelines Applied To The 78,705 Loans And 109 Individual Loan Groups Underlying The 51 Offerings And 629 Certificates At-Issue**

19.     "Underwriting" refers to the evaluation undertaken by a bank (e.g., IndyMac) to assess the eligibility of a particular mortgage loan for origination or acquisition.  An originator assesses the characteristics of the borrower, such as his or her credit history, credit score (e.g., FICO score), employment, and funds available.  The originator also assesses the property for which the borrower is seeking a loan, such as the property value (based on the sales price and/or appraisal) and the property type (e.g., whether the property is a single-family or multi-family property).  These characteristics are reviewed by the originator, compared to the requirements for, among other criteria, the collateral type and documentation program that the mortgage is underwritten pursuant to, and a determination is made as to whether or not the loan is granted. This determination is not uniform for every loan; it varies by multiple factors, including the point in time in which the loan was originated or acquired, the borrower and loan characteristics as well as the collateral type of the loan, the channel through which the loan was originated or acquired, the documentation program the loan is underwritten pursuant to, and any exceptions made with respect to the underwriting guidelines.  Below I will discuss each of these factors and demonstrate that the loans underlying the 629 certificates encompassed by the Proposed Expanded Class would have been subject to different IndyMac underwriting guidelines. ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[32] ▮▮▮▮▮▮▮▮▮▮▮



### 1. Different Underwriting Guidelines Applied For Different Time Periods

20.     I am unaware of any evidence identified by Plaintiffs or Professor Feinstein showing that IndyMac's loan underwriting guidelines remained static over time.  Instead, it is clear to me that different underwriting guidelines would have applied to loans over time.  For example, a number of the at-issue offerings were backed primarily by Alt-A loans, and these guidelines varied over time, meaning that the same underwriting guidelines would not necessarily apply to Alt-A loans underlying certificates issued in the same offering.  For instance, the Alt-A loans underlying the INDX 2007-AR21IP offering were originated between 150 months (12.5 years) prior to the securitization and one month prior to the securitization.[36]  Differences in loan ages mean that different underwriting guidelines would have been applied at origination to the 4,037 loans in the 10 loan groups underlying the INDX 2007-AR21IP offering, and, if the loans were acquired by IndyMac from other originators (which many were, in fact), then different underwriting guidelines would have applied depending on the time of loan acquisition by IndyMac.  Thus, the identification of the *specific* IndyMac underwriting guidelines that would have applied to each securitized loan itself would require individualized inquiry.

---

[33]

[34]

[35]

[36]   INDX 2007-AR21IP Prospectus Supplement, p. S-156.

21.     I have received over 15,000 pages of IndyMac underwriting guidelines from counsel that were produced in this matter; however, this is likely only a subset of the guidelines that pertain to the at-issue offerings.  While I do not have the IndyMac underwriting guidelines that applied contemporaneously to each loan included in each offering, I have compared certain IndyMac underwriting guidelines that likely applied to many of the underlying loans in INDX 2007-AR21IP as an illustrative example.

22.     As noted above, the origination dates of the loans underlying the INDX 2007-AR21IP offering span 12.5 years, so the underwriting guidelines were likely different given the variation in the vintages of the underlying loans.

17



23.     Because IndyMac's underwriting guidelines changed over time, it is not the case

that "the underlying underwriting standards would be the same across Offerings"[44] or that loan



underwriting guidelines "would be the same across different loans and offerings" and that falsity would therefore be "subject to generalized proof."[45]  Rather, any assessment of falsity would be based on a distinct set of questions and answers for individual loans or sets of loans at issue. Because the Proposed Expanded Class encompasses investors in 629 different certificates backed by 78,705 loans across 109 individual loan groups, there will be a multitude of distinct questions and answers that must be addressed.

**2. Different Underwriting Guidelines Applied For Different Loan Collateral Types**

24.     As reported by ABSNet,[46] the certificates in the Proposed Expanded Class were backed by a number of different collateral types, including subprime loans, Alt-A loans, prime loans, residential lot loans, and home equity lines of credit ("HELOC").[47]  Within these broad categories, there are additional subcategories. ███████████████████████████

████████████████████████████████████████████████████████████

25.     ███████████████████████████████████████████████████

Moreover, the underwriting guidelines for different types of loan collateral would have been

---

44     Lead Plaintiffs' Reply Memorandum, p. 2, footnote 4.

45     Memorandum Opinion, 286 F.R.D. at 241.

46     ABSNet refers to the ABSNet.net database, which is a subscription-based internet database of ABS offering performance data.  For more information, see <se.absnet.net/marketing/aboutabsnet/aboutabsnet.asp>.

47     Based on the ABSNet.net "Asset Class/Collateral Type" field at the offering level.

48     ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████

49     ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████

differentiated further along many dimensions including borrower eligibility and requirements, multiple documentation type programs, lien position, and limits for FICO score, loan-to-value ratios, and maximum loan amounts.  (I will discuss these and other loan and borrower characteristics further below in Section V.C.)

26.     As discussed above, because different certificates were backed by different types of collateral, it is not the case that "the underlying underwriting standards would be the same across Offerings"[50] or that loan underwriting guidelines "would be the same across different loans and offerings" and that falsity would therefore be "subject to generalized proof"[51] as Plaintiffs have claimed.  For example, according to ABSNet, INABS 2006-D is primarily backed by subprime loans, INDX 2006-AR13 is primarily backed by Alt-A loans, RMBT 2006-L2 is primarily backed by residential lot loans, and INABS 2006-H3 is primarily backed by HELOC loans.[52] ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████ the relevant questions and answers for falsity cannot be subject to "common proof."

---

dated September 25, 2007 (ALLREGS 0004181-4185, ALLREGS 0004190-4193, ALLREGS 0004198-4199, ALLREGS 0004202, ALLREGS 0004205-4208, ALLREGS 0004213, ALLREGS 0004216); and "2001.04 NonPrime First Mortgages" dated January 26, 2007 (ALLREGS 0006529-6564).

[50]   Lead Plaintiffs' Reply Memorandum, p. 2, footnote 4.

[51]   Memorandum Opinion, 286 F.R.D. at 241.

[52]   Based on the ABSNet.net "Asset Class/Collateral Type" field at the offering level.

[53]   ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████

### 3.   Different Underwriting Guidelines Applied For Different Channels

27.      As the sponsor of the at-issue securitizations, IndyMac acquired the loans underlying the securitizations through four principal channels:  (a) conduit; (b) correspondent; (c) consumer direct; and (d) mortgage professionals.[54]  In the prospectus supplements, IndyMac describes these channels as follows:

- *Conduit:*  "IndyMac Bank acquires pools of mortgage loans in negotiated transactions either with the original mortgagee or an intermediate owner of the mortgage loans."[55]

- *Correspondent:*  "Mortgage brokers, mortgage bankers, financial institutions and homebuilders who sell previously funded mortgage loans to IndyMac Bank."[56]

- *Consumer direct:*  "Mortgage loans initiated through direct contact with the borrower. This contact may arise from internet advertising and IndyMac Bank website traffic, affinity relationships, company referral programs, realtors and through its Southern California retail banking branches."[57]

- *Mortgage professionals:*  "Mortgage brokers, mortgage bankers, financial institutions and homebuilders who have taken applications from prospective borrowers and submitted those applications to IndyMac Bank."[58, 59]

---

[54]   See, for example, INDX 2006-AR25 Prospectus Supplement, pp. S-84 and S-85.

[55]   INDX 2006-AR25 Prospectus Supplement, p. S-85.

[56]   INDX 2006-AR25 Prospectus Supplement, p. S-84.

[57]   INDX 2006-AR25 Prospectus Supplement, p. S-84.

[58]   INDX 2006-AR25 Prospectus Supplement, p. S-84.

[59]   IndyMac also acquired a relatively small number of loans through "wholesale" and "retail" channels, which appear to be equivalent to the mortgage professionals channel and the consumer direct channel, respectively. INDX 2006-AR25 Prospectus Supplement, p. S-86 and INDX 2006-AR23 Prospectus Supplement, p. S-33.

28.    Different underwriting guidelines were used for loans acquired or originated by IndyMac through different acquisition channels.[60]  For example:

- ***The mortgage professionals channel utilized distinct underwriting guidelines.*** IndyMac's offering documents explicitly disclosed that IndyMac utilized distinct underwriting guidelines for loans originated through its mortgage professionals channel, stating "IndyMac Bank generally will re-verify income, assets, and employment for mortgage loans it acquires through the mortgage professionals channel, but not for mortgage loans acquired through other channels."[61]

- ***IndyMac operated two mortgage loan purchase programs under its correspondent channel, each of which used distinct underwriting guidelines.***  Under its Prior Approval Program, IndyMac would perform a full credit review and analysis of each mortgage originated by third-party originators *prior to* determining its eligibility for purchase.[62]  In contrast, under its Preferred Delegated Underwriting Program, "loan originators that meet certain eligibility requirements are allowed to tender mortgage loans for purchase without the need for IndyMac Bank to verify mortgagor information."[63]  Under this program, qualifying originators would directly underwrite and originate loans that they pledged met IndyMac's guidelines, and those loans were purchased by IndyMac without prior

---

[60]    See, for example, INDX 2006-AR25 Prospectus Supplement, p. S-87 ("Underwriting procedures vary by channel of origination").

[61]    See, for example, INDX 2007-AR21IP Prospectus Supplement, p. S-166.

[62]    See, for example, INDX 2006-AR25 Prospectus Supplement, p. S-87.

[63]    See, for example, INDX 2006-AR25 Prospectus Supplement, p. S-87.

approval.[64]  These differences were explicitly disclosed to investors in the offering

documents of at-issue offerings employing such a program.[65]

- ***Third-party originator guidelines, not IndyMac guidelines, were used on certain loans.***

  As implied by the above definition, IndyMac did not originate any loans acquired through

  its conduit channel.  Thus, third-party originators' underwriting guidelines would have

  been used in originating any loans acquired through the conduit channel.[66]  For example,

  IndyMac informed investors that "Mortgage loans originated through the conduit channel

  were generally initially underwritten by the seller [originator] to the seller's [originator's]

  underwriting guidelines."[67]  IndyMac would then review each conduit seller's guidelines

  for acceptability and would re-underwrite each loan for compliance with its guidelines

---

[64]   See, for example, INDX 2006-AR25 Prospectus Supplement, p. S-87.

[65]   For example, the INDX 2006-AR23 Prospectus Supplement describes the two mortgage loan purchase programs under its correspondent channel as follows:

"1. *Prior Approval Program.*  Under this program, IndyMac Bank performs a full credit review and analysis of each mortgage loan generally with the same procedures used for mortgage loans originated through the mortgage professionals channel.  Only after IndyMac Bank issues an approval notice to a loan originator is a mortgage loan eligible for purchase pursuant to this program.

2. *Preferred Delegated Underwriting Program.*  Under this program, loan originators that meet certain eligibility requirements are allowed to tender mortgage loans for purchase without the need for IndyMac Bank to verify mortgagor information.  The eligibility requirements for participation in the Preferred Delegated Underwriting Program vary based on the net worth of the loan originators with more stringent requirements imposed on loan originators with a lower net worth.  Loan originators are required to submit a variety of information to IndyMac Bank for review, including their current audited financial statements, their quality control policies and procedures, their current errors and omissions/fidelity insurance coverage evidencing blanket coverage in a minimum amount of $300,000, at least three underwriters' resumes showing at least three years' experience or a direct endorsement designation, and at least two references from mortgage insurance companies.  Loan originators are required to have an active, traditional warehouse line of credit, which is verified together with the bailee letter and wire instructions.  IndyMac Bank requires each loan originator to be recertified on an annual basis to ensure that it continues to meet the minimum eligibility guidelines for the Preferred Delegated Underwriting Program.

Under the Preferred Delegated Underwriting Program, each eligible loan originator is required to underwrite mortgage loans in compliance with IndyMac Bank's underwriting guidelines usually by use of e-MITS or, infrequently, by submission of the mortgage loan to IndyMac Bank for traditional underwriting.  A greater percentage of mortgage loans purchased pursuant to this program are selected for post-purchase quality control review than for the other program…"

See INDX 2006-AR23 Prospectus Supplement, p. S-38.

[66]   See, for example, INDA 2007-AR1 Prospectus Supplement, p. S-62.

[67]   See, for example, INDA 2007-AR1 Prospectus Supplement, p. S-62.

"based only on the objective characteristics of the mortgage loan, such as FICO Credit Score, documentation type, loan-to-value ratio, etc., but without reassessing the underwriting procedures originally used."[68]

- **IndyMac's own consumer direct underwriting guidelines were used for certain loans.** IndyMac used its e-MITS automated underwriting system for loans originated through the consumer direct channel and certain loans acquired through other channels that otherwise met certain criteria, while it required the application of traditional underwriting methods for certain other loans.[69] For example, the offering documents associated with the Alt-A collateral included in the INDX 2006-AR23 offering reported that mortgage loans originated through the consumer direct channel would be submitted to e-MITS for assessment and subjected to a full credit review and analysis while the lot collateral contained in the RMBT 2006-L2 offering likely did not allow for e-MITS underwriting for loans originated under any acquisition channel.[70]

29.     Different offerings were backed by, and different loan groups were comprised of, loans originated through different channels.  For example, while 100 percent of the loans in the IMSC 2007-F1 offering were acquired through IndyMac's conduit channel, just 0.1 percent were in INDX 2007-AR17.[71]  More than half (55.7 percent) of the loans in Group 1 of the INDX 2006-AR37 offering were acquired through IndyMac's correspondent channel, while none of the

---

[68]   See, for example, INDA 2007-AR1 Prospectus Supplement, p. S-62.

[69]   See, for example, INDX 2006-AR23 Prospectus Supplement, pp. S-36 and S-38.

[70]   INDX 2006-AR23 Prospectus Supplement, p. S-38 and RMBT 2006-L2 Prospectus Supplement, p. S-25.  The e-MITS underwriting method is not disclosed in the RMBT 2006-L2, therefore I assume that it was not used to underwrite the loans underlying the RMBT 2006-L2 offering.

[71]   IMSC 2007-F1 Prospectus Supplement, p. S-47 and INDX 2007-AR17 Prospectus Supplement, p. S-36.

loans in the INDX 2007-AR21IP offering were.[72]  Most loans (74.8 percent) in the INDX 2006-FLX1 offering were acquired from IndyMac's mortgage professionals channel, while just 2 percent were in IMSC 2007-F3.[73]  Because different offerings were backed by, and different loan groups were comprised of, loans originated through different channels, it is not the case that "the underlying underwriting standards would be the same across Offerings"[74] or that loan underwriting guidelines "would be the same across different loans and offerings" and that falsity would therefore be "subject to generalized proof."[75]

### 4.  Different Underwriting Guidelines Applied For Different Documentation Programs

30.     The underwriting guidelines also varied depending upon the documentation program for which a given borrower qualified.  For example, under the Full/Alternate Documentation Program, the prospective borrowers' employment, income, and assets were verified through written documentation such as tax returns, pay stubs, or W-2 forms.[76]  In contrast, under the Stated Income Documentation Program, more emphasis was placed on the prospective borrowers' FICO score and on the value and adequacy of the mortgaged property as collateral and other assets of the prospective borrower than on income documentation.[77]

███████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

---

[72]  INDX 2006-AR37 Prospectus Supplement, p. S-36 and INDX 2007-AR21IP Prospectus Supplement, pp. S-71 and S-162.

[73]  INDX 2006-FLX1 Prospectus Supplement, p. S-41 and IMSC 2007-F3 Prospectus Supplement, p. S-64.

[74]  Lead Plaintiffs' Reply Memorandum, p. 2, footnote 4.

[75]  Memorandum Opinion, 286 F.R.D. at 241.

[76]  See, for example, INDA 2006-AR1 Prospectus Supplement, p. S-39.

[77]  See, for example, INDX 2007-AR21IP Prospectus Supplement, p. S-166.



31.    Different offerings were backed by, and different loan groups were comprised of, loans originated through different documentation programs.  For example, according to the prospectus supplements, 8.9 percent of loans underlying the INDX 2006-FLX1 offering were originated pursuant to a full/alternate documentation program, whereas nearly half (49.2 percent) of the loans underlying the IMJA 2007-A2 offering were.[81]  While 88.9 percent of loans underlying the INABS 2006-H3 offering were underwritten pursuant to a stated income documentation program, just 38.3 percent of loans underlying the INDX 2006-AR23 offering were.[82]  And while 32.4 percent of the loans in the IMSC 2007-F3 offering were originated pursuant to a no income/no asset documentation program, less than 0.1 percent of the loans in INDA 2006-AR2 were.[83]

---

[78]  ██████████████████████████████████

[79]  ███████████████████████████████████

[80]  ███████████████████████████████████

[81]  INDX 2006-FLX1 Prospectus Supplement, p. S-38 and IMJA 2007-A2 Prospectus Supplement, p. S-59.

[82]  INABS 2006-H3 Prospectus Supplement, Annex I-9 and INDX 2006-AR23, p. S-30.

[83]  IMSC 2007-F3 Prospectus Supplement, p. S-63 and INDA 2006-AR2 Prospectus Supplement, p. S-77.

32.     Given the differences in documentation programs and underwriting guidelines for the loans supporting each offering, separate and distinct evaluations of falsity will be needed in relation to the different loan documentation programs and applicable underwriting guidelines associated with different loans, different loan groups, and different offerings.  Underwriting that might be considered problematic for one borrower and loan type, such as incomplete documentation of income, might be acceptable for other loans, loan groups, or offerings given the intent of the documentation program.  ███████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████  Plaintiffs' contention that they "need only show that IndyMac generally did not comply with the stated practices with respect to the Offerings"[85] ignores the substantial heterogeneity of the loans and underwriting guidelines at issue.

### 5.  Different Underwriting Exceptions Applied To Different Loans

33.     Beyond underwriting guideline differences based on different time periods, collateral types, origination channels, and documentation programs, an overarching factor that requires loan-level assessment of falsity is that underwriting exceptions were applied to individual IndyMac loans.  ████████████████████████████████████



---

[84] ████████████████████████████████████████████████

[85]     Plaintiffs' Motion to Expand the Certified Class, pp. 19-20.

