**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re INDYMAC MORTGAGE-BACKED SECURITIES LITIGATION | Master Docket No. 09-Civ. 04583 (LAK) ECF CASE |
| This Document Relates To:     ALL ACTIONS | |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR FINAL APPROVAL OF THE UNDERWRITER
DEFENDANT SETTLEMENT AND THE PROPOSED PLAN OF
<u>ALLOCATION, AND FINAL CERTIFICATION OF THE SETTLEMENT CLASS</u>**

# **TABLE OF CONTENTS**

**PAGE**

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................... 5

ARGUMENT ....................................................................................................... 5

I.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE
      UNDER THE APPLICABLE LEGAL STANDARD, AND SHOULD
      THEREFORE BE APPROVED ................................................................... 5

      A.    The Standard For Evaluating Class Action Settlements ........................ 5

      B.    Application Of The Grinnell Factors Supports Approval Of The
            Settlement .................................................................................... 6

            1.    The Complexity, Expense And Likely Duration Of The Action
                  Favor Final Approval Of The Partial Settlement ........................ 6

            2.    The Settlement Class' Reaction To The Settlement Favors Final
                  Approval ................................................................................ 10

            3.    The Stage Of The Proceedings And The Amount Of Information
                  Reviewed And Analyzed Favor Final Approval Of The Settlement ........ 11

            4.    The Risks Of Establishing Liability And Damages Favor Final
                  Approval Of The Partial Settlement .......................................... 14

                  a)    The Risks of Establishing Liability ................................... 14

                  b)    The Risks of Establishing Damages .................................. 18

            5.    The Risk Of Maintaining The Action As A Class Action Through
                  Trial Favors Final Approval Of The Settlement .......................... 21

            6.    The Underwriter Defendants' Ability To Withstand A Greater
                  Judgment ............................................................................... 24

            7.    The Range Of Reasonableness Of The Underwriter Defendant
                  Settlement Fund In Light Of The Best Possible Recovery And All
                  The Attendant Risks Of Litigation Supports Approval Of The
                  Settlement .............................................................................. 24

8.  The Settlement Was Reached After Arm's-Length Negotiations With The Assistance Of An Experienced Mediator And Is Procedurally Fair .................................................................. 26

II.   THE PLAN OF ALLOCATION IS FAIR AND REASONABLE AND SHOULD BE APPROVED ......................................................................... 28

III.   NOTICE TO THE SETTLEMENT CLASS SATISFIED RULE 23 AND DUE PROCESS .................................................................................... 31

IV.   THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS ................................ 33

CONCLUSION .................................................................................... 34

# TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*Chatelain v. Prudential-Bache Sec., Inc.*,
  805 F. Supp. 209 (S.D.N.Y. 1992) ................................................................................... 22

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974),
  *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*,
  209 F.3d 43 (2d Cir. 2000) ................................................................................... passim

*Cotton v. Hinton*,
  559 F.2d 1326 (5th Cir. 1977) ................................................................................... 7

*County of Suffolk v. Long Island Lighting Co.*,
  907 F.2d 1295 (2d Cir. 1990) ................................................................................... 6

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156, 94 S. Ct. 2140, 2150 (1974)................................................................. 32

*In re Am. Bank Note Holographics, Inc., Sec. Litig.*,
  127 F. Supp. 2d 418 (S.D.N.Y. 2001) .................................................... 10, 15, 21

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,
  No. MDL 1500, 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006)................................. 13

*In re Citigroup, Inc. Sec, Litig.*,
  965 F. Supp. 2d 369 (S.D.N.Y. 2013) .................................................... 10, 24

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
  No. 05 Civ. 10240 (CM), 2007 WL 2230177 (S.D.N.Y. July 27, 2007) ............ 27

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
  No. 02-CV-3400 (CM)(PED), 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ...... 15

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
  279 F.R.D. 151 (S.D.N.Y. 2011) ................................................................. 19

*In re Global Crossing Sec. & ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) ................................................... 6, 10, 30

*In re IMAX Sec. Litig.*,
  283 F.R.D. 178 (S.D.N.Y. 2012) ................................................................. 11

*In re Indep. Energy Holdings PLC Sec. Litig.*,
No. 00 Civ. 6689 (SAS), 2003 WL 22244676 (S.D.N.Y. Sept. 29, 2003)............................ 27

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
233 F.R.D. 306 (E.D.N.Y. 2006) ....................................................................... 7

*In re Merrill Lynch Tyco Research Sec. Litig.*,
249 F.R.D. 124 (S.D.N.Y. 2008) ....................................................................... 6

*In re Milken & Assocs. Sec. Litig.*,
150 F.R.D. 46 (S.D.N.Y. 1993) ......................................................................... 7

*In re PaineWebber Ltd. P'ships Litig.*,
171 F.R.D. 104 (S.D.N.Y.)
*aff'd*, 117 F.3d 721 (2d Cir. 1997)................................................... 13, 21, 24

*In re Sony Corp. SXRD*,
448 Fed. Appx. 85 (2d Cir. 2011).................................................................... 5

*In re Sony SXRD Rear Projection Television Class Action Litig.*,
No. 06 Civ. 5173, 2008 WL 1956267 (S.D.N.Y. May 1, 2008)........................... 24

*In re Sumitomo Copper Litig.*,
189 F.R.D. 274 (S.D.N.Y. 1999) ....................................................................... 6

*In re Telik, Inc. Sec. Litig.*,
576 F. Supp. 2d 570 (S.D.N.Y. 2008).............................................................. 30

*In re Veeco Instruments Inc. Sec. Litig.*,
No. 05 MDL 0165 (CM), 2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) ....................... 13, 27

*In re WorldCom, Inc. Sec. Litig.*,
388 F. Supp. 2d 319 (S.D.N.Y. 2005) .............................................................. 5

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005) ........................................................................... 19

*Maley v. Del Global Techs. Corp.*,
186 F. Supp. 2d 358 (S.D.N.Y. 2002) ................................................ 10, 11, 15, 30

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co. (Goldman)*,
693 F.3d 145 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1624 (2013)................... 3, 7

*Newman v. Stein*,
464 F.2d 689 (2d Cir. 1972) ........................................................................... 25

*Padro v. Astrue*,
No. 11-CV-1788 (CBA)(RLM), 2013 WL 5719076 (E.D.N.Y. Oct. 18, 2013) ................. 26

*Park v. The Thompson Corp.*,
   No. 05 Civ. 2931 (WHP), 2008 WL 4684232 (S.D.N.Y. Oct. 22, 2008)............................ 21

*Shapiro v. JPMorgan Chase & Co.*,
   No. 11 Civ. 8331 (CM)(MHD), 2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ... 7, 10, 24, 26

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
   396 F.3d 96 (2d Cir. 2005) ......................................................... 5, 25, 26, 32

*Weinberger v. Kendrick*,
   698 F.2d 61 (2d Cir. 1982) .................................................................. 32

*White v. First Am. Registry, Inc.*,
   No. 04 Civ. 1611 (LAK), 2007 WL 703926 (S.D.N.Y. Mar. 7, 2007) ................................. 6

**Statutes**

15 U.S.C. § 77k(b) ................................................................................. 14, 18

15 U.S.C. § 77k(e) ................................................................................. 19, 29

15 U.S.C. § 77l(b) ................................................................................. 14, 18

15 U.S.C. § 77z-1(a)(7) ............................................................................. 32

15 U.S.C. § 78u-4(f)(2)(B) .......................................................................... 20

Fed. R. Civ. P. 23(a) ................................................................................ 33

Fed. R. Civ. P. 23(b)(3) ............................................................................. 34

Fed. R. Civ. P. 23(c)(2)(B) .......................................................................... 32

Fed. R. Civ. P. 23(e) ................................................................................. 5

Fed. R. Civ. P. 23(e)(1) ............................................................................. 32

Fed. R. Civ. P. 23(e)(2) .............................................................................. 5

**Other Authorities**

4 A. Conte, H.B. Newberg, *Newberg on Class Actions* § 11.41 (4th ed. 2002) .......................... 26

L.T. Bulan, E.M. Ryan, L.E. Simmons, *Securities Class Action Settlements, 2013 Review
   and Analysis*, Cornerstone Research (2014) ......................................................... 26

Lead Plaintiffs Wyoming Retirement System and Wyoming State Treasurer,[1] on behalf of themselves and the Settlement Class,[2] respectfully submit this memorandum in support of their motion for (i) final approval of the proposed settlement with the Underwriter Defendants;[3] (ii) final certification of the Settlement Class; and (iii) final approval of the proposed Plan of Allocation.

