# TAB 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re INDYMAC MORTGAGE-BACKED SECURITIES LITIGATION | Master Docket No. 09-Civ. 04583 (LAK) ECF CASE |
| This Document Relates To: ALL ACTIONS | |

**DECLARATION OF PATRICK T. EGAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR FINAL**
**APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF**
**ALLOCATION AND MOTION FOR ATTORNEYS' FEES**
**AND REIMBURSEMENT OF LITIGATION EXPENSES**

**TABLE OF CONTENTS**

**PAGE**

I.    PRELIMINARY STATEMENT .................................................................. 2

II.   FACTUAL SUMMARY OF LEAD PLAINTIFFS' CLAIMS AGAINST THE
      UNDERWRITER DEFENDANTS ......................................................... 6

III.  PROCEDURAL HISTORY.................................................................. 8

      A.   Appointment Of Lead Plaintiffs........................................... 8

      B.   The Consolidated Amended Complaint And Motions To Dismiss ....... 9

      C.   The Motions to Intervene.................................................. 10

      D.   Discovery .................................................................... 12

           1.   Party Discovery.................................................... 13

                a.   Document Discovery from the Defendants.................. 13

                b.   Responding to Defendants' Discovery Requests........... 16

           2.   Document Discovery from Third Parties......................... 17

           3.   Depositions ........................................................ 20

           4.   Trial Strategy And Use of Additional Discovery Tools To Ensure
                Admissibility And Authenticity of Evidence At Trial.......... 21

      E.   Expert Discovery And Analysis............................................. 22

           1.   Re-Underwriting Experts......................................... 22

           2.   Class Certification Expert....................................... 23

           3.   Due Diligence Experts ........................................... 24

           4.   Damages Expert .................................................. 24

      F.   Initial Class Certification ............................................... 24

      G.   The *NECA-IBEW Health & Welfare Fund v. Goldman Sachs* Decision and
           the Motion For Reconsideration ......................................... 25

      H.   Initial Mediation in 2013 ................................................ 26

I.       Stipulation/Motion To Reinstate Dismissed Offerings ........................................ 26

J.       Class Certification Motion On Expanded Class ................................................ 27

K.       Mediation And Settlement Agreement With The Underwriter Defendants ......... 29

IV.     RISKS FACED BY LEAD PLAINTIFFS IN THE ACTION ................................. 29

A.       The Risks Of Establishing Liability ............................................................. 30

        1.       Proof of Falsity was Uncertain and Complicated. ................................ 30

        2.       Underwriter Defendants' Complete Due Diligence Defense ................... 31

        3.       Underwriter Defendants' Investor Knowledge Defense. ....................... 32

        4.       Underwriter Defendants' Statute of Limitations Defense. ..................... 32

B.       The Risks Of Establishing Damages ............................................................. 33

C.       The Risk Of Maintaining The Action As A Class Action Through Trial ............ 36

V.      PLAN OF ALLOCATION ............................................................................ 38

VI.     LEAD PLAINTIFFS' COMPLIANCE WITH THE NOTICE ORDERS ....................... 40

VII.    PLAINTIFFS' COUNSEL'S APPLICATION FOR AN AWARD OF
        REASONABLE ATTORNEYS FEES AND REIMBURSEMENT OF
        EXPENSES ............................................................................................... 42

A.       Plaintiffs' Counsel's Fee Request Is Reasonable ............................................ 42

        1.       The Joint Fee Request ................................................................. 44

        2.       Standing and Expertise of Plaintiffs' Counsel ................................... 48

        3.       Standing and Caliber of Defense Counsel ........................................ 48

        4.       Lead Plaintiffs Support The Fee Application ..................................... 49

        5.       The Requested Fee Is Below or In-Line with Comparable
                 Settlements ............................................................................. 50

        6.       The Risks And Unique Complexities Of The Litigation ........................ 51

B.       Request For Reimbursement Of Litigation Expenses ....................................... 53

        1.       Plaintiffs' Counsel Request Reimbursement of Their Reasonable
                 And Necessary Litigation Expenses ............................................... 53

      2.     Total Expenses Incurred to Date ................................................................. 53

      3.     Expert Expenses ......................................................................................... 56

      4.     Plaintiffs' Counsel's Additional and Necessary Expenses ....................... 60

   C.    RECOMMENDATION OF LEAD COUNSELS' PROPOSED ALLOCATION OF ATTORNEYS' FEES AND EXPENSES ........................... 61

VIII.  REIMBURSEMENT OF LEAD PLAINTIFFS' REASONABLE COSTS .................... 62

IX.    THE REACTION OF THE CLASSES TO THE FEE AND EXPENSE PETITION ............................................................................................................... 63

X.     TIMING AND ALLOCATION OF ANY FEE AND EXPENSE AWARD ................. 64

XI.    ADDITIONAL EXHIBITS ................................................................................... 65

XII.   CONCLUSION .................................................................................................... 66

**EXHIBITS**

| EX. | DESCRIPTION |
|---|---|
| A | Karen Sloan, *$1,000 Per Hour Isn't Rare Anymore; Nominal billing levels rise, but discounts ease blow,* The National Law Journal (January 13, 2014). |
| B | Summary Sheet Pursuant To The United States Trustee Guidelines For Reviewing Applications For Compensation And Reimbursement Of Expenses Filed Under 11 U.S.C. § 330, filed by Gibson Dunn & Crutcher, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (JMP) (Bankr. S.D.N.Y. July 13, 2012). |
| C | Order Granting Final Approval of Class Action Settlement, Plan of Allocation of Settlement Proceeds, and Request For an Award of Attorneys' Fees and Expenses, *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 10-cv-00302 (C.D. Cal. Dec. 5, 2013). |
| D | Order Awarding Attorneys' Fees and Expenses, *Pub. Emps.' Ret. Sys of Miss. v. Merrill Lynch & Co., Inc.*, No. 08 Civ. 10841 (S.D.N.Y. May 8, 2012). |
| E | Order on Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses, *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Grp.*, No. 08-cv-5093 (S.D.N.Y. Nov. 5, 2014). |
| F | Order Granting Lead Counsel's Motion for Attorneys' Fees and Reimbursement of Litigation Expenses, *Plumbers' & Pipefitters' Local #562 Supp'l Plan & Trust v. J.P. Morgan Acceptance Corp. I, et al.,* No. 2:08-cv-01713 (E.D.N.Y. July 24, 2014). |
| G | Order Awarding Attorneys' Fees And Reimbursement of Litigation Expenses, *In re Wells Fargo Mortg-Backed Certificates Litig.*, No. 09-CV-1376 (S.D.N.Y. Nov. 14, 2011). |
| H | Dr. Renzo Comolli and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2013 Full-Year Review Large settlements get larger; small settlements get smaller*, NERA Economic Consulting (Jan. 21, 2014). |
| I | Order Awarding Attorneys' Fees and Expenses, *In re Satyam Computer Services Ltd. Sec. Litig.*, No. 1:09-md-02027-JPO (S.D.N.Y. Sept. 13, 2011). |
| J | Order Approving Attorneys' Fees and Expenses and Awarding Costs and Expenses to Named and Lead Plaintiffs, *In re General Motors Corp. Sec. & Deriv. Litig.*, No. 2:06-md-01749-GER (E.D. Mich. Jan. 6, 2009). |
| K | Order, *In re Parmalat Sec. Litig.*, No. 04-md-01653-LAK (S.D.N.Y. Mar. 2, 2009). |

| EX. | DESCRIPTION |
|---|---|
| L | Declaration of Elizabeth Anderson, Esq., General Counsel of The Wyoming State Treasurer, in Support of Final Approval of The Settlement, Award of Attorneys' Fees And Reimbursement of Expenses and an Award To The Wyoming State Treasurer of Reimbursement of Reasonable Costs and Expenses Incurred in Representation of The Class, *Pub. Emps.' Ret. Sys of Miss. v. Merrill Lynch & Co., Inc.*, No. 08 Civ. 10841 (S.D.N.Y. Feb. 15, 2012). |
| M | Lead Plaintiffs' Memorandum of Law in Support of Their Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, *In re Parmalat Sec. Litig.*, No. 04-md-01653-LAK (S.D.N.Y. Sept. 18, 2008). |
| N | Order Approving Attorneys' Fees and Expenses, *Cornwell v. Credit Suisse Grp.*, No. 1:08-cv-03758-VM-JCF (S.D.N.Y. July 20, 2011). |
| O | Order and Final Judgment, *In re China Values Tech. Sec. Litig.*, No. 1:11-cv-00796-LAK (S.D.N.Y. September 30, 2014). |
| P | Selected pages and exhibits from the Declaration of William B. Federman in Support of (I) Plaintiffs' Motion For Final Approval of Settlement and (II) Plaintiffs' Motion For Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Reimbursement Awards, *In re China Values Tech. Sec. Litig.*, No. 1:11-cv-00796-LAK (S.D.N.Y. August 5, 2014). |
| Q | Declaration of Patrick T. Egan in Support of (A) Lead Plaintiffs' Motion For Final Approval of Partial Class Action Settlement With the Individual Defendants and Final Certification of the Settlement Class; and (B) Lead Counsel's Motion For Reimbursement of Expenses and Establishment of Litigation Fund, filed November 13, 2012 (ECF No. 387) (without attached exhibits). |
| R | Second Amended Consolidated Class Action Complaint for Violations of the Securities Act of 1933, filed August 15, 2011, ECF No. 337 (without attached exhibits). |

I, PATRICK T. EGAN, declare as follows:

1.      I am a partner of the law firm Berman DeValerio, Court-appointed lead counsel ("Lead Counsel") for Lead Plaintiffs, the Wyoming Retirement System ("WRS") and Wyoming State Treasurer ("WST") (collectively, "Lead Plaintiffs"), and counsel for Settlement Class Representative Los Angeles County Employees Retirement Association ("LACERA") in this consolidated securities class action (the "Action").[1]  I have personal knowledge of the matters set forth herein and, if called upon to do so, could and would testify competently thereto.

2.      I submit this Declaration in support of Lead Plaintiffs' Motion for Final Approval of Underwriter Defendant Settlement and the Proposed Plan of Allocation, and Final Certification of the Settlement Class ("Final Approval Motion") and in support of the Settlement Class Representatives Counsels' Motion for Attorneys' Fees and Reimbursement of Expenses ("Fee and Expense Application").

3.      This Declaration does not detail each and every event that occurred since the Action was commenced over five years ago.  Rather, the Declaration provides the Court with an outline of significant highlights of the litigation, the events leading to the Underwriter Defendant Settlement, the basis upon which Lead Counsel and Lead Plaintiffs recommend approval of the Underwriter Defendant Settlement and the Plan of Allocation, and also provides details concerning the Fee and Expense Application.

4.      On December 18, 2012, the Court entered an Order and Final Judgment (ECF No. 410), approving Lead Plaintiffs' partial settlement with the Individual Defendants (the

---

[1]  All capitalized terms not otherwise defined herein have the same meaning as set forth in (i) the September 19, 2014 Amended Stipulation and Agreement of Settlement ("Underwriter Defendant Stipulation") (ECF No. 539-1); and (ii) the July 31, 2012 Amended Stipulation and Agreement of Partial Settlement ("Individual Defendant Stipulation") (ECF No. 365-1).  Unless otherwise noted and where necessary, "Underwriter Defendant" has been added to all defined terms in the Underwriter Defendant Stipulation and "Individual Defendant" has been added to all defined terms in the Individual Defendant Stipulation to distinguish between the two settlements..

"Individual Defendant Settlement").  At that time, Lead Counsel did not seek an award of attorneys' fees and stated that it would instead seek attorneys' fees after a later resolution of the case.  The Fee and Expense Application here seeks attorneys' fees based upon both the Underwriter Defendant Settlement and Individual Defendant Settlement.  Since the factual underpinnings for the Individual Defendant Settlement may be relevant to this Courts' determination of an award of attorneys' fees today, undersigned counsel incorporates by reference the November 13, 2012 declaration that was filed in support of the approval of the Individual Defendant Settlement (ECF No. 387) (a copy of which is attached hereto as Exhibit Q, without exhibits).  Although Lead Counsel did not seek attorneys' fees from the Individual Defendant Settlement, the Court did allow Lead Counsel to seek reimbursement of a limited amount of expenses.  The Fee and Expense Application does not seek expenses previously reimbursed.

## I.    PRELIMINARY STATEMENT

5.    After extensive investigation, discovery and litigation over the course of more than five years, as well as two arm's-length mediation sessions facilitated by the Honorable Edward Infante (Ret.), an experienced and nationally-respected mediator and former federal judge, Lead Plaintiffs and the Underwriter Defendants agreed to settle all claims against the Underwriter Defendants in the Action in exchange for a payment of $340 million, which has been deposited in escrow (the "Underwriter Defendant Settlement").[2]

6.    As set forth in the Underwriter Defendant Stipulation, in exchange for this payment, the Underwriter Defendant Settlement resolves all claims asserted by Lead Plaintiffs

---

[2]   The Underwriter Defendants are Credit Suisse Securities (USA) LLC; Deutsche Bank Securities, Inc.; J.P. Morgan Securities, Inc. (in its own right and as successor-in-interest to Bear Stearns & Co., Inc.); RBS Securities, Inc. (as successor-in-interest to Greenwich Capital Markets, Inc.); Morgan Stanley & Co., Inc.; and UBS Securities LLC.

and the Underwriter Defendant Settlement Class against the Underwriter Defendants in the Action.[3]   In conjunction with the Individual Defendant Settlement (together, the "Underwriter Defendant Settlement" and the "Individual Defendant Settlement" are referred to as the "Settlements"), which the Court granted final approval on December 18, 2012, the total recovery for the class in the Action now stands at $346 million (the "Global Settlement Fund").

7.   The $340 million Underwriter Defendant Settlement obtained from the Underwriter Defendants, and the total recovery of $346 million, represents an excellent recovery for the Underwriter Defendant Settlement Class and the Individual Defendant Settlement Class (jointly referred to herein as "Settlement Classes") and ranks as the second largest recovery in any private securities class action brought in the United States involving mortgage-backed securities ("MBS") since the 2008 financial crisis.   This is so even despite the fact that the originator of the underlying mortgages, IndyMac Bank, filed for bankruptcy protection, which not only complicated the litigation, but significantly increased the risk of any recovery for the Settlement Classes.   The only settlement that was larger was in *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 10-cv-00302 (C.D. Cal.) ("*Countrywide*").   However, unlike the case at hand, *Countrywide* involved a solvent issuer-defendant by virtue of Bank of America Corporation's acquisition of Countrywide Financial Corp.   The following chart shows the MBS class action settlements to date.