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ Thus, there

will have to be a determination of whether applicable exceptions to underwriting guidelines

applied as the offering documents stated that the mortgage loans were underwritten "according to

IndyMac Bank's underwriting guidelines … or pursuant to an exception to those guidelines…"[87]

Such a determination regarding the applicability of exceptions clearly requires inquiry into

individual loans, which would not be relevant for other, individual loans.  Thus, "common proof"

will not suffice for the 78,705 loans spread across 109 individual loan groups encompassed by

the Proposed Expanded Class.[88]

### 6. Professor Feinstein Failed To Review Any Underwriting Guidelines That Applied To The At-Issue Certificates

34. ████████████████████████████████████████████████



████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ ██████████████████████████████ Over 15,000 pages of

---

[86] ███████████████████████████

[87] See, for example, INDA 2006-AR2 Prospectus Supplement, p. S-83.

[88] To the extent that Plaintiffs intend to employ some type of statistical sampling in the assessment of loan non-compliance, I note that Plaintiffs have failed to propose *any* specific sampling proposal that could be applied on a classwide basis, much less a sampling proposal that addresses the heterogeneity of the loans and underwriting guidelines at issue in the Proposed Expanded Class, as well as loans originated based on exceptions to underwriting guidelines after individualized assessments of compensating factors.  At a minimum, such a proposal would need to include the liability questions to be addressed by the samples for the relevant populations and subpopulations of interest; the size of the confidence interval and margin of error, any stratification method, and the extrapolation method; and, the need to assess and resolve any potential biases, including, for example, based on potentially missing loan files.

[89] ██████████████████████████████

underwriting guidelines were produced during discovery in this matter and are relevant for assessing falsity because different sets of underwriting guidelines applied to the mortgage loans underlying the 51 offerings and 109 individual loan groups at issue. ███████████

████████████████████████████████

35.     Moreover, the Plaintiffs and Professor Feinstein conflate disclosures related to underwriting contained in offering documents with the actual underwriting guidelines themselves.  Exhibit 4 to the Phillips Declaration filed by the Plaintiffs is used to focus on the similarities of disclosures related to underwriting contained in the prospectus supplements.[92] Similarly, Professor Feinstein reviewed the prospectus supplements of the at-issue offerings to assess whether the disclosures "about the underwriting process purportedly used in originating and pooling the mortgage loans underlying the Offerings"[93] were largely similar across offering documents, but this is the wrong question.  Instead, both the Plaintiffs and Professor Feinstein should have asked and assessed, in part, whether falsity can be established through "common proof."  An assessment of falsity does not require only a review of the disclosures related to underwriting contained in the offering documents, but also a review of the actual underwriting guidelines themselves.  As noted above, over 15,000 pages of underwriting guidelines have been produced in discovery in this matter; the applicable underwriting guidelines for each loan vary depending upon each loan's time of origination or acquisition, collateral type, acquisition channel, documentation type, and whether the loan required or met certain exception criteria.  An evaluation of falsity would be based on a distinct set of questions and answers particular to

---

[90] ████████████████████████████

[91] ████████████████████████████████

[92] Declaration of Anthony D. Phillips, *In re IndyMac Mortgage-Backed Securities Litigation*, Master Docket No. 09-CIV-04583 (LAK), August 30, 2013, Exhibit 4.

[93] Feinstein Report, paragraph 4.

individual loans, loan groups, and offerings, and those questions and answers must rely upon the individual underwriting guidelines that applied and cannot be assessed sufficiently using only disclosures contained in the offering documents.  As I demonstrate above, falsity cannot be established in this case through common proof because of the different underwriting guidelines that applied to the different loans and loan groups underlying the 629 at-issue certificates.

### C.   Differences In Loan And Borrower Characteristics Underscore That Different Sets Of Underwriting Guidelines Applied To Different Loan Groups And Different Offerings

36.    The disclosed characteristics of the different loans and loan groups underlying the certificates purchased by the investors encompassed by the Proposed Expanded Class further refute that "the underlying underwriting standards would be the same across Offerings"[94] or that loan underwriting guidelines "would be the same across different loans and offerings" and that falsity would therefore be "subject to generalized proof."[95]

37.    Indeed, as the prospectus supplements for the 51 offerings at issue in the Proposed Expanded Class demonstrate, there is substantial heterogeneity in the loans at issue and thus substantial heterogeneity in the underwriting guidelines at issue.  I discuss below several of these differences, which I have determined from reviewing the disclosures, data, and tables provided in the prospectus supplements that were available to all potential investors.  Each of these disclosed differences has separate implications for assessing falsity because different loan and borrower characteristics mean that different sets of underwriting guidelines would have applied to the mortgage loans underlying the 51 offerings and 109 individual loan groups at issue.

---

[94]    Lead Plaintiffs' Reply Memorandum, p. 2, footnote 4.

[95]    Memorandum Opinion, 286 F.R.D. at 241.

*Vintage*

38.     The origination period of the loans underlying the securitizations at issue varied widely.  For example, loans in INDX 2007-AR21IP Aggregate Loan Group II were originated by IndyMac in 2005 (on average), while loans in INDA 2007-AR9 were originated predominantly in 2007.[96]  As discussed above, IndyMac's underwriting guidelines were not static.  Instead, they changed over time so different underwriting guidelines would have applied to a loan originated in 2005 and a loan originated in 2007, even if both loans were of the same collateral type and originated pursuant to the same documentation program.[97]

*Loan Products*

39.     There are many different types of loan products that are included among the at-issue offerings. ██████████████████████████████████████████████████████ ███████████████████████████████████████████████████████  For example, there are fixed-rate loans, pay-option ARM loans, balloon loans, and interest-only loans that underlie the at-issue offerings.[99]  An offering with underlying fixed-rate loans is different from an offering with underlying pay-option ARM loans.  For example, the IMSC 2007-HOA1 offering is comprised entirely of pay-option ARM, or "FlexPay," negatively

---

[96]   INDX 2007-AR21IP Prospectus Supplement, p. S-156 and INDA 2007-AR9 Prospectus Supplement, p. S-63.

[97]   See discussion in paragraph 22.

[98]   ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

[99]   See, for example, INABS 2006-H3 Prospectus Supplement, p. S-7, INDYL 2006-L2 Prospectus Supplement, p. S-12, IMSC 2007-HOA1 Prospectus Supplement, p. S-39, and RAST 2006-A15 Prospectus Supplement, pp. S-28 and S-29.

amortizing mortgage loans.  For these loans, the borrower is allowed to choose from three payment options each month:  pay a minimum payment, an interest-only payment, or a fully-amortizing payment.[100]  These types of negatively amortizing loans carry a higher default risk relative to traditional amortizing loans because the outstanding principal balances on the loans can increase over a period of time before declining, ███████████████████████████████ ███████████

### *Property Type*

40.    A loan's property type is a description of the characteristics of the property that the mortgage loan is secured by, which is often characterized as single-family, two-to-four family, or condo.  The property type of the loans underlying the securitizations at issue varied widely.  For example, approximately 76 percent of the loans in the IMJA 2007-A3 offering were categorized as single family properties, while approximately only 56 percent of the loans in the INDX 2006-AR21 offering were single family.[102]  Additionally, approximately 16 percent of the loans in the RAST 2006-A14CB offering were categorized as two-to-four family properties, while less than one percent of the loans in the IMJA 2007-A3 offering were secured by two-to-four family properties.[103]  Based upon a review of the IndyMac underwriting guidelines, different underwriting criteria would have applied to loans of different property types.[104]

---

[100]  IMSC 2007-HOA1 Prospectus Supplement, pp. S-39 and S-40.

[101]  ████████████████████████████████████████████████████ ███████████████████████

[102]  IMJA 2007-A3 Prospectus Supplement, p. S-33 and INDX 2006-AR21 Prospectus Supplement, p. S-37.

[103]  RAST 2006-A14CB Prospectus Supplement, p. S-49 and IMJA 2007-A3 Prospectus Supplement, p. S-33.

[104]  ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

*Originator*

41.     There were at least four disclosed originators among the at-issue offerings (IndyMac Bank, F.S.B., MortgageIT, Inc., Quicken Loans Inc., and Residential Mortgage Capital).[105]  However, in many cases where IndyMac is listed as the originator in the prospectus supplement, it largely *acquired* loans from other originators and did not *originate* them.  For example, the mortgage loans forming the IMSC 2007-HOA1 mortgage pool were acquired entirely through IndyMac's conduit channel, with 48 percent of the loans originated by Quicken Loans Inc., 17 percent by Residential Mortgage Capital, and the remainder by other non-IndyMac originators.[106]  Additionally, MortgageIT, Inc. originated approximately 14.5 percent of the HELOC loans forming the INABS 2006-H3 mortgage pool.[107]  As discussed in Section V.B.3 above, different underwriting guidelines were used for loans acquired by IndyMac through different acquisition channels.

*Occupancy Status*

42.     A borrower in the offerings at issue may purchase a property as a primary residence, a secondary residence, or as an investment property.  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇



---

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

[105]  INABS 2006-H3 Prospectus Supplement, p. S-25 and IMSC 2007-HOA1 Prospectus Supplement, p. S-6.
[106]  IMSC 2007-HOA1 Prospectus Supplement, p. S-6.
[107]  INABS 2006-H3 Prospectus Supplement, p. S-25.
[108]  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

*FICO Score*

43.     Weighted average FICO scores for the borrowers underlying the at-issue certificates differ by over 140 points: from 618 in the INABS 2006-D offering (a subprime offering) to 759 in Aggregate Loan Group II of the INDA 2007-AR7 offering (a prime offering).[109]  This implies that the borrowers underlying the at-issue certificates have different credit histories, on average.  According to the Fair Isaac Corporation, the bottom 27 percent of the U.S. population has a FICO score below 650 while the top 40 percent has a FICO score of 750 or above.[110]  Borrowers with lower FICO scores are more likely to have experienced negative credit events in the past, including, for example, late or delinquent debt payments, prior declarations of bankruptcy or foreclosure, and/or maxing out available lines of credit.[111]



---

[109]   INABS 2006-D Prospectus Supplement, p. S-6 and INDA 2007-AR7 Prospectus Supplement, p. S-7.

[110]   "Interpreting Your Score" https://www.wellsfargo.com/credit_center/credit_status/understand/interpreting, accessed October 23, 2013.

[111]   See, for example, "Credit missteps – how their effect on FICO scores vary," http://www.myfico.com/crediteducation/questions/credit_problem_comparison.aspx, accessed October 23, 2013.

[112]

*Loan-To-Value Ratio*

44.     The weighted average loan-to-value ratios of the loans underlying the at-issue offerings differed, ranging from 68.6 percent (which is equivalent to the borrowers having on average 31.4 percent equity in their homes) for the INDX 2006-AR13 offering to 83.0 percent (17 percent equity) for the INDYL 2006-L2 offering.[113]  These differences are substantial: for similarly valued properties, absent a second lien, a borrower in INDX 2006-AR13 would have approximately twice the equity in a property, on average, compared to a borrower in INDYL 2006-L2. ███████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████[114]

*Lien Position*

45.     The loan groups underlying some of the at-issue offerings are comprised primarily of first liens (e.g., 99.4 percent and 97.0 percent of Group 1 and Group 2 of INABS 2006-D are comprised of first liens, respectively),[115] while the loan groups underlying other offerings are primarily second liens (e.g., 98.4 percent and 97.9 percent of INABS 2006-H3 and INABS 2006-H2 are comprised of second liens, respectively).[116]  First and second lien loans are

---

[113]   INDX 2006-AR13 Prospectus Supplement, p. S-6 and INDYL 2006-L2 Prospectus Supplement, p. S-6.

[114]   ████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

[115]   See INABS 2006-D Prospectus Supplement, p. S-6.

[116]   INABS 2006-H3 Prospectus Supplement, p. S-7 and INABS 2006-H2 Prospectus Supplement, p. S-7.

underwritten pursuant to different underwriting guidelines and requirements. 

### *Principal Balance*

46.     The average principal balances of the mortgage pools underlying the at-issue offerings range from $74,507 for the INABS 2006-H3 offering to $844,211 in Aggregate Loan Group II of the INDA 2007-AR7 offering.[119]  Differences in average principal balances are associated with different underwriting guidelines.  For example, the underwriting guidelines that applied to many of the high-balance loans included in the mortgage pools of the at-issue offerings were specific to jumbo loans.  Jumbo loans generally have specific guidelines that differ from the guidelines for otherwise similar conforming loans.[120]



[117]

[119]   INABS 2006-H3 Prospectus Supplement, p. S-7 and INDA 2007-AR7 Prospectus Supplement, p. S-7.

[120]



[REDACTED][121]

47.     As the foregoing illustrates, there is substantial heterogeneity in the loans at issue and thus substantial heterogeneity in the underwriting guidelines at issue for the Proposed Expanded Class.  It is not the case that "the underlying underwriting standards would be the same across Offerings"[122] or that loan underwriting guidelines "would be the same across different loans and offerings" and that falsity would therefore be "subject to generalized proof."[123]

### D.   Other Differences Among And Within The 51 Offerings Encompassed By The Proposed Expanded Class

48.     There are a variety of other differences among and within the 51 offerings encompassed by the Proposed Expanded Class.  Below, I discuss certain differences with respect to loan groups, resecuritization, and note guaranty insurance.

#### 1.   Different Loan Groups

49.     Among the 51 offerings, there are 95 aggregate loan groups, which are loan groups that are comprised of one or more individual loan groups.  For a number of offerings,

---

[121]    [REDACTED]

[122]    Lead Plaintiffs' Reply Memorandum, p. 2, footnote 4.

[123]    Memorandum Opinion, 286 F.R.D. at 241.

there is no cross-collateralization across aggregate loan groups.[124]  Loan groups without cross-

collateralization mean that distinct loan groups were formed within these offerings, such that a

single loan pool was not used to support all of the underlying certificates of the offering.  In my

Prior Report, I discussed at great length the need for at least group-level inquiry; however, by

taking out of context a single sentence in my report, Plaintiffs' reply submission for the first

class certification motion grossly oversimplified what my report stated, asserting that the

testimony in my Prior Report was only that, "Each Offering was backed by a single loan

pool."[125]  Unfortunately, Plaintiffs' mischaracterization of my Prior Report was subsequently

adopted by the Court.[126]

50.     Because Plaintiffs did not fairly describe the testimony in my Prior Report, I want

to be clear.  There are at-issue offerings for which there are no certificates that rely upon all

loans, but rather rely upon only a distinct loan group.[127]  Thus, a group-level comparison is an

---

[124]  For example, the Prospectus Supplements for INDX 2006-AR33, INDX 2007-AR5, RAST 2007-A8, INDA
2007-AR7, and INDX 2007-AR21IP all indicate that no cross-collateralization is permitted across aggregate
loan groups.  See INDX 2006-AR33 Prospectus Supplement, p. S-16; INDX 2007-AR5 Prospectus Supplement,
p. S-2; RAST 2007-A8 Prospectus Supplement, p. S-19; INDA 2007-AR7 Prospectus Supplement, p. S-16; and
INDX 2007-AR21IP Prospectus Supplement, p. S-21.

[125]  Lead Plaintiffs' Reply Memorandum, p. 2, footnote 5.  Plaintiffs cited to paragraph 31 of my Prior Report,
which reads: "Separate And Distinct Collateral And Different Loan Types. Each offering is backed by a
separate and distinct mortgage pool that was likely subject to distinct underwriting guidelines.  Different
mortgage pools consist of different types of mortgage loans with varying FICO scores, documentation types,
and principal balances among other differences.  Six of the ten offerings are backed by Alt-A mortgages; one
offering is backed by subprime mortgages (INABS 2006-D); two offerings are backed by prime mortgages
(INDA 2006-AR2 and INDA 2007-AR7); and one offering (RMBT 2006-L2) consists of "lot loans," mortgages
that are backed by residential lots rather than homes.  Lot loans would be subject to different underwriting
guidelines from residential mortgages, and the underwriting guidelines for subprime would differ from those for
prime mortgages."

[126]  See Memorandum Opinion, 286 F.R.D. at 241, footnote 114 ("The parties agree that each of the offerings in
question was backed by a single loan pool.").

[127]  For example, "[t]he mortgage loans backing INDA 2007-AR7 are divided into Aggregate Loan Group I and
Aggregate Loan Group II.  Group 1 is fully contained within Aggregate Loan Group I, and Groups 2 and 3
together comprise Aggregate Loan Group II.  The offering documents do not provide average statistics for the
loans that comprise the entire pool; instead, the most aggregated level of statistics are given for Aggregate Loan
Group I and Aggregate Loan Group II.  The distinction between Aggregate Loan Group I and Aggregate Loan
Group II demonstrates that the offering is essentially functioning as if it contained two entirely separate groups
of mortgages."  See Prior Report, paragraph 40.

important one because many certificates are backed by distinct groups of mortgage loans rather

than by all of the mortgages underlying an offering.  Moreover, the presence of contingent

provisions for cross-collateralization does not prove that the loans from one group have been or

would be used to support another loan group.  The absence of cross-collateralization for a

number of offerings in the Proposed Expanded Class proves that they are entirely separate loan

groups and should be treated as such for assessing falsity.

     51.    Furthermore, different underwriting guidelines would have applied to different

individual and aggregate loan groups within the same offering.  For example, 60.1 percent of

loans in Aggregate Group II for the INDX 2007-AR21IP offering were acquired through

IndyMac's conduit channel, while none of the loans in Aggregate Loan Group I were acquired

through the conduit channel.[128]  At the individual loan group level, Groups 1 and 2 of the INDX

2007-AR21IP offering were fully comprised of mortgages acquired through IndyMac's

consumer direct channel,[129] whereby IndyMac directly served as the mortgage originator and its

applicable underwriting guidelines would have been applied to each loan at origination.  In

contrast, 90.2 percent of the loans included in Group 9 of the INDX 2007-AR21IP offering were

acquired through IndyMac's conduit channel,[130] which as previously described, meant that non-

IndyMac lenders would have originated these loans, applying their own underwriting guidelines

at origination, and IndyMac would have applied a separate set of underwriting guidelines

specific to its conduit program.  Moreover, the INDX 2007-AR21IP weighted average loan age

---

[128]  INDX 2007-AR21IP Prospectus Supplement, pp. S-71 and S-162.