## INTRODUCTION

The Settlement achieved by Lead Plaintiffs with the Underwriter Defendants – which provides for a $340 million cash payment – is the **second largest class action recovery** for MBS investors since the 2008 financial crisis, and it is the **largest class action settlement amount solely against underwriters** where there was no solvent issuer-defendant.[4]  Egan Decl. ¶7.[5]

The Settlement is the product of five years of hard-fought litigation, and resulted from intensive, arm's-length negotiations conducted under the auspices of the Honorable Edward

---

[1]  All capitalized terms not otherwise defined herein have the same meaning as set forth in the Amended Stipulation and Agreement of Settlement, dated September 19, 2014 and filed on September 22, 2014 ("Stipulation") (ECF No. 539-1).

[2]  The Settlement Class is defined as:  All persons or entities who at any time purchased or otherwise acquired interests in the Certificates and have suffered damages.  Excluded from the Settlement Class are those persons or entities who purchased or otherwise acquired Certificates, but who have filed individual actions to separately pursue claims against the Settling Defendants relating to the Certificates or who have filed a valid request for exclusion in accordance with the requirements set forth in the Notice.  Also excluded from the Settlement Class are Defendants, their officers and directors at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which the Defendant has or had a controlling interest, except for any Investment Vehicle, to the extent such entities themselves had a proprietary (*i.e.*, for their own account) interest in the Certificates and not to the extent that they held Certificates in a fiduciary capacity or otherwise on behalf of any third-party client, account, fund, trust, or employee benefit plan that otherwise falls within the Settlement Class.  A complete list of the Certificates covered by the Settlement appeared on Table A-1 to the Court-approved Proof of Claim form circulated with the Notice.

[3]  The "Underwriter Defendants," also called the "Settling Defendants," are:  Credit Suisse Securities (USA) LLC; Deutsche Bank Securities, Inc.; J.P. Morgan Securities LLC (f/k/a J.P. Morgan Securities Inc.) (in its own right and as successor-in-interest to Bear Stearns & Co., Inc.); RBS Securities, Inc. (as successor-in-interest to Greenwich Capital Markets, Inc.); Morgan Stanley & Co., LLC (f/k/a Morgan Stanley & Co. Incorporated); and UBS Securities LLC.

[4]  Lead Plaintiffs also reached a $6 million settlement with the Individual Defendants, which bring the total settlements in this action to $346 million.

[5]  IndyMac Bank, the sponsor and issuer of the offerings in this case, is no longer in existence, and IndyMac MBS, Inc., the depositor for the offerings, is judgment proof.

Infante (Ret.), a nationally-respected mediator, with extensive experience overseeing negotiations of complex securities class action.

The parties reached Settlement at an advanced stage in the litigation, by which time Lead Plaintiffs and Lead Counsel had developed a thorough understanding of the strengths and weaknesses of the claims and defenses in the Action. They reviewed and analyzed over eleven million documents and loan files produced by the Federal Deposit Insurance Corporation ("FDIC") (IndyMac documents), defendants and third parties, consulted closely with experts and took, defended and/or prepared for a number of depositions. Lead Plaintiffs and Lead Counsel retained industry experts to engage in (i) re-underwriting a sample pool of the mortgages underlying the Certified Offerings; and (ii) assessing the quality of the Underwriter Defendants' due diligence. Lead Counsel also worked closely with damage experts on issues of establishing damages and rebutting defendants' inevitable challenges both to damages and causation against the backdrop of the 2008 financial crisis where this case had its genesis.

In sum, with the able assistance of counsel for the other Settlement Class Representatives, Lead Counsel: (i) conducted a thorough investigation into the facts for the preparation of the Second Amended Complaint; (ii) exhaustively briefed and argued defendants' motions to dismiss; (iii) conducted and defended both percipient witness and expert discovery related to class certification, successfully briefed motions for class certification, which included exchanging expert reports, taking/defending depositions of Lead Plaintiffs, third parties and experts, and successfully defeating defendants' Rule 23(f) petition; (iv) briefed motions for reconsideration; (v) briefed various discovery motions; (vi) fully briefed a motion to expand the certified class to include additional Offerings of mortgage pass-through certificates; (vii) conducted extensive discovery relating to the claims and underlying events and transactions

alleged in the Second Amended Complaint, including searching, culling and reviewing over eleven million documents, serving rounds of written discovery, deposing former and current employees of the defendants and interviewing dozens of witnesses; and (viii) consulted with experts on loan re-underwriting, due diligence, statistical sampling, valuation and damages.[6]

The Settlement should be viewed against the substantial risks and uncertainty of continued litigation. ***First***, as referenced above, the sponsor of the Offerings, IndyMac Bank, is no longer in existence and IndyMac MBS, Inc., is uncollectible. This fact not only limited the scope of collectible defendants, it also exposed plaintiffs to evidentiary issues regarding the admissibility of key documents. ***Second***, the Underwriter Defendants vigorously asserted ***complete*** affirmative defenses concerning the Underwriter Defendants' due diligence, negative causation and damages, any of which had the potential to absolve the Underwriter Defendants of liability altogether. ***Third***, there was significant uncertainty whether the Court would grant the pending expanded class certification motion as to the forty-two additional Offerings reinstated by the Court following the Second Circuit decision in *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co. (Goldman)*, 693 F.3d 145 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1624 (2013). An adverse class certification ruling would have wiped out any recovery for investors in these forty-two additional Offerings. ***Fourth***, given the number of Offerings at issue, the complicated factual nature of the Offerings and the heavy reliance of expert testimony (assuming Lead Plaintiffs were able to maintain a certified class action and survive the Underwriter Defendants' anticipated summary judgment motions), there would be real risks of jury confusion

---

[6] Berman DeValerio was appointed lead counsel. Other counsel playing a significant role in the prosecution of the consolidated cases working under lead counsel's direction include (i) Cohen Milstein Sellers & Toll PLLC, (ii) Cohen, Placitella & Roth, P.C., (iii) Kohn, Swift & Graf, P.C., (iv) Lieff Cabraser Heimann & Bernstein, LLP, (v) Schnader Harrison Segal & Lewis, LLP/Trujillo Rodriguez & Richards, LLC, (vi) Wolf Haldenstein Adler Freeman & Herz LLP, and (vii) Zwerling, Schachter & Zwerling, LLP. The specific contributions of each of the participating plaintiffs law firms are set forth in the accompanying joint and individual applications for a fee award of $44.89 million.

had the case proceeded to trial on liability and damages. **Fifth,** these risks were further exasperated by the fact that MBS cases have given rise to numerous novel issues regarding proving liability through sampling, the valuation of MBS, the calculation of damages and the impact of the financial crisis on the value of MBS.

Accordingly, while Lead Counsel believes that the Settlement Class had strong claims, they recognized that the Settlement Class would have faced significant risks in overcoming these obstacles and establishing all the elements of Lead Plaintiffs' claims against the Underwriter Defendants. Lead Plaintiffs, the Wyoming State Treasurer and Wyoming Retirement System, both of whom have been actively involved in the prosecution and settlement of this Action, also strongly support the Settlement.

On September 30, 2014, the Court issued an order directing Lead Plaintiffs to provide notice of the Settlement to the Settlement Class. *See* ECF No. 541 ("Notice Order"). As detailed below, more than 6,800 notices were mailed to potential Settlement Class Members and/or their nominee holders. Moreover, Summary Notices were published in *Investors Business Daily*, over *PR Newswire*, and distributed via the Depository Trust & Clearing Corporation Legal Notice System. All notices were also posted on the websites of the Claims Administrator and Lead Counsel. While the deadline for objections and request for exclusion is not until January 13, 2015, to date, there have been no objections or requests for exclusions to the Settlement.

The $340 million Settlement achieved by Lead Plaintiffs avoids these risks and provides an immediate and very substantial financial benefit for the Settlement Class. In light of the significant obstacles to recovery, and the substantial time and expense that continued litigation would require, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement is an

outstanding result for the Settlement Class, and provides a fair and reasonable resolution of the claims against the Underwriter Defendants.

## STATEMENT OF FACTS

The Declaration of Patrick T. Egan in Support of Lead Plaintiffs' Motion For Final Approval of Class Action Settlement and Plan of Allocation and Motion For Attorneys' Fees and Reimbursement of Litigation Expenses ("Egan Decl." or "Egan Declaration"), which is attached as Exhibit 1 to the accompanying Compendium of Declarations ("Compendium"), details the factual and procedural background of this case and the events that lead to the Settlement.  For the sake of brevity, those facts will not be recited here.