---

[3]   The Underwriter Defendant Settlement does not resolve the claims against Defendant IndyMac MBS.   Lead Plaintiffs believe, however, that IndyMac MBS has no ongoing business or income, little or no assets, and no applicable insurance.   Lead Plaintiffs previously filed the Declaration of Wayne S. Green, current Vice President of IndyMac MBS, Inc. and a Financial Manager in the General Accounting Unit of the Division of Resolutions and Receiverships of the Federal Deposit Insurance Corporation, attesting to these facts.   (ECF No. 536-5).   If and when the Underwriter Defendant Settlement receives final approval, Lead Plaintiffs expect to voluntarily dismiss their claims against IndyMac MBS without prejudice.   The contemplated voluntary dismissal of IndyMac MBS is not a term or condition of the Underwriter Defendant Settlement.   Notice of this anticipated dismissal was sent to members of the Settlement Classes.   Affidavit of Jason Rabe Regarding Notice Administration ("Mailing Aff." or "Mailing Affidavit"), ¶ 3 (attached as Exhibit 3 to the accompanying Compendium of Declarations ("Compendium")); *see also id.*, Ex. A at 2.

| MBS Class Action Case | Settlement Amount |
|---|---|
| *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 10-cv-00302 (C.D. Cal.) | $500,000,000 |
| ***In re IndyMac MBS Securities Litigation*** | **$346,000,000** |
| *Pub. Emps.' Ret. Sys of Miss. v. Merrill Lynch & Co., Inc.*, No. 08 Civ. 10841 (S.D.N.Y.) | $315,000,000 |
| *Plumbers' & Pipefitters' Local #562 Supp'l Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-cv-01713 (E.D.N.Y.) | $280,000,000 |
| *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Grp.*, No. 08-cv-5093 (S.D.N.Y.) | $275,000,000 |
| *In re Wells Fargo Mortg-Backed Certificates Litig.*, No. 09-CV-1376 (N.D. Cal.) | $125,000,000 |
| *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, No. 08-cv-8781 (S.D.N.Y.) (Partial Settlement) | $100,000,000 |
| *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, No. 09-CV-2137 (S.D.N.Y.) | $95,000,000 |
| *In re Lehman Brothers MBS Litig.*, Nos. 09-MD-2017 & 08-CV-6762 (S.D.N.Y.) | $40,000,000 |
| *Mass. Bricklayers & Masons Trust Funds, v. Deutsche Alt-A Sec.*, No. 08-cv-03178 (E.D.N.Y.) | $32,500,000 |
| *Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*, No. 09-cv-01110 (S.D.N.Y.) | $26,612,500 |
| *In re Wash. Mutual, Inc. MBS Litig.*, No. C09-0037 (W.D. Wash.) | $26,000,000 |
| *City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.*, No. 08-CV-01418 (E.D.N.Y.) | $24,975,000 |
| *Plumbers' Union Local 12 Pension Fund v. Nomura Asset Acceptance Corp.*, No. 08-cv-10446 (D. Mass) | $21,200,000 |
| *Genesee County Emps.' Ret. Sys. v. Thornburg Mortg.*, No. 09-cv-00300-JB-KBM (D.N.M.) | $11,250,000 |
| *Tsereteli v. RAST 2006-A8, Credit Suisse (USA) LLC*, No. 08-cv-10637 (S.D.N.Y.) | $11,000,000 |

8.     At the time of the Underwriter Defendant Settlement, discovery in the case was far advanced. As detailed below, for over five years prior to agreeing to the Underwriter Defendant Settlement, Lead Counsel conducted an extensive investigation into the events and transactions underlying the claims in the Action. Lead Counsel, and Additional Plaintiffs' Counsel[4] at Lead Counsel's direction, analyzed the evidence collected during this time, which included publicly-available information about IndyMac, over eleven million documents as well as information from confidential witnesses and Individual Defendants and from depositions of

---

[4]  "Additional Plaintiffs' Counsel" refers to the law firms of  Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein"); Cohen, Placitella & Roth, P.C. ("Cohen Placitella"); Kohn Swift & Graf, P.C. ("Kohn Swift"); Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser") (with their local firm, Stover, Gadow and Tyler, PLLC); Trujillo Rodriguez & Richards (which, subsequently, merged into Schnader Harrison Segal & Lewis LLP) ("Schnader Harrison"); Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein"); and Zwerling, Schachter & Zwerling, LLP ("Zwerling Schachter"). Together, Lead Counsel and Additional Plaintiffs' Counsel are referred herein as "Plaintiffs' Counsel").

both fact and expert witnesses.  Lead Counsel also consulted with experts on issues related to MBS, loan underwriting, due diligence, statistics, valuation, damages and loss causation. Indeed, Lead Counsel and their experts reviewed and, re-underwrote 1,200 mortgage loan files for the mortgages underlying the Certified Offerings, and then analyzed the results thereof.

9.      In addition to developing the factual record, Lead Counsel also researched and analyzed the novel issues of law arising regarding the strengths and weaknesses of the claims, especially in light of the unfolding factual evidence.  Lead Counsel further considered trial strategy and presentation of evidence at trial, including admissibility and authentication of evidence.

10.      Lead Counsel also worked efficiently and with the assistance of Additional Plaintiffs' Counsel to brief numerous significant motions, including (i) opposing defendants' five motions to dismiss; (ii) filing motions to intervene on behalf of additional investors; (ii) drafting two comprehensive motions for class certification; and (iii) drafting and responding to several discovery motions.  Lead Counsel also successfully opposed the Underwriter Defendants' attempt to appeal the class certification order.

11.      Lead Counsel prepared two detailed mediation statements and attended two day-long mediation sessions, held on April 29, 2013 and July 18, 2014 in New York, NY.  Both mediations were conducted with the assistance of Judge Infante.  At the time the arm's-length Underwriter Defendant Settlement was agreed to, therefore, Lead Counsel had a complete understanding of the strengths and weaknesses of their claims, the defenses, potential damages and the parties' relative positions.

12.      Lead Plaintiffs obtained this recovery for the Settlement Classes despite significant risks in terms of proving liability against the Underwriter Defendants, as well as the

availability to the Underwriter Defendants of affirmative defenses unavailable to other defendants in the Action.  As detailed in the accompanying memorandum in support of the Final Approval Motion ("Settlement Brief"), with respect to those other defendants, the bankruptcy of IndyMac Bank, the essential insolvency of IndyMac MBS, Inc. ("IndyMac MBS"), and the very limited recovery available from the Individual Defendants effectively precludes doubts about the collectability of any substantial judgment obtained against them had the case proceeded through trial.

13.     By Order dated September 30, 2014, this Court instructed Lead Plaintiffs and the Court-appointed Claims Administrator to provide notice of the settlement to potential class members.[5]  As of December 15, 2014, the notice administrator has disseminated notice of the Settlement to over 6,832 potential class members by first-class mail, postage prepaid.  *See* Mailing Aff. ¶ 12.  To date, there have been no objections to the Settlement or to Plaintiffs' request for an award of attorneys' fees and reimbursement of Litigation Expenses.  *Id.* ¶ 23. Moreover, to date, there have been no exclusion requests.  *Id.* ¶ 21.  The deadline for such objections and exclusions to be filed is January 13, 2015.

## II.     FACTUAL SUMMARY OF LEAD PLAINTIFFS' CLAIMS AGAINST THE UNDERWRITER DEFENDANTS

14.     The Class Action arises out of Underwriter Defendants' sale of mortgage pass-through certificates ("Certificates") derived from pools of securitized mortgages originated or acquired by IndyMac Bank, F.S.B. and then offered for sale to investors in discrete securities offerings ("Offerings").  Lead Plaintiffs asserted claims under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, against, *inter alia*,  IndyMac MBS, a wholly-owned subsidiary of IndyMac Bank as the Depositor and

---

[5]  *See* Order Certifying Class For Settlement And Approving Notice To The Settlement Class Of The Proposed Settlement With Underwriter Defendants (the "Notice Order") (ECF No. 541).

Registrant for the Offerings; the Individual Defendants who signed the Registration Statements for the Offerings and/or were directors of IndyMac MBS; and the Underwriter Defendants who sold the MBS to the public.

15.     As alleged, IndyMac Bank, with the participation of the other defendants, bundled mortgages into Certificates and sold them to investors pursuant to Offering Documents[6] that contained identical or nearly identical material untrue statements.   As alleged, the Offering Documents contained materially untrue statements of fact and/or omissions concerning IndyMac's compliance with its already liberal loan underwriting standards and its stated policies and procedures regarding loans originated by third-party bank, thereby misrepresenting the true character of the loans and borrows underlying the Offerings – including the true creditworthiness of the borrowers and the real value of the underlying collateral.   *See* Second Amended Consolidated Class Action Complaint ("Complaint" or "Compl.") (ECF No. 337) filed Aug. 15, 2011, at ¶¶ 9, 65; *see also id.* ¶¶ 112-117, 119, 168 (a true and correct copy of the Complaint, without exhibits, is attached hereto as Exhibit R).

16.     As detailed in the Complaint, however, Lead Plaintiffs alleged that defendants systematically disregarded and departed from the stated underwriting standards, guidelines and policies and procedures regarding loans originated by third-party banks, thereby ignoring borrowers' ability to meet monthly obligations and overstating the value of collateral. Accordingly, the statements about IndyMac's compliance with its underwriting guidelines and policies and procedures regarding loans acquired by third party originators were therefore materially untrue when made. *See* Compl. ¶¶ 134-45.

---

[6] The Registration Statements, Prospectuses and Prospectus Supplements are referenced collectively as the "Offering Documents."

17.     Consequently, the "investment-grade" Certificates that class members purchased were far riskier than represented and rapidly lost value as borrowers defaulted on loans.  By the time the first complaint in the Action was filed, the credit ratings of almost all of the Certificates at issue had been significantly downgraded, many to "junk" status.  *See* Compl. ¶¶ 16, 214.

## III.    PROCEDURAL HISTORY

18.     On May 14, 2009, the Police and Fire Retirement System of the City of Detroit ("DPFRS") filed a complaint against the Individual Defendants, and certain other defendants, in the United States District Court for the Southern District of New York ("Detroit Action"), asserting claims under Sections 11, 12(a)(2) and 15 of the Securities Act.  *Police and Fire Ret. Sys. of the City of Detroit v. IndyMac MBS, Inc.*, No. 09 Civ. 4583(LAK), 2009 WL 1467322 (S.D.N.Y. May 14, 2009).  On June 29, 2009, Lead Plaintiffs filed an action in the Southern District of New York titled *Wyoming State Treasurer v. Olinski*, No. 09 Civ. 5933(LAK) (S.D.N.Y.) ("Wyoming Action"), alleging violations of Sections 11, 12(a)(2) and 15 of the Securities Act.  The Wyoming Action asserted claims on behalf of investors in nine IndyMac MBS offerings that were not covered in the Detroit Action, and that were arguably about to expire.

### A.     Appointment Of Lead Plaintiffs

19.     On July 13, 2009, WRS and WST moved for appointment as lead plaintiff and for the approval their chosen counsel, Berman DeValerio, as lead counsel.  Two additional movants, including City of Philadelphia Board of Pensions and Retirement ("Philadelphia") and a group lead by DPFRS, also sought appointment as lead plaintiff.

20.     The motions were fully briefed and, upon careful consideration, by Order (ECF No. 58) filed July 29, 2009, the Court appointed WRS and WST as Lead Plaintiffs and Berman

DeValerio as Lead Counsel for the Action and consolidated the Detroit Action and the Wyoming Action under a single docket number.

### B.     The Consolidated Amended Complaint And Motions To Dismiss

21.     On October 9, 2009, Lead Plaintiffs filed the consolidated class action complaint. On October 29, 2009, the Lead Plaintiffs filed an amended consolidated complaint, correcting the name of one defendant (the "Amended Complaint") (ECF No. 131).  The nearly 300-page Amended Complaint, with exhibits, alleged claims related to 106 public Offerings of IndyMac MBS Certificates, and was the end product of an investigation by Plaintiffs' Counsel that included, among other things: (i) review and analysis of documents filed publicly by IndyMac and other named defendants, review and analysis of press releases, news articles, and other public statements issued by defendants or IndyMac, or concerning IndyMac MBSs; (ii) review and analysis of governmental and private reports on investigations concerning IndyMac and/or other named defendants; (iii) locating, contacting and interviewing potential witnesses; (iv) review and analysis of news articles, media reports, and other publications concerning the mortgage banking and lending industries; (v) review and analysis of certain pleadings filed in other pending litigation naming IndyMac as a defendant; (vi) legal research into applicable causes of action, legal issues including the statute of limitations/repose; and (vii) consulting with damages/loss causation consultants.

22.     On November 23, 2009, all defendants moved to dismiss the Amended Complaint.  From November 2009 through early February 2010, the parties fully briefed the five motions to dismiss.  This briefing addressed several significant and novel legal issues unique to MBS, including class standing, materiality, and statute of limitation.

23.     On February 5, 2010, the Court issued an Order (ECF No. 195) dismissing all claims against the Rating Agency Defendants.[7]  On February 17, 2010, the Court held a hearing on the remaining motions to dismiss.  On June 21, 2010, the Court issued a Memorandum Opinion (ECF No. 214) (the "June 21, 2010 Memorandum Opinion") granting in part and denying in part Defendants' motions to dismiss the Amended Complaint.  In its June 21, 2010 Memorandum Opinion, the Court found that Lead Plaintiffs had adequately alleged violations of the Securities Act against IndyMac MBS, the Individual Defendants and those Underwriter Defendants who participated in the Offerings purchased by Lead Plaintiffs.  The Court dismissed on standing grounds all claims based on any Offering from which Lead Plaintiffs themselves had not purchased Certificates, effectively reducing the case against the Underwriter Defendants to just ten Offerings.

### C.      The Motions to Intervene

24.     In response to the Court's standing concerns expressed at the February 17, 2010 conference, on May 17, 2010, four institutional investors, DPFRS, Philadelphia, the LACERA and the Public Employees' Retirement System of Mississippi ("MissPERS"), filed motions to intervene as named plaintiffs to assert claims on behalf of themselves and other investors as to Offerings that they had purchased, but Lead Plaintiffs had not.

25.     The law firm of Kohn Swift and Wolf Haldenstein represents DPFRS.  Cohen, Placitella and Schnader Harrison represent Philadelphia.   Berman DeValerio represents LACERA.  Lieff Cabraser represents MissPERS.

---

[7]  The rating agency defendants were:  The McGraw Hill Companies, Inc., through its subsidiary Standard & Poor's, Moody's Investors Service, Inc. and Fitch, Inc.  Lead Plaintiffs appealed the dismissal of the rating agency defendants.  The U.S. Court of Appeals for the Second Circuit affirmed the District Court's dismissal.  *See In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167 (2d Cir. 2011).

26.     On July 6, 2010, the General Retirement System of the City of Detroit ("DGRS") filed a similar motion to intervene.  Zwerling Schachter represents DGRS.

27.     On August 19, 2010, the Iowa Public Employees' Retirement System ("IPERS") filed a similar motion to intervene.  Cohen Milstein represents IPERS.

28.     Collectively, DPFRS, Philadelphia, LACERA, MissPERS, DGRS and IPERS are referred to as the "Settlement Class Representatives."

29.     Following full briefing, supplemented by several rounds of letters citing subsequent authority, on June 21, 2011, the Court issued a Memorandum Opinion (ECF No. 317), denying in part and granting in part the motions to intervene.  The Court denied the motions to intervene as to claims related to Offerings for which the applicable one and three year limitation periods had expired.  The Court granted the motions as to certain claims that were timely filed arising out of DPFRS, LACERA, MissPERS and Philadelphia's purchase of certain certificates.

30.     As a result, the claims related to an additional three Offerings purchased by DPFRS and Philadelphia were restored to the Action.

31.     To preserve the claims of IndyMac investors in offerings that were dismissed on this basis, LACERA, MissPERS and DGRS appealed the denial of their motions to intervene, arguing that the filing of the initial complaints served to toll all limitation periods of purported class members.  Following lengthy briefing and oral argument, on June 27, 2013, the Second Circuit affirmed on this issue of first impression in the Circuit, holding that courts could not toll the three-year statute of limitations period contained in Section 13 of the Securities Act.  On November 22, 2013, MissPERS petitioned the United States Supreme Court for a writ of certiorari, which was granted on March 10, 2014.  On May 21, 2014, MissPERS filed their

opening brief and DGRS and LACERA filed a joint brief in support of MissPERS.  However, by order dated September 29, 2014, the Supreme Court dismissed its writ of certiorari as improvidently granted.