[129]  INDX 2007-AR21IP Prospectus Supplement, pp. S-52 and S-61.  IndyMac described its Consumer Direct channel as "[m]ortgage loans initiated through direct contact with the borrower.  This contact may arise from internet advertising and IndyMac Bank website traffic, affinity relationships, company referral programs, realtors and through its Southern California retail banking branches."  See INDX 2007-AR21IP Prospectus Supplement, p. S-164.

[130]  INDX 2007-AR21IP Prospectus Supplement, p. S-139.

differed by 12 months between Aggregate Loan Groups (Aggregate Loan Group I weighted average loan age was 37 months, while Aggregate Loan Group II was 25 months).[131] Differences in loan origination dates mean that different sets of underwriting guidelines would have been applied contemporaneously to loans included in individual loan groups.

52.     As the foregoing illustrates, individual and aggregate loan groups within an offering had different characteristics reflecting that different sets of underwriting guidelines applied to these loan groups.  As such, falsity must be assessed separately for each loan group.

## 2.   Resecuritization

53.     The Proposed Expanded Class encompasses investors in "resecuritizations" (e.g., RAST 2006-R2 and INDX 2006-R1).  In these offerings, the issuing trust has interests in certificates from other offerings _not at issue_.  For example, the RAST 2006-R2 prospectus supplement states, "The assets of [RAST] 2006-R2 will consist of a 74.9000000000% percentage interest and a 74.6389063330% percentage interest in the IndyMac MBS, Inc., [RAST] 2006-A1, Mortgage Pass-Through Certificates, Series 2006-A, Class 1-A-1 and Class 1-A-3 Certificates, respectively…."[132]  The RAST 2006-A1 securitization is not part of the Proposed Expanded Class.  Therefore, the at-issue certificates that were resecuritized in this offering are different because the assets in the trust are not mortgages, but instead are other certificates that rely upon the performance of mortgages in another offering that is not at issue in this case.

54.     Moreover, there is no credit enhancement available in the RAST 2006-R2 offering, there is only credit enhancement provided by the underlying RAST 2006-A1 offering: "The issuing entity does not include any credit enhancement mechanism.  The only credit

---

[131]   INDX 2007-AR21IP Prospectus Supplement, pp. S-67 and S-156.
[132]   RAST 2006-R2 Prospectus Supplement, p. S-6.

enhancement available to the offered certificates consists of the credit enhancement provided to the deposited underlying certificates."[133]  This credit enhancement includes subordination provided by the certificates issued in the underlying RAST 2006-A1 trust, *not* certificates issued in the at-issue RAST 2006-R2 trust:  "Credit enhancement is generally provided to the deposited underlying certificates by allocation of realized losses to the related classes of subordinated certificates issued by the underlying trust until the class certificate balances of such subordinated certificates are reduced to zero."[134]  The underlying trust, RAST 2006-A1, is not at issue in this matter and therefore an assessment of falsity would require an analysis of those loans in that non-at-issue trust.  An assessment of falsity would be unique to this offering based on its resecuritization characteristics.

### 3.  Note Guaranty Insurance

55.     The Proposed Expanded Class includes investors that purchased certificates with note guaranty insurance policies with four different insurers.[135]  As I discussed in my Prior Report, note guaranty insurance "is a financial guarantee from a monoline insurance company (e.g., Financial Guaranty Insurance Corporation [("FGIC, Inc.")]) on a particular bond or class of certificates.  This guarantee ensures that timely payments of principal and interest are made to certificate holders if cash flows from the mortgage pool are insufficient to make such payments…"[136]  For example, IMSC 2007-HOA1 has three publicly offered certificates that

---

[133]   RAST 2006-R2 Prospectus Supplement, p. S-10.

[134]   RAST 2006-R2 Prospectus Supplement, p. S-10.

[135]   See, INDYL 2006-L2 Prospectus Supplement, p. S-1 (Financial Guaranty Insurance Company), INABS 2006-H2 Prospectus Supplement, p. S-1 (Ambac Assurance Corporation), INABS 2006-H3 Prospectus Supplement, p. S-1 (XL Capital Assurance Inc.), and IMSC 2007-HOA1 Prospectus Supplement, p. S-1 (Financial Security Assurance, Inc.).

[136]   Prior Report, paragraph 23.

were issued with note guaranty insurance as a credit enhancement.[137]   These insured certificates may receive principal payments that are not fully tied to the underlying borrowers, but are rather paid directly from the note guaranty insurer.  Disclosures regarding the note insurer would have been relevant to investors in the insured certificates but not to investors in other, non-insured certificates.

E.   **Implications For Falsity And The Incorrectness Of Professor Feinstein's Conclusions**

56.   As the preceding discussion illustrates, it is not the case that "the underlying underwriting standards would be the same across Offerings"[138] or that loan underwriting guidelines "would be the same across different loans and offerings" and that falsity would therefore be "subject to generalized proof."[139]  Rather, because of the substantial differences in the underwriting guidelines that applied to any given loan group due to, among other things, different mixes of loan vintages, loan collateral types, acquisition channels, documentation programs, and borrower characteristics, any assessment of falsity must be evaluated using the underwriting guidelines and the set of disclosures applicable to the individual loans, loan groups, and offerings encompassed by the Proposed Expanded Class.  Thus, assessments of falsity would be based on distinct sets of questions and answers particular to individual loans, loan groups, and offerings.

57.   Therefore, I conclude that "common proof" will not suffice for the 78,705 loans spread across 109 individual loan groups encompassed by the Proposed Expanded Class.  This conclusion, which is based on my analysis of the underwriting guidelines and disclosures that

---

[137]   The Class A-1-2, A-2-3, and A-3 certificates were insured by Financial Security Assurance, Inc.

[138]   Lead Plaintiffs' Reply Memorandum, p. 2, footnote 4.

[139]   Memorandum Opinion, 286 F.R.D. at 241.

would pertain to individual loans, loans groups, and offerings, stands in sharp contrast to

Plaintiffs' and Professor Feinstein's presumption that the questions and answers needed to assess

falsity with respect to IndyMac's underwriting are the same for all 78,705 loans, 109 individual

loan groups, and 51 offerings, and all 629 at-issue certificates.  For example, Professor Feinstein

opined regarding "Common Statements about Underwriting in the Offering Documents" that:

> "The allegedly untrue statements pertain to all the Certificates.  The descriptions of the underwriting process, which Plaintiffs allege are untrue, are contained in both the 2006 Registration Statement and the 2007 Registration Statement, pursuant to which all of the Certificates were issued and sold.  Allegedly untrue statements about the underwriting process are also contained in the prospectuses and prospectus supplements of all the Offerings."[140]

Professor Feinstein's superficial observation that all of the certificates were underwritten

by IndyMac and that Plaintiffs' claims concern all certificates across all offerings is

irrelevant to the fact that the proof needed to establish liability to the proposed class of

investors in these distinct offerings and certificates is not common or the same.[141]

## VI.    INDIVIDUALIZED ISSUES OF DAMAGES AND CAUSATION

58.    Professor Feinstein has opined that damages can be calculated by application of

"statutory arithmetic formulas."[142]  As explained below, Professor Feinstein offers a flawed

"damages computation methodology"[143] that does not provide a rigorous method for computing

damages on a classwide basis while accounting for individualized valuation factors among

---

[140]  Feinstein Report, p. 19.

[141]  Similarly, Professor Feinstein's previous statement in his rebuttal report that "[a]ll of the certificates share common origination, marketing, and trading processes" is belied by the fact that different sets of remaining Underwriter Defendants were involved with differing offerings and certificates, and at different times, and that it would presumptive to consider the underwriting, marketing, and trading of certificates to be common. Rebuttal Report of Professor Steven P. Feinstein, Ph.D., CFA, *In re IndyMac Mortgage-Backed Securities Litigation*, Master Docket No. 09-Civ-04583 (LAK), April 8, 2011 ("Feinstein Rebuttal Report"), p. 12.

[142]  Feinstein Report, pp. 5 and 23.

[143]  Feinstein Report, p. 21.

offerings and certificates.  Moreover, I have been advised by counsel that "negative causation" is an affirmative defense to Plaintiffs' asserted claims and that Plaintiffs may recover only damages that are actually caused by an alleged misrepresentation or omission.  Professor Feinstein's proposal ignores macroeconomic and other exogenous factors that would have caused loan defaults, and fails to control for certificate-specific valuation factors that would have interacted with these exogenous factors during the period over which each security was held.[144]

59.    In the following sections, I first discuss the factors that affect certificate performance and demonstrate that accounting for these factors would be necessary to calculate damages.  I then discuss the flaws in Professor Feinstein's proposal for computing damages on a classwide basis and indicate why both assessing damages and determining loss causation requires individualized inquiries that cannot be based on common proof.

**A.    The Performance Of The At-Issue Certificates Is Affected By Many Factors That Are Distinct From Underwriting**

60.    Performance of the at-issue certificates varies widely among and within offerings, and is impacted by a number of factors distinct from the alleged underwriting abandonment.  The general variation in performance of the 51 at-issue offerings is consistent with what one would expect given several of the characteristics of the underlying collateral.  For example, as one would expect, among the 51 at-issue offerings, prime offerings generally have performed best, followed by Alt-A offerings, followed by subprime offerings, followed by HELOC offerings.[145] However, even within collateral type subgroupings, there is variation in performance.  The

---

[144]    In other words, Professor Feinstein does not provide a rigorous method for computing damages on a classwide basis and fails to account for each investor's individual loss causation.

[145]    My examination of the trustee reports for the at-issue offerings reveals that prime offerings have the lowest realized losses as of August 2013 relative to the original loan balance, followed by Alt-A offerings, subprime offerings, and HELOCs.  Trustee reports of at-issue offerings, August 2013, Deutsche Bank Investor Reporting, available at: <https://tss.sfs.db.com/investpublic/>.

performance of the at-issue offerings is not substantially alike,[146] which is contrary to what one would have expected given Plaintiffs' claims that systematic underwriting failures drove performance.  The variation in performance suggests that there are offering-specific factors that must be understood and incorporated in assessing damages.  Therefore, further inquiry is necessary to understand the determinants of the observed diverse performance.

61.     There are numerous factors distinct from the allegedly systematic underwriting failures that likely would explain much of the variation in certificate, loan group, and offering performance.  For example, investors purchasing certificates backed by mortgages associated with relatively low FICO scores would have expected higher defaults on the underlying loans than when purchasing certificates backed by borrowers with relatively high FICO scores, all else equal.[147]  When I examine the at-issue offerings by average FICO score, independent of collateral type, the performance of the offerings generally lines up as one would expect based on the borrower's credit risk, with the disclosed collateral attributes frequently explaining performance in a straightforward manner (i.e., lower FICO scores are generally associated with higher losses).[148]  Similarly, with respect to lien position, mortgage pools with larger percentages of second-lien loans tend to have greater borrower realized losses.[149]

---

[146]   My examination of the trustee reports for the at-issue offerings reveals that, as of August 2013, the Alt-A offering with the lowest realized loss percentage shows losses that are less than one quarter of the Alt-A offering with the highest realized loss percentage.  Trustee reports of at-issue offerings, August 2013, Deutsche Bank Investor Reporting, available at: <https://tss.sfs.db.com/investpublic/>.

[147]   INABS 2006-D Prospectus Supplement, p. S-14.

[148]   My examination of the trustee reports for the at-issue offerings reveals that, as of August 2013, offerings with higher FICO scores tend to have lower realized losses relative to their original offering amounts, on average.  Trustee reports of at-issue offerings, August 2013, Deutsche Bank Investor Reporting, available at: <https://tss.sfs.db.com/investpublic/>; Prospectus Supplements of at-issue offerings.

[149]   My examination of the trustee reports for the at-issue offerings reveals that, as of August 2013, offerings with at least 90 percent second lien loans have a realized loss rate that is more than twice the realized loss rate of the remaining at-issue offerings.  Trustee reports of at-issue offerings, August 2013, Deutsche Bank Investor Reporting, available at: <https://tss.sfs.db.com/investpublic/>.

62.     Additionally, geographic distribution of the mortgaged properties impacts the performance of a loan group.  As I noted in my Prior Report:

> For each loan group, there is a different geographic distribution of the mortgaged properties.  For example, the geographic concentration of loans in California and Florida for Group 5 in INDX 2006-AR11 is 33 percent, whereas the geographic concentration of loans in California and Florida for Group 4 is 71 percent.  Loan groups with a higher concentration of mortgages in California and Florida (which have experienced unprecedented home price declines) are likely to be more adversely impacted by macroeconomic events in those states than other groups.[150]

Thus, the performance of each offering (and loan group, as applicable) is dependent upon the value of the underlying mortgaged properties; when home prices change in certain areas, certificate performance may also change depending upon the geographical mix of the underlying collateral.

63.     Professor Feinstein has not explained how his damages methodology would account for all of the factors that could affect the performance of each certificate irrespective of any alleged underwriting failures, and is fatally flawed in that respect.  Nor has Professor Feinstein been careful to distinguish between differences in disclosed underwriting standards and the alleged abandonment of stated underwriting standards.  This is an important distinction because many of the determinants of performance (e.g., loan characteristics) were disclosed to investors and are separate from the alleged abandonment of underwriting standards.

---

[150]   Prior Report, paragraph 42.

**B.** **Even Ignoring All The Factors Other Than Underwriting That Impact The Performance Of The At-Issue Certificates, Professor Feinstein's Damages Methodology Is Unable To Compute Damages On A Classwide Basis And Ignores Conflicts Of Interest Among Putative Class Members**

64.     Even ignoring all the factors other than underwriting that impact the performance of the at-issue certificates, Professor Feinstein has not provided a rigorous method for computing damages on a classwide basis.  It is my understanding that any computation of damages using Section 11 of the 1933 Securities Act relies upon a "value" for the at-issue certificates on the lawsuit date.  Professor Feinstein suggests using prices reported by Interactive Data Corporation ("IDC") as a proxy for value,[151] but fails to note that IDC does not offer prices on the lawsuit date for approximately half of the 629 publicly-offered certificates among the 51 at-issue offerings.[152]  Professor Feinstein has not provided alternative values or an alternative method for deriving certificate values on the date of the lawsuit to compensate for this substantial omission.[153]

65.     There are several reasons why a common method would not be available to determine value on a classwide basis.  First, in order to calculate damages as of the lawsuit date on May 14, 2009, one would need to account for distress, uncertainty, and the resultant illiquidity in the MBS market that occurred in mid-2009.  To the extent that the MBS market

---

[151]  Feinstein Report, pp. 21-22.

[152]  ██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
███████████████████████████████████  See also Interactive Data Corporation.

[153]  In his Rebuttal Report, Professor Feinstein claimed that "Of note, Dr. Torous explains that he did not examine the actual valuation data available from IDC, but rather relied solely upon lists of data availability dates.  For the minority of certificates for which IDC or actual trade data is unavailable for 14 May 2009, valuation models from numerous pricing services can fill in the gaps.  Dr. Torous is wrong to contend that these models 'would need to be developed.'  As noted above, and as Dr. Torous, himself, explains in his published articles, these models have already been developed and are widely available."  Feinstein Rebuttal Report, p. 22.  Professor Feinstein's claim is incorrect.  First, I examined the price data from IDC and observed their absence for numerous certificates.  Second, Professor Feinstein appears to imply that missing IDC prices could be inferred (which he has neither done nor shown to be the case), and presumes that I believe that models exist to fill such gaps in this matter.

distress factors depressed the IDC prices on which Professor Feinstein proposes to rely, an appropriate damages methodology would need to remove those factors.  Those factors, and their measurement, certainly could differ among the 629 at-issue certificates.

66.     Second, offering-level (and loan group-level, if applicable) loan collateral differences would also be relevant in certificate value determination.  For example, certificate valuation models for different types of loan collateral (e.g., fixed-rate mortgages, HELOCs) would differ because the relation between loan performance and borrower characteristics may differ across collateral types.

67.     Third, at a certificate level, there are a variety of differences that would disable a common damages method.  For example, some certificates were wrapped by monoline insurers, and valuation of those particular certificates would involve assessments of each insurer's ability and willingness to pay in the event of shortfalls.[154] ██████████████████████

████████████████████████████████████████████████████████

██████████████████████████ [155]  There are six certificates totaling $686.5 million in original principal balance have been completely paid off as of August 30, 2013.[156]  I understand

---

[154]   As another example, Professor Feinstein's damages proposal does not appear to exclude or consider separately the interest-only certificates included in the at-issue offerings.  Interest-only certificates are quite different from amortizing certificates.  These certificates do not have a principal balance, but rather pay interest tied to a notional balance.  While increased losses may reduce that notional balance, reduced prepayment may raise it relative to expectations.  In many cases, the yield associated with these certificates has risen dramatically, in part because one function of these certificates is to balance the flow of interest from the underlying mortgages with the flow of interest to the securities in the offering.  For example, in RAST 2006-A7CB, the amortizing certificates are LIBOR-tied or fixed rate, while most of the interest-only certificates are tied to a fixed rate minus LIBOR.  This reduces the sensitivity of the interest yielded by the offering in its entirety to LIBOR.  When, during and following the financial crisis, LIBOR plummeted, many interest-only certificate investors reaped a windfall.

[155]   ████████████████████████████████

[156]   IMJA 2007-A1 Class A-5, IMSC 2007-HOA1 Class A-3, INABS 2006-D Class 2-A1, INDX 2006-AR27 Class 1-A-1, INDX 2006-AR35 Class 2-A-2, and INDYL 2006-L2 Class A-1 have been completely paid off as of August 30, 2013.  Trustee reports of at-issue offerings, August 2013, Deutsche Bank Investor Reporting, available at: <https://tss.sfs.db.com/investpublic/>; Prospectus Supplements of at-issue offerings.

from counsel that the relevant parts of Section 11 and Section 12 do not provide any mechanism for damages such as Professor Feinstein suggests for investors that held to maturity and received all principal repayments.  In these instances, the underwriting failures alleged by Plaintiffs would not be relevant, as investors experienced no losses in holding to maturity and therefore could not have suffered damages.[157]  Professor Feinstein does not provide any rigorous method to support his damages theory for fully paid-off certificates.