## ARGUMENT

**I.   THE PROPOSED SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE UNDER THE APPLICABLE LEGAL STANDARD, AND SHOULD THEREFORE BE APPROVED**

### A.   The Standard For Evaluating Class Action Settlements

Under Rule 23(e) of the Federal Rules of Civil Procedure, a class action settlement must be approved by a court.  A settlement should be approved if the Court finds it "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2); *In re Sony Corp. SXRD*, 448 Fed. Appx. 85, 86 (2d Cir. 2011).  Courts in the Second Circuit realize the "strong judicial policy in favor of settlements, particularly in the class action context."  *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (citation and internal quotation marks omitted).[7]

The standards governing approval of class action settlements are well established in this Circuit.  In *City of Detroit v. Grinnell Corp.*, the U.S. Court of Appeals for the Second Circuit held that the following were factors to be considered in evaluating a class action settlement:

---

[7]   *See also In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 337 (S.D.N.Y. 2005) ("[P]ublic policy favors settlement, especially in the case of class actions.").

(1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of the litigation.[8]

Importantly, in deciding whether a settlement merits approval, "not every factor must weigh in favor of settlement, 'rather the court should consider the totality of these factors in light of the particular circumstances.'"  *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004) (citation omitted).[9]  Further, when weighing these factors, a court "should not attempt to approximate a litigated determination of the merits of the case lest the process of determining whether to approve a settlement simply substitute one complex, time consuming and expensive litigation for another."  *White v. First Am. Registry, Inc.*, No. 04 Civ. 1611 (LAK), 2007 WL 703926, at *2 (S.D.N.Y. Mar. 7, 2007) (Kaplan, J.) (footnote omitted).

Here, the Settlement clearly satisfies the criteria for approval articulated by the Second Circuit in *Grinnell*.

**B.    Application Of The Grinnell Factors Supports Approval Of The Settlement**

**1.    The Complexity, Expense And Likely Duration Of The Action Favor Final Approval Of The Partial Settlement**

By their nature, securities class actions are difficult and notoriously uncertain.  *See*, *e.g.*, *Sumitomo*, 189 F.R.D. at 281 (district courts in this Circuit "have long recognized" that securities class actions are "notably difficult and notoriously uncertain") (citation and internal quotation marks omitted).  Because it is "common knowledge that class action suits have a well deserved

---

[8]  *City of Detroit v. Grinnell Corp. (Grinnell)*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000) (citations omitted); *see also County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1323-24 (2d Cir. 1990); *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999).

[9]  *See also In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 134 (S.D.N.Y. 2008).

reputation as being most complex," courts acknowledge the "overriding public interest in favor of settlement" of class actions. *In re Milken & Assocs. Sec. Litig.*, 150 F.R.D. 46, 53 n.6 (S.D.N.Y. 1993) (citing *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)). Indeed, as one court noted, "[c]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006); *see also Shapiro v. JPMorgan Chase & Co.*, No. 11 Civ. 8331 (CM)(MHD), 2014 WL 1224666, at *8 (S.D.N.Y. Mar. 24, 2014)

Beyond its inherent complexities, this Action posed many challenges and delays particular to the claims alleged and to the mortgage-backed securities ("MBS") at issue related to nettlesome issues of standing, materiality, investor knowledge, causation and damages. *See* Egan Decl. ¶¶22, 108-117.

First, from the inception of the case through Settlement, there was significant uncertainty regarding the scope of the case, which has led to protracted and complex litigation. Specifically, Lead Plaintiffs initially pursued claims on behalf of all investors in 106 different offerings who purchased Certificates pursuant to registration statements filed with the Securities and Exchange Commission ("SEC") in 2005, 2006 and 2007. Egan Decl. ¶21. On June 21, 2010, this Court determined that Lead Plaintiffs lacked standing to represent investors in Offerings from which Lead Plaintiffs did not themselves purchase, effectively reducing the case against the Underwriter Defendants to just ten Offerings. *Id.* ¶23. Subsequently, the Second Circuit clarified effectively the issue of constitutional standing of a lead plaintiff in *Goldman* case in September 2012. *See Goldman*, *supra*, 693 F.3d 145. Based on this ruling, on May 9, 2013, the parties stipulated to the reinstatement of claims on behalf of investors relating to thirty-six

additional Offerings and the Court ordered the reinstatement of claims for an additional six Offerings on July 23, 2013 (for a total of forty-two additional Offerings). Egan Decl. ¶¶90-92.

Even then, there remained significant issues as to whether individual issues in MBS cases predominate over the common questions. When the parties reached settlement, the latest round of class certification briefing was complete, but the Court had not ruled. Egan Decl. ¶¶93-97. Regardless of how the Court would have ruled on class certification, the losing party would likely have appealed the ruling. *Id.*

An order on class certification was crucial because the scope of the case and necessary discovery was fraught with uncertainty pending the resolution of this motion. Until this motion was resolved and, despite being prepared with respect to the initial nine Certified Offerings, Lead Plaintiffs could not promptly proceed with depositions of key witnesses on behalf of the Underwriter Defendants on the Certified Offerings without risking not being able to re-depose these individuals after discovery regarding the additional forty-two Offerings was sufficiently advanced. Egan Decl. ¶¶71-73; *see also* Memo. Endorsement, March 18, 2014, ECF No. 526 ("Plaintiffs should understand, however, that the likelihood that this Court would permit a second deposition of any witness is minimal."). This additional discovery includes (i) obtaining a sampling of loan documents from the additional 57,831 loans underlying each of the 518 Certificates that were part of the forty-two additional Offerings; (ii) obtaining documents from the Underwriter Defendants and their due diligence vendors regarding the forty-two additional Offerings; and (iii) the time consuming expert re-underwriting of the new sample of loans. Egan Decl. ¶41. It is clear that the expansion of the case more than three years after inception of the case and the uncertainty regarding the scope of the class had led and would continue to lead to potentially significant time delays in the prosecution of this Action.

Second, because every element of MBS cases is proven primarily through expert testimony, fact discovery would be followed by very extensive expert discovery. There would then be extensive summary judgment practice regarding novel issues surrounding MBS securities class actions. For example, as discussed in further detail in Section I.B.4.b below, there are unresolved legal questions regarding how precisely damages should be calculated in an MBS case and whether falsity can be established through sampling. Indeed, since this Settlement resolves claims related to fifty MBS Offerings, which were backed by a pool of over 74,000 individual mortgage loans (Egan Decl. ¶165), much of the proof would be made through opinions by industry experts on compliance with underwriting guidelines, policies and procedures.

To demonstrate the falsity of the statements in the Offering Documents,[10] Lead Plaintiffs and Lead Counsel recognized the necessity of presenting an enormous amount of complex and detailed information about the design and structure of the Offerings as well as IndyMac's compliance with its underwriting guidelines and stated policies and practices regarding acquiring and securitizing loans purchased from third-party mortgage originators. To do so for such a large volume of loans, Lead Plaintiffs and their experts selected and analyzed a sample of the underlying loans using a statistically defensible approach to extrapolate the findings about the sample loans to the broader pools. Egan Decl. ¶¶75-76. This analysis, which at the time of Settlement was substantially complete for the Certified Offerings and underway for the recently added forty-two offerings, involved an extensive review by an expert team qualified and experienced in loan re-underwriting to opine on whether the loans met IndyMac's standards or whether IndyMac complied with its policies and procedures regarding the purchase of mortgages

---

[10] The Registration Statements, Prospectuses and Prospectus Supplements are referenced collectively as the "Offering Documents."

originated by third parties. *Id.* This type of proof would have resulted in a prolonged "battle of the experts" during expert discovery, summary judgment and trial. Similar expert battles would have been necessary respecting materiality, causation, damages and the Underwriter Defendants' affirmative defenses, including their individual due diligence defenses. Litigating the case through the remainder of discovery, extensive additional expert discovery, summary judgment and trial would therefore have necessitated an additional substantial investment of time and money.

By settling the Action at this juncture, Lead Plaintiffs have forestalled substantial, continued and uncertain litigation against the Underwriter Defendants and assured the Settlement Class of a tangible recovery now, rather than the high uncertainty associated with continued and protracted litigation.

## 2. The Settlement Class' Reaction To The Settlement Favors Final Approval

The reaction of the Settlement Class to the Settlement is a significant factor to be weighed in considering its adequacy. *See Shapiro*, 2014 WL 1224666, at *9 ("A small number of objections are convincing evidence of strong support by class members."); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002).[11]

Here, the reaction of the Settlement Class to date strongly indicates the fairness of the Settlement. Pursuant to the Court's September 30, 2014 Notice Order, 6,832 copies of the Notice were mailed to potential Settlement Class Members, banks, brokerage houses and nominees, and the Summary Notice was published in *Investor's Business Daily* and issued over the *PR Newswire* on October 20, 2014. *See* Affidavit of Jason Rabe Regarding Notice

---

[11] *See also In re Citigroup, Inc. Sec, Litig.*, 965 F. Supp. 2d 369, 382 (S.D.N.Y. 2013) ("A favorable reception by the class constitutes 'strong evidence' that a proposed settlement is fair." (quoting *Grinnell*, 495 F.2d at 462)); *In re Am. Bank Note Holographics, Inc., Sec. Litig.*, 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001); *Global Crossing*, 225 F.R.D. at 455.