### D.    Discovery

32.    Following this Court's decision on the motions to dismiss, the PSLRA discovery stay lifted and the parties commenced discovery.  On August 27, 2010, the remaining defendants filed Answers to the operative complaint.  On September 10, 2010, the parties filed a joint Fed. R. Civ. P. 26(f) Report and Proposed Discovery Plan.  On September 17, 2010, the Court held a conference to discuss scheduling and discovery.  On October 15, 2010, the Court entered a Scheduling Order.

33.    On October 18, 2010, the Court entered the negotiated Stipulation and Order for the Production and Exchange of Confidential Information.

34.    On January 31, 2011, the Parties also entered into a Stipulation and Order Regarding Expert Discovery.  Lead Plaintiffs and the FDIC also negotiated a "claw back" agreement related to the production of potentially privileged information produced by the FDIC Receiver, which they filed with the Court on September 9, 2011.  On November 10, 2011, a separate confidentiality stipulation was entered, which concerned documents produced by the non-parties FDIC, as Receiver for IndyMac Bank, and OneWest Bank F.S.B., the current servicer of the loans underlying the Certificates at issue.

35.    As discussed herein, the parties conducted extensive discovery.  And, overwhelmingly, the parties were able to resolve their discovery disputes through negotiation and without Court intervention.  In fact, there were only four discovery motions filed: (i) one by plaintiffs for a protective order protecting absentee class members from discovery; (ii) one by

plaintiffs for production of certain documents about the Underwriter Defendants' later sale and solicitation of the Certificates; and (iii) two motions for protective order filed by the Underwriter Defendants related to 30(b)(6) and non-party depositions.   Additional disputes concerning document productions and written discovery responses were resolved without court intervention.

### 1.     Party Discovery

#### a.     Document Discovery from the Defendants

36.     On October 1, November 24, and December 17, 2010, Lead Plaintiffs served their first set of document requests on the Underwriter Defendants, the Individual Defendants and IndyMac MBS, respectively.   The requests were accompanied by a detailed production protocol prepared by Lead Plaintiffs in consultation with their e-discovery consultants concerning production format.   Defendants served objections in response.

37.     Document discovery, including additional document requests, meet and confer sessions between the parties, and related motion practice continued throughout the case.   By the time the Settlement was reached, Lead Plaintiffs had propounded two sets of document requests on the Individual Defendants; three sets on IndyMac MBS; and five sets on each Underwriter Defendant.

38.     The parties engaged in multiple, extensive meet and confer efforts to address defendants' objections and negotiate with respect to the production of documents.   These discussions concerned the scope and time period of discovery, relevant custodians, and search terms, with the parties visiting negotiations based on the production of documents throughout the litigation.

39.     Discussions with the Individual Defendants and IndyMac MBS were further complicated by the fact that most of IndyMac's documents were under the direct control of the

FDIC.  As such, Lead Counsel also engaged in lengthy and intense negotiations with defendants and FDIC's counsel concerning access to and searches of the FDIC's databases for responsive documents.  The FDIC also raised additional concerns about privileged documents and documents containing nonpublic personal information, which required Lead Counsel to negotiate a separate privilege "claw back" agreement and an additional protective order related exclusively to IndyMac documents produced by the FDIC.  This also placed additional burdens on Lead Counsel each time they attempted to use any such documents.

40.     By the time of the Underwriter Defendant Settlement, the Individual Defendants, along with the FDIC in its capacity as Receiver for IndyMac Bank, FSB and IndyMac Federal Bank, FSB had produced over 168,000 pages of legacy IndyMac documents directly to Lead Counsel, which were loaded into an electronic database called Lextranet.  In addition, the FDIC granted Lead Plaintiffs access to responsive documents contained in its online repository of IndyMac documents hosted by Relativity.  This repository alone comprised over eleven million documents.

41.     In addition to the IndyMac documents, the Underwriter Defendants produced almost one million pages of documents relevant to their involvement in the Offerings and concerning their due diligence defenses.  Also, discovery included (i) obtaining a sampling of loan documents from the additional 57,831 loans underlying each of the 518 Certificates that were part of the forty-two additional Offerings; (ii) obtaining documents from the Underwriter Defendants and their due diligence vendors regarding the forty-two additional Offerings; and (iii) the time consuming expert re underwriting of the new sample of loans.

42.     Lead Counsel, assisted by Additional Plaintiffs' Counsel, deployed significant attorney resources to review documents in both these databases and to identify and organize

documents relevant to Lead Plaintiffs' claims.  Lead Counsel assembled a document review team comprised of a discrete group of attorneys whose full time assignment was to review, analyze, and code documents, and to conduct targeted searches into specific factual issues.  Lead Counsel's attorneys trained, directed and supervised the document review team to develop the factual record in support of its claims.  Considerable time, expense, planning, and management was required to efficiently and effectively complete the review of such a large number of documents and extract the most probative information.  Moreover, a core team of the front-level document reviewers would hold regular status meeting with attorneys on the team to discuss the review and relevant issues.

43.    Lead Counsel's document review consequently culled a highly relevant selection of documentary evidence that Lead Counsel planned to submit into evidence to support Lead Plaintiffs' claims and challenge defendants' affirmative defenses.  Information learned through document review, also, formed the basis for identifying deposition witnesses, areas of examination, and for propounding additional discovery requests.

44.    Examples of such additional discovery requests included follow up document requests, subpoenas to third parties indentified in the document review, twelve separate sets of requests for admission, and interrogatories propounded on the Underwriter Defendants.  Each of these requests, in turn, spurred additional meet and confer efforts and the production of additional relevant information.

45.    Based on their extensive review of information obtained from all sources, Lead Counsel also propounded several sets of interrogatories and requests for admissions on the Underwriter Defendants.

15

### b.     Responding to Defendants' Discovery Requests

46.     Defendants also propounded discovery requests on Lead Plaintiffs, to which Lead Plaintiffs responded.   In anticipation of this, at the outset of the litigation, Lead Counsel interviewed staff at Lead Plaintiffs to identify necessary witnesses and preserve relevant documents.

47.     On November 1, 2010, the Underwriter Defendants and Individual Defendants served their first set of document requests on Lead Plaintiffs.   Lead Plaintiffs filed their timely responses and objections.   Meet and confer efforts then proceeded to address Lead Plaintiffs' objections and negotiate the production of documents.   A second request for production was served on Lead Plaintiffs on September 17, 2013, to which Lead Plaintiffs responded on October 18, 2013.

48.     Lead Plaintiffs ultimately produced over 53,000 pages of responsive documents in response to defendants' document requests.

49.     On November 1, 2010, Individual Defendant Lynette Antosh served her First Set of Interrogatories to Lead Plaintiffs, which Lead Plaintiffs responded to on December 13, 2010.

50.     Additional Plaintiffs have also responded to Defendants' document requests, served on DPFRS and Philadelphia on September 8, 2011 and again on DPFRS on September 3, 2013.   DPFRS produced over 16,000 pages of responsive documents and Philadelphia produced 1,000 pages of documents, as well.

51.     DGRS, LACERA, MissPERS and IPERS also responded to defendants' document requests, served in late August and early September, 2013.   DGRS produced over 1,000 pages of responsive documents; LACERA over 57,000 pages; MissPERS over 3,900 pages; and IPERS over 95,000 pages.

52.    In addition to their production of documents, Lead Plaintiffs also responded to interrogatories served by the Individual Defendants on January 27, 2011 and by the Underwriter Defendants on September 26, 2013.

53.    Each production required the culling and review of documents, as well as participation in meet and confers over the scope of the production.

### 2.    Document Discovery from Third Parties

54.    Discovery from Non-Parties has been a critical aspect in the Action, particularly given IndyMac's demise and the important role played by third party due diligence vendors retained by the Underwriter Defendants.

55.    Between September 2010 and the date of the Settlement Agreement, Lead Counsel served forty-two subpoenas, in addition to four FOIA requests, on third parties, which included (i) multiple subpoenas served on OneWest Bank (in their capacities as successor in interest to IndyMac); (ii) numerous subpoenas directed to on the Underwriter Defendants' due diligence vendors ; (iii) subpoenas on the accounting firms retained by IndyMac and/or the Underwriter Defendants; and (iv) subpoenas on brokers/traders in the MBS market.  Lead Counsel met and conferred extensively with these subpoenaed third parties, who collectively produced over 1.1 million pages of responsive documents.

56.    Like the documents produced by defendants, the documents produced by third parties were loaded into Lead Counsel's Lextranet database and reviewed by Lead Counsel's discovery team.  Documents were coded for responsiveness and compiled into the record Lead Plaintiffs planned to present for their case-in-chief.  This document review also provided insight that formed the basis for further discovery requests to Defendants and other third parties.  IndyMac's legacy mortgage loan files were of critical importance to Lead Plaintiffs' case.  After

the failure of IndyMac, those loan files were transferred to OneWest Bank, F.S.B., who became the servicer of the loans.  To prove Lead Plaintiffs' allegation that IndyMac failed to follow its stated mortgage loan underwriting standards and policies and procedures, forensic review of the actual loan files was necessary.  Lead Counsel worked with a statistical expert to select a viable sample of loans from the over 16,000 mortgage loans underlying the Certified Offerings.  Those loans were identified by a unique loan number assigned by IndyMac around the time of origination.

57.     On October 14, 2010, Lead Plaintiffs subpoenaed OneWest Bank seeking production of relevant loan files and related documents in its possession, custody or control. Lead Counsel engaged in protracted negotiations with OneWest over the scope and form of production, as well as the costs of such production.  Lead Counsel further negotiated a further protective order with the FDIC and OneWest to address the widespread nonpublic personal information that was contained in the loan files.  Through those negotiations, OneWest ultimately produced loan files for over 2,700 loans (comprising over one million pages), which were then reviewed and analyzed by Lead Counsel and Lead Plaintiffs' re-underwriting expert.

58.     At the time the Underwriter Defendant Settlement was reached, Lead Plaintiffs had issued a second subpoena to OneWest seeking production of additional loan files related to the loan pools underlying the Offerings in the expanded case.

59.     In addition to OneWest, Lead Plaintiffs sought significant documents from a number of other third parties, particularly the due diligence vendors retained by the Underwriter Defendants to perform a loan level review for each Offering.  Such vendors conducted onsite loan level reviews and prepared summary reports, which also included recommendation for loans that should be excluded from the loan pool.  Additional vendors also reviewed the value of the

underlying collateral backing the loans.  These documents were critical in establishing not only what the Underwriter Defendants did, but what they did not do during the due diligence process.

60.     Lead Plaintiffs also subpoenaed eleven separate financial institutions to obtain trading data about sales and other transactions in the Certificates sold in each Offering.  Such data was relevant not only to the question of numerosity, but also relevant to Lead Plaintiffs' damages analysis.

61.     Defendants also engaged in extensive third-party document discovery, serving eleven separate subpoenas on plaintiffs' financial advisors.

62.     Defendants also obtained large document productions from an entity known as AllREGS, which was purportedly comprised of over 10,000 pages of IndyMac loan underwriting guidelines applicable since the early 2000s.  Both the FDIC and the Underwriter Defendants produced multiple copies of these underwriting guidelines.

63.     These documents were a key focus of the Underwriter Defendants' arguments opposing the second class certification motion.  The Underwriter Defendants argued that the underwriting guidelines changed throughout the relevant time period based on loan type and origination channel.  At the direction of Lead Counsel, attorneys at Berman DeValerio and Kohn Swift completed a comprehensive review of the underwriting guidelines and documented the extent to which versions materially differed, if at all. The results of that analysis were summarized in Lead Plaintiffs' reply brief in support of their motion to expand the certified class.

### 3.    Depositions

64.    The parties engaged in extensive deposition practice during both rounds of class certification briefing and depositions on the merits of the case were underway at the time the Settlement was reached.

65.    The deposition planning for this case took considerable time to ensure that the limited depositions were chosen and employed efficiently and effectively.  At the September 17, 2010 Rule 26 conference, Lead Plaintiffs requested leave to take up to forty depositions of fact witnesses, citing the number of defendants and offerings at issue in the litigation.  Defendants opposed, and this Court imposed a fifteen deposition limit, for both fact and expert depositions. As a result, Lead Counsel had to be particularly efficient in its approach to depositions and discovery as a whole to ensure that the necessary evidence would be admissible at trial.  Some of its tactics included the use of Fed. R. Evid. 902(11) declarations, requests for admissions, and interrogatories.

66.    Additionally, Lead Counsel balanced between focusing on Rule 30(b)(6) depositions of the Underwriter Defendants, as opposed to focusing in on the two or three people that were closely involved in the due diligence process and trading of the MBSs.  The parties met and conferred extensively respecting the 30(b)(6) deposition notices and the third-party deposition subpoenas.   Most of the individuals named in the nonparty subpoenas were represented by the same counsel as the Underwriter Defendants.

67.    While the parties resolved some disputes regarding the scope of depositions, they reached an impasse respecting others.  On August 21, 2013, the Underwriter Defendants filed a Motion for Protective Order Regarding Disputed Topics in Lead Plaintiffs' Notices for Rule

30(b)(6) Depositions.  Lead Plaintiffs opposed.  On March 18, 2014, the Court denied this motion.

68.     By the time the parties reached settlement, there were fifteen depositions, including four depositions of class representatives; four expert depositions; three depositions of investment advisors to the class representatives; three deposition of fact witnesses; and one Rule 30(b)(6) deposition.  Lead Counsel took six of those depositions and participated in and/or defended the remaining nine depositions.  Moreover, at the time settlement was reached, Lead Counsel had also prepared for, and were in the process of scheduling, several additional 30(b)(6) depositions, as well as several additional depositions of the Underwriter Defendants former employees and advisors.

### 4.     Trial Strategy And Use of Additional Discovery Tools To Ensure Admissibility And Authenticity of Evidence At Trial

69.     As part of its trial strategy, Lead Plaintiffs considered evidentiary issues about how to best present its case to a jury.  This was particularly important here because IndyMac was no longer in existence and, thus, documents could not be authenticated or rendered admissible through company custodians.  Accordingly, Lead Counsel negotiated with and prepared a number of declarations for Individual Defendants and other IndyMac former employees that would ensure the authentication and admissibility of such documents.

70.     Further, Lead Counsel served a number of requests for admissions and interrogatories, both in an attempt to limit the need for certain depositions and to facilitate proof at trial.

71.     Additionally, once the Court allowed Lead Counsel to expand the Action to cover investors in forty-two Additional Offerings, Lead Plaintiffs requested that the Court hold a bellwether trial on a limited number of Certified Offerings, for which Plaintiffs' expert analysis

and discovery was substantially advanced.   However, this request was neither granted nor denied.

72.     Many of the Underwriter Defendants' witnesses for the Certified Offerings were the same as for the Additional Offerings.  Thus, the Underwriter Defendants demanded that Lead Plaintiffs agree not to re-depose any witness a second time.  Lead Plaintiff opposed this request as premature.  On November 18, 2013, the Underwriter Defendants and certain non-parties in their individual capacities filed a Motion for a Protective Order Preventing Multiple Depositions of Non-Party Witnesses.

73.     On March 18, 2014, the Court denied the two pending Motions for Protective Order.  But, while the Lead Plaintiffs won both motions, the Court cautioned that it was unlikely to approve a second deposition of any witness.  This was an issue because while document discovery related to the Certified Offerings was essentially complete, the Underwriter Defendants were producing documents related to the forty-two offerings added to the case in July 2013 on a rolling basis.