68.     To illustrate the reality of the aforementioned damages calculation issues, consider the INDX 2006-AR27 offering.  The Class 1-A-1 certificate has been fully paid off; the Class 1-A-5, M-1, M-2, M-3, M-4, M-5, M-6, M-7, M-8 certificates have been written off; and the Class 1-A-2, 1-A-3, 1-A-4, 2-A-1, 2-A-2, 2-A-3 certificates, which continue to receive cashflows,[158] are all missing IDC prices on the lawsuit date.[159] ███████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████[160]
████████████████████████████████

69.     Employing models to value the at-issue certificates involves making assumptions and estimating inputs.  Such assumptions and estimates may result in valuations that are beneficial to some putative class members depending upon the certificates that they held, but may be detrimental to other putative class members.  Thus, there exist potential differences

---

[157]  It is possible an investor may have experienced a loss if he or she bought and sold in a short-term trade and was negatively impacted by price fluctuations, in place of holding to maturity.

[158]  INDX 2006-AR27 Trustee Report, August 2013, Deutsche Bank Investor Reporting, available at: https://tss.sfs.db.com/investpublic/.

[159]  The Class 1-A-1, 1-A-5, M-2 certificates, which are paid off or written off, also have no IDC prices available on the lawsuit date.  See data from Interactive Data Corporation.

[160]  ████████████████████████████████████████████

among the Proposed Expanded Class in their preferences for various model assumptions and inputs such as prepayment speeds, default projections, and recovery rates.

70.    During the financial crisis, the average time between a borrower's last payment and liquidation of the underlying property increased.[161]  Because servicers may have different methods for loan modification and foreclosure practices over time, the resultant difference in time to liquidation may result in conflicting interests among certificate holders.[162]  For example, loan servicers can affect the cash flows received by a certificate holder because loan servicers ultimately control when to foreclose or modify troubled loans.  A given loan's time and path to liquidation, and ultimately its loss recognition, may vary greatly from another comparable loan where the borrower stopped making mortgage payments at a different time.  Losses on troubled loans may be realized by certificate holders at various points between two months and two years (or potentially more) from when the borrower first misses a payment and becomes delinquent.  In addition to this variation, realized losses also depend upon the state laws in which the property is located and the specific liquidation event, be it a short sale, foreclosure auction, or real-estate owned (REO) sale.[163]

71.    In general, senior certificate holders have a greater preference for foreclosure on a troubled loan because liquidation proceeds result in accelerated principal repayment at the expense of subordinated certificate holders, who prefer to "play for time" through loan modifications to avoid experiencing realized losses.[164]  This difference in preference between

---

[161]  Goodman, Laurie S. et al., "Benefiting from Extension Risk in the Non-Agency Market," *The Journal of Fixed Income*, Winter 2010.

[162]  Goodman, Laurie S. et al., *Subprime Mortgage Credit Derivatives,* 2008, pp. 46-47, 52-55.

[163]  Goodman, Laurie S. et al., *Subprime Mortgage Credit Derivatives,* 2008, pp. 46-47, 52-55.

[164]  I note that a similar adversarial dynamic often occurs in bankruptcy proceedings between bondholders and equity holders who respectively are analogous to the senior and subordinate tranches in this context.

senior and subordinate certificate holders has been well documented and gives rise to conflicts of interest for putative class members. For example, Federal Reserve Chairman Ben Bernanke stated at the end of 2008:

> However, despite the substantial costs imposed by foreclosure, anecdotal evidence suggests that some foreclosures are continuing to occur even in cases in which the narrow economic interests of the lender would appear to be better served through modification of the mortgage. This apparent market failure owes in part to the widespread practice of securitizing mortgages, which typically results in their being put into the hands of third-party servicers rather than those of a single owner or lender. ***The rules under which servicers operate do not always provide them with clear guidance or the appropriate incentives to undertake economically sensible modifications. The problem is exacerbated because some modifications may benefit some tranches of the securities more than others, raising the risk of investor lawsuits.*** [emphasis added][165]

**C.    Professor Feinstein's Damages Methodology Ignores Loss Causation And Fails To Disambiguate What Loss, If Any, Was Caused By The Alleged Misstatements And Omissions**

72.



[167] By ignoring these factors, Professor Feinstein has assumed that the entire statutory damages amount, that he proposes to calculate formulaically, results only from an alleged misrepresentation or omission.[168] In so doing, and in failing to consider the many factors that lead to different performance, Professor Feinstein has

---

[165]  Bernanke, Ben, "Housing, Mortgage Markets, and Foreclosures," Speech at the Federal Reserve System Conference on Housing and Mortgage Markets, December 4, 2008.  See also, Goodman, Laurie S. et al., "Benefiting from Extension Risk in the Non-Agency Market," *The Journal of Fixed Income*, Winter 2010, which finds that holders of more subordinated certificates benefit at the expense of holders of senior certificates from delays in liquidation.

[166]  Feinstein Report, p. 21.

[167]

[168]  Feinstein Report, pp. 21-22;

failed to provide a common method capable of computing what component of losses, if any, was actually due to the Plaintiffs' alleged misrepresentations either collectively or individually for each investor.  I briefly discuss below how the macroeconomy would differentially contribute to investors' losses.

73.     As I discussed in my Prior Report, the macroeconomic environment changed dramatically during the period in which putative class members purchased the at-issue certificates.[169]  Moreover, the changing macroeconomic environment cannot be ignored, as Professor Feinstein has done, in assessing what caused loan defaults and losses, if any, to investors in the at-issue certificates.

74.     Real estate economists have attributed the downturn in the mortgage market predominantly to the deterioration in the macroeconomic environment, and more specifically to the unprecedented fall in home prices.  Research has shown that the decline in home prices was the primary driver of high levels of delinquency and foreclosures.[170]

75.     For example, an empirical study by economists at the Federal Reserve Bank in 2009 concluded that the dominant driver of recent residential foreclosures was the macroeconomy – dramatic declines in home prices – rather than the underwriting standards applied to loans.  In the Federal Reserve study, researchers took a sample of 2005-vintage loans

---

[169]  Prior Report, pp. 26-30, 32-45.

[170]  Professor Feinstein tries in his rebuttal report filed in April 2011 to portray my argument regarding the importance of declining housing prices as a fringe theory and contrary to the view that loosened underwriting standards were a factor.  First, my argument (consistent with the literature that he cites, such as Gerardi et al) is that loosened underwriting standards were a factor, but that without substantial declines in home prices, severe mortgage defaults and MBS losses would not have occurred.  Second, it appears that Professor Feinstein is arguing that declining housing prices are irrelevant to mortgage default and MBS losses.  That position is incorrect; for example, no underwriting standard would protect an investor from losses stemming from a 50 percent drop in home prices in Riverside County, California.  Furthermore, the decline in house prices experienced was far from uniform across localities, and therefore its effect will vary across loan groups with different geographic distributions of loans.

and applied the home price paths experienced by a sample of 2002-vintage loans.[171]   The

researchers found that "had house prices not fallen, the foreclosure crisis would not have

occurred, regardless of whether lenders had lowered underwriting standards."[172]   The study

found that the decline in home prices was a primary driver of foreclosures, and that "lowered

underwriting standards" would not have similarly increased the foreclosure rate without a decline

in home prices.[173]

76.     Another paper written by economists at the Federal Reserve Bank of Boston in

2012 described "Twelve Facts About the Mortgage Market."  This paper refutes numerous

claims about the financial crisis, such as that it was caused by resets of ARM mortgages or

"designed to fail" mortgages.[174]   It shows that "[m]ortgage investors had lots of information,"

and that "[i]nvestors understood the risks."[175]   The authors place blame most squarely on

investor optimism about housing prices, stating that "the contemporary evidence on what

investors believed about prices suggests that their widespread optimism encouraged them to

purchase subprime securities, despite the well-understood risks involved."[176]   Homeowners too

---

[171]   The authors found that, given these housing price paths, "foreclosure rates would rise relative to 2002 levels, but would still remain almost an order of magnitude below those seen in 2005."  The researchers then took the sample of 2002-vintage loans, to which they applied the price paths experienced by the sample of 2005-vintage loans, and found that foreclosure rates decreased relative to 2005, but were still "gigantic" relative to historical averages.  See Gerardi, Kristopher, et al., "Decomposing the Foreclosure Crisis: House Price Depreciation versus Bad Underwriting," Federal Reserve Bank of Atlanta Working Paper Series, September 2009, p. 3.

[172]   Gerardi, Kristopher, et al., "Decomposing the Foreclosure Crisis: House Price Depreciation versus Bad Underwriting," Federal Reserve Bank of Atlanta Working Paper Series, September 2009, p. 25.

[173]   Gerardi, Kristopher, et al., "Decomposing the Foreclosure Crisis: House Price Depreciation versus Bad Underwriting," Federal Reserve Bank of Atlanta Working Paper Series, September 2009, p. 1.

[174]   Foote, Christopher L., et al., "Why Did So Many People Make So Many *Ex* Post Bad Decisions? The Causes of the Foreclosure Crisis," Federal Reserve Bank of Boston Public Policy Discussion Papers, July 20, 2012, pp. 5-8.

[175]   Foote, Christopher L., et al., "Why Did So Many People Make So Many *Ex* Post Bad Decisions? The Causes of the Foreclosure Crisis," Federal Reserve Bank of Boston Public Policy Discussion Papers, July 20, 2012, pp. 14-17.

[176]   Foote, Christopher L., et al., "Why Did So Many People Make So Many *Ex* Post Bad Decisions? The Causes of the Foreclosure Crisis," Federal Reserve Bank of Boston Public Policy Discussion Papers, July 20, 2012, p. 18.

were overly optimistic about future house prices.[177]  This being the case, mortgages written to looser disclosed underwriting standards were understood to be riskier and more vulnerable to macroeconomic shocks.  While many investors did not expect the financial crisis to be as deep and as prolonged as it proved to be, the mortgages backing many certificates proved predictably vulnerable to widespread house price declines.  In proving damages, Plaintiffs must disambiguate this predictable effect from any potential effect of allegedly faulty underwriting.

77.



[180]  Thus, the impact of adverse macroeconomic events on different certificates must be separately assessed based on the different collateral backing the certificates.

78.     As discussed above, the differences in the underlying collateral and the various effects that macroeconomic factors may have on the loans in a given pool are likely the primary drivers of loan pool performance.  Recoverable damages cannot be computed through "statutory

---

[177]  Between 2003 and 2012, the founders of the widely used S&P/Case-Shiller home price index surveyed homebuyers' expectations of home prices and compared them with the changes in home prices that actually occurred.  The survey results show that homebuyers were optimistic about home prices throughout this time period, from both a short- as well as long-term perspective.  Even when home prices began to fall, the authors found that home price expectations remained optimistic with homebuyers still expecting double-digit long-term returns in the future.  These optimistic long-term expectations continued despite dramatic declines in home prices in 2007 and 2008.  See Case, Karl E., et al., "What Have They Been Thinking? Home Buyer Behavior in Hot and Cold Markets," *Brookings Papers on Economic Activity*, Fall 2012.

[178]  Feinstein Report, p. 21.

[179]

[180]

arithmetic formulas"[181] because of the importance of macroeconomic and other exogenous factors on loan default and certificate losses.  Moreover, a "straightforward" damages method would not account for the impact of adverse macroeconomic events on different certificates, which must be assessed separately based on the different collateral backing the certificates and characteristics of the certificates themselves.  Certainly, Professor Feinstein did not provide any such common method that accounted for these factors.  Rather, individualized inquiries of damages and loss causation will be required for individual certificates.

## VII.    INDIVIDUAL ISSUES OF INVESTOR KNOWLEDGE

79.    I understand from counsel that an investor's lack of knowledge of an alleged misstatement or omission is one of the elements for a Section 12(a)(2) claim for which a plaintiff bears the burden of proof, and that that an investor's knowledge of an alleged misstatement or omission is an affirmative defense to a Section 11 claim.

80.    Professor Feinstein does not identify any common evidence of the lack of investor knowledge for the Proposed Expanded Class.  Nor does Professor Feinstein identify any common evidence that could address the affirmative defense of investor knowledge for all the investors encompassed by the entire Proposed Expanded Class.  During the more than seven-year period that the Proposed Expanded Class currently spans, different information about IndyMac's loan underwriting practices, the performance of the at-issue certificates, and the performance of the underlying loan collateral was available depending on the time at which a putative class member purchased certificates.  Moreover, the Proposed Expanded Class is predominantly comprised of investors who were leading players in the MBS markets and whose advisors had

---

[181]    Feinstein Report, pp. 5, 23.

distinct and proprietary methods for evaluating MBS investments and undertook *independent*
research, investigation, and analyses beyond the review of offering documents and publicly
available information, including private meetings with loan originators.

81.     As discussed in my Prior Report and in Appendix C attached hereto, in light of
the changing mix of information over time, the different research, analyses and due diligence
undertaken by different investors, and the indefinite time period for the Proposed Expanded
Class, individualized inquiries will be required to assess each investor's knowledge, or lack
thereof, of the alleged misstatements and omissions.

## VIII.   CONCLUSIONS

82.     To summarize, I have reached the following conclusions:

- In previously certifying a class of investors in nine offerings, the Court, in part,
relied upon Plaintiffs' mischaracterization of my deposition testimony.  In their
reply submission to the Court, Plaintiffs represented that I "'presumed' the
underlying underwriting standards would be the same across [the Previously
Certified] Offerings."[182]  Plaintiffs' mischaracterization of my deposition
testimony was subsequently adopted by the Court in finding that falsity in this
case "will be one subject to generalized proof."[183]  My actual testimony, both at
deposition and in my Prior Report, was that different sets of underwriting
guidelines applied to the nine Previously Certified Offerings.  I have since been
provided IndyMac underwriting guidelines obtained by the parties in discovery,
and they confirm that the underwriting guidelines for the loans underlying the
different at-issue certificates for both the nine Previously Certified Offerings and
the 42 Additional Offerings were *not* the same.

- Myriad differences exist among and within the underwriting guidelines that applied to
the 109 individual loan groups underlying the 629 publicly-offered certificates in the
Proposed Expanded Class.  In all, these 629 certificates were backed by over 78,000
mortgage loans originated over a 12-year period, and were acquired by IndyMac
through multiple acquisition channels, and pursuant to many different documentation
programs.  The disclosed characteristics of the different loans and loan groups

---

[182]   Lead Plaintiffs' Reply Memorandum, p. 2, footnote 4.

[183]   See Memorandum Opinion, 286 F.R.D. at 241 ("Defendants' own expert, moreover, stated that he 'presumed'
that the underwriting guidelines would be the same across different loans and offerings.").

demonstrate that different sets of underwriting guidelines applied to different loan groups.

- 

- Falsity cannot be established through "common proof" because of the different underwriting guidelines that applied to the different loans and loan groups underlying the 629 publicly-offered certificates in the Proposed Expanded Class.

- An evaluation of falsity would be based on a distinct set of questions and answers particular to individual loans, loan groups, and offerings, and those questions and answers cannot be assumed to pertain to or be informative for other at-issue loans, loan groups, or offerings. Moreover, a finding of falsity for a given loan or loan group does not necessarily indicate a finding of falsity for any other certificate supported by other loan groups in that offering, or other certificates in any other offering.

- Contrary to Professor Feinstein's presumption that falsity can be determined through "common proof," my detailed analyses herein of the different types of proof needed to evaluate individual loans, loan groups, and offerings shows that there is no "common proof" of liability for the Proposed Expanded Class.

---

184 ███████████████████████

185 ███████████████████████

186 Feinstein Report, paragraph 4.

- The performance of the at-issue offerings, and the underlying loans and certificates, varies widely.  The wide extent of variation in performance underscores that "common proof" of a "systematic failure" to apply underwriting standards does not exist, and instead will require individual inquiry of loans, loan groups, certificates, and offerings.  Professor Feinstein offers a flawed "damages computation methodology" that, among other things, fails to account for certificate-specific value determination factors that cannot be identified or assessed using a common method.  Rather, value determinations would need to be made for hundreds of certificates using models specific to each loan group or offering, and in many cases, each certificate.  Furthermore, Professor Feinstein fails to consider potential conflicts of interest among putative class members due to their different preferences for foreclosure and modification practices based on the putative class member's position in the securitization seniority structure.

- Professor Feinstein also ignores the macroeconomic and other exogenous factors that would have affected loan defaults and certificate performance.  Because these factors affected loan default and any losses to certificate holders, and because the impact of adverse macroeconomic events on different certificates must be separately assessed based on the different characteristics of the collateral backing the certificates and the characteristics of the certificates themselves, recoverable damages cannot be computed through "statutory arithmetic formulas," as Professor Feinstein suggests.

- Professor Feinstein did not provide a common method that would account for any of these exogenous factors associated with damages or loss causation.  And with good reason; individualized inquiries of damages and loss causation will be required for individual certificates.

- Because of the broad scope of the Proposed Expanded Class, individualized inquiries of investor knowledge will be required.  During the more than seven-year period that the Proposed Expanded Class currently encompasses, different information about IndyMac's loan underwriting practices, the performance of the at-issue certificates, and the performance of the underlying loan collateral was available depending on the time at which a putative class member was considering purchasing certificates.  In addition, the Proposed Expanded Class is predominantly comprised of investors who were leading players in the MBS markets and whose advisors had distinct and proprietary methods of evaluating MBS investments and undertook *independent* research, investigation, and analyses beyond the review of offering documents and publicly available information, including private meetings with loan originators and issuers.  In light of the changing mix of information over time, the different research, analyses and due diligence undertaken by the different putative class members, and the indefinite time period for the Proposed Expanded Class, individualized inquiries of investor knowledge will be required.

Walter N. Torous, Ph.D.