Administration ("Mailing Aff."), attached as Exhibit 3 to the Compendium, at ¶¶12-14 & Exs. A-B, D-G.   While the deadline set by the Court for Settlement Class Members to exclude themselves or object to the Partial Settlement has not yet passed, to date there have been no requests for exclusion nor have there been any objections to the Settlement.   *Id.* ¶¶20-23.   The deadline for submitting objections and requesting exclusion from the Settlement Class is January 13, 2015.   *Id.*   Lead Plaintiffs will file reply papers with the Court on January 27, 2015 to address any timely objections or requests for exclusion.

### 3.   The Stage Of The Proceedings And The Amount Of Information Reviewed And Analyzed Favor Final Approval Of The Settlement

Another factor looks at "'whether the parties had adequate information about their claims,' such that their counsel can intelligently evaluate the 'merits of [p]laintiff's claims, the strengths of the defenses asserted by [d]efendants, and the value of [p]laintiffs' causes of action for purposes of settlement.'"   *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 190 (S.D.N.Y. 2012) (alteration in original) (citations omitted).   *See also Maley*, 186 F. Supp. 2d at 363 (to satisfy this factor, the parties need not have even engaged in formal or extensive discovery).

Lead Counsel had a clear understanding of the strengths and weaknesses of the case when it negotiated the Settlement.   The Settlement came about only after more than five years of litigation, during which the parties expended substantial effort and resources analyzing and litigating many of the key factual and legal issues in the case.   As set forth in the Egan Declaration, Lead Counsel's investigation and further development of the factual record included, amongst other things:

- Conducting a thorough pre-filing investigation, including interviewing witnesses, analyzing the Offering Documents and other public filings, and reviewing governmental and private reports prepared following investigations into IndyMac. Egan Decl. ¶21.

- Researching various legal issues including statute of limitations/repose issues and filing an initial complaint to preserve the claims of numerous class members. *Id.*

- Researching and drafting a detailed consolidated complaint based on factual investigation and legal research into applicable causes of action. *Id.* ¶¶9, 2.

- Researching, drafting and filing an omnibus brief in opposition to several motions to dismiss. *Id.* ¶¶10, 21-23.

- Researching, drafting and filing a successful motion for class certification, which necessitated significant discovery, including the deposition of each party's expert witness and five additional fact witnesses, and successfully defeating a Rule 23(f) petition. *Id.* ¶¶10, 83-85.

- Preparing and issuing document requests and subpoenas that engendered the production of millions of pages of documents. *Id.* ¶¶36-45, 54-63.

- Obtaining over 2,700 loan files for a statistically significant sample of mortgage loans from IndyMac's successor-in-interest and working with loan underwriting experts to review over one million pages of loan files and opine on IndyMac Bank's compliance with IndyMac's applicable underwriting standards and/or stated policies and procedures. *Id.* ¶57.

- Consulting with experts in the fields of mortgage-backed securities, loan re-underwriting, statistics, underwriter due diligence and damages. *Id.* ¶¶8, 74-82.

- Researching bankruptcy law related to IndyMac's status as a defendant and insurance coverage issues related to the Individual Defendants. *See id.* ¶4; Ex. Q attached hereto at ¶9.

- Briefing and obtaining preliminary and final approval for the Partial Settlement reached between Lead Plaintiffs and the Individual Defendants. Egan Decl. ¶4.

- Filing a successful motion for reconsideration of dismissal of Lead Plaintiffs' claims related to forty-two additional Offerings, based on an intervening change in controlling law. *Id.* ¶¶90-92.

- Successfully opposing two motions for protective orders, by which the Underwriter Defendants sought to forestall depositions and taking the depositions of four percipient fact witnesses. *Id.* ¶73.

- Propounding requests for admissions and interrogatories. *Id.* ¶45.

- Preparing for presentation of evidence at trial by, among other things, obtaining Fed. R. Evid. 902(11) declarations authenticating and rendering admissible key documents. *Id.* ¶65.

- Drafting and filing a second motion for class certification to expand the certified class to include forty-two additional Offerings, which necessitated significant additional discovery including taking the depositions of the parties' expert witnesses, defending the depositions of two proposed additional class representatives, and reviewing over 15,000 pages of documents (principally numerous copies of IndyMac loan underwriting guidelines previously produced) relied on by the Underwriter Defendants in their opposition. *Id*. ¶¶93-97.

- Drafting mediation statements and participating in multiple in-person mediation sessions and negotiations with counsel for both the Individual Defendants (with whom Lead Plaintiffs settled in 2012) and the Underwriter Defendants. *Id*. ¶¶11, 89, 98-99.

In addition, discovery had been well underway by the time of the Settlement, and Lead Plaintiffs had successfully obtained documents and testimony from defendants and numerous third parties. Egan Decl. ¶¶32-68. The resulting document productions comprised over eleven million documents, including over one million pages of mortgage loan files. *Id*. ¶57.

As a result of these litigation efforts over the course of five years, Lead Counsel became very familiar with the Underwriter Defendants' defenses and "obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement." *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, No. MDL 1500, 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006). Given this, Lead Counsel's opinion that the Settlement is fair, reasonable and adequate is entitled to "great weight." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y.), *aff'd*, 118 F.3d 721 (2d Cir. 1997). *See also In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 0165 (CM), 2007 WL 4115809, at *12 (S.D.N.Y. Nov. 7, 2007).[12]

---

[12] It should be noted that counsel for the Class Representatives, many of whom also have extensive experience in securities litigation and MBS litigation, also support the Settlement. *See* Compendium, Exs. 7-13.

### 4.    The Risks Of Establishing Liability And Damages Favor Final Approval Of The Partial Settlement

*Grinnell* holds that, in assessing the fairness, reasonableness and adequacy of a settlement, courts should consider such factors as the "risks of establishing liability" and "the risks of establishing damages." 495 F.2d at 463.   While Lead Plaintiffs and Lead Counsel believe that the claims asserted against the Underwriter Defendants are meritorious, they also recognize that there were considerable risks in pursuing the Action that could have led to a substantially smaller recovery or no recovery at all for the Settlement Class.  Indeed, the risks of establishing liability were especially heightened in the case at hand compared to almost all other MBS class action cases that have settled because there was no collectible issuer.[13]   Once materially false statements are proven, under Section 11 and 12 an issuer's liability is close to a certainty.   However, underwriter defendants can avail themselves to a due diligence defense, which, if successful, eviscerates plaintiffs' securities act claim.  15 U.S.C. § 77k(b); 15 U.S.C. § 77l(b).   These risk factors, detailed in the Egan Declaration, also support approval of the Settlement.  Egan Decl. ¶¶106-07.

#### a)    The Risks of Establishing Liability

**Proof of Falsity was Uncertain and Complicated.**    There were significant risks that Lead Plaintiffs would not be able to establish falsity.   For one, the Underwriter Defendants argued that the loans underlying the MBS performed well and, but for the unprecedented real estate collapse against which no amount of loan underwriting could protect, would have continued to have maintained their value.  Indeed, the Underwriter Defendants would have likely argued that (i) the projected performance for these Offerings exceeded the average projected

---

[13] The only MBS class actions to settle without a collectible issuer defendant were before this Court.  *See In re Lehman Bros. MBS Litig.*, Nos. 09-MD-2017 & 08-CV-6762 (S.D.N.Y.) (Kaplan, J.) (settled for $40 million); *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, No. 08-cv-10637 (S.D.N.Y.) (Kaplan, J.) (settled for $11 million).

performance for their respective comparable pools; and (ii) the underlying mortgage loans here had lower default rates than comparable loans with similar characteristics.  Egan Decl. ¶101.

Moreover, the Underwriter Defendants also argued that there were significant risk disclosures that warned investors about the risks investing in the MBS such that the statements were not untrue.  Egan Decl. ¶102.  For example, the Underwriter Defendants placed significant weight on the fact that the Offering Documents all disclosed that the underlying loans were often "low doc," "no doc" or "stated income" loans, which did not require income, employment or asset verification.  *Id.*  They also pointed to language in the Offering Documents that "exceptions" to IndyMac Bank's underwriting guidelines were permitted.  *Id.*

Additionally, Lead Plaintiffs' ability to prove falsity relied heavily on expert testimony, which included a complex sampling of the loan pools at issue, an analysis of the underlying sample and the extrapolation of such results to the loan pool in its entirety.  The Underwriter Defendants would have challenged both this use of sampling to prove falsity and the actual expert findings through with their own expert testimony.  Egan Decl. ¶¶103-04.  As a result, there were risks that the sampling might not be admissible, that the expert's testimony would be discredited and of juror confusion.  *See, e.g.*, *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400 (CM)(PED), 2010 WL 4537550, at *18 (S.D.N.Y. Nov. 8, 2010) ("The jury's verdict … would … depend on its reaction to the complex testimony of experts, a reaction that is inherently uncertain and unpredictable."); *Maley*, 186 F. Supp. 2d at 365 (there was a risk that a "jury could be swayed by experts for the Defendants"); *Am. Bank Note Holographics*, 127 F. Supp. 2d at 426-27 ("[i]n such a battle, Plaintiffs' Counsel recognize the possibility that a jury could be swayed by experts for Defendants").