**E.     Expert Discovery And Analysis**

74.     As noted above, the factual nature of this litigation and the novel issues involving MBS required the reliance on experts in the areas of loan re-underwriting, class certification, due diligence, and damages, as detailed below.

**1.     Re-Underwriting Experts**

75.     The heart of Lead Plaintiffs' factual case centered on the thousands of loans that comprised the loan pools underlying each Offering.  To determine whether the Offering Documents contained false statements about IndyMac's adherence to proper underwriting standards and requirements that loans it acquires equally adhere to such standards required a

detailed analysis that could only be meaningfully performed by experts in the field of loan underwriting.   Lead Plaintiffs' re-underwriting team were comprised of experienced staff of former mortgage loan underwriters and worked under the direction of Lead Plaintiffs' anticipated testifying expert.   They reviewed 1,200 loan files and prepared findings for each loan and detailed IndyMac's compliance with stated guidelines and policies.   This expert review contained several steps, including among other things: (1) determining a statistically significant cross-section of applicable loan pools; (2) determining applicable underwriting guidelines for each loan in the sample; (3) analyzing the loans in comparison to applicable underwriting guidelines; and (4) extrapolating those findings to the broader loan pool.

76.    At the time the Parties reached the Underwriter Defendant Settlement, Lead Plaintiffs' experts had reviewed substantially all of the sample of loans underlying the Certified Offerings and prepared detailed findings that were reviewed and analyzed by Lead Counsel. This data was an important focus of Lead Plaintiffs' mediation arguments during discussions with the Underwriter Defendants.

## 2.    Class Certification Expert

77.    In connection with Lead Plaintiffs' first motion for class certification, discussed below, Lead Plaintiffs' expert, Prof. Steven P. Feinstein ("Prof. Feinstein"), produced over 2,700 pages of documents and was deposed on January 28, 2011.   Defendants' expert, Walter N. Torous, Ph.D. ("Dr. Torous") produced over 20,000 pages of documents and was deposed by Lead Plaintiffs on March 15, 2011.

78.    In connection with the second motion for class certification, Lead Plaintiffs' expert, Prof. Feinstein, produced another 3,500 pages of documents and was again deposed on

October 18, 2013.  Dr. Torous produced another 3,000 pages of documents and was deposed by Lead Plaintiffs on December 12, 2013.

### 3.     Due Diligence Experts

79.     In addition to forensic re-underwriting, Lead Plaintiffs retained an expert in due diligence to opine on the Underwriter Defendants' pre-offering review and an economist to opine on damages and the so-called negative causation defense.

80.     The due diligence expert assisted Lead Counsel in understanding the nomenclature and principles peculiar to the world of due diligence in mortgage-backed securities offerings and also reviewed relevant documents with Lead Counsel.  This assistance guided Lead Counsel in crafting discovery requests, exploring new avenues of discovery and preparing for depositions.

### 4.     Damages Expert

81.     Lead Plaintiffs retained an economist to opine on damages, materiality and the so-called negative causation defense.

82.     The economist prepared detailed econometric models of valuation and damage calculations that accounted for variable scenarios for individual tranches and certificates in each Offering including, for example, valuations on specific relevant dates and the effect of paydowns.  These models proved invaluable in Lead Counsel's preparations for mediation.

### F.     Initial Class Certification

83.     On December 10, 2010, Lead Plaintiffs filed their Motion to Certify Class and Appoint Class Representatives And Class Counsel (the "First Class Certification Motion").  The First Class Certification Motion sought to certify a class of investors that had purchased Certificates issued in ten IndyMac MBS Offerings that the Court had denied the Motions to

Dismiss.   Defendants opposed the motion.   As noted above, this motion was fully briefed following extensive class certification discovery, including six depositions of both Plaintiffs' investment advisers and experts.

84.     On August 17, 2012 the Court granted the First Class Certification Motion as to nine Offerings and dismissed Lead Plaintiffs' claims as to the tenth.

85.     On August 30, 2012, the Underwriter Defendants petitioned the United States Court of Appeal for the Second Circuit pursuant to Federal Rule of Civil Procedure 23(f) for review of the class certification decision.   *See Police and Fire Retirement System of the City of Detroit v. Credit Suisse (USA) LLC*, No. 12-3463 (2d Cir.), Lead Plaintiffs opposed the 23(f) petition.   On January 17, 2013, the Second Circuit denied the 23(f) petition.   The class certification order as to the First Class Certification Motion, therefore, became law of the case on that date and the Action proceeded as a class action.

**G.     The *NECA-IBEW Health & Welfare Fund v. Goldman Sachs* Decision and the Motion For Reconsideration**

86.     On September 6, 2012, the Second Circuit issued its opinion in *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1624 (Mar. 18, 2013) ("*Goldman*").   The *Goldman* opinion set forth the controlling law in the Second Circuit regarding issues of standing to bring class claims.   In *Goldman*, the Second Circuit reversed a District Court's dismissal of claims based on an interpretation of class standing similar to that relied on by the Court in its June 2011 Motion to Dismiss Order.

87.     In light of *Goldman*, on October 12, 2012, Lead Plaintiffs filed their Rule 54(b) Motion for Reconsideration of the Court's June 21, 2010 Memorandum Opinion Based on an Intervening Change in Controlling Law ("Motion for Reconsideration").   The Motion for Reconsideration sought reinstatement of the class claims as to forty-two of the ninety-two

Offerings dismissed by the Court's June 2010 Order.  Defendants opposed the Motion for Reconsideration as to five of the offerings and requested a stay pending the U.S. Supreme Court's decision on a writ of certiorari brought by the *Goldman* appellees.  On November 16, 2012, the Court denied the Motion for Reconsideration without prejudice to its renewal after the U.S. Supreme Court's disposition of the *Goldman* petition for certiorari.

88.     On March 18, 2013 the U.S. Supreme Court denied the writ of certiorari in *Goldman*.  133 S. Ct. 1624 (Mar. 18, 2013).  A Status Conference was held before this Court on the same day.  At the Status Conference, the Court ordered the parties to mediation and stayed all proceedings for sixty days.  In the event no settlement resulted from the mediation, the Court instructed the parties to submit a stipulation respecting the IndyMac MBS offerings they agreed could be reinstated into the Action under *Goldman* and to renew the Motion for Reconsideration as to the remainder.

**H.     Initial Mediation in 2013**

89.     In compliance with the Court's instructions, the mediation took place in New York on April 29, 2013, with the assistance of Judge Infante.  In preparation of for the mediation, the parties prepared detailed mediations statements, with supporting documentation, engaged the assistance of experts, and participated in a one-day session attended by representatives of both Lead Plaintiffs and the Wyoming Attorney General's office.  The session did not result in a settlement.

**I.     Stipulation/Motion To Reinstate Dismissed Offerings**

90.     The parties promptly informed the Court of the unsuccessful mediation.  On May 9, 2013, in accordance with the Court's orders, the parties submitted three Status Reports and a Stipulation Regarding Lead Plaintiffs' Anticipated Renewal of their Motion for

Reconsideration by which the Underwriter Defendants agreed not to oppose the renewed Motion for Reconsideration as to thirty-six of the forty-two offerings originally identified in the Motion for Reconsideration. The parties also submitted a Stipulation respecting Lead Plaintiffs' Anticipated Motion to Amend the Class Certification Order, in which the Underwriter Defendants agreed not to contest the numerosity requirement of Federal Rule 23(a) in any future class certification briefing.

91. On May 17, 2013, Lead Plaintiffs filed their Renewed Motion for Reconsideration of the Court's June 20, 2010 Memorandum Opinion Based on an Intervening Change in Controlling Law to address the six contested offerings. Defendants opposed.

92. On July 23, 2013, the Court granted the Motion for Reconsideration. At that point, the Action comprised a certified class with claims arising out of nine IndyMac MBS Offerings and the additional reinstated forty-two Offerings for which Lead Plaintiffs possessed class standing, but class certification had not been granted.

## J. Class Certification Motion On Expanded Class

93. On August 30, 2013, in accordance with the schedule stipulated to by the parties, Lead Plaintiffs filed their Motion to Expand the Certified Class to Include Additional Offerings of Mortgage Pass-Through Certificates (the "Second Class Certification Motion"). Submissions in support of the Second Class Certification Motion demonstrated that the statements in the two Registration Statements and fifty-one Prospectus Supplements now at issue in the Action were effectively identical. Lead Plaintiffs also submitted an expert report of Prof. Feinstein in support of their arguments as to the materiality of statements about loan underwriting and the commonality of class members' claims. Lead Plaintiffs also moved for appointment of the Additional Plaintiffs as additional class representatives.

94.     The Underwriter Defendants opposed the Second Class Certification Motion. Before filing their Opposition on November 15, 2013, the Underwriter Defendants conducted additional discovery including taking the deposition of two new proposed class representatives and of Lead Plaintiffs' expert, Prof. Feinstein.   Submissions in support of the Underwriter Defendants' Opposition included an expert report by Dr. Torous challenging the opinions of Prof. Feinstein.   Dr. Torous's report and the Underwriter Defendants' Opposition also relied heavily on their purported review of over 15,000 pages of IndyMac underwriting guidelines. The Underwriter Defendants argued that these underwriting guidelines changed materially over time, raising individual issues about whether any individual loan had been properly originated that would predominate over questions common to all class members.

95.     On January 13, 2014, Lead Plaintiffs filed their reply papers in further support of the Second Motion for Class Certification.   Submissions in support of Lead Plaintiffs' reply included a comprehensive rebuttal to the Underwriter Defendants' arguments about the underwriting guidelines and the results of Plaintiffs' Counsel's review of underwriting guidelines relied on by the Underwriter Defendants.   Among other things, Lead Plaintiffs demonstrated how the origination standards reflected in the underwriting guidelines did not materially change during the relevant time period, how the statements regarding IndyMac's policies and procedures were uniform and, thus, how individual issues did not predominate.

96.     On January 29, 2014, the Underwriter Defendants moved for leave to file a Sur-Reply to the Second Class Certification Motion.   Lead Plaintiffs opposed.   The Court granted the Underwriter Defendants' motion for leave on March 18, 2014.   The parties also submitted supplemental authority relevant to the Second Class Certification Motion on March 19 and 20, 2014.

97.     On March 20, 2014, the Underwriter Defendants filed their Sur-Reply, as permitted by the Court.  At the time the parties reached their tentative settlement, the Second Motion for Class Certification was under submission.  Regardless of how the Court would have ruled on class certification, the losing party would likely have appealed the ruling.

### K.     Mediation And Settlement Agreement With The Underwriter Defendants

98.     On July 18, 2014, the parties again met in New York City for a second all-day mediation session before the Hon. Judge Infante.  As before, the parties presented detailed accounts of their perspectives on all aspects of the Action and engaged in contentious negotiations, facilitated by Judge Infante.  The session was attended by representatives of Lead Plaintiffs, including two representatives from the Wyoming Attorney General's office. Following intense negotiations, Judge Infante made a "mediator's proposal" to resolve the litigation.  The following week, all parties agreed to settle the claims against the Underwriter Defendants pursuant to the proposal.

99.     On September 9, 2014, the parties formalized the Settlement in a signed Stipulation of Settlement and, on September 11, 2014, Lead Plaintiffs filed their Unopposed Motion For Certification Of The Settlement Class, Approval Of Form Of Notice And Scheduling Of Final Settlement Hearing.  (ECF No. 532.)  Following discussion at the September 18, 2014 telephonic conference before the Court, the parties revised certain provisions and executed an Amended Stipulation and Agreement of Settlement, dated September 19, 2014.

## IV.     RISKS FACED BY LEAD PLAINTIFFS IN THE ACTION

100.     While Lead Plaintiffs and Lead Counsel believe that the claims asserted against the Underwriter Defendants have merit, they also recognize that there were considerable risks involved in pursuing the Action that could have led to a substantially smaller recovery or no

recovery at all for the Settlement Class.  Indeed, the risks of establishing liability were especially heightened in the case at hand compared to almost all other MBS class action cases that have settled because there was no collectible issuer.

**A.      The Risks Of Establishing Liability**

**1.      Proof of Falsity was Uncertain and Complicated.**

101.    There were significant risks that Lead Plaintiffs would not be able to establish falsity.  For one, the Underwriter Defendants argued that the loans underlying the MBS performed well and, but for the real estate collapse against, against which no amount of loan underwriting could protect, would have continued to have maintained their value.  Indeed, they indicated that they would argue that (i) the projected performance for these Offerings exceeded the average projected performance for their respective comparable pools; and (ii) the underlying mortgage loans here had lower default rates than comparable loans with similar characteristics.

102.    Moreover, the Underwriter Defendants also argued that there were significant risk disclosures that warned investors about the risks investing in the MBS such that the statements were not untrue.  For example, the Underwriter Defendants placed significant weight on the fact that the Offering Documents all disclosed that the underlying loans were often "low doc," "no doc" or "stated income" loans, which did not require income, employment, or asset verification and that the Offering Documents disclosed that "exceptions" to IndyMac Bank's underwriting guidelines were permitted.  *See* Underwriter Defendants' Motion to Dismiss Plaintiffs' Amended Consolidated Class Action Complaint (ECF No. 159) at 13-14.

103.    Additionally, Lead Plaintiffs' ability to prove falsity relied heavily on expert testimony, which included a complex sampling of the loan pools at issue, an analysis of the underlying sample, and the extrapolation of such results to the loan pool in its entirety.  The

Underwriter Defendants would have challenged both this use of sampling to prove falsity and the actual expert findings through with their own expert testimony.

104.    The Underwriter Defendants would have also challenged the admissibility of certain IndyMac internal documents that Lead Plaintiffs believed evidenced problems with its compliance with its underwriting guidelines and its policies concerning loans originated by third-party lenders.   Since the Issuer, Depositor, and Sponsor here were in liquidation, the Underwriter Defendants would challenge Lead Plaintiffs' ability to introduce key IndyMac documents into evidence to establish that the statements contained in the Offering Documents were untrue.

105.    In addition, each Underwriter Defendant is only potentially liable for the specific Offerings that it underwrote.   Thus, they would argue that Lead Plaintiffs had to make a separate showing as to each specific Offering.   While Lead Plaintiffs believe that they could make a showing by proving a pattern across all Offerings, this fact gives rise to additional complexity and challenges to proving liability to a jury.

### 2.    Underwriter Defendants' Complete Due Diligence Defense.

106.    Another hurdle that Lead Plaintiffs faced was that the Underwriter Defendants' due diligence defense offered a complete defense to liability.   Unlike virtually every other MBS class action that has settled to date, there are no issuer or issuer-related parties that can be held strictly liable.   While an issuer is held to a strict liability standard, underwriters may escape liability if they establish their due diligence.   Here, the Underwriter Defendants argued that they had no knowledge of the falsity of the statements in the registration statements, that they conducted adequate due diligence with respect to their inquiry as to the truth of the statements, and that they believed the statements to be true.

107.     Although Lead Plaintiffs' experts would have testified that the Underwriter Defendants' due diligence was inadequate and that they lacked a reasonable basis to believe that the statements were true, the Underwriter Defendants would have proffered testimony that the due diligence performed was reasonable and in accordance with the custom and standards in the industry at that time.  Moreover, the Underwriter Defendants would have argued that they earned a mere pittance compared to the total potential damages and, thus, should not be held liable for such large losses.   Indeed, the Offering Documents state that the underwriters' fees in the aggregate for all fifty Offerings amounted to approximately $35.6 million, roughly a tenth of the value of the settlement.   It is unclear how a jury would have weighed the competing expert testimony and all this evidence.