# Appendix A

**WALTER N. TOROUS**

MIT Center for Real Estate

**Office Address:**

Center for Real Estate
Massachusetts Institute of Technology
Building 9-330
77 Massachusetts Avenue
Cambridge, MA, 02139
Telephone:     (Office)          (617) 253-5901


E-Mail          wtorous@mit.edu


**Home Address**

50 Longwood Avenue, Apt. #916
Brookline, MA, 02446
Telephone:     (310) 234-1090

**Academic Degrees**

B. Math.        University of Waterloo, Statistics and Economics, 1976
Ph. D.          University of Pennsylvania, Economics, 1981

**Academic Appointments**

1980-81         Graduate School of Business Administration, University of
                Michigan, Lecturer

1981-85         Graduate School of Business Administration, University of
                Michigan, Assistant Professor

1986-87         Graduate School of Management, University of California, Los
                Angeles,  Visiting Assistant Professor

1987-90         Graduate School of Management, University of California,
                Los Angeles, Assistant Professor

| | |
|---|---|
| 1990-95 | John E. Anderson Graduate School of Management, University of California, Los Angeles, Associate Professor |
| 1995-97 | London Business School, Corporation of London Professor of Finance |
| 1995-2006 | John E. Anderson Graduate School of Management, University of California, Los Angeles, Professor |
| 1997-2003 | Director, Richard S. Ziman Real Estate Center, John E. Anderson Graduate School of Management, University of California, Los Angeles |
| 2006-2012 | John E. Anderson Graduate School of Management, University of California, Los Angeles, Lee and Seymour Graff Endowed Professor |
| 2009-2011 | Visiting Professor Center for Real Estate Massachusetts Institute of Technology, Cambridge, MA |
| 2013- | Senior Lecturer Center for Real Estate / Sloan School of Management Massachusetts Institute of Technology, Cambridge, MA |

## Professional Activities

Journal of Housing Economics, Associate Editor, 1991 -
Journal of Real Estate Finance and Economics, Associate Editor, 1992 -
Real Estate Economics,
         Associate Editor, 1993 - 2005
         Editor, 2006 -
Pacific-Basin Finance Journal, Associate Editor, 1997- 2003
Economic Notes, Associate Editor, 1999 - 2011

Ad hoc referee for Journal of Finance, Journal of Financial and Quantitative Analysis, Journal of Banking and Finance, Journal of Business, Review of Financial Studies, Journal of Financial Economics, Journal of Money, Credit, and Banking, Management Science, Journal of Empirical Finance, Journal of International Money and Finance

Member:
American Finance Association, 1980 -
American Real Estate and Urban Economics Association, 1990 -

Western Finance Association, 1980 -
Associate Program Chair, 1990
Board of Directors, 1991-94


**Refereed Publications**

1. Ball, C. A., and Torous, W. N., "A Simplified Jump Process for Common Stock Returns," Journal of Financial and Quantitative Analysis, 18:1, pp. 53-65, March 1983.

2. Ball, C. A., and Torous, W. N., "Bond Price Dynamics and Options," Journal of Financial and Quantitative Analysis, 18:4, pp. 517-531, December 1983.

3. Ball, C. A., and Torous, W. N., "The Maximum Likelihood Estimation of Security Price Volatility: Theory, Evidence, and Application to Option Pricing," Journal of Business, 57:1, pp. 97-112, January 1984.

4. Milne, W. J., and Torous, W. N., "Long-Term Interest Rates and the Price Level: The Canadian Evidence on the Gibson Paradox," Canadian Journal of Economics, 17:2, pp. 327-339, May 1984.

5. Ball, C. A., Torous, W. N., and Tschoegl, A. E., "On Inferring Standard Deviations from Path Dependent Options," Economic Letters, 18, pp. 377-380, 1985.

6. Ball, C. A., Torous, W. N., and Tschoegl, A. E., "The Degree of Price Resolution: The Case of the Gold Market," Journal of Futures Markets, 5:1, pp.29-43, Spring 1985.

7. Ball, C. A., Torous, W. N., and Tschoegl, A. E., "An Empirical Investigation of the EOE Gold Options Market," Journal of Banking and Finance, 9:1, pp. 101-113, March 1985.

8. Ball, C. A., and Torous, W. N., "On Jumps in Common Stock Prices and Their Impact on Call Option Pricing," Journal of Finance, 40:1, pp. 155-173, March 1985.

9. Torous, W. N., "Differential Taxation and the Equilibrium Structure of Interest Rates," Journal of Banking and Finance, 9, pp. 363-385, August 1985.

   Reprinted in The Debt Market, S. Ross (Editor), Edward Elgar, 2000.

10. Ball, C. A., and Torous, W. N., "Futures Options and the Volatility of Futures Prices," Journal of Finance, 41:4, pp. 857-870, September 1986.

A-3

11. Ball, C. A., and Torous, W. N., "Investigating Security Price Performance in the Presence of Event Date Uncertainty," Journal of Financial Economics, 22, pp. 123-153, October 1988.

12. Schwartz, E. S., and Torous, W. N., "Prepayment and the Valuation of Mortgage-Backed Securities," Journal of Finance, 44:2, pp. 375-392, June 1989.

13. Titman, S., and Torous, W. N., "Valuing Commercial Mortgages: An Empirical Investigation of the Contingent-Claims Approach to Valuing Commercial Mortgages," Journal of Finance, 44:2, pp. 345-373, June 1989.

    Reprinted in The Debt Market, S. Ross (Editor), Edward Elgar, 2000.

14. Franks, J. R., and Torous, W. N., "An Empirical Investigation of U.S. Firms in Reorganization," Journal of Finance, 44:3, pp. 747-769, July 1989.

    Reprinted in Corporate Bankruptcy and Distressed Restructurings: Analytical Issues and Investment Opportunities, E. Altman (Editor), Irwin, 1992.

15. Schwartz, E. S., and Torous, W. N., "Valuing Stripped Mortgage-Backed Securities," Housing Finance Review, 8, pp. 241-251, Fall 1989.

    Reprinted in The Debt Market, S. Ross (Editor), Edward Elgar, 2000.

16. Haugen, R. A., Talmor, E., and Torous, W. N., "The Effect of Volatility Changes on the Level of Stock Prices and Subsequent Expected Returns," Journal of Finance, 46:8, pp. 985-1007, July 1991.

17. Geske, R. L., and Torous, W. N., "Skewness, Kurtosis, and Black-Scholes Option Mispricing," Statistical Papers, 32, pp. 299-309, December 1991.

18. Schwartz, E. S., and Torous, W. N., "Prepayment, Default, and the Valuation of Mortgage Pass-Through Securities," Journal of Business, 65:2, pp. 221-239, April 1992.

19. Franks, J. R., and Torous, W. N., "Lessons from a Comparison of U.S. and U.K. Insolvency Codes," Oxford Review of Economic Policy, 8:3, pp. 70-82, September 1992.

    Reprinted in Journal of Applied Corporate Finance, pp. 95-103, January 1993.

20. Schwartz, E. S., and Torous, W. N., "Mortgage Prepayment and Default Decisions: A Poisson Regression Approach," Journal of the American Real Estate and Urban Economics Association, 21:4, pp. 431-448, March 1993.

21. Franks, J. R., and Torous, W. N., "A Comparison of Financial Recontracting in Workouts and Chapter 11 Reorganizations," <u>Journal of Financial Economics</u>, 28:8, pp. 349-370, June 1994.

    Reprinted in <u>Studies in Empirical Corporate Finance</u>, M. Brennan (Editor), Edward Elgar, 2001.

22. Ball, C. A., and Torous, W. N., "On Unit Roots and the Estimation of Interest Rate Dynamics," <u>Journal of Empirical Finance</u>, 3:2, pp. 215-238, June 1996.

23. Franks, J. R., Nyborg, K., and Torous, W. N., "A Comparison of U. K, U. S., and German Insolvency Codes," <u>Financial Management</u>, 25:3, pp. 274-301, Autumn 1996.

24. Roma, A., and Torous, W. N., "On the Cyclical Behavior of Interest Rates," <u>Journal of Finance</u>, 52:4, pp. 1519-1542, September 1997.

25. Brennan, M. J., and Torous, W. N., "Individual Decision Making and Investor Welfare," <u>Economic Notes</u>, 28:2, pp. 119-143, July 1999.

26. Ball, C. A., and Torous, W. N., "The Stochastic Volatility of Short-term Interest Rates: Some International Evidence," <u>Journal of Finance</u>, 54:6, pp. 2339-2359, December 1999.

    Reprinted in <u>Model Risk: Concepts, Calibration, and Pricing</u>, R. Gibson (Editor), Risk Books, 2000.

27. Ball, C. A., and Torous, W. N., "Stochastic Correlation Across International Stock Markets," <u>Journal of Empirical Finance</u>, 7:3-4, pp. 373-388, November 2000.

28. Torous, W. N., Yan, S. and Valkanov, R., "On Predicting Stock Returns with Nearly Integrated Explanatory Variables," <u>Journal of Business</u>, 77:4, pp. 937-966, October 2004.

29. Dierker, M., Quan, D., and Torous, W. N., "Pricing the Defeasance Option in Securitized Commercial Mortgages," <u>Real Estate Economics</u>, 33:4, pp. 663-680, Winter 2005.

30. Berardi, A., and Torous, W. N., "Term Structure Forecasts of Long Term Consumption Growth," <u>Journal of Financial and Quantitative Analysis</u>, 40:2, pp. 241-258, June 2005.

31. Brennan, M. J., Lee, F., and Torous, W. N., "Dollar Cost Averaging", <u>Review of Finance</u>, 9:4, pp. 509-535, 2005.

32. Hong, H, Torous, W. N., and Valkanov, R., "Do Industries Lead Stock Markets?, Journal of Financial Economics, 83:2, pp. 367-396, 2007.

33. Schwartz, E. S., and Torous, W. N., "Commercial Office Space: Testing the Implications of Real Options Model with Competitive Interactions", Real Estate Economics, 35:1, pp. 1-20, 2007.

    Awarded Edwin S. Mills Prize for best paper in Real Estate Economics for 2007.

34. Plazzi, A., Torous, W. N., and Valkanov, R., "The Cross-Sectional Dispersion of Commercial Real Estate Returns and Rent Growth: Time Variation and Economic Fluctuations", Real Estate Economics, 36:3, pp. 403-429, 2008.

35. Plazzi, A., Torous, W. N., and Valkanov, R., "Expected Returns and the Expected Growth in Rents of Commercial Real Estate", Review of Financial Studies, 23:9, pp. 3469-3519, 2010.

36. Plazzi, A., Torous, W.N., and Valkanov, R., "Exploiting Property Characteristics in Commercial Real Estate Portfolio Allocation", Journal of Portfolio Management, Special Real Estate Issue, pp. 39-50, 2011.


**Chapters in Books**

37. Geske, R. L., and Torous, W. N., "Black-Scholes Option Pricing and Robust Variance Estimation," pp. 49-69, in Options: Recent Advances in Theory and Practice, S. Hodges (Editor), Manchester University Press, 1990.

38. Schwartz, E. S., and Torous, W. N., "Caps on Adjustable Rate Mortgages: Valuation, Insurance, and Hedging," pp. 283-303, in Financial Markets and Financial Crises, R. G. Hubbard (Editor), University of Chicago Press, 1991.

39. Betker, B. L., Franks, J. R., and Torous, W. N., "Are Stockholders Better Off When Debt is Restructured Privately?," pp. 391-400, in Corporate Bankruptcy and Distressed Restructuring: Analytical Issues and Investment Opportunities, E. Altman (Editor), Irwin, 1992.

40. Torous, W. N., "Mortgage Backed Securities," in North-Holland Handbook of Operations Research and Management Science, R. A. Jarrow, V. Maksimmovic, and W. T. Ziemba (Editors), North-Holland, 1995.

41. Franks, J. R., Nyborg, K, and Torous, W. N., "A Tale of Three Codes: A Comparison of U. K., U. S., and German Insolvency Codes," in Mastering Finance, H. Rose (Editor), Pittman Publishing, 1998.

42. Torous, W. N. "The Behaviour of Short Term Interest Rates," in <u>Mastering Finance</u>, H. Rose (Editor), Pittman Publishing, 1998.

43. Schwartz, E. S., and Torous, W. N., "Can We Disentangle Risk Aversion from Intertemporal Substitution in Consumption?," in <u>Essays on Uncertainty: Festschrift in Honor of Steinar Ekern</u>, Norges Handelshoyskole, Bergen, Norway, 2002.

44. Ghyssels, E., Plazzi, A., Torous, W. N., and R. Valkanov, R., "Forecasting Real Estate Prices", in <u>Handbook of Economic Forecasting,</u> Volume 2A, G. Elliott and A. Timmermann (Editors), North-Holland, 2013.


## Submitted Manuscripts

45. Torous, W. N., and Valkanov, R., "Boundaries of Predictability: Noisy Predictive Regressions", *revise and resubmit*, <u>Review of Financial Studies</u>, 2000.

46. Ball, C. A., and Torous, W. N., "Contagion in the Presence of Stochastic Interdependence", *revise and resubmit*, <u>Review of Financial Studies</u>, 2005.

47. Linnainmaa, J. T., and Torous, W. N., "Reading the Tea Leaves: Why Serial Correlation Patterns in Analysts' Forecast Errors are Not Evidence of Inefficient Information Processing", *submitted*, <u>Review of Financial Studies</u>, 2010.


## Working Papers

48. Goyal, A., Kahl, M., and Torous, W. N., "The Long-Run Performance of Financially Distressed Firms: An Empirical Investigation", 2003.

49. Miltersen, K., and Torous, W. N., "Second Mortgages: Valuation and Implications for the Performance of Structured Financial Products", 2010.

50. Bokhari, S., Torous, W. N., and Wheaton, W., "Why did Household Mortgage Leverage Rise from the mid-1980s until the Great Recession?", 2012.

**Testimony in the Past Four Years**

2013 - *MBIA Insurance Corporation v. J.P. Morgan Securities LLC (f/k/a Bear, Stearns & Co. Inc.)*, In the Supreme Court for the State of New York County of Westchester; No. 64676/2012
Provided expert report and deposition testimony.

2012 - *In re Lehman Brothers Equity/Debt Securities Litigation,* In the United States District Court for the Southern District of New York;  No. 09 MD 2017 (LAK)
Provided expert report and deposition testimony.

2011 - *Mass. Bricklayers & Masons Trust Funds, et al. v. Deutsche Alt-A Securities*, et. al.; In the United States District Court for the Eastern District of New York; No. 08-cv-03178-LDW-ARL
Provided expert report and deposition testimony.

2011 - *Public Employees' Retirement System of Mississippi, et al. v. The Goldman Sachs Group, Inc., et al.*; In the United States District Court for the Southern District of New York; No. 09-CV-1110 (HB)
Provided expert report and deposition testimony.

2011 - *Maine State Retirement System, et al. v. Countrywide Financial Corporation, et al.*; In the United States District Court for the Central District of California; Civil Action No. 2:10-CV-00302 MRP (MAN)
Provided expert report and deposition testimony.

2011 - *City of Ann Arbor Employees' Retirement System, et al. v. Citigroup Mortgage Loan Trust, Inc., et al.*; In the United States District Court for the Eastern District of New York; Civil Action No. 08-CV-01418
Provided expert report and deposition testimony.

2011 - *In re IndyMac Mortgage-Backed Securities Litigation*; In the United States District Court for the Southern District of New York; Civil Action No. 09-CIV-04583 (LAK)
Provided expert report and deposition testimony.

2011 - *Vasili Tsereteli and Vaszurele Ltd., et. al., v. Residential Asset Securitization Trust 2006-A8, Credit Suisse Securities (USA) LLC, Moody's Investor Service, Inc., and The McGraw-Hill Companies, Inc.*; In the United States District Court for the Southern District of New York; Civil Action No. 08-CV-10637 (LAK)
Provided expert report and deposition testimony.

2010 - *New Jersey Carpenters Vacation Fund, et. al., v. The Royal Bank of Scotland Group, plc, et. al*; In the United States District Court for the Southern District of New York; Civil Action No. 08-CV-5093 (HB)
Provided expert report and deposition testimony.

A-8

2009 - *WFC Holdings Corporation v. United States of America*; In the United States District Court for the District of Minnesota; Civil Action No. 07-CV-3320-JRT-FLN
Provided expert report, deposition testimony, and trial testimony.

# Appendix B

# Materials Relied Upon

## Academic Literature

- Case, Karl E., et al., "What Have They Been Thinking? Home Buyer Behavior in Hot and Cold Markets," *Brookings Papers on Economic Activity*, Fall 2012.
- Dattels, Peter, et. al., "Global Financial Stability Report: Market Developments and Issues," *International Monetary Fund,* April 10, 2007.
- Foote, Christopher L., et al., "Why Did So Many People Make So Many Ex Post Bad Decisions? The Causes of the Foreclosure Crisis," *Federal Reserve Bank of Boston Public Policy Discussion Papers,* July 20, 2012.
- Goodman, Laurie S., et al., "Benefiting from Extension Risk in the Non-Agency Market," *The Journal of Fixed Income,* Winter 2010.
- Goodman, Laurie S., et al., *Subprime Mortgage Credit Derivatives,* 2008.
- Gerardi, Kristopher, et al., "Decomposing the Foreclosure Crisis: House Price Depreciation versus Bad Underwriting," *Federal Reserve Bank of Atlanta Working Paper Series,* September 2009.
- Hayre, Lakhbir, *Salomon Smith Barney Guide to Mortgage-Backed and Asset-Backed Securities*, 2001.

## Data Sources

- ABSNet.net
- Bloomberg
- Capital IQ
- Factiva
- Interactive Data Corporation (IDC)
- S&P/Case-Shiller Home Price Index
- Westlaw

## Depositions



## Government Publications

- "Financial Crisis Inquiry Report," *Financial Crisis Inquiry Commission*, January 2011.

## Industry Publications

- "Aladdin Capital Management LLC, Private Investment Firm Profile," *Capital IQ*, accessed on February 23, 2011.
- "Moody's Takes Negative Rating Actions on Certain IndyMac Alt-A Deals Issued in 2006 and Late 2005," *Moody's Investors Service,* November 13, 2007.
- "U.S. Alt-A RMBS Class Affected by December 19, 2007 Rating Actions," *Standard & Poor's,* December 19, 2007.
- Hudson, Mike, "IndyMac: What Went Wrong?" *Center for Responsible Lending,* June 30, 2008.
- Rocco, Joseph A., "Early Defaults Rise in Mortgage Securitizations," *Moody's Investors Service,* January 18, 2007.

## Legal Filings

- Amended Complaint, *Tripp v. IndyMac Bancorp, Inc.,* No. 07-CV-1635 (C.D. Cal.), September 7, 2007.
- Complaint, *Cedeno v. IndyMac Bancorp, Inc., et al.*, No. 06-CV-6438 (S.D.N.Y.), August 25, 2006.
- Complaint, *IBEW Local 103 v. IndyMac MBS, Inc., et al.*, No. BC405843 (Cal. Super. Ct. L.A. Cnty.), January 20, 2009.
- Complaint, *Police & Fire Retirement System of Detroit v. IndyMac MBS, Inc. et al.*, No. 09-CV-04583-LAK (S.D.N.Y.), May 14, 2009.
- Complaint, *Reese v. IndyMac Financial, Inc.*, No. 07-CV-01635 (C.D. Cal.), March 19, 2007.
- Complaint, *Tsereteli v. RAST 2006-A8, et al.*, No. 08-CIV-10637 (S.D.N.Y.), November 19, 2006.
- Declaration of Anthony D. Phillips, *In re: IndyMac Mortgage-Backed Securities Litigation*, Master Docket No. 09-CIV-04583 (LAK), August 30, 2013.