The Underwriter Defendants would have also challenged the admissibility of certain IndyMac internal documents that Lead Plaintiffs believed evidenced problems with its compliance with its underwriting guidelines and its policies concerning loans originated by third-party lenders.  Egan Decl. ¶104.  Unlike most other cases, the Issuer and Sponsor here were in liquidation and, thus, the Underwriter Defendants likely could have challenged Lead Plaintiffs' ability to introduce key IndyMac documents into evidence to establish that the statements contained in the Offering Documents were untrue.  *Id.*

In addition, each Underwriter Defendant is only potentially liable for the specific Offerings that it underwrote.  Thus, they would argue that Lead Plaintiffs had to make a separate showing as to each specific Offering.  Egan Decl. ¶105.  While Lead Plaintiffs believe that they could make a showing by proving a pattern across all Offerings, this fact gives rise to additional complexity and challenges to proving liability to a jury.  *Id.*

**Underwriter Defendants' Complete Due Diligence Defense.**  Another hurdle that Lead Plaintiffs faced was that the Underwriter Defendants' due diligence defense offered a complete defense to liability.  Egan Decl. ¶106.  Unlike virtually every other MBS class action that has settled to date, there is no issuer or issuer-related parties that can be held liable.[14]  *Id.*  While an issuer is held to a strict liability standard, underwriters may escape liability if they establish their due diligence.  Here, the Underwriter Defendants argued that they had no knowledge of the falsity of the statements in the registration statements, that they conducted adequate due diligence with respect to their inquiry as to the truth of the statements and that they believed the statements to be true.  *Id.*

---

[14] Of the fourteen MBS class actions that have settled, the only one which was brought against underwriters alone was the *Tsereteli* case, which settled for $11 million.

Although Lead Plaintiffs' experts would have testified that the Underwriter Defendants' due diligence was inadequate and that they lacked a reasonable basis to believe that the statements were true, the Underwriter Defendants would have proffered testimony that the due diligence performed was reasonable and in accordance with industry standards at that time. Egan Decl. ¶107. Moreover, the Underwriter Defendants would have argued that their underwriter fees represented a small fraction of the total potential damages. Indeed, the Offering Documents state that the underwriters' fees in the aggregate for all fifty Offerings amounted to approximately $35.6 million, roughly a tenth of the value of the settlement. *Id*. It is unclear how a jury would have weighed the competing expert testimony and all this evidence.

**Underwriter Defendants' Investor Knowledge Defense.** The Underwriter Defendants also would have vigorously argued that Lead Plaintiffs and members of the Settlement Class had knowledge that the alleged misstatements in the Offering Documents were untrue and are precluded from recovery. Egan Decl. ¶108. For example, the Underwriter Defendants would argue that sophisticated investors were well aware of problems with MBS securities and the loans underlying them well in advance of the market crash. *Id.* Such arguments could have been appealing to the jury.

**Underwriter Defendants' Statute of Limitations Defense.** The Underwriter Defendants contend that investors were on notice of potential problems before one year prior to the first complaint being filed. Egan Decl. ¶109. While the Court dismissed this challenge at the motion to dismiss phase, this remained a question of fact for the jury to weigh. *Id.* *See* Memo. Opinion, June 21, 2010, ECF No. 214, at 17 ("the Court ***cannot conclude as a matter of law*** that the publicly available information was sufficiently specific to put the plaintiffs on actual or inquiry notice that a cause of action was probable") (emphasis added).

### b)      The Risks of Establishing Damages

Establishing damages in this case would have been particularly complicated.   Unlike securities that trade in a liquid market, the MBS Offerings at issue here did not trade on an exchange and were automatically priced.   Egan Decl. ¶110.   Given that there was scant information concerning market transactions, Lead Plaintiffs' damages expert had to apply more complex methods to determine value for each Certificate.   *Id*.   The Underwriter Defendants made clear that they were prepared to challenge Lead Plaintiffs' ability to calculate damages and would have retained experts to challenge the reliability of Lead Plaintiffs' experts' damages models particularly for Offerings where there was no pricing data.   *Id*.   Moreover, Defendants had a series of defenses to reduce or eliminate damages, even if Plaintiffs were able to prove damages, as noted below.   *Id.*

**Underwriter Defendants' Negative Causation Defense.**   The Underwriter Defendants' negative causation defense also posed a threat to a plaintiff verdict.   Although Section 11 losses are presumed to be caused by allegedly untrue statements in the Offering Documents, the Underwriter Defendants have an affirmative defense whereby they could absolve themselves of liability or drastically reduce damages if they showed that the losses were caused in whole or in part by other factors.   15 U.S.C. § 77k(b); 15 U.S.C. § 77l(b)   Here, the Underwriter Defendants would have argued that macroeconomic factors, *i.e.*, the financial market meltdown in 2008, housing price declines and reduced liquidity, caused the losses.   Egan Decl. ¶111.   Indeed, they would have tried to proffer expert testimony to show that the IndyMac MBS outperformed many similar MBS.   They would have argued that the housing market meltdown was so severe that no amount of strict underwriting could have prevented the drop in MBS value.   *Id*.   Although Lead Plaintiffs believe that the Underwriter Defendants would not have sustained their burden of showing that some or all losses were caused by the market meltdown, this also remained a

question for the jury.  *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) (the likelihood of demonstrating loss causation decreases if a "plaintiff's loss coincides with a marketwide phenomenon"); *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 161-62 (S.D.N.Y. 2011) (approving settlement where the litigation risks included a "credible defense of 'negative causation'").  If the Underwriter Defendants were successful in establishing "negative causation," the damages could have gone to zero.

**Underwriter Defendants' Additional Challenges To Damages.**  Under Section 11 of the Securities Act, damages are the difference between the amount paid for the security and (i) the value of the security at the date of suit; (ii) the price of the security if sold before suit was brought; or (iii) the price of the security if sold after suit was brought and before judgment, if damages are less under the latter calculations.  15 U.S.C. § 77k(e).  Lead Plaintiffs' expert estimated that the statutory damages were arguably as high as $8.6 billion assuming all its assumptions and methodology for valuing MBS were accepted.  Egan Decl. ¶112.  However, even assuming Lead Plaintiffs could establish liability and were able to overcome any negative causation defense, the Underwriter Defendants would have argued that the statutory damages should be substantially reduced to avoid what they argue would be a windfall.  *Id.*

For example, the Underwriter Defendants argued that statutory damages must be reduced because many of the Certificates at issue have increased in value since the first complaint was filed.  Egan Decl. ¶113.  In May 2009, when the first complaint was filed, the MBS market had plummeted across the board.  Thus, the Underwriter Defendants would argue, the May 14, 2009 values of the IndyMac MBS did not stem from the allegedly untrue statements and, thus, the May 14, 2009 values were understated.  *Id.*

Similarly, the Underwriter Defendants argued that Settlement Class Members have continued to receive paydowns (*i.e.*, principle distributions) on many of the Certificates since May 14, 2009.  Egan Decl. ¶114.  Indeed, the Underwriter Defendants argued that these paydowns were effectively no different from bond redemptions.  *Id.* Accordingly, the Underwriter Defendants would argue, equity requires that any damages be reduced by the value of the payments so that Settlement Class Members do not receive a double windfall, particularly where the Certificates were paid off in full.  *Id.*  In retort, Lead Plaintiffs contend that it would be improper to reduce the damages because the value of the MBS Certificates on the complaint date assumes continued paydowns.  Thus, reducing damages by the value of these additional payments would amount to reducing the value of the MBS Certificates based on paydowns twice.  Also, Lead Plaintiffs believe that Section 11 provides for a clear method of calculating damages and does not permit this further reduction.  However, no court has yet considered precisely these questions it is, at best, unclear how they would be ultimately resolved.  *Id.*