### 3.     Underwriter Defendants' Investor Knowledge Defense.

108.     The Underwriter Defendants also would have vigorously argued that Lead Plaintiffs and members of the Settlement Class had knowledge that the alleged misstatements in the Offering Documents were untrue and are precluded from recovery.   For example, the Underwriter Defendants would argue that sophisticated investors were well aware of problems with MBS securities and the loans underlying them well in advance of the market crash.   Such arguments could have been appealing to lay jury members.

### 4.     Underwriter Defendants' Statute of Limitations Defense.

109.     The Underwriter Defendants contend that investors were on notice of potential problems before one year prior to the first complaint being filed.   While the Court dismissed this challenge at the motion to dismiss phase, this remained a question of fact for the jury to weigh.

### B.      The Risks Of Establishing Damages

110.      Establishing damages in this case would have been particularly complicated. Unlike securities that trade in a liquid market, the MBS Offerings at issue here did not trade on an exchange and were automatically priced.  Given that there was either scant or no information concerning market transactions, Lead Plaintiffs' damages expert had to apply more complex methods to determine the value for each Certificate.  The Underwriter Defendants made clear that they were prepared to challenge Lead Plaintiffs' ability to calculate damages and would have retained experts to challenge the reliability of Lead Plaintiffs' experts' damages models particularly for Offerings where there was no pricing data.  Moreover, the Underwriter Defendants had a series of defenses to reduce or eliminate damages, even if Plaintiffs were able to prove damages, as noted below.

111.      **Underwriter Defendants' Negative Causation Defense.**  The Underwriter Defendants' negative causation defense also posed a threat to a verdict in favor of Plaintiffs. Although Section 11 losses are presumed to be caused by allegedly untrue statements in the Offering Documents, the Underwriter Defendants have an affirmative defense whereby they could absolve themselves of liability or drastically reduced damages if they showed that the losses were caused in whole or in part by other factors.  Here, the Underwriter Defendants would have argued that macroeconomic factors, *i.e.*, the financial market meltdown in 2008, housing price declines, and reduced liquidity, caused the losses.  Indeed, they would have tried to proffer expert testimony to show that the IndyMac MBS outperformed many other MBS.  They would have argued that the meltdown was so severe that no amount of strict underwriting could have prevented the drop in MBS value.  Although Lead Plaintiffs believe that the Underwriter Defendants would not have sustained their burden of showing that some or all losses were

caused by the market meltdown, this also remained a question for the jury.  If the Underwriter Defendants were successful in establishing "negative causation," the damages could have gone to zero.

112.    **Underwriter Defendants' Additional Challenges To Damages.**  Under Section 11 of the Securities Act, damages are "the difference between the amount paid for the security and (i) the value of the security at the date of suit; (ii) the price of the security if sold before suit was brought; or (iii) the price of the security if sold after suit was brought and before judgment, if damages are less under the latter calculations."  15 U.S.C. § 77k(e).  Lead Plaintiffs' expert estimated that the statutory damages were arguably in the billions, assuming all its assumptions and methodology for valuing MBS were accepted.  However, even assuming Lead Plaintiffs could establish liability and were able to overcome any negative causation defense, the Underwriter Defendants would have argued that the statutory damages should be further reduced to avoid what they perceived to be a windfall.

113.    For example, the Underwriter Defendants argued that statutory damages must be reduced because many of the 615 Certificates at issue have increased in value since the first complaint was filed.  In May 2009, when the first complaint was filed, the MBS market had plummeted across the board.  Thus, the Underwriter Defendants would argue, the May 14, 2009 values of the IndyMac MBS did not stem from the allegedly untrue statements and, thus, the May 14, 2009 values were understated.

114.    Similarly, the Underwriter Defendants argued that Settlement Class Members have continued to receive paydowns (*i.e.*, principle distributions) on many of the Certificates since May 14, 2009.  Indeed, the Underwriter Defendants argued that these paydowns were effectively no different than bond redemptions.  Accordingly, the Underwriter Defendants would

argue, equity requires that any damages be reduced by the value of the payments so that members of the Settlement Classes do not receive a double windfall, particularly where the Certificates were paid off in full.  Lead Plaintiffs contend that it would be improper to reduce the damages because the value of the MBS Certificates on the complaint date assumes continued paydowns.  Thus, reducing damages by the value of these additional payments would amount to reducing the value of the MBS Certificates based on paydowns twice.  Also, Lead Plaintiffs believe that Section 11 provides for a clear method of calculating damages and does not permit this further reduction.  However, no court has yet considered either of these matters, and it is unclear how they would be resolved.

115.    In addition, the Underwriter Defendants would argue that any judgment against them must be further reduced pursuant to the proportional liability provisions of the federal securities laws.  When, as here, a plaintiff partially settles claims against certain defendants, the non-settling defendants argue that they are entitled to a judgment credit of at least the proportionate fault of the settling defendants.  *See* 15 U.S.C. § 78u-4(f)(2)(B).  The Underwriter Defendants assigned all or most of the fault to others, such as IndyMac and its officers and directors, who arguably were more responsible for untrue statements and omissions (authored by IndyMac) in the Offering Documents.  If the case proceeded to trial, the Underwriter Defendants would argue that any judgment against them must be reduced by the value of the Individual Defendants' proportional share of liability and, given that the Individual Defendants were executives at IndyMac MBS Inc., they bear the vast majority of the liability.  While Lead Plaintiffs argue that this proportional liability theory does not apply to Section 11 claims, the Underwriter Defendants would have argued that common law and equity require this proportional liability cap.  If successful, these defenses could substantially reduce or eliminate

any recovery against the Underwriter Defendants.  Since this is a relatively novel issue, there were significant risks involved.

116.    The bottom line is that the Underwriter Defendants believed that, even assuming that Lead Plaintiffs could establish liability and the Underwriter Defendants could not prove negative causation, the maximum class-wide damages were a mere fraction of what Lead Plaintiffs believed the statutory damages were.

117.    In sum, although Lead Plaintiffs strongly believe their claims have substantial merit, they face significant hurdles in proving the liability of each of the Underwriter Defendants, establishing damages, and countering the Underwriter Defendants affirmative defenses.  Resolution of any of these issues, including due diligence, would inevitably have involved various "battles of the experts," with the concomitant risk that the jury could credit the Underwriter Defendants' experts over Lead Plaintiffs' experts.

### C.    The Risk Of Maintaining The Action As A Class Action Through Trial

118.    While this Court certified a litigation class in this action, maintaining class certification throughout the litigation and trial presented additional risks.  This is particularly so because, at the time of the Underwriter Defendant Settlement, Lead Plaintiffs' second motion for class certification was pending.  While the Court initially certified a class of investors in nine offerings, it allowed Lead Plaintiffs to expand the action to cover an additional forty-two offerings. There was a risk that the Court would decertify the existing class and/or refuse to certify the forty-two additional offerings.

119.    In opposing the second class certification motion, the Underwriter Defendants made a number of arguments, which they claimed the Court had not considered during the first round of class certification.  While Lead Plaintiffs made counter-arguments to each of these

theories, the risk remained that the Court could rule in the Underwriter Defendants' favor and deny class certification as to the Additional Offerings in the expanded case. For example, the fifty Offerings were issued over a multi-year period and issued pursuant to different registration statements (though they contained common representations). During this time period, IndyMac's underwriting guidelines changed and provided different guidelines for different types of loans (including loans originated through different documentation programs or collateral types). Moreover, the loans underlying the MBS Offerings were originated by multiple banks pursuant to different underwriting guidelines. Thus, the Underwriting Defendants took the position that Lead Plaintiffs would have to provide separate proof as to each set of underwriting guidelines in force at the time of each offering.

120. Moreover, the Underwriting Defendants argued that individual issues predominated because there were multiple mortgages in different loans and, thus, each group required separate proof. Although Lead Plaintiffs asserted that variations in the underwriting guidelines and mortgages were immaterial for a host of reasons, the Court did not rule on these issues. Moreover, the Underwriting Defendants argued that unique issues regarding how to calculate the value of the MBS on the complaint filing date predominated such that the class should not be certified. While some district courts have certified class actions in MBS cases, these cases did not involve fifty-one offerings where loans were originated by numerous third-party lenders.

121. Finally, even if the Court certified a class, there is a risk that it would find that the class representatives were not adequate representatives for investors who purchased MBS in different Offerings or different tranches of Certificates in each Offering. Thus, the scope of the

case could have been reduced from covering investors in fifty offerings to investors in seventeen offerings.

122.     Even if the Court again ruled in Lead Plaintiffs' favor respecting the second class certification motion, it is likely another Rule 23(f) petition from the Underwriter Defendants would have followed.  Absent the Settlement, therefore, the Underwriter Defendants would have continued to challenge class certification throughout the pendency of the Action.

123.     Lead Plaintiffs believe they would have prevailed in their second motion for class certification and against any subsequent attempt to decertify the class.   Nonetheless, Lead Plaintiffs acknowledge the ongoing risks in maintaining class certification and that the Settlement dispenses with any uncertainty that a class can be maintained.

## V.     PLAN OF ALLOCATION

124.     Pursuant to the Notice Orders and as set forth in the Notice and Supplemental Notice, all Settlement Class Members[8] that wish to participate in the distribution of the Settlement Funds must submit a valid Proof Of Claim and all required supporting information postmarked no later than January 28, 2015.  As provided in the Notice and Supplemental Notice, after deduction of Court-awarded attorneys' fees and expenses (which may include reimbursement of Lead Plaintiffs' expenses), notice and administration costs, banking fees and taxes, the balance of the Settlement Funds (the "Net Settlement Funds") will be distributed according to a Plan of Allocation approved by the Court.  The proposed Plan of Allocation applies to both the Underwriter Defendant Settlement and the Individual Defendant Settlement.

125.     If approved, the Plan of Allocation will govern how the Net Settlement Funds will be distributed amongst Authorized Claimants.  The proposed Plan of Allocation is intended to

---

[8]   As used in this section, Settlement Class Members encompasses both Underwriter Defendant Class Members and Individual Defendant Class Members.

achieve an equitable and rational distribution of the Net Settlement Funds, but is not intended as a formal damages analysis like that which would be submitted at trial.

126.    Lead Counsel developed the Plan of Allocation in consultation with its damages expert and believes the Plan provides a fair and reasonable means to equitably and clearly distribute the Net Settlement Fund amongst Authorized Claimants.  The Declaration of Brett Brandenberg in Support of Plan of Allocation filed concurrently herewith ("Brandenberg Decl." or "Brandenberg Declaration") (attached as Exhibit 4 to the Compendium), explains the methodology used in determining the Recognized Claims and the basis for the analysis.

127.    The Plan of Allocation provides for distribution of the Settlement Funds amongst Authorized Claimants for each settlement on a *pro rata* basis and according to a formula determined in accordance with the damages calculation set forth in the Securities Act.  As explained more fully in the Plan of Allocation, which was attached to the Proof of Claim and Release form – through illustrative examples – and in the Brandenberg Declaration, a Recognized Loss of Gain Amount will be calculated for each purchase or acquisition of a Certificate.  That formula accounts for (a) the face value of Certificates purchased; (b) the time of acquisition and price paid; (c) any principal payments received; (d) whether or not the Certificates were sold (and if so, when and for how much); and, (e) if held on the applicable date of suit, the price of the Certificates on that date.

128.    The Plan of Allocation does not assign any fixed percentage of the Settlement Funds to any particular Offering, Certificate or group of Certificates.  Rather, the proposed distribution will be on a *pro rata* basis based on the claims submitted, without favoring one Certificate over another.

129.    Rust Consulting, the Court-approved claims administrator, will determine each Authorized Claimant's *pro rata* share of the Settlement Funds based upon information submitted with the Claim Form and in accordance with the formula described above.

130.    Based on its consultation with its damages expert, Lead Counsel believes that the Plan of Allocation will fairly and rationally allocate the Settlement Fund amongst Authorized Claimants and will do so in accordance with the damages calculation set forth in the Securities Act.  To date, there have been no objections to the proposed Plan of Allocation.  Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair, reasonable, and should be approved.

## VI.    LEAD PLAINTIFFS' COMPLIANCE WITH THE NOTICE ORDERS

131.    The Notice, approved by the Court in the Notice Order, provides Underwriter Defendant Settlement Class members with information on (a) the terms of the Settlement, including their right to exclude themselves from the Settlement Class; (b) their right to object to any aspect of the Settlement, the Plan of Allocation, or the Fee and Expense Application; and (c) the manner by which a Proof of Claim should be submitted to the Claims Administrator.  The Notice also informs Settlement Class members of Lead Counsel's intent to apply for an award of attorneys' fees of no more than 13% of the Global Settlement Fund and for reimbursement of "Additional Litigation Expenses" not to exceed $3,400,000, and that the "Additional Litigation Expenses" may include an amount for reimbursement of Lead Plaintiffs' expenses incurred in connection with litigating the Action.  The Notice also informs the Settlement Class of Lead Plaintiffs' intent to dismiss IndyMac MBS from the Action.

132.    The Notice also informs Settlement Class members of the January 13, 2015 deadlines for seeking exclusion from the Settlement or objecting to the Settlement, the Plan of Allocation or the Fee and Expense Application.

133.    In addition to the Underwriter Defendant Settlement Notice, the Court also ordered Supplemental Notice to the Individual Defendants Class.  Because the Court has already granted Final Approval to the Individual Defendants Settlement (ECF No. 410), the Supplemental Notice was limited to informing members of the Individual Defendants Settlement Class about the proof of claim process and deadlines, as well as their right to object to the Plan of Allocation; to Lead Counsel's application for attorneys' fees and reimbursement of expenses; and to Lead Plaintiffs' request to dismiss IndyMac MBS from the Action.

134.    Pursuant to the Notice Orders (ECF Nos. 541-542) the Court appointed Rust Consulting as Claims Administrator in the Action and instructed Rust to disseminate the Notice, Supplemental Notice, and Proof of Claim Form by mail and to publish the Publication Notices in *Investor's Business Daily* and over the *PR Newswire* service.

135.    As detailed in the Mailing Affidavit, on October 15, 2014, Rust began mailing notice packets to potential Class Members, as well as banks, brokerage firms and other third party nominees.  *Id.* ¶ 7.  Between October 15, 2014 and December 15, 2014, Rust mailed 6,832 claim packets to potential nominees and Class Members by first-class mail, postage prepaid.  *Id.* ¶ 12.

136.    On October 20, 2014, Rust caused the Publication Notices to appear in *Investor's Business Daily* and to be released over *PR Newswire.  Id.* ¶¶ 13-14; *see also id.*, Exs. D-G.

137.    Rust forwarded copies of the Publication Notices to the Depository Trust & Clearing Corporation ("DTCC") Legal Notice System ("LENS").  *Id.* ¶ 15.  On December 18,

2014, the DTCC posted the Publication Notices on their LENS System, where they instantly became available to all DTCC member banks and brokers, as well as non-member banks and brokers on contract and fee schedule service agreements.  *Id.*

138.    Rust also published information about the Settlement on a dedicated website set up for the Action, www.IndyMacMBSclassaction.com, to provide potential Class Members with information about the Settlement and downloadable copies of all relevant case and Settlement materials.  *Id.* ¶ 16.  Lead Counsel has also made these materials available for download on its website.

## VII.   PLAINTIFFS'   COUNSEL'S   APPLICATION   FOR   AN   AWARD   OF REASONABLE ATTORNEYS FEES AND REIMBURSEMENT OF EXPENSES

139.    Plaintiffs' Counsel has expended a total of 55,372.25 hours in the prosecution and investigation of the claims against the defendants.  The total lodestar for Plaintiffs' Counsel is $24,568,369.50.   For the extensive efforts expended on behalf of the Settlement Class, Lead Counsel are applying on behalf of Plaintiffs' Counsel for fees totaling $44,890,000, which represents 12.974% of the Settlement Funds or a 1.83 multiplier on Plaintiffs' Counsels' total lodestar.  They are also requesting reimbursement of litigation expenses that have not yet been reimbursed or advanced of $2,971,114.16.