██████████████████████████████████

- Expert Report of Professor Steven P. Feinstein, Ph.D., CFA, *In re: IndyMac Mortgage-Backed Securities Litigation,* Master Docket No. 09-CIV-04583 (LAK), August 30, 2013.
- Expert Report of Walter N. Torous, Ph.D., *In re: IndyMac Mortgage-Backed Securities Litigation,* Master Docket No. 09-CIV-04583 (LAK), February 28, 2011.
- *In re: IndyMac Mortgage-Backed Securities Litigation,* 286 F.R.D. 226 (S.D.N.Y. August 17, 2012).

- Lead Plaintiffs' Reply Memorandum in Further Support of Their Motion for Class Certification, *In re: IndyMac Mortgage-Backed Securities Litigation*, Master Docket No. 09-CIV-04583 (LAK), April 8, 2011.
- Memorandum of Law in Support of Lead Plaintiffs' Motion to Expand the Certified Class to Include Additional Offerings of Mortgage Pass-Through Certificates, *In re: IndyMac Mortgage-Backed Securities Litigation*, Master Docket No. 09-CIV-04583 (LAK), August 30, 2013.
- Rebuttal Expert Report of Professor Steven P. Feinstein, Ph.D., CFA, *In re: IndyMac Mortgage-Backed Securities Litigation,* Master Docket No. 09-CIV-04583 (LAK), April 8, 2011.

**News Articles and Press Releases**

- "Lenders Made Wholesale Exceptions to Underwriting Policies in 2006 to Try and Correct Thinning Margins in the Subprime Market," *Securitization News,* December 22, 2006.
- "2006 Subprime Mortgage Collateral Heads South-DBRS," *Reuters News,* December 11, 2006.
- "Alt-A Backed Rating Methodology Refined," *Mortgage Servicing News,* September 1, 2007.
- ████████████████████████████████████████████
- "Bank Regulators Issue Warnings," *National Mortgage News,* November 6, 2006.
- ████████████████████████████████████████████
- "Bleak Houses – American Mortgages," *The Economist,* February 17, 2007.
- "Comptroller Dugan Urges Improved Underwriting Standards On Third Party Loans," *States News Service,* October 8, 2007.
- "Defaults Go Up and Prices Go Down," *Mortgage Servicing News,* October 1, 2007.
- "Did Big Lenders Cross the Line?, Lawsuits assert some firms doctored loan documents," *Bloomberg BusinessWeek,* August 20, 2007.
- "Editorial: $1 Billion Here, $1 Billion There," *National Mortgage News,* December 11, 2006.
- "Entering its Prime," *National Mortgage News,* June 7, 2004.
- "Fitch: Is the U.S. Consumer Prepared for Rising Interest Rates?," *Business Wire,* June 16, 2004.
- "Fitch: U.S. Alt-A RMBS Faced With Potential Landmines," *Business Wire,* October 12, 2004.
- "IndyMac Seized by FDIC; Office of Thrift Supervision Reproaches Sen. Schumer," *AFX Asia,* July 11, 2008.
- "IO, Option ARM Guidance May Have Chilling Effect," *Home Equity Wire,* January 1, 2006.
- "Lenders Asked to Stem Home Defaults," *Monterey County Herald,* May 16, 2007.
- "Mortgage Froth Worries Fed.," *Home Equity Wire,* June 15, 2005.
- ████████████████████████████████████████████
- "Option ARMs, Low Doc, Piggyback Loan Worries," *Home Equity Wire,* October 15, 2005.
- "Rising damp – Subprime lending," *The Economist,* March 10, 2007.
- "Roundup: S&P Eyeing 200+ Alternative-A Credit RMBS Classes," *National Mortgage News,* August 20, 2007.
- "Subprime Lending Rising Damp – Will Turbulence in America's Subprime Mortgage Market Spread?," *The Economist,* March 8, 2007.
- "Subprime Subsidence – Mortgage lending," *The Economist,* December 16, 2006.
- "Subprime Litigation," *FT.com,* April 10, 2007.

B-3

- "US Subprime Turmoil Claims Another Victim," *Guardian Unlimited*, June 28, 2007.
- "When It Goes Wrong...," *The Economist,* September 22, 2007.
- Abreu, Steven M., "The Alt-A Mortgage Problem? Too Many Rookies Making Loans," *American Banker,* May 27, 2004.
- Adelson, Mark and Jacob, David, "ABS/MBS Litigation Outlook," *Asset Securitization Report,* November 19, 2007.
- Adelson, Mark, "U.S. Fixed Income 2005 Outlook/2004 Review*," Nomura Fixed Income Research,* December 16, 2004.
- Anderson, Jenny, "Wall St. Firms Hurt by the Subprime Lending Fallout," *The New York Times,* June 15, 2007.
- Andrews, Edmund L., "Rising Rates Could be Trouble for Some Homeowners; Buyers with Most of Income Wrapped Up in House May be Squeezed," *The Milwaukee Journal Sentinel,* July 4, 2004.
- Anusha Shrivastava, "ABS Subprime Loan Deals Churned Out At Higher Premiums," *Dow Jones Newswires,* December 8, 2006.
- Bajaj, Vikas and Haughney, Christine, "Tremors at the Door," *The New York Times,* January 26, 2007.
- Bajaj, Vikas, "Bankers' Lesson From Mortgage Mess: Sell, Don't Hold," *The New York Times,* November 5, 2007.
- Bajaj, Vikas, "If Everyone's Finger-Pointing, Who's to Blame?," *The New York Times,* January 22, 2008.
- Barr, Alistair, "Subprime Mortgage Woes May Be Spreading," *MarketWatch,* March 11, 2007.
- Beales, Richard and Spikes, Sarah, "Scrutiny grows on US subprime lenders," *FT.com,* March 4, 2007.
- Beckner, Steven K., "Fed'l Regulators Working on Guidance to Curb Risky Mortgage Loans," *Market News International,* November 10, 2005.
- Bergman, Hannah, "Fast-Growing Loan Lines Show Stress," *American Banker,* December 6, 2004.
- Berry, Kate and Shenn, Jody, "Countrywide's Suit Illustrates Exception Risk," *American Banker,* September 29, 2006.
- Berry, Kate, "Fast Defaults Spur Earlier Intervention," *American Banker,* November 27, 2006.
- Bhaktavatsalam, Sree Vidya, and Christopher Condon, "BlackRock to Earn $71 Million to Oversee Maiden Lane," *Bloomberg,* July 14, 2009.
- Bielski, Lauren, "Helping Handoff: More Profitable Than Vanilla Lending, But More "High Maintenance," Specialty- And Consumer Lending Thrive With Outsource Partners (Outsourced Lending)," *ABA Banking Journal,* October 1, 2006.
- Bisbey Colter, Allison, "2005 Vintage Of Subprime Mortgage ABS May Not Age Well," *Dow Jones Newswires,* January 27, 2006.
- Church, Steven and Bradley Keoun, "American Home Files for Bankruptcy," *The Miami Herald,* August 6, 2007.
- Collins, Brian, "Borrowers Fib About Income," *National Mortgage News,* July 24, 2006.

- Collins, Brian, "Fed Tallies 'Nontraditional' Mortgage Percentages," *Origination News,* September 1, 2005.
- Collins, Brian, "IOs/POAs Spark Concern," *National Mortgage News,* August 21, 2006.
- Comtois, James, "UBS: 2006 Vintage Shaping Up as a Bad One; 'We Were a Bit Surprised at the Magnitude and Speed at Which this Vintage Year Deteriorated'," *National Mortgage News,* November 27, 2006.
- Cornwell, Ted, "Defaults Set Record," *National Mortgage News,* March 10, 2008.
- Cornwell, Ted, "Lenders Refocus on Borrower's Capacity to Pay," *Mortgage Servicing News,* July 1, 2007.
- Cranford, John, "Political Economy: 'Home' to Roost?," *CQ Weekly,* January 12, 2007.
- Craver, Richard, "The Other Side Of The Housing Boom; More Triad People Are Buying Homes, But Risky Mortgages Put Them In Danger; A Wider Swath: All Kinds Of Homeowners Affected," *Winston-Salem Journal,* October 1, 2006.
- Der Hovanesian, Mara, "Nightmare Mortgages," *Business Week,* September 11, 2006.
- Dreman, David, "Bad Times Ahead? The Market Will Be Volatile For A While. But The Subprime Mess Won't Prompt A Recession. So Good Bargains Are To Be Had," *Forbes,* April 23, 2007.
- Edwards, Will and Elizabeth Hester, "Mortgage Defaults Hurt Lenders Countrywide Financial, Indymac And Friedman, Billings All Posted Weaker First-Quarter Earnings," *Orlando Sentinel,* April 27, 2007.
- Eisinger, Jesse, "Long & Short: Mortgage Market Begins to See Cracks As Subprime-Loan Problems Emerge," *The Wall Street Journal,* August 30, 2006.
- England, Robert Stowe, "Pushing the Edge on Alternative-A," *Mortgage Banking,* February 1, 2004.
- Feldheim, David, "Interest-Only Mortgage Loans Role Grows In Home-Equity Deals*," Dow Jones Newswires,* May 7, 2004.
- Garrahan, Matthew, "Zero US Effort' On Housing Slammed," *Financial Times,* October 30, 2007.
- Griffin, Greg, David Olinger and Jeffrey A. Roberts, "Foreclosing on the American Dream," *The Denver Post,* September 17, 2006.
- Hadar, Leon, "Subprime Loans Crisis Offers Some Lessons," *Business Times Singapore,* March 15, 2007.
- Harney, Kenneth R., "Subprime Mortgage Market inT," *San Jose Mercury News,* February 16, 2007.
- Harney, Kenneth R., "Lies are Growing in Loan Process," *The Washington Post,* July 30, 2005.
- Harney, Kenneth R., "Subprime Market's Sinking Fortunes," *The Washington Post,* February 17, 2007.
- Heavens, Alan J., "Rules Aim to Cut Risks on 'Exotic' Mortgages," *The Philadelphia Inquirer,* October 15, 2006.
- Hernandez, Jaime O., "High-risk Loans Take Toll on Both Lenders, borrowers; Capital Sources," *Broward Daily Business Review,* February 28, 2007.
- Hopkins, Cheyenne, "Mortgage Buyers, Legislators Argue On Laying Blame," *American Banker,* May 9, 2007.
- Hyde, Paul and Saumya, Shubh , "Viewpoint: Mortgage Crisis Exposed System Flaws," *American Banker,* September 7, 2007.

- Isidore, Chris, "'Liar Loans': Mortgage Woes Beyond Subprime," *CNNMoney.com,* March 19, 2007.
- Jackson, Paul, "Moody's Downgrades 388 Alt-A RMBS Classes; Warns on 254 Aaa-rated Tranches," *Housing Wire,* April 23, 2008.
- Kaiser, Emily, "UPDATE 1-Sen. Clinton-Wall St Must Share Blame for Subprime," *Reuters News,* December 5, 2007.
- Kaper, Stacy, "GAO Study: Foreclosure Level to Top One Million; Report's views on causes may support assignee liability," *American Banker,* October 16, 2007.
- Kaper, Stacy, "OCC Study Links Disclosure, Foreclosure," *American Banker,* August 31, 2006.
- Kopecki, Dawn, "Exotic New Mortgages Loans Could Lead To Rise In Delinquencies*," Dow Jones Newswires,* May 3, 2005.
- Lagomarsino, Deborah, "Fed Survey: Alternative Mortgages Less Than 25% Of All Mortgages," *Dow Jones Newswires,* August 15, 2005.
- Lagomarsino, Deborah, "Fed Bies: Worry US Borrowers 'Increasingly Speculative'," *Dow Jones Newswires,* June 14, 2005.
- Laing, Jonathan R., "Review & Preview Follow-Up -- A Return Visit to Earlier Stories: A Subprime Lender's Woes Aren't Over," *Barron's,* February 12, 2007.
- Leckey, Andrew, "Lure of Easy Credit Tends to End with a Hard Lesson*," Chicago Tribune,* August 26, 2007.
- Leinfuss, Nancy, "UPDATE 2-Benchmark ABX subprime indexes sink to record lows*," Reuters News,* August 16, 2007.
- LePage, Andrew, "Popular Loan Can Be A Stretch; With Stated-Income Mortgages, Some May Blur Truth To Get Into A Home - And Get In Over Their Heads," *The Sacramento Bee,* December 5, 2004.
- Mavin, Duncan, "Housing Market Fallout: HSBC Says Profit Will Be Hit By Soaring Sub-Prime Home-Mortgage Defaults," *National Post,* February 9, 2007.
- Maxey, Henry, "A Subprime Tale of Silliness and Irrational Behavior," *Financial Times,* July 12, 2007.
- McAllister, Sue, "Loans Without Proof of Income," *San Jose Mercury News,* November 26, 2004.
- Mildenberg, David, "IndyMac Reports $202.7 Million Loss on Late Payments (Update6)," *Bloomberg News,* November 6, 2007.
- Mitchell, Eve, "Tighter Lending Standards Make Home Loans Hard to Get," *Oakland Tribune,* July 20, 2007.
- Morse, Neil J, "Servicing's Tough New Challenges," *Mortgage Banking,* February 1, 2007.
- Mullins, Luke, "In Brief: Bies Warns of Real Estate Lending Risks," *American Banker,* October 13, 2005.
- Paletta, Damian, "Fed's Bies: Banks Must Recognize Mortgage Lending Risks," *Dow Jones Newswires,* January 11, 2007.
- Paletta, Damian, "Subprime Players Get Washington Summons --- Regulators Ask Wall Street If Investor Demand Led To Looser Loan Standards," *The Wall Street Journal,* March 28, 2007.
- Paletta, Damian, "US Senate Democrats Urge Fed To Curb Subprime Lending Abuses," *Dow Jones Newswires*, April 23, 2007.

- Paletta, Damian and Blackstone, Brian, "No Big Subprime Spillover Seen Into Economy," *Dow Jones Newswires,* May 17, 2007.
- Paletta, Damian, "OCC Chief Warns Of Growing Dangers Of 'Stated Income' Loans," *Dow Jones Newswires,* May 23, 2007.
- Paletta, Damian, "U.S. Tightens Rules for Subprime Loans --- Bank Regulators Tell Mortgage Lenders to Toughen Criteria," *The Wall Street Journal,* July 2, 2007.
- Petruno, Tom, "Cheap Loans Are Under Fire," *Los Angeles Times,* September 18, 2005.
- ███████████████████████████████
- Powell, Joy, "Here Come The Foreclosures; Low Rates And Aggressive Lending Let Some Overreach For The American Dream. Now, They're A Stumble Away From Losing It," *Star-Tribune,* June 11, 2006.
- Pyburn, Allison, "ABS CDS Contracts Under Scrutiny," *Asset Securitization Report,* November 20, 2006.
- Pyburn, Allison, "2006 HE ABS Vintage: the Worse Ever?," *Asset Securitization Report,* November 27, 2006.
- Pyburn, Allison, "Home Price Growth Flounders in Q1," *Asset Securitization Report,* May 29, 2006.
- Pyburn, Allison, "Who's Playing Who in Subprime?," *Asset Securitization Report,* September 19, 2005.
- Reed, Danielle, "Beyond Subprime: Problems Simmer For Alt-A Bonds, CDOs," *Dow Jones Newswires,* March 28, 2007.
- Richardson, Karen and Ng, Serena, "Bond Insurers Appear Shaky As Credit Climate Worsens," *The Wall Street Journal,* November 8, 2007.
- Richardson, Karen, "Double Trouble for Mortgage Shares: Dual-Loan Borrowers Pose Added Risk," *The Wall Street Journal,* December 12, 2006.
- Rucker, Patrick, "Wall Street Often Shelved Damaging Subprime Reports," *Reuters News,* July 27, 2007.
- Sanders, Bob, "As Housing Market Cools, Foreclosure Rate Rises," *New Hampshire Business Review,* September 1, 2006.
- Scholtes, Saskia, "High-risk Loans Revealing Shaky Foundations," *Financial Times,* January 11, 2007.
- Scholtes, Saskia, "S&P Could Cut Ratings on Alt-A loans," *Financial Times,* August 7, 2007.
- Scholtes, Saskia, "Subprime Bonds in Ratings Downgrades," *FT.com,* July 10, 2007.
- Scholtes, Saskia, "Subprime Woes Fuel Concern for CDO Holdings," *Financial Times,* March 2, 2007.
- Scholtes, Saskia, "Warning on Home-backed Bonds – Subprime Mortgages," *Financial Times,* December 22, 2006.
- Sender, Henny, "Hedge Funds' Risky Bets Come to Roost --- Subprime Investments Are Starting to Hurt, Highlighting Volatility," *The Wall Street Journal,* March 8, 2007.
- Shenn, Jody, "'Prime,' 'Subprime,' 'Nonprime' – Does it Matter?," *American Banker,* October 21, 2005.
- Shenn, Jody, "'05 Home Loan Delinquency Rise a Riddle," *American Banker,* May 23, 2006.
- Shenn, Jody, "How Lenders Cut Risk on Low-Doc Loans," *American Banker,* October 26, 2004.