Significantly, the Underwriter Defendants would also argue that any judgment obtained at trial against them must be reduced pursuant to the proportional liability provisions of the federal securities laws.  Egan Decl. ¶115.  When, as here, a plaintiff partially settles claims against certain defendants, the non-settling defendants argue that they are entitlement to a judgment credit of at least the proportionate fault of the settling defendants.  *See* 15 U.S.C. § 78u-4(f)(2)(B).  The Underwriter Defendants would try and assign all or most of the fault by way of a special verdict to others, such as IndyMac and its officers and directors, who they contend were fully responsible any untrue statements and omissions (authored by IndyMac) in the Offering Documents.  Egan Decl. ¶115.  Here, after trial, the Underwriter Defendants would argue that any judgment against them must be reduced by the value of the Individual Defendants'

proportional share of liability and, given that the Individual Defendants were executives at IndyMac MBS Inc., they should bear the vast majority of the liability.  While Lead Plaintiffs would argue that this proportional liability theory does not apply to Section 11 claims, the Underwriter Defendants would have argued that common law and equity require this proportional liability cap.  If successful, these defenses could substantially reduce or eliminate any recovery against the Underwriter Defendants.  Since this is a relatively novel issue, there were significant risks involved.  *Id.*

The bottom line is that the Underwriter Defendants believed that, even assuming that Lead Plaintiffs could establish liability and the Underwriter Defendants could not prove negative causation, the maximum class-wide damages were a mere fraction of what Lead Plaintiffs believed the statutory damages were.  Egan Decl. ¶116.  Moreover, resolution of any of these issues, including due diligence, would inevitably have involved various "battles of the experts," with the concomitant risk that the jury could credit the Underwriter Defendants' experts over Lead Plaintiffs' experts.  *Id.* ¶117.  Courts have recognized that when parties will likely rely on significant expert testimony and analysis, settlement is favored.  *See Park v. The Thompson Corp.*, No. 05 Civ. 2931 (WHP), 2008 WL 4684232, at *4 (S.D.N.Y. Oct. 22, 2008) (significant expert testimony and analysis required to prove damages weighed in favor of settlement).[15]

### 5. The Risk Of Maintaining The Action As A Class Action Through Trial Favors Final Approval Of The Settlement

While this Court certified a litigation class in this action, maintaining class certification throughout the litigation and trial presented additional risks.  Egan Decl. ¶¶118-23.  This is particularly so because, at the time of Settlement, Lead Plaintiffs' second motion for class

---

[15] *See also Am. Bank Note Holographics*, 127 F. Supp. 2d at 426-27 ("In such a battle, Plaintiffs' Counsel recognize the possibility that a jury could be swayed by experts for Defendants, who could minimize or eliminate the amount of Plaintiffs' losses."); *PaineWebber*, 171 F.R.D. at 129 ("damages are a matter for the jury, whose determinations can never be predicted with certainty").

certification was pending.   While the Court initially certified a class of investors in nine offerings, there was a risk that the Court would decertify the existing class and/or refuse to certify the forty-two additional offerings.   *See Chatelain v. Prudential-Bache Sec., Inc.*, 805 F. Supp. 209, 214 (S.D.N.Y. 1992) ("Even if certified, the class would face the risk of decertification."); *see also* Order, July 23, 2013, ECF No. 450, at 3 ("In the last analysis, it may be that differences in time periods, loan products, and disclosures are significant enough to preclude certification of a class comprised of investors in all of the offerings at issue.   But such considerations properly are reserved for a motion for reconsideration of the class certification order.").

In opposing the second class certification motion, the Underwriter Defendants made a number of arguments, which they claimed the Court had not considered during the first round of class certification.   Egan Decl. ¶119.   While Lead Plaintiffs made counter-arguments to each of these theories, the risk remained that the Court could rule in the Underwriter Defendants' favor and deny class certification as to the additional Offerings in the expanded case.   Specifically, while Lead Plaintiffs believe that there was substantial evidence that the Offering Documents contained materially untrue statements or omissions about the quality of and the underwriting of the loans underlying the MBS, *see id.*, there was nonetheless a substantial risk that the Court could find that Lead Plaintiffs could not establish their *prima facie* case as to all Offerings through common proof.   For example, the fifty Offerings were issued over a multi-year period and issued pursuant to different registration statements (though they contained common representations).   During this time period, IndyMac's underwriting guidelines changed and there were different guidelines for different types of loans (including loans originated through different documentation programs or collateral types).   Moreover, the loans underlying the MBS Offerings

were originated by multiple banks pursuant to different underwriting guidelines.  Thus, the Underwriting Defendants took the position that Lead Plaintiffs would have to provide separate proof as to each set of underwriting guidelines in force at the time of each offering.  *Id*.

Moreover, the Underwriting Defendants argued that individual issues predominated because there were multiple mortgages in different loans and thus each group required separate proof.  Egan Decl. ¶120.  Although Lead Plaintiffs asserted that variations in the underwriting guidelines and mortgages were immaterial for a host of reasons, the Court had not ruled on these issues.  Moreover, the Underwriter Defendants argued that unique issues regarding how to calculate the value of the MBS on the complaint filing date predominated such that the class should not be certified.  *Id*.  While some district courts have certified class actions in MBS cases, these cases did not involve fifty-one offerings where loans were originated by numerous third-party lenders.  *Id.*

Finally, even if the Court certified a class, there is a risk that it would find that the class representatives were not adequate representatives for investors who purchased MBS in different Offerings or different tranches of Certificates in each Offering.  Egan Decl. ¶121.  Thus, the scope of the case could have been reduced from covering investors in fifty offerings to investors in seventeen offerings.  *Id.*

Moreover, even if the Court again ruled in Lead Plaintiffs' favor respecting the second class certification motion, it is likely another Rule 23(f) petition from the Underwriter Defendants would have followed.  Lead Plaintiffs believe they would have prevailed in their second motion for class certification and against any subsequent attempt to decertify the class.  Nonetheless, Lead Plaintiffs acknowledge the ongoing risks in maintaining class certification and that the Settlement dispenses with any uncertainty that a class can be maintained.

### 6. The Underwriter Defendants' Ability To Withstand A Greater Judgment

While it appears that the Underwriter Defendants could withstand a higher judgment than the amount of the Settlement, the events of recent years have proven that liquidity is never guaranteed.[16]   In any event, this factor is generally not determinative when other factors weigh in favor of approval, as they do here.   *Shapiro*, 2014 WL 1224666, at *11 ("[A] defendant is not required to 'empty its coffers' before a settlement can be found adequate." (quoting *In re Sony SXRD Rear Projection Television Class Action Litig.*, No. 06 Civ. 5173, 2008 WL 1956267, at *8 (S.D.N.Y. May 1, 2008)); *Citigroup*, 965 F. Supp. 2d at 384 ("[W]hile the defendants' ability to pay more suggests a settlement might be unfair, 'this factor standing alone, does not suggest that the settlement is unfair.'") (citation omitted).

### 7. The Range Of Reasonableness Of The Underwriter Defendant Settlement Fund In Light Of The Best Possible Recovery And All The Attendant Risks Of Litigation Supports Approval Of The Settlement

The last *Grinnell* factor requires that courts consider the range of reasonableness of the settlement fund in light of (i) the best possible recovery; and (ii) litigation risks.   *Grinnell*, 495 F.2d at 463.   The question for the Court is not whether the settlement represents the best possible recovery, but how the settlement relates to the strengths and weaknesses of the case.

In making this assessment, the court must "consider and weigh the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable."   *Id.* at 462 (citation omitted). Courts agree that the determination of a "reasonable" settlement "is not susceptible of a mathematical equation yielding a particularized sum."   *PaineWebber*, 171 F.R.D. at 130 (citation

---

[16] Indeed, Lehman Brothers Inc., who co-underwrote several of the Offerings at issue here, was not named as a defendant because it filed for Chapter 11 bankruptcy protection on September 15, 2008.   *See* Second Amended Complaint, Aug. 15, 2011, ECF No. 337, at ¶23 (attached as Egan Decl. Ex. R).

and internal quotation marks omitted).  Rather, "in any case there is a range of reasonableness with respect to a settlement." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

Theoretically, statutory damages – before taking into account causation and other defenses – could have amounted to billions of dollars in aggregate damages for all the Offerings. However viewed, the $340 million Settlement represents a significant recovery in absolute terms or in terms of recovery per Certificate and particularly when weighed against the risks posed by continued litigation and the defenses available to the Underwriter Defendants outlined above. Indeed, while Lead Plaintiffs, absent negative pretrial rulings, would have had their damages expert testify that the aggregate class damages are as high as $8.6 billion, as noted above in the discussions of the risks, the Underwriter Defendants would likely have countered that this figure, even if accepted, had to be reduced to reflect paydowns received by Settlement Class Members amounting to billions of dollars.  Egan Decl. ¶¶112-14.  No doubt, the Underwriter Defendants would have argued that applying proportional liability, a concept Lead Plaintiffs vigorously contest, would result in a further multi-billion dollar reduction in damages.  *Id.* ¶¶115-16. Looking at the $340 million through the lens of the Underwriter Defendants' arguments suggests that the settlement recovery is much closer to Lead Plaintiffs' provable class-wide damages.  *See Wal-Mart*, 396 F.3d at 119 ("There is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." (quoting *Newman*, 464 F.2d at 693)).  Moreover, unlike traditional securities stock cases, the vast majority of the issues facing Lead Plaintiffs here, which are highlighted above, give rise to novel questions of law that have yet to be challenged or resolved.  Additionally, again unlike traditional securities stock cases, all the elements of the claims and defenses were to be proven

by experts.  Finally, unlike all but one of the MBS class action settlements (*Tsereteli*), the only collectible defendants here were the Underwriter Defendants who had additional and powerful defenses available to them.