### A.    Plaintiffs' Counsel's Fee Request Is Reasonable

140.    Over the five years that this matter was litigated, the work undertaken in prosecuting this case has been challenging and the outcome has been uncertain.  This case has at all times been pursued on a fully contingent basis.  Counsel has not received any payment for their services in pursuing claims against defendants on behalf of the Settlement Classes.  As set forth in the accompanying Memorandum of Law in Support of Settlement Class Representatives' Counsel's Motion for Attorneys' Fees and Reimbursement of Expenses ("Fee Memorandum"),

Lead Counsel and Additional Plaintiffs' Counsel respectfully request attorneys' fees of 12.974% of the Settlement Funds ($44,890,000).   Lead Counsel further respectfully submit that the requested fee is justified and should be approved based on the result achieved for the Settlement Class, the extent and quality of work performed, the risks of litigation and the contingent nature of representation.

141.   At the outset of this case, Lead Plaintiffs negotiated a cap on Lead Counsel's fees to protect the interests of the class and avoid awarding a windfall to Lead Counsel.  As a result, Lead Counsel agreed to a sliding scale for its fees.  For a $346 million settlement, Lead Plaintiffs have imposed a cap of 12.974% of the Global Settlement Fund on Lead Counsel's fees. The fee requested is based on the total recovery in both the Underwriter Defendant Settlement and the Individual Defendant Settlement.   As explicitly noted in the original Individual Defendant Settlement Notices, Lead Counsel did not request any attorneys' fees in connection with final approval of the Individual Defendant Settlement.  That notice expressly stated that, "[a]t a later time, Lead Counsel intends to apply to the Court for an award of attorneys' fees to Lead Counsel from the Settlement Fund in an amount not to exceed 18% of the Settlement Fund."  ECF No. 365-1.  There were no objectors to any aspect of the Individual Defendant Settlement.  As noted herein, the current Notice and Supplemental Notice informed class members that counsel would seek an award up to just 12.974% of the Settlement Fund.  The differences between the percentages stems from the fact that the retainer agreements provided for a sliding scale fee award whereby Lead Counsel was entitled to a lower percentage fee award on larger incremental settlement amounts. For any recovery from $0 to $75 million, Lead Counsel agreed to cap fees at 18%.  For the next $50 million, the cap is reduced to 15%.  For the next $50 million, the cap is reduced to 13%.  For the next $100 million, the cap is reduced to 11%.  For the next $100

million, the cap is reduced to 9%.  Finally, for any amount above $375 million the cap is 7%.
Applying these percentages to the $346 million settlement, Lead Plaintiffs have effectively
imposed a cap of 13% on Lead Counsel's fees.  While the deadline for objections has not passed,
to date there are no objections to the fee request.

### 1.    The Joint Fee Request

142.    The firms applying for fee awards and reimbursement of expenses in connection
with the Individual Defendant and Underwriter Defendant Settlements include Lead Counsel and
Additional Plaintiffs' Counsel.   Lead Counsel has coordinated with Additional Plaintiffs'
Counsel as necessary and appropriate throughout the litigation.   At the direction of Lead
Counsel, Additional Plaintiffs' Counsel have provided valuable services that have supported and
facilitated the prosecution of the Action, as reflected on the accompanying declarations of each
Additional Plaintiffs' Counsel.   *See* Compendium of Declarations, Exhibits. 6-13, filed
concurrently herewith.

143.    The Declaration of Nicole Lavallee in Support of Settlement Class
Representatives Counsels' Motion for Attorney Fees and Reimbursement of Expenses Filed on
Behalf of Berman DeValerio ("Berman Declaration" or "Berman Decl.") (attached as Exhibit 6
to the Compendium), contains details of Lead Counsel's own lodestar.   Likewise the
Declarations of Additional Plaintiffs' Counsel also detail the work performed by Additional
Plaintiffs' Counsel for the benefit of the Settlement Classes and each firm's lodestar (*see*
Compendium Exs. 7-13 (Cohen Milstein Decl. ¶¶3-5; Cohen Placitella Decl. ¶3; Kohn Decl. ¶3;
Lieff Decl. ¶3; Schnader Decl. ¶3; Wolf Decl. ¶3; Zwerling Decl. ¶¶3-4)).   The lodestar
summaries were prepared from contemporaneous daily time records regularly prepared and
maintained by counsel.

144. The lodestar chart accompanying each of Plaintiffs' Counsel declarations (i) identifies the names and positions (*i.e.*, title) of the firm's timekeepers who undertook litigation activities in connection with the Action and who expended ten (10) hours or more on the case; (ii) provides the total number of hours each such timekeeper reported expending in connection with work on the Action from the investigation of the potential claims to the present; (iii) provides each such timekeeper's current hourly rate, subject to any rate cap requested by lead counsel as noted in the chart; and (iv) provides the total billable amount, in dollars, of the work performed by each timekeeper and the entire firm. Compendium Exs. 6-13 (Berman Decl. ¶¶4-8 & Ex. B; Cohen Milstein Decl. ¶¶6-10 & Ex. B; Cohen Placitella Decl. ¶¶4-8 & Ex. B; Kohn Decl. ¶¶4-8 & Ex. B; Lieff Decl. ¶¶4-8 & Ex. B; Schnader Decl. ¶¶4-8 & Ex. B; Wolf Decl. ¶¶4-8 & Ex. B; Zwerling Decl. ¶¶5-9 & Ex. B)

145. The lodestar figure for all counsel does not include charges for expenses that are billed separately, and such charges are not duplicated in Lead Counsel's billing rates.

146. Lead Counsel maintained daily control and monitoring of the work performed by the attorneys on this case. While Lead Counsel's senior attorneys devoted substantial time to prosecuting the claims against the defendants, other experienced attorneys at Lead Counsel's firms undertook particular tasks appropriate to their levels of expertise, skill and experience, and more junior attorneys and paralegals worked on matters appropriate to their experience levels.

147. Throughout the prosecution of the claims, Lead Counsel allocated work assignments among the attorneys at Lead Counsel's firm and other Plaintiffs' Counsel to avoid unnecessary duplication of effort. Teams of more junior attorneys, for example, devoted themselves to analyzing discovery and developing evidence. Such analysis included reviewing and organizing the voluminous document productions, assisting in assessing the adequacy of

various document productions for meet and confer efforts, preparing internal memoranda on key legal and factual issues, assembling witness files for use in depositions, and supporting Plaintiffs' consulting experts.  The teams were overseen by more experienced attorneys in order to efficiently coordinate the process, identify and instruct on the legal and factual issues and review the work product.

148.   To ensure that the hours submitted are not excessive, redundant or otherwise unnecessary, Lead Counsel has reviewed its own time and the time of Additional Plaintiffs' Counsel and made adjustments where appropriate.  It is my understanding that all counsel have excluded: (a) time spent preparing this application for fees and reimbursement of expense; (b) time spent preparing the prior motions for reimbursement of expenses; and (c) any time spent pursing the "statute of repose" appeal after July 24, 2013 – the date that this Court reinstated the forty-two Additional Offerings into this Litigation.  Plaintiffs' Counsel included time for work performed on the IndyMac appeal of the claims dismissed based on the Court's application of the statute of repose prior to that date because such work was necessary at that time to preserve these claims.  However, after Goldman was decided and after this Court reinstated the claims of investors who purchased MBS in the forty-two Additional Offerings, arguably any work to protect the interests of the Settlement Classes on the appeal became moot.  After July 24, 2013, the appeal of the repose issue related primarily to claims by investors in offerings underwritten by Goldman Sachs & Co., who is not a defendant in any of the Offerings covered by the Underwriter Defendants Settlement.

149.   The hourly rates charged by the Lead Counsel are the same or lower than the firm's regular rates for contingent cases and those generally charged to clients for their services in non-contingent/hourly matters, subject to rate caps in certain instances.  For personnel who are

no longer employed by the firm, the hourly rate used is the billing rate for such personnel in his or her final year of employment by the firm.  The firm's billing records, which are regularly prepared from the contemporaneous daily time records, are available at the request of the Court. Based on my knowledge and experience, these rates are also within the range of rates normally and customarily charged in their respective cities by attorneys and paraprofessionals of similar qualifications and experience in cases similar to the Action, and have been approved in connection with other class action settlements.

150.    The hourly rates charged by the Additional Plaintiffs' Counsel are based on the same criteria as set forth in their respective declarations.  However, because hourly rates did vary significantly across firms for timekeepers whose levels of responsibilities were similar, Lead Counsel imposed the following caps on billable rates for certain categories of timekeepers:

- Partners capped at $835 per hour.

- Of Counsel capped at $605 per hour.

- Associates who have 7 or more years of experience capped at $420 per hour.

- Associates who have less than 7 years experience capped at $370 per hour.

- Document reviewers capped at $350 per hour.

- Paralegals capped at $305 per hour.

151.    Plaintiffs' Counsels' hourly rates are comparable to or less than the known hourly rate for counsel for the Underwriter Defendants, Gibson, Dunn & Crutcher.  According to a *National Law Journal* article published on January 13, 2014, a true and correct copy of which attached hereto as Exhibit A, the Gibson Dunn average partner hourly rate is $980 and average associate hourly rate is $614.  Further, according to a filing in *In re Lehman Brothers' Holdings Inc.*, et al., No. 08-bk-13555 (Bankr. S.D.N.Y. July 13, 2012), a true and correct copy of which is attached hereto as Exhibit B, Gibson Dunn's hourly rates for partners ranged from $627.50 to

$1,032.27 (with a median rate of $837.40) and rates for associates ranged from $275 to $766.30 (with a median rate of $495.15).

### 2.      Standing and Expertise of Plaintiffs' Counsel

152.   Lead Counsel and the Additional Plaintiffs' Counsel are experienced in prosecuting securities class actions and have worked diligently and efficiently to litigate the Action.   Lead Counsel, Berman DeValerio, is a national law firm with offices in California, Massachusetts and Florida.   It is among the most experienced and skilled firms in securities litigation and has a distinguished track record, as demonstrated by its firm resume, a true and correct copy is attached as Exhibit A to the Berman Declaration.   Likewise, Additional Plaintiffs' Counsel are also among the nation's leading securities class action law firms, as detailed in their respective declarations.   *See* Compendium Exs. 7-13 (Cohen Milstein Decl. ¶¶1-2 & Ex. A; Cohen Placitella Decl. ¶¶1-2 & Ex. A; Kohn Decl. ¶¶1-2 & Ex. A; Lieff Decl. ¶¶1-2 & Ex. A; Schnader Decl. ¶¶1-2 & Ex. A; Wolf Decl. ¶¶1-2 & Ex. A; Zwerling Decl. ¶¶1-2 & Ex. A).

### 3.      Standing and Caliber of Defense Counsel

153.   The quality of the work performed by Lead Counsel in reaching the Settlements must also be considered in light of the quality of the Underwriter Defendant and Individual Defendant opposition.   The Underwriter Defendants are represented by one of the most prestigious law firms in the United States – Gibson, Dunn & Crutcher LLP.   Gibson Dunn vigorously represented the Underwriter Defendants throughout the Action.   Similarly, IndyMac MBS is represented by Hughes Hubbard & Reed, LLP, another premier U.S. law firm.   The Individual Defendants were likewise represented by excellent counsel from the law firms of Eiseman, Levine, Lehrhaupt & Kakoyiannis, P.C. (composed of former counsel from Proskauer

according to its website), Corbin Fitzgerald & Athey LLP and Fairbank & Vincent (formed by former counsel from Gibson, Dunn & Crutcher LLP according to its website).

154.    In the face of such experienced, formidable, and well-financed opposition, Lead Counsel was, nonetheless, able to develop a strong factual record in support of Lead Plaintiffs' claims and reach Settlements with terms highly favorable to the Settlement Classes.

### 4.    Lead Plaintiffs Support The Fee Application

155.    WST is responsible for investing all funds of the State of Wyoming, except for state retirement funds.  The State's investment portfolio totaled over $18 billion.  WRS is a $7.5 billion system, which serves roughly 42,000 active Wyoming public employees and 25,500 retirees.  Its active membership is comprised of employees from school districts, the University of Wyoming and community colleges, state and local government and various other political subdivisions.

156.    Lead Plaintiffs were closely involved in the litigation of the Action from the outset.  Their respective in-house counsel have been closely involved in each step of the litigation from inception, through discovery, and representatives of WST and WRS attended all mediation sessions and carefully evaluated the Settlement before agreeing to it.

157.    WST has submitted the Declaration of Elizabeth Anderson, General Counsel of the WST, in Support of Final Approval of the Underwriter Defendant Settlement, Reimbursement of Certain of Lead Plaintiffs' Reasonable Costs and Expenses Incurred in Representation of the Class, and an Award of Attorneys' Fees and Reimbursement of Expenses ("Anderson Declaration" or "Anderson Decl.") (attached as Exhibit 4 to the Compendium).

158.    WRS has submitted the Declaration of Benjamin Brandes, Chief Legal Officer of the WRS, in Support of Final Approval of the Underwriter Defendant Settlement,

Reimbursement of Certain of Lead Plaintiffs' Reasonable Costs and Expenses Incurred in Representation of the Class, and an Award of Attorneys' Fees and Reimbursement of Expenses ("Brandes Declaration" or "Brandes Decl.") (attached as Exhibit 5 to the Compendium).

159.   As stated in their respective declarations, Lead Plaintiffs fully support the requested award of attorneys' fees totaling $44,890,000 and the reimbursement of litigation expenses sought herein.  *See* Compendium Exs. 6-13, and exhibits thereto.

### 5.   The Requested Fee Is Below or In-Line with Comparable Settlements

160.   Lead Counsel's review of settlements of securities class action litigation since the 2008 financial crisis shows that the MBS settlements in excess of $100,000,000 ("$100M+"), resulted in fee awards from 17% to 19.75 percent of the common fund and lodestar multipliers of 1.84 to 2.82 as shown in the following chart:

| | Settlement Amount | % of Common Fund | Lodestar Multiplier | Total Lodestar |
|---|---|---|---|---|
| *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 10-cv-00302 (C.D. Cal.) (Pfaelzer, J.) | $500,000,000 | 17% | 2.2 | Approx. $39 million |
| *Pub. Emps.' Ret. Sys of Miss. v. Merrill Lynch & Co., Inc.*, No. 08 Civ. 10841 (S.D.N.Y.) (Rakoff, J.) | $315,000,000 | 17% | 2.3 | Approx. $23 million |
| *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group*, No. 08-cv-5093 (S.D.N.Y.) (Preska, J.) | $275,000,000 | 17% | 2.28 | $20.5 million |
| *Plumbers' & Pipefitters' Local #562 Supp'l Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-cv-01713 (E.D.N.Y.) (Chen, J.) | $280,000,000 | 17% | 1.84 | $25.9 million |
| *In re Wells Fargo Mortg-Backed Certificates Litig.*, No. 09-CV-1376 (N.D. Cal.) (Koh, J.) | $125,000,000 | 19.75% | 2.82 | $8.7 million |

161.   Attached hereto as Exhibits C-G are the Orders awarding fees in these $100M+ MBS Settlements.  The only other $100 million plus MBS class action settlement of which Lead

Counsel is aware was a partial settlement in *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, No. 08-cv-8781 (S.D.N.Y.) ("*RALI*"), which partially settled in 2013 for $100,000,000.  However, to date no fee application has been filed in that case.