- Shenn, Jody, "Moody's Says Some 'Alt A' Mortgages Are Like Subprime (Update3)," *Bloomberg,* July 31, 2007.
- Shenn, Jody, "Mortgage Risk Debate Heating Up," *American Banker,* May 5, 2005.
- Shenn, Jody, "OFHEO's New Worry at Fannie; Report cites credit risk, liquidity soft spots," *American Banker,* June 16, 2005.
- Shenn, Jody, "WaMu Tightens Rules for Mortgages, UBS AG Stops Accepting No-documentation Loans," *Seattle Post-Intelligencer,* August 8, 2007.
- Shrivastava, Anusha, "Murky World Of Alt-A Loans Gives Bond Investors Pause," *Dow Jones Newswires,* May 10, 2007.
- Shrivastava, Anusha, "S&P Warns About Alt-A Mortgage Bond Deal For First Time," *Dow Jones Newswires,* February 15, 2007.
- Shrivastava, Anusha, "Asset-Backed Issuance To Slow Amid Housing Market Troubles," *Dow Jones Newswires,* December 20, 2006.
- Shrivastava, Anusha, "Mortgage Delinquency Levels Could Go Higher, Says S&P," *Dow Jones Newswires,* March 13, 2007.
- Simon, Ruth and Hudson, Michael, "Whistling Past Housing's Graveyard? --- Bad Loans Draw Bad Blood," *The Wall Street Journal,* October 9, 2006.
- Simon, Ruth, "Late Payments on Mortgages Rise – Studies Find Higher Loan Delinquencies Stemming From 2005's Lending Boom," *The Wall Street Journal,* May 18, 2006.
- Simon, Ruth, "Mortgage Lenders Loosen Standards --- Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules," *The Wall Street Journal,* July 26, 2005.
- Simpson, Glenn R., "Loan Data Focus of Probe," *The Wall Street Journal,* March 11, 2008.
- Sloan, Steven, "Fed Official Says Some Systems Are Vulnerable," *American Banker,* October 18, 2006.
- Stein, Gabrielle, "Subprime Contagion Spreads to Prime RMBS?," *Asset Securitization Report,* August 6, 2007.
- Steverman, Ben, "Mortgage Crisis Roughs Up IndyMac: The Mortgage Lender, Which Provides 'Alt-A' Loans, Suffers as the Mortgage Crisis Spreads," *BusinessWeek Online,* July 18, 2007.
- Tedeschi, Bob, "Mortgages: The Growing Problem of Fraud," *The New York Times,* July 9, 2006.
- Terris, Harry and Kate Berry, "Warning Puts Alt-A Loans In Spotlight," *American Banker,* July 2, 2007.
- Thetgyi, Olivia, "Subprime Shorting Hedge Fund To Launch," *Securitization News,* September 15, 2006.
- Tyson, James, Torres, Craig and Vekshin, Alison, "Fed Admits To Subprime Inaction; 'We Could Have Done More Sooner,' Bank Director Tells Senate Hearings Amid Fears Crisis Will Spread," *The Toronto Star,* March 23, 2007.
- Veiga, Alex, "Industry Tightens Standards on 'No Proof' Loans Amid Subprime Woes," *Associated Press Newswires,* April 2, 2007.
- Veiga, Alex, "U.S. Foreclosures Jump Sharply in July," *Associated Press,* August 21, 2007.
- Wei, Lingling and Enrich, David, "Ameriquest Empire Once High Flying May Find Citi A Buyer," *Dow Jones Newswires,* February 14, 2007.

- White, Brenda B., "Change Is the Only Constant," *Mortgage Banking,* October 1, 2007.
- White, Brenda B., "The Emergence of Alt-A," *Mortgage Banking,* April 1, 2006.
- Wiggins, Jenny, "Interest Rate Rises to Hit Households' Debt Loads," *Financial Times (FT.Com),* August 9, 2004.
- Yip, Pamela, "Borrowing Trouble Looser Lending Leads to More Homeownership - and more foreclosures," *The Dallas Morning News,* August 29, 2004.
- Yoon, Al, "Subprime Home Loan Improvement Sparse, Lenders Say," *Reuters News,* January 31, 2007.
- Yoon, Al, "U.S. Bond Group Urges Subprime Loan Modifications," *Reuters News,* June 6, 2007.
- Zelman, Ivy L., et al., "Mortgage Liquidity du Jour: Underestimated No More," *Credit Suisse,* March 12, 2007.

**Prospectus Supplements and Other Company Filings**

█████████████████████████████████████

█████████████████████████████████████

- IndyMac Bancorp 2007 Annual Report, February 12, 2008.
- IndyMac INDX Mortgage Loan Trust 2006-AR21 Trustee Report, August 2013.
- IndyMac INDA Mortgage Loan Trust 2006-AR1 Trustee Report, August 2013.
- IndyMac INDX Mortgage Loan Trust 2006-AR23 Trustee Report, August 2013.
- IndyMac INDX Mortgage Loan Trust 2006-AR25 Trustee Report, August 2013.
- IndyMac INDX Mortgage Loan Trust 2006-R1 Trustee Report, August 2013.
- Residential Asset Securitization Trust 2006-A11 Trustee Report, August 2013.
- IndyMac INDX Mortgage Loan Trust 2006-AR27 Trustee Report, August 2013.
- IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series 2006-H3 Trustee Report, August 2013.
- Residential Asset Securitization Trust 2006-A12 Trustee Report, August 2013.
- Residential Asset Securitization Trust 2006-A13 Trustee Report, August 2013.
- Residential Asset Securitization Trust 2006-R2 Trustee Report, August 2013.
- Residential Asset Securitization Trust 2006-A14CB Trustee Report, August 2013.
- IndyMac INDX Mortgage Loan Trust 2006-AR33 Trustee Report, August 2013.
- Residential Asset Securitization Trust 2006-A15 Trustee Report, August 2013.
- IndyMac INDX Mortgage Loan Trust 2006-AR37 Trustee Report, August 2013.
- IndyMac INDX Mortgage Loan Trust 2006-AR41 Trustee Report, August 2013.
- IndyMac INDA Mortgage Loan Trust 2007-AR1 Trustee Report, August 2013.
- Residential Asset Securitization Trust 2007-A1 Trustee Report, August 2013.
- IndyMac INDX Mortgage Loan Trust 2007-AR5 Trustee Report, August 2013.
- Residential Asset Securitization Trust 2007-A5 Trustee Report, August 2013.
- IndyMac INDX Mortgage Loan Trust 2007-AR9 Trustee Report, August 2013.
- IndyMac INDA Mortgage Loan Trust 2007-AR2 Trustee Report, August 2013.

- IndyMac INDX Mortgage Loan Trust 2007-FLX3 Trustee Report, August 2013.
- IndyMac IMSC Mortgage Loan Trust 2007-F1 Trustee Report, August 2013.
- IndyMac INDX Mortgage Loan Trust 2007-AR17 Trustee Report, August 2013.
- IndyMac INDX Mortgage Loan Trust 2007-AR15 Trustee Report, August 2013.
- IndyMac IMSC Mortgage Loan Trust 2007-AR1 Trustee Report, August 2013.
- IndyMac IMSC Mortgage Loan Trust 2007-F2 Trustee Report, August 2013.
- Residential Asset Securitization Trust 2007-A8 Trustee Report, August 2013.
- IndyMac IMSC Mortgage Loan Trust 2007-HOA1 Trustee Report, August 2013.
- IndyMac INDX Mortgage Loan Trust 2007-AR19 Trustee Report, August 2013.
- IndyMac IMSC Mortgage Loan Trust 2007-F3 Trustee Report, August 2013.
- IndyMac IMJA Mortgage Loan Trust 2007-A3 Trustee Report, August 2013.
- IndyMac INDX Mortgage Loan Trust 2007-AR21IP Trustee Report, August 2013.
- IndyMac INDA Mortgage Loan Trust 2007-AR8 Trustee Report, August 2013.
- IndyMac INDA Mortgage Loan Trust 2007-AR9 Trustee Report, August 2013.
- IndyMac IMJA Mortgage Loan Trust 2007-A4 Trustee Report, August 2013.
- IndyMac IMJA Mortgage Loan Trust 2007-A1 Trustee Report, August 2013.
- IndyMac IMJA Mortgage Loan Trust 2007-A2 Trustee Report, August 2013.
- IndyMac INDA Mortgage Loan Trust 2006-AR2 Trustee Report, August 2013.
- IndyMac INDA Mortgage Loan Trust 2007-AR7 Trustee Report, August 2013.
- IndyMac INDX Mortgage Loan Trust 2006-AR14 Trustee Report, August 2013.
- Residential Asset Securitization Trust 2006-A7CB Trustee Report, August 2013.
- IndyMac INDX Mortgage Loan Trust 2006-AR13 Trustee Report, August 2013.
- IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series 2006-H2 Trustee Report, August 2013.
- IndyMac INDX Mortgage Loan Trust 2006-AR15 Trustee Report, August 2013.
- IndyMac INDX Mortgage Loan Trust 2006-AR29 Trustee Report, August 2013.
- IndyMac INDX Mortgage Loan Trust 2006-AR35 Trustee Report, August 2013.
- IndyMac INDX Mortgage Loan Trust 2006-FLX1 Trustee Report, August 2013.
- IndyMac Residential Mortgage Backed Trust, INDYL 2006-L2 Trustee Report, August 2013.
- IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series 2006-D Trustee Report, August 2013.
- IndyMac INDX Mortgage Loan Trust 2006-AR21 Prospectus Supplement, June 27, 2006.
- IndyMac INDA Mortgage Loan Trust 2006-AR1 Prospectus Supplement, June 28, 2006.
- IndyMac INDX Mortgage Loan Trust 2006-AR23 Prospectus Supplement, July 25, 2006.
- IndyMac INDX Mortgage Loan Trust 2006-AR25 Prospectus Supplement, July 27, 2006.
- IndyMac INDX Mortgage Loan Trust 2006-R1 Prospectus Supplement, July 28, 2006.
- Residential Asset Securitization Trust 2006-A11 Prospectus Supplement, August 29, 2006.
- IndyMac INDX Mortgage Loan Trust 2006-AR27 Prospectus Supplement, August 29, 2006.
- IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series 2006-H3 Prospectus Supplement, September 27, 2006.
- Residential Asset Securitization Trust 2006-A12 Prospectus Supplement, September 27, 2006.
- Residential Asset Securitization Trust 2006-A13 Prospectus Supplement, October 26, 2006.

- Residential Asset Securitization Trust 2006-R2 Prospectus Supplement, October 30, 2006.
- Residential Asset Securitization Trust 2006-A14CB Prospectus Supplement, November 2, 2006.
- IndyMac INDX Mortgage Loan Trust 2006-AR33 Prospectus Supplement, November 28, 2006.
- Residential Asset Securitization Trust 2006-A15 Prospectus Supplement, November 28, 2006.
- IndyMac INDX Mortgage Loan Trust 2006-AR37 Prospectus Supplement, December 27, 2006.
- IndyMac INDX Mortgage Loan Trust 2006-AR41 Prospectus Supplement, December 28, 2006.
- IndyMac INDA Mortgage Loan Trust 2007-AR1 Prospectus Supplement, January 29, 2007.
- Residential Asset Securitization Trust 2007-A1 Prospectus Supplement, January 30, 2007.
- IndyMac INDX Mortgage Loan Trust 2007-AR5 Prospectus Supplement, March 29, 2007.
- Residential Asset Securitization Trust 2007-A5 Prospectus Supplement, March 29, 2007.
- IndyMac INDX Mortgage Loan Trust 2007-AR9 Prospectus Supplement, April 26, 2007.
- IndyMac INDA Mortgage Loan Trust 2007-AR2 Prospectus Supplement, April 26, 2007.
- IndyMac INDX Mortgage Loan Trust 2007-FLX3 Prospectus Supplement, April 27, 2007.
- IndyMac IMSC Mortgage Loan Trust 2007-F1 Prospectus Supplement, May 29, 2007.
- IndyMac INDX Mortgage Loan Trust 2007-AR17 Prospectus Supplement, June 27, 2007.
- IndyMac INDX Mortgage Loan Trust 2007-AR15 Prospectus Supplement, June 27, 2007.
- IndyMac IMSC Mortgage Loan Trust 2007-AR1 Prospectus Supplement, June 28, 2007.
- IndyMac IMSC Mortgage Loan Trust 2007-F2 Prospectus Supplement, June 28, 2007.
- Residential Asset Securitization Trust 2007-A8 Prospectus Supplement, June 29, 2007.
- IndyMac IMSC Mortgage Loan Trust 2007-HOA1 Prospectus Supplement, June 29, 2007.
- IndyMac INDX Mortgage Loan Trust 2007-AR19 Prospectus Supplement, July 30, 2007.
- IndyMac IMSC Mortgage Loan Trust 2007-F3 Prospectus Supplement, August 30, 2007.
- IndyMac IMJA Mortgage Loan Trust 2007-A3 Prospectus Supplement, September 25, 2007.
- IndyMac INDX Mortgage Loan Trust 2007-AR21IP Prospectus Supplement, November 5, 2007.
- IndyMac INDA Mortgage Loan Trust 2007-AR8 Prospectus Supplement, November 29, 2007.
- IndyMac INDA Mortgage Loan Trust 2007-AR9 Prospectus Supplement, December 21, 2007.
- IndyMac IMJA Mortgage Loan Trust 2007-A4 Prospectus Supplement, December 26, 2007.
- IndyMac IMJA Mortgage Loan Trust 2007-A1 Prospectus Supplement, June 28, 2007.
- IndyMac IMJA Mortgage Loan Trust 2007-A2 Prospectus Supplement, August 30, 2007.
- IndyMac INDA Mortgage Loan Trust 2006-AR2 Prospectus Supplement, August 29, 2006.
- IndyMac INDA Mortgage Loan Trust 2007-AR7 Prospectus Supplement, September 27, 2007.
- IndyMac INDX Mortgage Loan Trust 2006-AR14 Prospectus Supplement, October 30, 2006.
- Residential Asset Securitization Trust 2006-A7CB Prospectus Supplement, May 30, 2006.
- IndyMac INDX Mortgage Loan Trust 2006-AR13 Prospectus Supplement, May 30, 2006.
- IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series 2006-H2 Prospectus Supplement, June 26, 2006.
- IndyMac INDX Mortgage Loan Trust 2006-AR15 Prospectus Supplement, May 26, 2006.
- IndyMac INDX Mortgage Loan Trust 2006-AR29 Prospectus Supplement, September 28, 2006.
- IndyMac INDX Mortgage Loan Trust 2006-AR35 Prospectus Supplement, November 29, 2006.
- IndyMac INDX Mortgage Loan Trust 2006-FLX1 Prospectus Supplement, September 27, 2006.
- IndyMac Residential Mortgage Backed Trust, INDYL 2006-L2 Prospectus Supplement, June 14, 2006.
- IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series 2006-D Prospectus Supplement, September 7, 2006.

- IndyMac INDA Mortgage Loan Trust 2007-AR1 Prospectus, January 29, 2007.
- IndyMac INDX Mortgage Loan Trust 2006-AR15 Prospectus, April 25, 2006.
- "Insurance Investments," AIG Insurance Investment Portfolios, AIG Investor Meeting, December 5, 2007.
- █████████████████████████████
  ████████████████████
- S&P Case-Shiller Home Price Indices, available at <http://www.standardandpoors.com/indices/sp-case-shiller-home-price-indices /en/us/?indexId=spusa-cashpidff--p-us---->, accessed on January 14, 2011.

**Speeches**

- Bernanke, Ben, "Housing, Mortgage Markets, and Foreclosures," Speech at the Federal Reserve System Conference on Housing and Mortgage Markets, December 4, 2008.

**Underwriting Guidelines Produced in Discovery**

- ALLREGS_0000001 - ALLREGS_0010130
- DBSI_0014297 - DBSI_0014303
- CS_0015995 - CS_0016017
- CS_0016020 - CS_0016042
- CS_0136906 - CS_0136975
- CS_0136976 - CS_0136978
- CS_0139037 - CS_0139106
- CS_0139108 - CS_0139110
- CS_0043181 - CS_0043237
- CS_0046606 - CS_0046610
- CS_0046611 - CS_0046667
- CS_0110038 - CS_0110044
- CS_0139727 - CS_0139733
- CS_0050561 - CS_0050565
- CS_0050566 - CS_0050622
- CS_0050662 - CS_0050666
- CS_0050667 - CS_0050723
- CS_0047059 - CS_0047063
- CS_0047064 - CS_0047120
- CS_0110048 - CS_0110117
- CS_0110118 - CS_0110120
- CS_0110126 - CS_0110195
- CS_0110196 - CS_0110198
- CS_0111245 - CS_0111294

- CS_0112241 - CS_0112247
- CS_0112248 - CS_0112253
- CS_0111321 - CS_0111327
- CS_0111328 - CS_0111333
- CS_0120456 - CS_0120460
- CS_0120461 - CS_0120517
- CS_0140822 - CS_0140871
- CS_0140872 - CS_0140928
- CS_0140929 - CS_0140958
- CS_0140959 - CS_0140984
- CS_0140985 - CS_0140992
- CS_0140993 - CS_0141007
- CS_0141011 - CS_0141060
- CS_0141061 - CS_0141117
- CS_0141118 - CS_0141147
- CS_0141148 - CS_0141173
- CS_0141174 - CS_0141181
- CS_0141182 - CS_0141196
- CS_0141198 - CS_0141247
- CS_0141248 - CS_0141304
- CS_0141305 - CS_0141334
- CS_0141335 - CS_0141360
- CS_0141361 - CS_0141368
- CS_0141369 - CS_0141383
- CS_0142455 - CS_0142511
- CS_0143557 - CS_0143606
- CS_0143607 - CS_0143663
- CS_0143664 - CS_0143693
- CS_0143694 - CS_0143719
- CS_0143720 - CS_0143727
- CS_0143728 - CS_0143742
- CS_0143945 - CS_0144001
- CS_0141812 - CS_0141868
- CS_0144472 - CS_0144521
- CS_0144522 - CS_0144578
- CS_0144580 - CS_0144629
- CS_0144630 - CS_0144686
- CS_0144726 - CS_0144775
- CS_0144776 - CS_0144832
- CS_0144834 - CS_0144883
- CS_0144884 - CS_0144940