Despite these challenges, the fact that this Settlement ranks number two among all the MBS class action settlements to date is remarkable.  Egan Decl. ¶7.  Moreover, the Settlement also far exceeds the average and median settlement amounts for securities class actions brought since the passage of the PSLRA ($55.5 million and $8.3 million, respectively) and the average and median settlement amounts for securities class actions settled in 2013 ($71.3 million and $6.5 million, respectively).  L.T. Bulan, E.M. Ryan, L.E. Simmons, *Securities Class Action Settlements, 2013 Review and Analysis*, Cornerstone Research (2014), at 1, http://securities.stanford.edu/research-reports/1996-2013/Settlements-Through-12-2013.pdf).

In light of the substantial risks presented by this litigation, the Settlement here is well within the range of reasonableness.

### 8.    The Settlement Was Reached After Arm's-Length Negotiations With The Assistance Of An Experienced Mediator And Is Procedurally Fair

A strong initial presumption of fairness attaches to a proposed settlement if it is reached as a result of arm's-length negotiations between experienced counsel after meaningful discovery. *See Wal-Mart*, 396 F.3d at 116; *Shapiro*, 2014 WL 1224666 at *7  ("A class action settlement is entitled to a presumption of fairness when it is the product of extensive arm's-length negotiations." (citing 4 A. Conte, H.B. Newberg, *Newberg on Class Actions* § 11.41 (4th ed. 2002)); *Padro v. Astrue*, No. 11-CV-1788 (CBA)(RLM), 2013 WL 5719076, at *3 (E.D.N.Y. Oct. 18, 2013) ("Where the integrity of the negotiation process is preserved, a strong initial presumption of fairness attaches to the proposed settlement.").

Lead Counsel are intimately familiar with the facts in the case and have extensive experience prosecuting comparable securities class actions. There can be no dispute that the Settlement was the result of arm's-length negotiations between experienced counsel well-versed in the strengths and weaknesses of the claims. Not only was the Settlement a product of informed arm's-length negotiations, those negotiations were conducted under the auspices of former federal magistrate Judge Edward Infante. Egan Decl. ¶¶5, 11, 89, 98-99. Judge Infante over saw two separate in-person mediation sessions over the course of fifteen months. *Id.* The active involvement of an experienced and independent mediator in negotiating the Settlement supports the presumption of reasonableness. *In re Indep. Energy Holdings PLC Sec. Litig.*, No. 00 Civ. 6689 (SAS), 2003 WL 22244676, at *4 (S.D.N.Y. Sept. 29, 2003) ("[T]he fact that the Settlement was reached after exhaustive arm's-length negotiations, with the assistance of a private mediator experienced in complex litigation, is further proof that it is fair and reasonable.").

Morever, this Settlement is "entitled to an even greater presumption of reasonableness" because it was achieved "under the supervision and with the endorsement of a sophisticated institutional investor." *Veeco*, 2007 WL 4115809, at *5 ("'Absent fraud or collusion, the court should be hesitant to substitute its judgment for that of the parties who negotiated the settlement.'") (citation omitted); *see also In re EVCI Career Colls. Holding Corp. Sec. Litig.*, No. 05 Civ. 10240 (CM), 2007 WL 2230177, at *4 (S.D.N.Y. July 27, 2007) (same).

Lead Plaintiffs and the Wyoming Attorney General agree that this Settlement, which provides an immediate and substantial benefit to Settlement Class Members, outweighs the benefits of continued litigation. Egan Decl. ¶¶155-59; *see also* Anderson Decl. ¶¶3-9, 15;

Brandes Decl. ¶¶3-9, 15.[17]  The Lead Plaintiffs and the Attorney General were well informed and familiar with the risks and challenges of continued prosecution of this case when they approved the Settlement.  Indeed, as detailed in their declarations, both Lead Plaintiffs devoted significant time to oversee this litigation and consult with Lead Counsel on all significant issues.  Egan Decl. ¶156; *see also* Anderson Decl. ¶¶1, 6-12; Brandes Decl. ¶¶1, 6-12.  Moreover, General Counsel for both Lead Plaintiffs and a Deputy Attorney General with the Wyoming Attorney General's Office attended all mediations sessions that led to this Settlement, read the Underwriter Defendants' mediation statements and heard their arguments.  *Id*.  John G. Knepper, Esq., the Chief Deputy Attorney General of Wyoming and former Deputy General Counsel for the U.S. Department of the Treasury working to coordinate the government's response to the 2008 financial crisis, participated in the final round of mediation discussions.

* * *

Based on the foregoing, and taken as a whole, consideration of the *Grinnell* factors supports a finding that the Settlement is fair, reasonable and adequate.  Lead Counsel respectfully requests that the Court grant final approval, accordingly.

## II.    THE PLAN OF ALLOCATION IS FAIR AND REASONABLE AND SHOULD BE APPROVED

Lead Plaintiffs have proposed a plan to allocate the proceeds (the "Plan of Allocation") of the Underwriter Defendant Settlement and Individual Defendant Settlement[18] ("Settlements")

---

[17]  The "Anderson Decl." refers to the declaration of Elizabeth Anderson, Esq., General Counsel of the Wyoming State Treasurer and the "Brandes Decl." refers to the declaration of Benjamin Brandes, Esq. Chief Legal Officer of the Wyoming Retirement System, in support of final approval of the Underwriter Defendant Settlement, reimbursement of certain of Lead Plaintiffs' reasonable costs and expenses, and an award of attorneys' fees and reimbursement of expense, attached as Exs. 4 and 5 to the Compendium, respectively.

[18]  "Underwriter Defendant Settlement" as used in this section refers to the Settlement with the Underwriter Defendants and "Individual Defendant Settlement" means the settlement with the "Individual Defendants."

among Class Members[19] who submit valid Claim Forms that are approved for payment from the Net Settlement Funds[20] ("Authorized Claimants").  The objective of the proposed Plan of Allocation is to equitably distribute proceeds from the Settlements to those Class Members who suffered economic losses as a result of the alleged untrue statements and omissions. *See* Egan Decl. ¶¶124-28.

The Plan of Allocation, as set forth as an Appendix to the Proof of Claim and Release form ("Proof of Claim"), allocates the Net Settlement Funds based principally on the statutory measure of damages set out in Section 11(e) of the Securities Act, 15 U.S.C. § 77k(e).  Lead Plaintiffs engaged Brett Brandenberg, a Director at AlixPartners and a Chartered Financial Analyst, to examine the Plan of Allocation.

The Declaration of Brett Brandenberg ("Brandenberg Decl." or "Brandenberg Declaration"), attached as Exhibit 2 to the Compendium, explains the methodology for determining each Authorized Claimant's Recognized Claim under the Plan of Allocation and the basis for the analysis.  As explained more fully in the Plan of Allocation – including through illustrative examples – and in the Brandenberg Declaration, a "Recognized Loss Amount" or "Recognized Gain Amount" will be calculated for each purchase or acquisition of a Certificate. Brandenberg Decl. ¶7.  The calculation of an Authorized Claimant's Net Recognized Loss will depend on several factors, including: (a) the face value of the Certificates purchased; (b) when the Certificates were purchased or acquired and the price paid; (c) any principal payments received; (d) whether the Certificates were sold, and if so, when they were sold and for how much; and/or (e) if held on the applicable Date of Suit for the Certificates, the price of the

---

[19] "Class Members" as used in this section refers to any persons or entities that are an Underwriter Defendant Class Member and/or an Individual Defendant Class Member.

[20] "Net Settlement Funds" refers to the Underwriter Defendant Settlement Fund and Individual Defendant Settlement Fund.