162.   The only MBS class actions to settle without a collectible issuer-defendant are:  *In re Lehman Brothers MBS Litig.*, Nos. 09-MD-2017 & 08-CV-6762 (S.D.N.Y.) (Kaplan, J.) and *Tsereteli v. RAST 2006-A8, Credit Suisse (USA) LLC*, No. 08-cv-10637 (S.D.N.Y.) (Kaplan, J.).

163.   Also, according to a recent report, which reviewed securities class action settlements from 2011 to 2013, the median plaintiffs' lawyers' fee award for settlements in the range of $100 to $500 million was 20% of the settlement value.  *See* Comolli and Starykh, *Recent Trends in Securities Class Action Litigation: 2013 Full-Year Review Large settlements get larger; small settlements get smaller*, NERA Economic Consulting (Jan. 21, 2014) at 34, *available at* http://www.nera.com/publications/archive/2014/recent-trends-in-securities-class-action-litigation-2013-fully.html, and attached hereto as Exhibit H.

### 6.      The Risks And Unique Complexities Of The Litigation

164.   The specific risks faced by Lead Plaintiffs in litigating the Action through summary judgment, trial and beyond are detailed, above.

165.   This Action involves over fifty Offerings, based by over 74,000 loans, each of which arguably required separate evidence as to falsity.  From the outset of the Action, Lead Counsel understood and advised Lead Plaintiffs as to the inherently complex, expensive and lengthy litigation posed by the Action, and that there was no guarantee of ever recovering compensation for the substantial investment of time and money the Action would require.  In undertaking the Action, Lead Counsel were obliged to ensure that sufficient resources would be dedicated to the prosecution of the Action, including funds available to compensate staff and

cover the considerable costs required to litigate the Action effectively.  Given the anticipated years-long span of the Action, the financial burden on Lead Counsel as contingency fee counsel is far greater than that on a firm paid on an ongoing basis.  Plaintiffs' Counsel have incurred $4,887,520.84, in aggregate expenses prosecuting the Action and, with the exception of the $1,916,406.68 reimbursed from the Individual Defendants Settlement Fund or advanced from the Court-approved, have received no compensation.

166.    Counsel bore the risk that no recovery would be achieved (or that a judgment could be obtained but not collected).  Even with vigorous and competent Litigation Advanced Fund established out the Individual Defendant Settlement Fund, have received prosecution, success is never guaranteed.

167.    Counsel knew from experience that the commencement of a class action does not guarantee settlement.  To the contrary, it requires hard work and diligence by skilled counsel to develop the facts and theories necessary to sustain a complaint, move a complex case forward through the various contentious stages of litigation, and convince sophisticated defendants to engage in meaningful settlement negotiations.

168.    The legal challenges faced by Plaintiffs' Counsel are described in detail above.  Those risks are also relevant to an award of attorneys' fees.  Here, the risks undertaken by Plaintiffs' Counsel and the time and expenses incurred without payment were extensive.  Plaintiffs' Counsel's persistent efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Classes.  The requested fee of $44,890,000 (which represents a lodestar multiplier of 1.83 and only 12.974% of the Settlement Fund) is therefore, reasonable and should be approved.

**B.      Request For Reimbursement Of Litigation Expenses**

**1.      Plaintiffs' Counsel Request Reimbursement of Their Reasonable And Necessary Litigation Expenses**

169.     Plaintiffs' Counsel is requesting reimbursement from the Global Settlement Fund in the amount of $ 2,971,114.16.  This amount covers litigation expenses reasonably incurred in prosecuting this Action.  This request does not include any of the expenses that were previously reimbursed or advanced from the Individual Defendant Settlement Fund pursuant to the Court's orders dated December 18, 2012 (ECF No. 408), April 5, 2013 (ECF No. 426) or August 27, 2013 (ECF No. 467).

170.     Lead Counsel respectfully submits that this expense application is appropriate, fair and reasonable, and should be approved in the amounts submitted herein.  Plaintiffs' Counsel were aware that they might not recover any of their expenses incurred in prosecuting the claims, and, at the very least, would not recover such expenses until the claims were successfully resolved.  Plaintiffs' Counsel also understood that, even assuming that the case was ultimately successful, an award of expenses would not compensate them for the lost use of the funds advanced to prosecute the claims. Thus, Lead Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the Action.

**2.      Total Expenses Incurred to Date**

171.     In addition to the unreimbursed expenses, Plaintiffs' Counsel also incurred additional expenses that were reimbursed or advanced from the Individual Defendant Settlement Fund by the Court's (i) December 17, 2012 Order Awarding Expenses and Establishment of a Litigation Fund (ECF No. 408); (ii) March 28, 2013 Order Granting Lead Counsel's Supplemental Application for Reimbursement of Certain Previously Submitted Expert and

Consultant Expenses and Application for Reimbursement of Certain Litigation Expenses Incurred Between November 1, 2012 and January 31, 2013 (entered April 5, 2013) (ECF No. 426); and (iii) August 25, 2013 Order Granting Lead Counsel's Second Application for Withdrawal of Monies from the Litigation Fund (entered August 27, 2013) (ECF No. 467). These reimbursed expenses totaled $1,916,406.68.

172.    Indeed, by its December 18, 2012 Order Awarding Expenses and Establishment of a Litigation Fund (ECF No. 408), the Court issued an order (i) reimbursing Plaintiffs' Counsel $450,561.01 in expenses from the Individual Defendants' Settlement Fund; and (ii) authorizing Lead Counsel to establish a litigation fund of $1 million from the Individual Defendants Settlement Fund (the "Litigation Expense Advance Fund").   By its March 28, 2013 Order Granting Lead Counsel's Supplemental Application for Reimbursement of Certain Previously Submitted Expert and Consultant Expenses and Application for Reimbursement of Certain Litigation Expenses Incurred Between November 1, 2012 and January 31, 2013 (entered April 5, 2013), the Court issued an order (i) reimbursing Plaintiffs' Counsel an additional $465,497.43 in expenses from the Individual Defendants' Settlement Funds; and (ii) authorizing Lead Counsel to withdraw $324,818.22 from the Litigation Expense Advance Fund.   By its August 25, 2013 Order Granting Lead Counsel's Second Application for Withdrawal of Monies from the Litigation Fund (ECF No. 467), the Court issued an order authorizing Lead Counsel to withdraw the balance of the Litigation Expense Advance Fund plus interest.   This amounted to $675,181.78 plus $348.24 interest, totaling $675,530.02.

173.    The total expenses, reimbursed and unreimbursed, incurred in the prosecution of this Action total $4,887,520.84.  These expenses are as follows:

| DESCRIPTION | | EXPENSES |
|---|---|---|
| | | |
| Experts | | $3,755,924.78 |
|    Alix Partner | $888,883.17 | |
|    Crowninshield | $226,593.00 | |
|    Five Bridges | $735,426.50 | |
|    Forensic Economics | $11,058.76 | |
|    Kaye Scholer, LLP | $8,033.85 | |
|    New View Advisors | $120,550.00 | |
|    Wilden Lane | $1,765,379.50 | |
| Filing Fees | | $18,557.48 |
| Court Reporters/ Transcripts | | $20,418.25 |
| Disclosure/Press Release | | $1759.50 |
| Lexis/Dow Jones/Westlaw/Research | | $207,514.43 |
| Photocopying | | $189,987.95 |
| Electronic Database and ediscovery consultants | | $436,629.97 |
| Mediation | | $74,966.95 |
| Outside Supplies | | $525.05 |
| Postage/Express/Delivery | | $25,187.08 |
| Secretarial Overtime | | $88.84 |
| Telephone/FAX | | $12,576.54 |
| Travel, Meals, Lodging | | $139,472.75 |
| Witness/Service Fees | | $3,800.70 |
| Other | | $110.60 |
| | | |
| **TOTAL** | | $4,887,520.84 |

174.   The current requested expenses are reflected in the books and records maintained by Plaintiffs' Counsel.  Lead Counsel's expense report and the litigation fund expense report were prepared based on expense vouchers, check records and other accounting source material and are an accurate record of expenses incurred.  The unreimbursed expenses incurred by Lead Counsel are detailed in Exhibit C to the Berman Declaration.  In each case, the category of expense is given (*e.g.*, computer research; experts' fees; travel costs; electronic discovery hosting costs; litigation support services; photocopying; phone; postage; and other costs).  Expense items are billed separately and are not duplicated in the amounts requested for attorneys' fees.  The

unreimbursed expenses incurred by Additional Plaintiffs' Counsel are listed in Exhibit C to the declarations filed on behalf of the firms, which are attached as Exhibits 7 to 13 to the Compendium.

175.    Lead Counsel closely monitored and controlled litigation expenses, including the expenses incurred by the Additional Plaintiffs' Counsel.  Moreover, many expenses were paid out of a litigation fund created and maintained by Lead Counsel, to which Lead Counsel and Additional Plaintiffs' Counsel collectively contributed over $500,000.  Contributions to and payments from the Litigation Fund are described in more detail in the Berman Declaration.

### 3.    Expert Expenses

176.    The largest expense incurred in the Action relates to experts and consultants. Lead Counsel expended more than $3,755,924.78, or 76.8% of the total litigation expenses, on experts and consultants.  Of this amount, $2,338,688.33 has not yet been reimbursed.  As referenced above, Lead Counsel retained experts on forensic loan re-underwriting, due diligence, damages, bankruptcy advice and sampling.  A summary of the expert and consultant expenses for which Lead Counsel now seek reimbursement, is set forth in the following table:

| Expert Name | Area of Expertise | Total Expert Expenses | Unreimbursed Expert Expenses[9] |
|---|---|---|---|
| AlixPartners | Damages, causation and statistical sampling | $888,883.17 | $541,789.18 |
| Crowninshield Financial Research, Inc. | Class certification | $226,593.00 | $97,256.00 |
| Five Bridges Advisors, LLC | Mortgage loan underwriting | $735,426.50 | $587,225.00 |
| New View Advisors | Due Diligence Experts | $120,550.00 | $120,550.00 |
| Wilden Lane | Mortgage loan | $1,765,379.50 | $991,868.15 |

---

[9]  Certain of these expenses were paid directly by Lead Counsel and others were paid out of the Litigation Fund, as discussed in Berman Declaration ¶¶9-16 and Exhibits C, D and E.

| Expert Name | Area of Expertise | Total Expert Expenses | Unreimbursed Expert Expenses[9] |
|---|---|---|---|
| Holding, LLC | underwriting | | |
| Kaye Scholer | Bankruptcy Advice | $8,033.85 | 0 |
| Forensic Economics | Damages | $11,058.76 | 0 |
| **TOTAL:** | | **$3,755,924.78** | **$2,338,688.33** |

177.     In connection with its prior requests for reimbursement of expenses and its requests for advances from the Litigation Expense Advance Account, Lead Counsel included a description of the work performed, the hourly rates charged and the hours worked for all but one of the above expenses.  Below is an updated description of the work performed, hourly rates charged and hours charged since the last request and a description for one expert that had not been previously identified:

> **AlixPartners – Damages:**  AlixPartners provides the economic and financial expertise necessary to quantify economic losses in litigation.  Specifically, Lead Counsel retained AlixPartners to establish an economic model to calculate class members' damages at trial and for use in settlement negotiations.  AlixPartners has also consulted with Lead Counsel regarding the statistical sampling of mortgage loans underlying each of the offerings at issue in the Litigation.  AlixPartners was also involved in calculating potential damages for mediation, analyzing Defendants' position on damages, and consulting with Lead Counsel in drafting the proposed Plan of Allocation.

> Under the terms of the retainer agreement negotiated by Lead Counsel, AlixPartners receives $725 per hour for services rendered by its managing director/testifying expert; $665 per hour for services rendered by directors; and $455 per hour for vice presidents.  Between May 1, 2013 and the present, AlixPartners spent 1,140.80 hours consulting with Lead Counsel on damages, loss causation, statistical sampling and plan of allocation questions.  Based on the actual fees billed, AlixPartners charged Lead Counsel a blended rate of $588.81 per hour.[10]  AlixPartners also sought reimbursement of expenses in the amount of $21,785.85 for that time period.

> Between May 1, 2013 to the present, the Class incurred total fees and expenses of $693,503.85 for work performed by AlixPartners.

---

[10]   The blended rate is calculated by dividing the total amount of fees actually billed by the total number of hours actually billed.

2.    **Crowninshield – Class Certification:**    Crowninshield Financial Research, Inc. ("Crowninshield") is a consulting firm that provides research, consulting and expert witness testimony on questions of economics, finance and accounting.

Lead Counsel retained Crowninshield to prepare an expert report in support of Lead Plaintiffs' two class certification motions.   In both declarations, Crowninshield's President and Senior Expert, Prof. Feinstein, articulated opinions essential to Lead Plaintiffs' legal arguments about the materiality of the alleged false statements at issue in the Litigation, numerosity of the proposed class, and the calculation of damages on a classwide basis.

In preparing their oppositions to the motions for class certification, Defendants took two, separate full-day depositions of Prof. Feinstein.   Prof. Feinstein also prepared rebuttal reports to address points raised by Defendants' expert witness in opposing class certification.

Under the terms of the retainer agreement negotiated by Lead Counsel, Crowninshield receives $675 per hour for services rendered by Prof. Feinstein and $195-$250 per hour for services rendered by other staff.   Between May 1, 2013 and the present, Crowninshield staff spent 268.80 hours working on the project and consulting with Lead Counsel on class certification questions. Crowninshield's fees for that time period came to $87,320.00, for an actual blended rate of $324.85 per hour.   Crowninshield also sought reimbursement of out-of-pocket expenses in the amount of $2,436.00 for that time period.

Between May 1, 2013 and the present, the Class incurred total fees and expenses of $89,756.00 for work performed by Crowninshield.

3.    **Five Bridges, LLC – Mortgage Loan Re-Underwriting (Testifying Expert):**    Five Bridges, LLC ("Five Bridges") is a consulting firm with specialized knowledge in the areas of mortgage loan underwriting and mortgage-backed securities.   Five Bridges also provides testifying experts on questions related to mortgage loan underwriting and mortgage-backed securities.   Five Bridges worked closely with Wilden Lane (see below) to synthesize and articulate the findings of Lead Plaintiffs' mortgage loan re-underwriting project and prepare expert reports and provide expert testimony on those findings.   Lead Counsel retained Five Bridges and Wilden Lane at close to the same time.

Under the terms of the retainer agreement negotiated by Lead Counsel, Five Bridges receives $825 per hour for services rendered by its principals and $650-$695 per hour for services rendered by its managing directors.   Between May 1, 2013 and the present, Five Bridges spent 907.65 hours consulting with Lead Counsel and working with Wilden Lane to develop the loan analysis approach for this case, review the findings of that analysis and to draw and articulate conclusions, accordingly.    Five Bridges' fees for that time period came to

$699,575.99, for an actual blended rate of $770.75 per hour.  Five Bridges also sought reimbursement of out-of-pocket expenses in the amount of $13,189.00 for that time period.

Between May 1, 2013 and the present, the Class incurred total fees and expenses of $712,746.00 for work performed by Five Bridges.

**4.      New View Advisors – Due Diligence Economics/Damages:**  New View Advisors ("New View") is a financial services firm advising clients on capital markets, product development and valuation, mergers and acquisitions, and asset investment strategies in the reverse mortgage industry.  Lead Counsel retained New View to assist in rebutting the Underwriter Defendants' due diligence defense to liability.  New View consulted in, among other things, analyzing certain discovery produced by the Underwriter Defendants and advising on discovery strategies.