- CS_0046682 - CS_0046738
- CS_0051317 - CS_0051373
- CS_0046777 - CS_0046833
- CS_0051836 - CS_0051892
- CS_0051913 - CS_0051969
- CS_0051153 - CS_0051202
- CS_0051203 - CS_0051259
- RBS_0062521 - RBS_0062528
- RBS_0065296 - RBS_0065345
- CS_0118085 - CS_0118088
- CS_0118396 - CS_0118402
- CS_0118403 - CS_0118410
- CS_0118415 - CS_0118469
- JPMSL 0050107 - JPMSL 0050111
- JPMSL 0050112 - JPMSL 0050168
- JPMSL 0139388 - JPMSL 0139444
- JPMSL 0139445 - JPMSL 0139449
- JPMSL 0139836 - JPMSL 0139892
- JPMSL 0139893 - JPMSL 0139897
- JPMSL 0139999 - JPMSL 0140055
- JPMSL 0140375 - JPMSL 0140431
- JPMSL 0140432 - JPMSL 0140436
- CS_0052067 - CS_0052069
- CS_0052079 - CS_0052080
- CS_0112281 - CS_0112441
- CS_0112458 - CS_0112490
- CS_0112542 - CS_0112574
- CS_0112575 - CS_0112582
- CS_0112583 - CS_0112635
- CS_0112636 - CS_0112685
- CS_0112686 - CS_0112742
- CS_0112743 - CS_0112772
- CS_0112773 - CS_0112798
- CS_0112799 - CS_0112806
- RBS_0082487 - RBS_0082536
- JPMSL 0033974 - JPMSL 0033978
- JPMSL 0033979 - JPMSL 0034035
- JPMSL 0034139 - JPMSL 0034143
- JPMSL 0034144 - JPMSL 0034200
- JPMSL 0034202 - JPMSL 0034251
- JPMSL 0034252 - JPMSL 0034308

- JPMSL 0034309 - JPMSL 0034310
- JPMSL 0034311 - JPMSL 0034352
- JPMSL 0073983 - JPMSL 0074039
- JPMSL 0074040 - JPMSL 0074041
- JPMSL 0074042 - JPMSL 0074083
- JPMSL 0074084 - JPMSL 0074133
- CS_0052803 - CS_0052807
- CS_0052808 - CS_0052864
- CS_0052894 - CS_0052950
- CS_0053740 - CS_0053789
- CS_0053790 - CS_0053846
- CS_0053847 - CS_0053876
- CS_0053877 - CS_0053902
- CS_0053903 - CS_0053910
- CS_0053911 - CS_0053925
- CS_0053928 - CS_0053977
- CS_0053978 - CS_0054034
- CS_0054101 - CS_0054105
- CS_0054106 - CS_0054162
- CS_0054169 - CS_0054173
- CS_0054174 - CS_0054230
- CS_0117165 - CS_0117214
- CS_0121706 - CS_0121710
- CS_0121711 - CS_0121767
- CS_0121790 - CS_0121846
- CS_0121847 - CS_0121851
- CS_0121854 - CS_0121858
- CS_0121887 - CS_0121891
- CS_0121892 - CS_0121948
- CS_0122139 - CS_0122143
- CS_0122144 - CS_0122200
- CS_0122203 - CS_0122207
- CS_0122208 - CS_0122264
- CS_0120780 - CS_0120784
- CS_0120785 - CS_0120841
- CS_0120849 - CS_0120853
- CS_0120854 - CS_0120910
- CS_0148963 - CS_0148963
- CS_0148964 - CS_0148970
- CS_0148971 - CS_0149008
- CS_0149009 - CS_0149043

- CS_0149044 - CS_0149071
- CS_0149073 - CS_0149073
- CS_0149074 - CS_0149104
- CS_0149105 - CS_0149111
- CS_0149112 - CS_0149149
- CS_0149150 - CS_0149184
- CS_0054283 - CS_0054339
- CS_0054341 - CS_0054397
- CS_0051264 - CS_0051282
- CS_0054468 - CS_0054486
- JPMSL 0009675 - JPMSL 0009679
- JPMSL 0009680 - JPMSL 0009736
- JPMSL 0024789 - JPMSL 0024793
- JPMSL 0024794 - JPMSL 0024850
- DBSI_0079714 - DBSI_0079720
- DBSI_0079734 - DBSI_0079740
- DBSI_0080339 - DBSI_0080345
- DBSI_0036334 - DBSI_0036340
- DBSI_0036347 - DBSI_0036353
- DBSI_0072340 - DBSI_0072346
- DBSI_0084494 - DBSI_0084500

**<u>Websites</u>**



- "███████████████████
███████████████████████████████████

- "Credit Missteps – How Their Effect on FICO Scores Vary,"
<http://www.myfico.com/crediteducation/questions/credit_problem_comparison.aspx>, accessed on October 23, 2013.

- "Interpreting Your Score,"
<https://www.wellsfargo.com/credit_center/credit_status/understand/interpreting>, accessed on October 23, 2013.

# APPENDIX C

A.    **Different Members Of The Putative Class, Which Spans More Than Seven Years, Had Different Information Depending On When They Purchased**

1.    Different putative class members had different information depending on when they purchased during the more than seven-year period that the Proposed Expanded Class currently encompasses.

2.    Exhibit 1 and Exhibit 2 illustrate the types of information that emerged from January 2004 through December 2008 regarding underwriting practices in the Alt-A mortgage market,[1] in which IndyMac was the largest player,[2] and in subprime and non-prime mortgage markets.  Among other things, relaxed underwriting standards, aggressive lending practices, and the expansion of "nontraditional" loan products were widely reported.[3]  At the same time, there were reports of increased borrower fraud.[4]  Given the reports of aggressive lending practices and increased borrower fraud, industry observers noted that it had become exceptionally difficult to quantify the default risk of potential borrowers.[5]

3.    Even before any of the at-issue securitizations here occurred, the press had reported "concerns about the [A]lt-A mortgage market: lax underwriting standards, a propensity

---

[1]    "Alt-A loans are typically (but not exclusively) made to 'A' quality credit borrowers whose mortgage characteristics encompass a wide range of loan balances, LTVs, documentation types, and so on."  See Hayre, Lakhbir, *Salomon Smith Barney Guide to Mortgage-Backed and Asset-Backed Securities*, 2001, p. 281.

[2]    Isidore, Chris, "'Liar Loans': Mortgage Woes Beyond Subprime," *CNNMoney.com*, March 19, 2007.

[3]    Simon, Ruth, "Late Payments on Mortgages Rise – Studies Find Higher Loan Delinquencies Stemming From 2005's Lending Boom," *The Wall Street Journal*, May 18, 2006; Mullins, Luke, "In Brief:  Bies Warns of Real Estate Lending Risks," *American Banker*, October 13, 2005; Simon, Ruth, "Mortgage Lenders Loosen Standards – Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income, and Debt-Load Rules," *The Wall Street Journal*, July 26, 2005.

[4]    Collins, Brian, "Borrowers Fib About Income," *National Mortgage News*, July 24, 2006; Harney, Kenneth R., "Lies are Growing in Loan Process," *The Washington Post*, July 30, 2005; Tedeschi, Bob, "Mortgages: The Growing Problem of Fraud," *The New York Times*, July 9, 2006.

[5]    "Bleak Houses - American Mortgages," *The Economist*, February 17, 2007.

for borrowers to 'misstate' their incomes, and 'no doc' programs being used to mask qualification issues."[6]  In September 2006, the press reported that "exotic" mortgage loan products "that require no proof of income" had resulted in increased foreclosures.[7]  Such reports led investors to conduct their own market investigations, such ███████████████████ ████████████████████████████

4.        Numerous questions were specifically raised about IndyMac's underwriting practices.  In August 2006, for example, a putative class action lawsuit was filed alleging that IndyMac "promote[d] and encourage[d] the inflation of valuation results."[9]  In January 2007, Moody's reported that "[m]ortgages backing securities issued in late 2005 and early 2006 have had sharply higher rates of foreclosure, real estate owned (REO) and loss than previously issued securities at similar, early points in their lives."[10]  In February 2007, the press reported that "90 percent of stated-income mortgage applicants 'had inflated incomes compared to IRS documents,'" with "60 percent of them exaggerat[ing] their incomes by 50 percent or more."[11]

5.        On March 19, 2007, a lawsuit was filed alleging that IndyMac's "underwriting guidelines [failed] to adequately manage the risk of loan delinquencies."[12]  That same day, *CNNMoney.com* reported statements of industry experts describing Alt-A loans as "liar loans"

---

[6]    Steven M. Abreu, "The Alt-A Mortgage Problem? Too Many Rookies Making Loans," *American Banker*, May 27, 2004.

[7]    Greg Griffin, David Olinger & Jeffrey A. Roberts, "Foreclosing on the American Dream," *The Denver Post*, September 17, 2006.

[8]    ████████████████████████████████████████

[9]    Complaint in *Cedeno v. IndyMac Bancorp, Inc., et al.*, No. 06-CV-6438 (S.D.N.Y.), August 25, 2006, paragraph 40.3,

[10]   Joseph A. Rocco, "Early Defaults Rise in Mortgage Securitizations," *Moody's Investors Service*, January 18, 2007.

[11]   Kenneth R. Harney, "Subprime Market's Sinking Fortunes," *The Washington Post*, February 17, 2007.

[12]   Complaint in *Reese v. IndyMac Financial, Inc.*, No. 07-CV-01635 (C.D. Cal.), March 19, 2007, paragraph 29.

based on "little or no verification of income," and identified IndyMac as "the biggest Alt. A lender."[13]

6.      On July 18, 2007, *BusinessWeek Online* reported that "[b]uyers who take out Alt-A loans . . . submit little documentation" and that "IndyMac, as one of the country's biggest Alt-A originators, is vulnerable as the defaults rise among the loans."[14]  And on September 7, 2007, the amended complaint in the lawsuit filed against IndyMac in March 2007 alleged that IndyMac had "greatly loosened its underwriting guidelines in order to drive up volume and bring in more loan sales" and adopted a policy of "'pushing through' unqualified loans."[15]

7.      In November 2007, it was reported that IndyMac's losses were five times larger than had been forecasted, as "[b]orrowers with the worst credit histories are failing to keep up with higher payments on adjustable-rate mortgages."[16]  In that same month, Moody's downgraded its ratings for 57 IndyMac-sponsored RMBS, including a number of the at-issue certificates in the Proposed Expanded Class.[17]  One month later, Standard & Poor's downgraded its ratings for 45 IndyMac-sponsored RMBS, including a number of the at-issue certificates in the Proposed Expanded Class.[18]

8.      In a February 2008 letter to shareholders, IndyMac's Chairman and CEO acknowledged that the company's "innovative home lending went too far," resulting in a

---

[13]  Isidore, Chris,  "'Liar Loans': Mortgage Woes Beyond Subprime," *CNNMoney.com*, March 19, 2007.

[14]  Steverman, Ben, "Mortgage Crisis Roughs Up IndyMac: The Mortgage Lender, Which Provides 'Alt-A' Loans, Suffers as the Mortgage Crisis Spreads," *BusinessWeek Online*, July 18, 2007.

[15]  Amended Complaint, paragraphs 39, 55, in *Tripp v. IndyMac Bancorp, Inc.*, No. 07-CV-1635 (C.D. Cal.), September 7, 2007.

[16]  David Mildenberg, "IndyMac Reports $202.7 Million Loss on Late Payments (Update6)," *Bloomberg News*, November 6, 2007.

[17]  "Moody's takes negative rating actions on certain IndyMac Alt-A deals issued in 2006 and late 2005," *Moody's Investors Service*, November 13, 2007.

[18]  "U.S. Alt-A RMBS Class Affected by December 19, 2007 Rating Actions," *Standard & Poor's*, December 19, 2007.

"systemic underestimation of credit risk."[19]  By April 2008, Moody's downgraded RMBS from 75 Alt-A offerings, 46 of which were IndyMac-sponsored offerings.[20]

9.     On June 30, 2008, the Center for Responsible Lending published a report (the "CRL Report") stating that "[l]ike many other lenders during the housing and mortgage boom of 2003-2006, IndyMac moved away from documenting borrowers' incomes and assets – basic information that's crucial to determining whether consumers can afford a loan."[21]  On July 11, 2008, the Office of Thrift Supervision seized IndyMac.[22]

10.     ███████████████████████████████████

███████████████████████████████████████████████████

███████

11.     In November 2008, a putative class action lawsuit was filed in the U.S. District Court for the Southern District of New York, alleging that IndyMac had abandoned its loan underwriting guidelines in connection with the loan collateral for an IndyMac-sponsored securitization.[23]  And in January 2009, a putative class action lawsuit was filed in California state court alleging that IndyMac had abandoned its loan underwriting guidelines in connection with the loan collateral for 105 IndyMac-sponsored securitizations.[24]  In May 2009, another putative class action lawsuit was filed in the U.S. District Court for the Southern District of New York

---

[19]   IndyMac Bancorp 2007 Annual Report, p. 4, February 12, 2008.

[20]   Paul Jackson, "Moody's Downgrades 388 Alt-A RMBS Classes; Warns on 254 Aaa-rated Tranches," *Housing Wire*, April 23, 2008, *available at* <http://www.housingwire.com/2008/04/23/moodys-downgrades-388-alt-a-rmbs-classes-warns-on-254-aaa-rated-tranches>.

[21]   Hudson, Mike, "IndyMac:  What Went Wrong?" *Center for Responsible Lending*, June 30, 2008, p. 3.

[22]   "IndyMac seized by FDIC; Office of Thrift Supervision reproaches Sen. Schumer," AFX Asia, July 11, 2008.

[23]   Complaint in *Tsereteli v. RAST 2006-A8, et al.*, No. 08 Civ. 10637 (S.D.N.Y.), November 19, 2006.

[24]   Complaint in *IBEW Local 103 v. IndyMac MBS, Inc., et al.*, No. BC405843 (Cal. Super. Ct. L.A. Cnty.), January 20, 2009.

alleging that IndyMac had abandoned its loan underwriting guidelines in connection with the loan collateral for 74 IndyMac-sponsored securitizations.[25]

12.     In addition to the foregoing information about IndyMac's underwriting practices, putative class members who purchased certificates in the months or years following their initial offerings had full access to additional information regarding the performance of the certificates and the loans underlying them than did initial investors.  As disclosed in the offering documents for the at-issue securitizations, monthly trustee reports would be made publicly available on the internet.[26]

13.     These monthly trustee reports provided cumulative and monthly information regarding the performance of the certificates, including a breakdown of the principal and interest payments to each certificate, the extent to which any losses had occurred, and aggregated and loan-by-loan reports on delinquencies and foreclosures in the underlying collateral groups.[27]

**B.     The Putative Class Is Comprised Of Investors Who Undertook *Independent* Research, Investigation, And Analyses Beyond The Review Of Offering Documents And Publicly Available Information**

14.     In addition to the changing mix of information over time, there would have been different inquiries by different putative class members because the Proposed Expanded Class is predominantly comprised of investors who were leading players in the RMBS markets and whose advisors had distinct and proprietary methods for evaluating RMBS investments and undertook *independent* research, investigation, and analyses beyond the review of offering documents and publicly available information.

---

[25]   Complaint in *Police & Fire Retirement System of Detroit v. IndyMac MBS, Inc. et al.*, No. 09-cv-04583-LAK (S.D.N.Y.), May 14, 2009.

[26]   See, for example, INDA 2007-AR1 Prospectus, pp. 33-34; INDX 2006-AR15 Prospectus, pp. 33-34.

[27]   See, for example, Trustee reports of at-issue offerings, August 2013, Deutsche Bank Investor Reporting, available at: <https://tss.sfs.db.com/investpublic/>.



16.    To illustrate the range of investors in the proposed class, I describe below the

businesses and roles in the MBS markets of some of the entities in the proposed class:











17.     The *independent* research, analyses, and due diligence undertaken by these and

other putative class members[54] beyond the review of offering documents and publicly available

information likely included one or more of the following:

- Evaluating mortgage originators, their respective underwriting guidelines, and a securitization's underlying servicer(s) through due diligence conducted by their own internal credit departments

- Conducting sensitivity analyses of expected certificate performance based on the underlying collateral performance, which would include taking into account collateral statistics, home price changes, and adjustments to default or loss expectations to account for less stringent underwriting

- Contacting rating agencies to ascertain corporate debt rating, performance ratings on the originator/servicer, credit enhancement structure, certificate rating, and views on expected collateral performance

- Speaking or meeting with originators, along with the issuer and servicer, on a regular basis to discuss underwriting guidelines and practices, including exceptions to guidelines that could carry a greater risk of delinquency and default, and to uncover any changes to underwriting guidelines, market conditions, and loan performance

- Attending conferences on the ABS/MBS market and reading research reports on the industry from broker/dealers and third parties

**C.     Differences In Investor Knowledge Necessitate Individualized Inquiries**

18.     Plaintiffs seek to certify a single class consisting of each and every investor in 629

different securities over a period of more than seven years.

---

53  

54

19.     In light of the changing mix of information about IndyMac's underwriting practices and the performance of the at-issue certificates and loan collateral over time, the different research, analyses and due diligence undertaken by different investors beyond the review of offering documents and publicly available information, and the indefinite time period for the Proposed Expanded Class, individualized inquiries will be required to assess each investor's knowledge, or lack thereof, of the alleged misstatements and omissions.

**Exhibit 1**
**Selected Public Knowledge about Underwriting Standards in the Alt-A Mortgage Market**
**January 2004 - December 2008**



**Note:**
[1] The Case-Shiller Home Price Index Composite (10) tracks monthly changes in the value of the residential real estate market in 10 metropolitan regions (Boston, Chicago, Denver, Las Vegas, Los Angeles, Miami, New York, San Diego, San Francisco, and Washington DC). The Case-Shiller indices use a value-weighted repeat sales pricing technique to measure changes in these housing markets. Seasonally adjusted values are used for this analysis.

**Sources:**
[1] S&P/Case-Shiller Home Price Indices, <http://www.standardandpoors.com/indices/sp-case-shiller-home-price-indices/en/us/?indexId=spusa-cashpidff--p-us---->, accessed on January 14, 2011.
[2] Press articles and other public references; Factiva.

**Exhibit 2**
**Selected Public Knowledge about Underwriting Standards in the Subprime and Non-Prime Mortgage Market**
**January 2004 - December 2008**



Note:
[1] The Case-Shiller Home Price Index Composite (10) tracks monthly changes in the value of the residential real estate market in 10 metropolitan regions (Boston, Chicago, Denver, Las Vegas, Los Angeles, Miami, New York, San Diego, San Francisco, and Washington DC). The Case-Shiller indices use a value-weighted repeat sales pricing technique to measure changes in these housing markets. Seasonally adjusted values are used for this analysis.

Sources:
[1] S&P/Case-Shiller Home Price Indices, <http://www.standardandpoors.com/indices/sp-case-shiller-home-price-indices/en/us/?indexId=spusa-cashpidff--p-us---->, accessed on January 14, 2011.
[2] Press articles and other public references; Factiva.