Certificates on that date.  *Id.* ¶6.  Although the formula has a degree of complexity necessary to allocate the settlement funds fairly among Authorized Claimants and based on the statutory damage calculations mandated by Section 11 of the Securities Act, investors in MBS are typically sophisticated investors, and the language utilized in the Plan of Allocation is consistent with industry terminology.  *Id.* ¶7.  In addition, specific examples of how to calculate hypothetical examples under various scenarios are included in the Plan of Allocation for clarification.  *Id.*

The Plan of Allocation does not allocate any fixed percentage of the Net Settlement Funds to any particular offering or security.  Rather, the proposed distribution will be shared on a *pro rata* basis based on the claims submitted, without favoring one security over another.  Egan Decl. ¶128.

"To warrant approval, the plan of allocation must also meet the standards by which the . . . settlement was scrutinized – namely, it must be fair and adequate."  *See Maley*, 186 F. Supp. 2d at 367 (citation omitted).  A plan that allocates settlement funds to class members based on the extent of their injuries or the strengths of their claims is fair and reasonable.  *See In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 580 (S.D.N.Y. 2008) ("A reasonable plan may consider the relative strength and values of different categories of claims.").  Moreover, in assessing a proposed plan of allocation, the Court may give great weight to the opinion of informed counsel.  *See, e.g., Global Crossing*, 225 F.R.D. at 462 ("When formulated by competent and experiences class counsel," a plan of allocation "need have only a reasonable, rational basis.") (citation and internal quotation marks omitted); *Maley*, 186 F. Supp. 2d at 367 ("An allocation formula need only have a reasonable, rational basis, particularly if recommended by 'experience and competent' class counsel.").

The proposed Plan of Allocation in this case is based on the statutory damages permitted under Section 11 of the Securities Act and was fully explained in the Proof of Claim sent to Class Members.  It was prepared in consultation with Lead Plaintiffs' consultant and tracks the theory of damages asserted by Lead Plaintiffs.  Accordingly, it is the opinion of Lead Counsel that the Plan of Allocation is fair, reasonable and adequate to the Class as a whole.  Egan Decl. ¶130.  Following dissemination of 6,800 Notices and Proof of Claim forms, to date, there are no objections to the Plan of Allocation.

## III.  NOTICE TO THE SETTLEMENT CLASS SATISFIED RULE 23 AND DUE PROCESS

In accordance with the Court's Notice Orders, beginning on October 15, 2014, the Court-appointed Claims Administrator, Rust Consulting, Inc. ("Rust"), caused 6,832 copies of the Notice to be mailed by first-class mail to potential Settlement Class Members.  Mailing Aff. ¶¶3-12.  Rust identified potential class members in several ways.  As described in ¶¶4 and 7 of the Affidavit of Eric J. Miller Regarding Notice Administration ("Miller Affidavit"), November 12, 2012, ECF No. 387-2, Rust previously provided notice to Individual Defendant Class Members as part of the notice program related to that settlement.  *See also* Mailing Aff. ¶4.  As a result of that effort, Rust has maintained a list of the names and addresses of potential Settlement Class Members for the Underwriter Defendants Settlement (the "Rust Mailing Database").  *Id*. ¶¶5-7.  Since the initial notice mailing to Settled Individual Defendants on September 12, 2012, and during the normal course of administering the Individual Defendants Settlement, Rust has continually updated the mailing list.  *Id*. ¶5.  Rust also supplemented the list of potential Settlement Class Members by mailing to a collection of the largest and most common U.S. nominees (*i.e.*, brokerage firms, banks and institutions who hold securities in the name of a

nominee on behalf of beneficial purchasers), whose names it maintains in a proprietary database (the "Broker Database"). *Id*. ¶¶6-7.

In addition, on October 20, 2014, Lead Plaintiffs caused the Summary Notice to be published in *Investor's Business Daily* and transmitted over the *PR Newswire.* Mailing Aff. ¶¶13-14. The Claims Administrator also distributed the Summary Notice via the Depository Trust & Clearing Corporation Legal Notice System. *Id.* at ¶15. In coordination with Lead Counsel, Rust established a settlement website, where Settlement Class Members can access the Notice, the stipulations for both the Underwriter Defendants Settlement and Individual Defendants Settlement (as defined above), and other relevant information about the Settlement and the Action. *Id.* at ¶¶16-18.

This combination of individual first-class mailed notice to all Underwriter Defendant Settlement Class Members who could be identified with reasonable effort, supplemented by notice in a widely circulated publication, transmitted over a newswire and set forth on an internet website, is "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173, 94 S. Ct. 2140, 2150 (1974).

The Notice also satisfies Rule 23(e)(1) because it was provided in a "reasonable manner" – *i.e.*, it must "'fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings.'" *Wal-Mart*, 396 F.3d at 114 (quoting *Weinberger v. Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982)). The Court-approved Notice includes all the information required by Rule 23(c)(2)(B) of the Federal Rules of Civil Procedure and the PSLRA, 15 U.S.C. § 77z-1(a)(7), including: (i) an explanation of the nature of the Action and claims; (ii) a definition of the Settlement Class; (iii) the amount of the Settlement; (iv) an explanation of the reasons why the parties are proposing the

Settlement; (v) a description of the Plan of Allocation; (vi) a statement indicating the attorneys' fees and costs that will be sought; (vii) a description of the right to opt-out of the Settlement Class or object to the Settlement or the requested fees and costs; and (viii) notice of the binding effect of a judgment on Settlement Class Members.  *See* Mailing Aff. Ex. B.  Moreover, this Notice is similar to other notices issued and approved in other MBS such as *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp.*, No. 08-cv-01713-PKC (E.D.N.Y. May 2, 2014);[21] *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, No. 08-cv-10637 (LAK) (S.D.N.Y. Sept. 25, 2013)[22] (preliminary approval granted Oct. 3, 2013); *In re Lehman Bros. Sec. & ERISA Litig.*, No. 08-cv-05523-LAK (S.D.N.Y. Jan. 13, 2012).[23]

## IV.    THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS

In presenting the proposed Settlement to the Court for approval of class-wide notice, Lead Plaintiffs requested that the Court conditionally certify the Settlement Class so that notice of the proposed Settlement, the final approval hearing and the rights of Settlement Class Members to request exclusion, object or submit Proof of Claims could be issued.  In its Notice Order, the Court granted Lead Plaintiffs' request.  ECF No. 541.

Nothing has changed to alter the propriety of the Court's certification, and, for the reasons stated in the Memorandum of Law in Support of Lead Plaintiffs' Unopposed Motion For Certification of The Settlement Class, Approval of Form of Notice and Scheduling of Final Settlement Hearing, Sept. 19, 2014, ECF No. 533, Lead Plaintiffs request that the Court: (1) finally certify the Settlement Class for settlement purposes, pursuant to Fed. R. Civ. P. 23(a)

---

[21] *Available at* http://www.jpmcertificatesettlement.com/docs/notice.pdf.

[22] *Available at* http://www.wolfpopper.com/docs/RAST%20-%20Notice%20-%20FINAL.pdf.

[23] *Available at* http://www.lehmanmbssettlement.com/Portals/0/Documents/Final%20Notice%20wTable%204-12-12revd.pdf

and (b)(3); (2) appoint as Class Representatives Lead Plaintiffs and the City of Philadelphia

Board of Pensions and Retirement, the Los Angeles County Employees Retirement Association,

the Police and Fire Retirement System of the City of Detroit, the Public Employees' Retirement

System of Mississippi, the General Retirement System of the City of Detroit and the Iowa Public

Employees' Retirement System; and (3) appoint Lead Counsel as Class Counsel.

<u>**CONCLUSION**</u>

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court (1) find that

the proposed class action Settlement with the Underwriter Defendants is fair, reasonable and

adequate; (2) find that the Plan of Allocation is fair, reasonable and adequate; (3) finally certify

the Underwriter Defendant Settlement Class; and (4) grant final approval to the Underwriter

Defendant Settlement.  A proposed judgment will be submitted with Lead Plaintiffs' reply papers

after the deadline for objections and exclusions has passed.

Dated:  December 30, 2014                              Respectfully submitted,

**BERMAN DEVALERIO**


By: ___*/s/ Nicole Lavallee*_____

Joseph J. Tabacco, Jr. (JJT-1994)
Nicole Lavallee (admitted *pro hac vice*)
Anthony D. Phillips (admitted *pro hac vice*)
One California Street Suite 900
San Francisco, California 94111
Telephone:    (415) 433-3200
Facsimile:     (415) 433-6382
jtabacco@bermandevalerio.com
nlavallee@bermandevalerio.com
aphillips@bermandevalerio.com

Patrick T. Egan (PE-6812)
One Liberty Square
Boston, Massachusetts 02109
Telephone:     (617) 542-8300
Facsimile:     (617) 542-1194
pegan@bermandevalerio.com

***Class Counsel, Counsel for Lead Plaintiffs,
the Wyoming State Treasurer and
Wyoming Retirement System, and Counsel
for Settlement Class Representative the Los
Angeles County Employees Retirement
Association***