Under the terms of the retainer agreement negotiated by Lead Counsel, New View charged a rate of $650 per hour for senior employees, and $250 per hour for staff.

Between the inception of the Action to the present,[11] the Class incurred total fees and expenses of $120,550.00 for work performed by New View since inception of the Action.  The actual, blended rate for the work performed was $605.78 per hour.

**5.      Wilden Lane Holding, LLC – Mortgage Loan Underwriting (Consultant):**  Wilden Lane Holding, LLC ("Wilden Lane") is a consulting firm with specialized knowledge in the areas of mortgage loan underwriting and mortgage-backed securities.  Wilden Lane works closely with Five Bridges (see above).  In doing so, Wilden Lane assisted in developing the plan for sampling and re-underwriting mortgage loans underlying the securities at issue.  Wilden Lane performed (and continues to perform) re-underwriting analysis of mortgage loan files and has articulated its findings for Lead Counsel.

Under the terms of the retainer agreement negotiated by Lead Counsel, Wilden Lane receives $300-$350 per hour for services rendered by its principals and $120-$225 per hour for services rendered by its other staff.

Between May 1, 2013 and the present, Wilden Lane spent 11,699.70 hours consulting with Lead Counsel and working with Five Bridges to develop and implement a loan analysis approach, review the findings of that analysis and to draw and articulate conclusions, accordingly.  Wilden Lane's fees for that time period came to $1,666,353.50, for an actual blended rate of $142.43 per hour.

---

[11]   This is the first request for reimbursement for expenses paid to New View, which is why the request includes expenses dating back to the inception of the case.

178.    Before retaining each of the experts discussed above, Lead Counsel considered competing proposals, interviewed several candidates, consulted with Lead Plaintiffs, negotiated at arm's length, and considered the prevailing market rates and competitive bids.  Lead Counsel is confident that the rates agreed to and the fees and expenses incurred so far have been fair and reasonable.

### 4.    Plaintiffs' Counsel's Additional and Necessary Expenses

179.    Costs associated with electronic discovery databases and ediscovery consultants used to store, collate, and review documents produced by the various defendants and third parties represent a significant share of the unreimbursed expenses.   The total costs of electronic discovery databases and ediscovery consultants was $436,629.97, or 8.9% of total expenses.  Of this, $290,549.53 has not been reimbursed.  These expenses were expended mostly in connection with Lead Counsel's retention of Merrill Corp. to host, maintain and support the Lextranet database.   The main cost was incurred to gain and maintain access to an FDIC-controlled electronic database of IndyMac documents.   Use of the Lextranet and the FDIC databases enabled Lead Counsel to effectively review – and coordinate the review by attorneys located around the United States – of over 11 million documents.

180.    Online factual and legal research accounted for another large component of the unreimbursed litigation expenses.  In addition to legal research of complex topics necessary to brief the substantive legal issues in the case, Plaintiffs' Counsel also conducted factual research. This included identifying and locating witnesses using online databases.  The costs associated with legal and factual research amounted to $207,514.43, or 4.25% of the total litigation expenses.  Of this, $97,235.25 has not been reimbursed.

181.    Fees associated with both mediation sessions accounted for $74,966.95, or 1.53%, of the total litigation expenses.  Of this, $26,975.40 has not been reimbursed.

182.    The remaining items for which Plaintiffs' Counsel seeks reimbursement are the types of expenses often necessarily incurred during litigation and routinely charged to clients in hourly-billed cases.  These expenses include court fees, travel, copying and printing, long distance telephone, and postage and delivery charges.

183.    All of Lead Counsel's expenses incurred were necessary to the successful litigation of the Action and in reaching the Settlement.  Lead Counsel has also reviewed the Additional Plaintiffs' Counsel's stated expenses and finds them to be reasonable and consistent with the work assigned by Lead Counsel to each firm.  Moreover, Lead Counsel noted that the largest expenses incurred by the Additional Plaintiffs' Counsel related to contributions to the Litigation Fund, which were used to offset the costs of expert expenses, as detailed in the Berman Fee Declaration.

### C.    RECOMMENDATION OF LEAD COUNSELS' PROPOSED ALLOCATION OF ATTORNEYS' FEES AND EXPENSES

184.    During the Courts' conference call with Lead Counsel and Underwriter Defendants' counsel on September 18, 2014, the Court discussed the applications for attorneys' fees.  Tel. Conf. Tr. dated Sept. 18, 2014 (ECF No. 544), at 3-4.  The Court indicated that, if there is an award to be allocated or divided between law firms, Lead Counsel may submit a rationale, which the Court may accept or may reject in its discretion.

185.    Counsel's hours, lodestar and unreimbursed expenses are summarized as follows:

| Counsel | Hours | Lodestar | Unreimbursed Expenses |
|---|---|---|---|
| Berman DeValerio (Lead Counsel) | 41,783.25 | $18,212,228.75 | $2,393,134.24 |
| Cohen Milstein Sellers & Toll PLLC | 4,236.75 | $1,555,128.75 | $41,593.31 |
| Cohen, Placitella & Roth, P.C. | 375.10 | $254,405.00 | $25,047.37 |

| Counsel | Hours | Lodestar | Unreimbursed Expenses |
|---|---|---|---|
| Kohn, Swift & Graf, P.C. | 3,626.30 | $1,680,367.00 | $215,734.79 |
| Lieff Cabraser Heimann & Bernstein, LLP | 1,969.60 | $964,430.00 | $167,036.55 |
| Schnader Harrison Segal & Lewis, LLP (include predecessor firm) | 599.10 | $264,038.00 | $689.75 |
| Wolf Haldenstein Adler Freeman & Herz LLP | 1,330.25 | $857,860.00 | $117,430.23 |
| Zwerling, Schachter & Zwerling, LLP | 1,451.90 | $779,912.00 | $10,447.92 |

186.    Lead Counsel has reviewed the Declarations of Additional Plaintiffs' Counsel. Based on their contributions to the case, the attorneys' fee lodestar and expenses submitted and additional risks assumed by these firms (including contributions to a litigation fund for expenses), Lead Counsel has reached a conclusion concerning an appropriate award for each firm.

187.    Based on Lead Counsel's analysis, the proposed fee awards for each of Plaintiffs' Counsel is as follows:

| Firm | Lodestar | Unreimbursed Expenses | Proposed Multiplier | Recommended Fee Award | Recommended Expense Award |
|---|---|---|---|---|---|
| Berman | $18,212,228.75 | $2,393,121.21 | 1.9196 | $34,959,359 | $2,393,134.24 |
| Cohen Milstein | $1,555,128.75 | $41,593.31 | 1.61 | $2,503,757 | $41,593.31 |
| Cohen, Placitella | $254,405.00 | $25,047.37 | 1.61 | $409,592 | $25,047.37 |
| Kohn, Swift | $1,680,367.00 | $215,734.79 | 1.61 | $2,705,391 | $215,734.79 |
| Lieff | $964,430.00 | $167,036.55 | 1.61 | $1,552,732 | $167,036.55 |
| Schnader Harrison | $264,038.00 | $689.75 | 1.32 | $348,530 | $689.75 |
| Wolf | $857,860.00 | $117,430.23 | 1.61 | $1,381,155 | $117,430.23 |
| Zwerling | $779,912.00 | $10,447.92 | 1.32 | $1,029,484 | $10,447.92 |
| **Total** | **$24,568,369.50** | **$2,971,114.16** | **1.83** | **$44,890,000** | **$2,971,114.16** |

## VIII.   REIMBURSEMENT OF LEAD PLAINTIFFS' REASONABLE COSTS

188.    Lead Plaintiffs also seek reimbursement of limited expenses pursuant to the PSLRA. 15 U.S.C. § 77z-1(a)(4) in the amounts of $14,050 and $13,675 for WST and WRS,

respectively.  These expenses are described in more detailed in the Anderson Declaration and Brandes Declaration, which are attached as Exhibits 4 and 5 to the Compendium.

189.    As detailed in the accompanying Anderson Declaration and Brandes Declaration, Lead Plaintiffs supervised this litigation and were actively involved in all material aspects of the prosecution of the action.  Moreover, the reimbursement requests relate only to a fraction of the time actually spent overseeing the litigation.  Indeed, as detailed in the accompanying declarations, the amounts sought by Lead Plaintiffs, which are located in Cheyenne, Wyoming, are limited to reimbursement for time expended in connection with (i) two in-person meetings with counsel in preparation for mediation sessions in New York; (ii) participation in three in-person mediation sessions in New York; and (iii) the preparation for and deposition of its Rule 30(b)(6) deposition in New York.  Thus, the amounts sought ***do not*** relate to the day-to-day supervision of Lead Counsel, including numerous e-mails and phone conferences with Lead Counsel, additional in-person meetings throughout the litigation, the review of pleadings and discovery or time related to the discovery responses and production, over the nearly six years that this action has been litigated.

190.    Lead Counsel respectfully submit that an award to Lead Plaintiffs (to be paid directly to them from the Settlement Fund) is fully consistent with Congress's intent, as expressed in the PSLRA, to encourage institutional investors such as WRS and WST to take an active role in bringing and supervising cases like the Action.

## IX.    THE REACTION OF THE CLASSES TO THE FEE AND EXPENSE PETITION

191.    As noted, over 6,832 Claim Packets were mailed to potential members of the Settlement Classes advising them that Counsel would apply for an award of attorneys' fees up to 13% of the Settlement Fund.  *See* Mailing Affidavit ¶ 12.  The Notices also advised the

Settlement Classes that Counsel would seek reimbursement of expenses in an amount not to exceed $3,400,000, which award would include a request for an award to Lead Plaintiffs. The amount of the requested Litigation Expenses is below the amount referenced in the Notice.

192.    The deadline for objecting to the fee and expense request is January 13, 2015. To date, no objection to the fee or expense requests has been received. *See* Mailing Affidavit ¶ 23.

## X.    TIMING AND ALLOCATION OF ANY FEE AND EXPENSE AWARD

193.    As detailed in the Notice and Supplemental Notice distributed to members of the Settlement Classes, Counsel request that all Court-awarded attorneys' fees and expenses (including previously approved expense reimbursements and advances) be allocated proportionally between the Individual Defendant Settlement Fund and the Underwriter Defendant Settlement Fund. All the Litigation Expenses benefited members of both Settlement Classes. Accordingly, Lead Counsel requests that 1.73% of any fee award and Litigation Expenses be withdrawn from the Individual Defendant Settlement Fund and that the remaining 98.27% of all fees and Litigation Expenses be payable from the Underwriter Defendant Settlement Fund. This proposed allocation will be reflected in a proposed order, to be submitted with Lead Plaintiffs' reply papers.

194.    As discussed during the December 18, 2014 conference, the Court has full discretion not only as to the amount of any awarded fees and expenses but also the timing of such payments and reimbursements. The deadline for objecting to any aspect of the Settlement, including the fee award, is January 13, 2015. Accordingly, in their reply papers, Lead Counsel will address the issue of when any Court awarded fees and expenses should be paid out of the settlement funds.

## XI.    ADDITIONAL EXHIBITS

195.    Attached hereto as Exhibit I is a true and correct copy an Order Awarding Attorneys' Fees and Expenses, filed on September 13, 2011, in *In re Satyam Computer Services Ltd. Sec. Litig.*, No. 1:09-md-02027-JPO (S.D.N.Y.).

196.    Attached hereto as Exhibit J  is a true and correct copy an Order Approving Attorneys' Fees and Expenses and Awarding Costs and Expenses to Named and Lead Plaintiffs, filed on January 6, 2009, in *In re General Motors Corp. Sec. & Deriv. Litig.*, No. 2:06-md-01749-GER (E.D. Mich.).

197.    Attached hereto as Exhibit K is a true and correct copy an Order, filed on March 2, 2009, in *In re Parmalat Sec. Litig.*, No. 04-md-01653-LAK (S.D.N.Y.).

198.    Attached hereto as Exhibit L is a true and correct copy of the Declaration of Elizabeth Anderson, Esq., General Counsel of The Wyoming State Treasurer, in Support of Final Approval of The Settlement, Award of Attorneys' Fees and Reimbursement of Expenses and an Award To The Wyoming State Treasurer of Reimbursement of Reasonable Costs and Expenses Incurred in Representation of The Class, filed on February 15, 2012, in *Pub. Emps.' Ret. Sys of Miss. v. Merrill Lynch & Co., Inc.*, No. 08 Civ. 10841 (S.D.N.Y.).

199.    Attached hereto as Exhibit M is a true and correct copy Lead Plaintiffs' Memorandum of Law in Support of Their Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, filed on September 18, 2008, in *In re Parmalat Sec. Litig.*, No. 04-md-01653-LAK (S.D.N.Y.).

200.    Attached hereto as Exhibit N is a true and correct copy of the Order Approving Attorneys' Fees and Expenses, filed on July 20, 2011, in *Cornwell v. Credit Suisse Grp.*, No. 1:08-cv-03758-VM-JCF (S.D.N.Y.).

201.    Attached hereto as Exhibit O is a true and correct copy of the Order and Final

Judgment, filed on September 30, 2014, in *In re China Values Tech. Sec. Litig.*, No. 1:11-cv-

00796-LAK (S.D.N.Y.).

202.    Attached hereto as Exhibit P are true and correct copies of selected pages and

exhibits from the Declaration of William B. Federman in Support of (I) Plaintiffs' Motion For

Final Approval of Settlement and (II) Plaintiffs' Motion For Award of Attorneys' Fees,

Reimbursement of Litigation Expenses, and Reimbursement Awards, filed on August 5, 2014, in

*In re China Values Tech. Sec. Litig.*, No. 1:11-cv-00796-LAK (S.D.N.Y.).

203.    Attached hereto as Exhibit Q is a true and correct copy of the Declaration of

Patrick T. Egan in Support of (A) Lead Plaintiffs' Motion For Final Approval of Partial Class

Action Settlement With the Individual Defendants and Final Certification of the Settlement

Class; and (B) Lead Counsel's Motion For Reimbursement of Expenses and Establishment of

Litigation Fund, filed November 13, 2012 (ECF No. 387) (without attached exhibits).

204.    Attached hereto as Exhibit R is a true and correct copy of the Second Amended

Consolidated Class Action Complaint for Violations of the Securities Act of 1933, filed herein

on August 15, 2011, ECF No. 337, without the attached exhibits.

## XII.    CONCLUSION

205.    In view of the significant recovery obtained for the Underwriter Defendant

Settlement Class and the substantial risks posed by further litigation of the Action, Lead Counsel

respectfully submit that the Underwriter Defendant Settlement should be approved as fair,

reasonable and adequate, and that the Plan of Allocation should be approved as likewise fair,

reasonable and adequate.  In view of the significant recovery despite substantial risks faced, the

quality of the work performed, the contingent nature of Lead Counsel's role in the Action and

the standing and experience of Lead Counsel and Additional Plaintiffs' Counsel, Lead Counsel respectfully submits that a fee in the amount of $44,890,000 – equal to 12.974% of the Global Settlement Fund – be awarded to Lead Counsel and Additional Plaintiffs' Counsel.   Lead Counsel also respectfully request an award in the amount of $2,971,114.16 to reimburse expenses incurred by Lead Counsel and Additional Plaintiffs' Counsel in connection with litigating the Action.   Similarly, Lead Counsel request an award in the amount of $14,050 and $13,675 to reimburse expenses incurred by Lead Plaintiffs, WST and WRS, respectively.

I declare, under the penalty of perjury under the laws of the United States of America, that the foregoing facts are true and correct.

Executed this 30th day of December, 2014, at Boston, Massachusetts.

Patrick T. Egan