UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE: INDYMAC MORTGAGE-BACKED                  Master Docket
SECURITIES LITIGATION                           No. 09-cv-4583 (LAK)

This document relates to:        *All Actions*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# MEMORANDUM OPINION

Appearances:

Joseph C. Kohn                          Joseph J. Tabacco, Jr.
Denis F. Sheils                         Nicole C. Lavallee
William E. Hoese                        Anthony D. Phillips
KOHN, SWIFT & GRAF., P.C.               Patrick T. Egan
                                        BERMAN DEVALERIO
Lawrence P. Kolker
Gregory M. Nespole                      *Class Counsel, Counsel for Lead Plaintiffs,*
WOLF HALDENSTEIN ADLER FREEMAN &        *the Wyoming State Treasurer and Wyoming*
HERZ LLP                                *Retirement System, and Counsel for*
                                        *Settlement Class Representative the Los*
                                        *Angeles County Employees Retirement*
*Counsel for Settlement Class Representative*   *Association*
*Police and Fire Retirement System of the City*
*of Detroit*

                                        Richard M. Heimann
                                        Joy A. Kruse
                                        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
Kenneth I. Trujillo
Ira N. Richards                         John L. Gadow
SCHNADER HARRISON SEGAL & LEWIS, LLP    STOVER, GADOW AND TYLER, PLLC

Stewart L. Cohen
Jacob A. Goldberg                       *Counsel for Settlement Class Representative*
Jillian A. S. Roman                     *Public Employees' Retirement System of*
COHEN, PLACITELLA & ROTH, P.C.          *Mississippi*

*Counsel for Settlement Class Representative*
*City of Philadelphia Board of Pensions and*
*Retirement*

Joel P. Laitman
Christopher Lometti
Julie Goldsmith Reiser
Daniel B. Rehns
Kenneth M. Rehns
COHEN MILSTEIN SELLERS & TOLL PLLC
*Counsel for Settlement Class Representative
Iowa Public Employees' Retirement System*

Robin F. Zwerling
Jeffrey C. Zwerling
Justin M. Tarshis
ZWERLING, SCHACTER & ZWERLING, LLP
*Counsel for Settlement Class Representative
the General Retirement System of the City of
Detroit*

LEWIS A. KAPLAN, *District Judge.*

This action concerns mortgage pass-through certificates (the "Certificates") issued by IndyMac MBS, Inc. in several offerings pursuant to multiple registration statements and related prospectuses and prospectus supplements (the "Offering Documents").[1]  Lead plaintiffs, the Wyoming State Treasurer and the Wyoming Retirement System, allege that the Certificates were issued pursuant to materially misleading Offering Documents in violation of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.[2]  Plaintiffs sue both individual and underwriter defendants involved in preparing the Offering Documents.

The parties filed a stipulation of settlement on September 11, 2014,[3] and the Court approved the settlement and certified a settlement class on February 23, 2015.[4]  The settlement terminates this case as against the underwriter defendants in exchange for a payment of $340

---

[1] *See* Second Am. Consolidated Compl. [DI 337] ¶¶ 1, 6.

[2] 15 U.S.C. §§ 77k(a), 77l(a)(2), 77o.

[3] DI 536-1; *see also* DI 539-1 (amended stipulation of settlement).

[4] DI 565.

million.[5]   Lead plaintiffs previously reached a $6 million settlement with certain individual defendants.[6]   Consequently, there is a total settlement fund of $346 million.[7]   The matter is now before the Court on plaintiffs' counsel's motion for attorneys' fees and reimbursement of expenses.[8]

### *The Request for Attorneys' Fees and Expenses*

Eight law firms that served as counsel for plaintiffs[9] request an aggregate fee award of $44.89 million,[10] or about 13 percent of the $346 million settlement fund.   The aggregate lodestar of $24.57 million reflects 55,372 hours worked multiplied by hourly rates of between of $210 and $420 for associates and $410 to $835 for partners.[11]   The total requested fee reflects a blended multiplier of 1.83, with proposed multipliers varying by firm (from a low of 1.32 to a high of 1.92).[12]

---

[5]   DI 539-1 ¶ 1(vv).

[6]   *See* DI 410 (approving settlement); DI 365-1 ¶ 1(ll) (specifying the $6 million payment).

[7]   *See* Mem. in Support of Motion for Atty's' Fees [DI 549] at 1 & n.4.

[8]   DI 548.

[9]   The eight law firms are (i) Berman DeValerio, (ii) Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein"), (iii) Cohen, Placitella & Roth, P.C. ("Cohen Placitella"), (iv) Kohn, Swift & Graf., P.C. ("Kohn Swift"), (v) Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser"), (vi) Schnader Harrison Segal & Lewis, LLP ("Schnader Harrison"), (vii) Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein"), and (viii) Zwerling, Schacter & Zwerling, LLP ("Zwerling Schacter").

[10]   *See* Decl. of Nicole Lavallee [DI 556] Ex. A ("Proposed Allocation of Attorneys' Fees and Expenses").

[11]   DI 549 at 12-13.

[12]   *Id.* at 14.

In addition, counsel seek reimbursement of $2.99 million in litigation expenses.  The two lead plaintiffs separately request reimbursement of costs and expenses of $27,725 relating to their participation in a mediation and Rule 30(b)(6) depositions.[13]

There have been no objections to counsel's proposed fees and expenses.

## Discussion

### I.   Legal Standards

Rule 23(h) permits the Court to "award reasonable attorney's fees and nontaxable costs" in a certified class action.  The decision as to what constitutes a reasonable award rests in the sound discretion of the Court.[14]  That discretion is especially capacious in this context because the Court "is intimately familiar with the nuances of the case [and] is in a far better position to make [such] decisions than is an appellate court."[15]  The Court evaluates a request for fees as a fiduciary for the class.[16]  It therefore is obliged to protect the settlement fund from excessive fee awards.  The

---

13

  *See* Decl. of Elizabeth Anderson [DI 551-3]; Decl. of Benjamin Brandes [DI 551-4].  The Wyoming State Treasurer seeks compensation for 148.5 hours of time, billed at a rate of $100 per hour, for a total of $14,050.   DI 551-3 ¶ 12.  The Wyoming Retirement System seeks compensation for 143.5 hours of time, billed at rates between $75 and $100 per hour, for a total of $13,675.  DI 551-4 ¶ 12.

14

  *In re World Trade Ctr. Disaster Site Litig.*, 754 F.3d 114, 126 (2d Cir. 2014); *see also Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000) (citing *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 172 (2d Cir. 1998)).

15

  *McDaniel v. Cnty. of Schenectady*, 595 F.3d 411, 416 (2d Cir. 2010) (quoting *Goldberger*, 209 F.3d at 47-48).

16

  *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1099 (2d Cir. 1977), *abrogated on other grounds by Goldberger*, 209 F.3d at 43 (in awarding fees, the district court acts as a "fiduciary who must serve as a guardian of the rights of absent class members").

party seeking fees bears the burden of establishing the reasonableness of the fee award requested, including the number of hours for which compensation is sought.[17]

In evaluating the reasonableness of a proposed fee, a court may elect either the "percentage of the fund" or the "lodestar" method.[18] Under the former, a court simply determines what percentage of the recovery would constitute an appropriate fee. Under the latter, a court "scrutinizes the fee petition to ascertain the number of hours reasonably billed to the class and then multiplies that figure by an appropriate hourly rate."[19] The court then may "increase the lodestar by applying a multiplier" based on factors such as "the risk of the litigation and the performance of the attorneys" – that is, the six case-specific factors delineated by the Second Circuit in *Goldberger v. Integrated Resources*.[20] Many, though not all, courts in this circuit begin with the percentage of the fund method and then perform a lodestar "cross-check" to "ensure that the percentage of the fund method yields appropriate compensation without resulting in a windfall for plaintiffs' attorneys."[21]

While the framework for scrutinizing fee awards is clear, the waters quickly muddy. Neither the lodestar nor the percentage method closely aligns the incentives of the class and those of its attorneys. Focusing on the lodestar encourages investment of needless hours, while the

---

[17]

    *Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1160 (2d Cir. 1994).

[18]

    *See McDaniel*, 595 F.3d at 417 ("[I]t remains the law in this Circuit that courts 'may award attorneys' fees in common fund cases'" under either method) (quoting *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005)).

[19]

    *Goldberger*, 209 F.3d at 47.

[20]

    *Id.* at 50.

[21]

    *In re Citigroup Inc. Bond Litig.*, 988 F. Supp. 2d 371, 373 (S.D.N.Y. 2013).

percentage of the fund method can generate egregiously high fees for the lawyers and encourage counsel to settle a case prematurely.[22]  Nor do the difficulties stop there.  As this Court has stated previously:

> "It is common knowledge that almost all securities class actions are settled.  Those that are settled typically are resolved on terms pursuant to which any fee award comes out of the overall settlement fund and thus is of no concern to the defendant and its counsel. The courts asked to approve these fees thus are left without any effective adversarial testing of the claimed lodestar except in rare cases. . . . In consequence, courts in the position in which this one finds itself are left pretty much at sea, aided however by the principles that (1) the Court is a fiduciary for the class members who ultimately pay any fee, (2) the class lawyers' interests at this stage diverge sharply from those of the class members, (3) it is the lawyers who bear the burden of justifying the size of the award they seek at their clients' expense, and (4) the risk of non-persuasion is with those lawyers."[23]

In the final analysis, then, the Court's determination of what constitutes a reasonable fee rests on its own experience:  twenty-four years in practice, including the litigation of securities cases generally and class actions in particular, and more than twenty years on the bench.

For reasons that will appear, the Court finds that the requested fee of $44.89 million is unreasonably high.  Instead, the Court approves an aggregate fee award of approximately $28.48 million, a figure at which it arrives by cutting that portion of the aggregate lodestar attributable to discovery costs by 25 percent and by adopting reduced multipliers.  The bottom-line award is still over 115 percent of counsel's original lodestar and, in the Court's view, strikes a more salutary balance between the interests of the class and the attorneys than the fee proposed by counsel.

---

[22]

*McDaniel*, 595 F.3d at 419; *see also In re Auction Houses Antitrust Litig.*, 197 F.R.D. 71, 76-78 (S.D.N.Y. 2000) (exploring the problems of perverse incentives and fee awards in greater depth).

[23]

*In re Weatherford Int'l Sec. Litig.*, No. 11-cv-1646 (LAK), 2015 WL 127847, at *1 (S.D.N.Y. Jan. 5, 2015).

Thus, counsel will be rewarded generously.

## II.   *The Requested Fee Award Would Be an Unreasonably High Percentage of the Fund*

The Court begins in this case by considering the proposed $44.89 million fee as a percentage of the fund.

Plaintiffs' counsel argue that the proposed fee, which would amount to 13 percent of the $346 million settlement fund, would be "modest and very much on the low end of percentage fee awards by other courts in similar [mortgage-backed securities ("MBS")] and securities litigation."[24] In support of this proposition, they cite orders in five other MBS cases in which counsel received fees amounting to between 17 and 20 percent of recoveries exceeding $100 million.[25]

While comparisons to fee awards in similar cases can be helpful, their utility here is limited.  In the first place, only one of the fee orders submitted by counsel contains any substantive analysis.[26]  The remainder appear to be lawyer-authored boilerplate.  At least one of my colleagues has expressed concern at the attempted use of such orders as precedential authority to support fee

---

[24]

DI 549 at 8.

[25]

*See* Decl. of Patrick Egan [DI 550] Ex. C (order in *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 10-cv-302 (C.D. Cal.)); *id.* Ex. D (order in *Pub. Emps.' Ret. Sys of Miss. v. Merrill Lynch & Co., Inc.*, No. 08-cv-10841 (S.D.N.Y.)); *id.* Ex. E (order in *N.J. Carpenters Vacation Fund v. Royal Bank of Scot. Grp.*, No. 08-cv-5093 (S.D.N.Y.)); *id.* Ex. F (order in *Plumbers' & Pipefitters' Local #562 Supp'l Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-cv-1713 (E.D.N.Y.)); *id.* Ex. G (order in *In re Wells Fargo Mortgage-Backed Certificates Litig.*, No. 09-cv-1376 (N.D. Cal.)).

[26]

*See* DI 550 Ex. C.

applications.[27]  More troubling, a non-random sample of five fee awards amounts to no more than

looking out over a crowd and picking out one's friends.  This approach just as easily could support

a fee much lower than 13 percent.[28]  It does not take a statistical whiz to appreciate that a more

helpful, though certainly not conclusive, approach would be to consider the proposed fee in light of

the *distribution* of all attorney fee awards in cases involving comparable settlement funds.

Counsel do bring to the Court's attention at least one such authority – a 2014 report

regarding trends in securities litigation.[29]  It states that the median fee award in securities cases with

recoveries between $100 million and $500 million in the period from 1996 to 2013 was 22.2 percent

of plaintiffs' total recovery.[30]  The report further notes that court-approved awards seem to be getting

smaller, with the median fee in the same recovery range shrinking to 20 percent of settlement

amounts in the period from 2011 to 2013.[31]  These figures roughly match those appearing in a 2010

---

[27]

*Sakiko Fujiwara v. Sushi Yasuda Ltd.*, No. 12-cv-8742 (WHP), 2014 WL 5840700, at *8 (S.D.N.Y. Nov. 12, 2014) ("By submitting proposed orders masquerading as judicial opinions, and then citing to them in fee applications, the class action bar is in fact creating its own caselaw on the fees it is entitled to. . . . No wonder that 'caselaw' is so generous to plaintiffs' attorneys.").

[28]

*See In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d at 525 (awarding a fee of 6.511 percent of the settlement fund); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 486 (S.D.N.Y. 1998) ("In cases where a class recovers more than $75–$200 million . . . fees in the range of 6–10 percent and even lower are common.") (citing examples).

[29]

DI 550 ¶ 163 & Ex. H (citing RENZO COMOLLI & SVETLANA STARYKH, NERA ECONOMIC CONSULTING, RECENT TRENDS IN SECURITIES CLASS ACTION LITIGATION: 2013 FULL-YEAR REVIEW (2014) ("NERA STUDY")).

[30]

*Id.* at 34.

[31]

*Id.*

study published in the *Journal of Empirical Legal Studies*.[32]  Focusing only on settlements reached in 2006 and 2007,[33] that article found that the mean and median fees were 17.8 percent and 19.5 percent of plaintiffs' recovery in eight cases with class settlements between $250 million and $500 million.[34]  Both reports conclude that fee awards decrease on a percentage basis as total recoveries for a class increase.[35]

Another study, also published in the *Journal of Empirical Legal Studies*, reports somewhat more conservative findings.[36]  There, Professors Eisenberg and Miller examined 689 settlements in common fund cases between 1993 and 2008.[37]  Two key conclusions emerge from their data.  First, the class recovery of $346 million in this case is high – larger than 90 percent of settlements in common fund cases.[38]  By way of comparison, mean and median class recoveries in

---

[32]

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUDIES 811 (2010).

[33]

*Id.* at 812.

[34]

*Id.* at 839 (table 11).

[35]

*Id.*; *see also* NERA STUDY at 34 ("the percentage of fees shrinks as settlement size grows").

[36]

Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. EMPIRICAL LEGAL STUDIES 248 (2010).

[37]

*Id.* at 251.

[38]

*Id.* at 264-65 (table 7 and accompanying discussion).

Of course, the size of a settlement tells us little about the success of the lawyers in achieving compensation for the class without knowing also what could have been recovered if the case had been tried to verdict and, in addition, the likelihood of such a result.

the Second Circuit were $119.06 million and $11.63 million during this period.[39]  Second, Eisenberg and Miller reported smaller fee percentages for large-recovery cases than either of the two studies mentioned in the previous paragraph.  For cases with total recoveries of $175.5 million or higher, they found a mean fee of 12 percent of the settlement amount and a median fee of 10.2 percent.[40]

How, then, to reconcile these different benchmarks?  The Court ultimately concludes, in light of its own experience[41] as well as its knowledge of this case, that a fee of eight to ten percent of the settlement fund (i.e., $27.68 million to $34.6 million) would be more appropriate.  Such a fee would be closer to the average figures reported in the Eisenberg-Miller study, to which several courts in this circuit have looked for guidance in recent years.[42]  More fundamentally, the Court finds that counsel's proposed fee of 13 percent of plaintiffs' recovery is simply too high.  Taking into account

---

[39]

    *Id.* at 260 (table 4).

[40]

    *Id.* 265 (table 7).

[41]

    The Court's experience includes *In re Auction Houses Antitrust Litigation*, 197 F.R.D. 71, a case in which the position of lead class counsel was selected in part by an auction in which (1) the Court fixed the compensation of the lead counsel as 25 percent of any class recovery in excess of "X," and (2) competing counsel submitted bids for the "X" that they would offer.  The larger the "X" bid, the more favorable to the class the bid was.  In the event, the case settled for $512 million.  The successful bidder in the lead counsel auction, who had "bid" that the class would receive the first $405 million of any recovery free of any attorneys' fees, received a fee of 25 percent of the excess over $405 million, which was $26.75 million.  Thus, in a competitive environment, the successful bidder agreed to a compensation arrangement that ultimately produced a fee equal to 5.2 percent of the recovery.

    While *Auction Houses* is distinguishable from this case, the fact that able counsel were prepared to undertake representation of that class on terms that ultimately yielded a fee of 5.2 percent of a recovery more or less of the same order of magnitude is interesting.

[42]

    *See, e.g.*, *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 349-51 (S.D.N.Y. 2014); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 444 (E.D.N.Y. 2014).

the total number of lawyer and professional staff hours reflected in counsel's billing records – 55,372 – the proposed fee of $44.89 million would result in a blended hourly rate for *all* attorneys and other time-keeping staff of $810.71, which strikes the Court as quite excessive.[43]  Any fee in the Court's adopted range would remunerate plaintiffs' counsel beyond their lodestar of $24.57 million and would reflect a more reasonable proportion of the total recovery.  The Court rejects also any notion that a fee in this range would penalize plaintiffs' counsel.  In light of the $346 million recovery for the class, it is eminently sensible that the fee percentage should be smaller than in a more typical litigation.[44]

### III.    Consideration of the Goldberger *Factors*

Irrespective of whether a court adopts the percentage of the fund or the lodestar approach, it must assess the six factors delineated in *Goldberger*.[45]  These include "(1) counsel's time and labor, (2) the litigation's magnitude and complexity, (3) the risk of the litigation, (4) the quality of representation, (5) the requested fee in relation to the settlement, and (6) public policy

---

[43]

> *See, e.g.*, *In re Gilat Satellite Networks, Ltd.*, No. 02-cv-1510 (CPS), 2007 WL 2743675, at *18 (E.D.N.Y. Sept. 18, 2007) (an effective hourly rate of $602 for all personnel was "significant" if not quite excessive); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, No. 02-mdl-1484 (JFK), 2007 WL 313474, at *23 (S.D.N.Y. Feb. 1, 2007) (describing an effective hourly rate of $1,193.51 per hour as "exorbitant").

[44]

> *See, e.g.*, *In re Indep. Energy Holdings PLC*, No. 00-cv-6689 (SAS), 2003 WL 22244676, at *6 (S.D.N.Y. Sept. 29, 2003) ("[T]he percentage used in calculating any given fee award must follow a sliding-scale and must bear an inverse relationship to the amount of the settlement.  Otherwise, those law firms who obtain huge settlements, whether by happenstance or skill, will be over-compensated to the detriment of the class members they represent.").

[45]

> *Wal-Mart*, 396 F.3d at 121 (under either method, "the *Goldberger* factors ultimately determine the reasonableness of a common fund fee.") (internal quotation marks omitted).

considerations."[46]  While plaintiffs' counsel argue that the *Goldberger* factors support their proposed fee, this Court is dubious.

**(1)  Counsel's time and labor.**  Plaintiffs' counsel argue that their labor on this case was intensive and state that it was not until after class certification and "extensive fact discovery" that negotiations led to a settlement.[47]  The total number of hours – 55,372 – certainly indicates that much effort was expended in litigating this case.  Of course, it remains to be seen whether the total number of hours devoted to it was reasonable.

**(2)  The magnitude and complexity of the action.**  Counsel assert that the complexities of this case were myriad.  The case involved over 50 offerings based on more than 74,000 loans.  Those 50 offerings in turn involved 465 certificates, each of which arguably might have required expert proof as to valuation.[48]

**(3)  The litigation risks involved.**  Counsel assert that litigation risks in this case were high, principally because IndyMac is insolvent and the underwriter defendants had viable affirmative defenses.  They argue also that evidence as to proof of falsity would have been complex and required expert testimony, and they highlight the parties' disagreement over the proper calculation of damages.[49]  Nevertheless, there are at least two cross-cutting considerations.  First, securities cases like this practically always settle, meaning that the risk of total non-recovery was almost non-

---

[46]     *McDaniel*, 595 F.3d at 423 (citing *Goldberger*, 209 F.3d at 50).

[47]     DI 549 at 4.

[48]     *Id.* at 17-18.

[49]     *Id.* at 19-20.

existent.[50]  Second, plaintiffs in this case had the benefit of pre-existing investigations by government

authorities,[51] a fact that rendered the case less risky than it otherwise might have been.[52]

        **(4) The quality of class counsel's representation.**  The Court is satisfied that class

counsel litigated this case effectively.  Moreover, the Court is mindful that this is the second largest

MBS settlement on record and the largest reported settlement against underwriters in the absence of

a solvent issuer,[53] although the significance of these facts is not as strong as counsel would have it.[54]

        **(5) The requested fee in relation to the settlement.**  Counsel assert that lead

plaintiffs, who are "sophisticated institutional investors,"[55] have reviewed the fee request and find

it reasonable.  That may be so, but such an agreement between plaintiffs and their lawyers is no

substitute for an adversary testing of counsel's assertions.[56]  The Court already has determined that

---

[50]

    *Goldberger*, 209 F.3d at 52 ("At least one empirical study has concluded that 'there appears to be no appreciable rate of non-recovery' in securities class actions, because 'virtually all cases are settled.'") (citing Janet Cooper Alexander, *Do the Merits Matter? A Study of Settlements in Securities Class Actions*, 43 STAN. L. REV. 497, 578 (1991)).

[51]

    *See* DI 337 ¶ 9 ("Indeed, a February 26, 2009 report issued by the Office of Inspector General . . . of the U.S. Department of Treasury . . . confirmed that many of these undisclosed or untrue facts were part of long, systematic problems at IndyMac.").

[52]

    *Cf. In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 399 (S.D.N.Y. 2013) ("[T]he factors that traditionally render securities cases most likely to survive a motion to dismiss and, in turn, to settle – such as prior government investigations – are absent here.").

[53]

    Mem. in Support of Final Approval of Settlement [DI 547] at 1.

[54]

    *See supra* note 39.

[55]

    DI 549 at 23.

[56]

    *See Sushi Yasuda*, 2014 WL 5840700, at *8 (citing discussions in cases and articles).

13 percent of the settlement fund is too high a proportion of the recovery in these circumstances.

**(6) Public policy considerations.**  Counsel contend that public policy supports class actions ending in settlement and fee awards sufficient to encourage plaintiffs' counsel to bring future actions.[57]  The Court agrees.  But the ultimate determination as to the incentive effects of any given award is left to the Court's discretion.[58]  The Court has concluded that an award at or above counsel's lodestar is warranted, albeit below the 13 percent of plaintiffs' recovery sought.  In the final analysis, if such an award "amounts to punishment . . . there will be many attempts to self-inflict similar punishment in future cases."[59]

The Court has considered all of the *Goldberger* factors and is confident in its conclusion that an award between eight and ten percent of the settlement fund is appropriate.

*IV.  The Lodestar Cross-Check Confirms that the Proposed Fee Is Too High*

Counsel helpfully have adopted a common format for the presentation of their time records that distinguishes hours billed by category of task.  These categories include (1) investigations and factual research, (2) discovery, (3) pleadings and pretrial motions (including legal research), (4) court appearances, (5) settlement, (6) litigation strategy and analysis, (7) class certification issues, and (8) appeal issues.

The aggregate lodestar is built upon hourly rates between $210 and $420 for

---

[57]  DI 549 at 24.

[58]  *See McDaniel*, 595 F.3d at 426 (stating that the Second Circuit has been "loath to disturb the determinations of district courts" with respect to findings regarding public policy considerations).

[59]  *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d at 525.

15

associates and between $410 and $835 for partners,[60] and counsel have agreed to certain self-imposed rate caps "for greater consistency" across firms.[61]   The Court finds that these hourly rates are reasonable in this context, at least in the absence of any objections or contrary evidence.

As to hours expended, however, the Court has concerns – particularly as it relates to hours spent on discovery.  Counsel report that they devoted 32,658 hours to discovery, a figure amounting to nearly 60 percent of all hours spent on this case.  Figure 1 below helps illustrate the extent to which work on discovery drove the total number of hours.[62]   In turn, the hours devoted to discovery accounted for $12.6 million, or about 51 percent of the total lodestar.

Counsel have attempted to document exactly what tasks underlay this figure.[63]   They included four discovery motions,[64] propounding over a dozen document requests,[65] participation in 15 depositions,[66] and "reviewing and analyzing over eleven million documents produced by parties and third parties,"[67] among others.  Even so, the sheer number of hours here is eyebrow-raising.  Assuming an industrious attorney billing 200 hours per month, the lawyers in this case claim to have

---

[60]

DI 549 at 12.

[61]

*Id.*

[62]

All figures and tables appear at the conclusion of this opinion.

[63]

*See* DI 550 ¶¶ 32-68.

[64]

*Id.* ¶ 35.

[65]

*Id.* ¶ 37.

[66]

*Id.* ¶ 68.

[67]

DI 549 at 9.

spent the equivalent of 13.6 years' worth of effort on discovery. That would be surprising even in a case with many depositions; it borders on astounding in this one, in which only 15 were taken. And the astonishment is not fully mitigated by the volume of the documents produced. In a case such as this, it is likely that many of the documents consisted of duplicates produced by similarly situated defendants (especially the underwriters) as well as nearly identical offering documents and other voluminous materials, relatively few of which contained much if anything that mattered to the case.[68] The Court, having conducted a "conscientious and detailed inquiry" into whether such hours were expended "usefully and reasonably,"[69] and bearing in mind plaintiffs' counsel's burden of persuasion, cannot conclude that an efficient attorney "would have engaged in similar time expenditures."[70]

The Court therefore makes the following two adjustments to counsel's proposed fee. First, it exercises its discretion to cut "surplusage" on a percentage basis by reducing the portion of each firm's lodestar attributable to discovery by 25 percent.[71] This results in a revised aggregate lodestar of $21.42 million. Second, while the Court believes that the recovery for the class justifies

---

[68]

       Plaintiffs' counsel, who of course have the burden here, were at liberty to demonstrate that the nature of the eleven million documents was quite different and required the enormous investment of time that was recorded.

[69]

       *Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994).

[70]

       *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992).

[71]

       *See Kirsch*, 148 F.3d at 173 ("Hours that are excessive, redundant, or otherwise unnecessary are to be excluded, and in dealing with such surplusage, the court has discretion to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application.") (citation omitted); *see also In re Warner Chilcott Ltd. Sec. Litig.*, No. 06-cv-11515 (WHP), 2009 WL 2025160, at *4 (S.D.N.Y. July 10, 2009) (applying a multiplier less than one in part to "encourage[] more efficient discovery practices").

a multiplier, it is not convinced that the blended multiplier of 1.83 suggested by counsel is warranted. It therefore reduces the portion of any multiplier greater than 1 by 60 percent across the board (i.e., a multiplier of 1.92 becomes 1 plus 40 percent of 0.92, or 1.37). This yields a new blended multiplier of 1.33 and a total fee award of $28.48 million. Updated firm-by-firm numbers appear below in Table 1. The revised award is almost 116 percent of counsel's original lodestar, 133 percent of counsel's adjusted lodestar, 8.2 percent of the total $346 million recovery, and results in a blended hourly rate of $514.29.

To be sure, these cuts represent "rough justice [rather than] auditing perfection."[72] Still, the Court believes that this revised fee award more reasonably balances the interests of the class – which the Court must guard jealously[73] – with the goal of adequately compensating counsel for their work on this litigation. None of the Court's statements are intended to impugn the lawyers who toiled on this case. Rather, the Court "has merely done the best it can with the tools at hand, given the lack of any real adversarial testing of any of the key issues."[74]

## V.   The Request for Reimbursement of Expenses

Plaintiffs' counsel seek $2.99 million in reimbursement of expenses. The Court has reviewed this request and finds nothing objectionable. Counsel's request is granted.

Lead plaintiffs, the Wyoming State Treasurer and the Wyoming Retirement System,

---

[72]   *Fox v. Vice*, 131 S. Ct. 2205, 2216 (2011).

[73]   *See McDaniel*, 595 F.3d at 411 ("[A] fee award should be based on scrutiny of the unique circumstances of each case, and a jealous regard to the rights of those who are interested in the fund.") (internal quotation marks omitted).

[74]   *In re Weatherford Int'l Sec. Litig.*, 2015 WL 127847, at *2.

further request reimbursement of costs and expenses of $27,725.  These expenses relate to preparation for a mediation, attending the mediation, and preparing for (and attending) Rule 30(b)(6) depositions.[75]  Lead plaintiffs recognize that the Court has denied such applications previously,[76] but they assert that, unlike plaintiffs in these prior cases, they have explained adequately the basis for their request.  They point also to a recent case, *In re China Valves Technology Securities Litigation*,[77] in which the Court did approve an award of $5,000 in expenses to lead plaintiffs.

As a colleague of mine recently articulated, it is totally unclear "why a party who chooses to bring a lawsuit should be compensated for time expended in appearing at a deposition taken in order to insure that [he or she] is actually capable of fulfilling his statutory obligations, or responding to document requests, or performing what are essentially duplicative reviews of pleadings and motions that his lawyers are perfectly capable of reviewing."[78]  This Court agrees.  If the Wyoming State Treasurer and the Wyoming Retirement System do not want the bother of serving as lead plaintiffs in future cases, they can decline to take on that role.

---

[75]
    *See* DI 551-3; DI 551-4.

[76]
    *See* Order, *In re Parmalat Sec. Litig.*, No. 04-cv-30 (LAK) (S.D.N.Y. Mar. 2, 2009) [DI 1055] (denying request for award of costs and expenses to lead plaintiffs); *In re NTL Inc. Sec. Litig.*, No. 02-cv-3013 (LAK), 2007 WL 1294377, at *10-11 (S.D.N.Y. May 2, 2007) (adopting magistrate judge's recommendation that a request for reimbursement of lost wages be denied).

[77]
    Order ¶ 17, No. 11-cv-796 (LAK) (S.D.N.Y. Sept. 30, 2014) [DI 119].

[78]
    *City of Providence v. Aeropostale, Inc.*, No. 11-cv-7132 (CM), 2014 WL 1883494, at *19 (S.D.N.Y. May 9, 2014).

*Conclusion*

The Court grants the motion for attorneys' fees and reimbursement of expenses [DI 548] in the aggregate amount of $31,469,489.61, which is broken down by law firm in Table 2 below.  Lead plaintiffs' request for reimbursement of fees and expenses is denied.

SO ORDERED.

Dated:      March 24, 2015

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)



**Figure 1:** Total Reported Hours by Category
*In re IndyMac Mortgage-Backed Sec. Litig.*, No. 09-cv-4583 (LAK)

**Table 1: Revised Fee Awards**

| Firm | Proposed Lodestar | Adjusted Lodestar | Proposed Multiplier | Adjusted Multiplier | Approved Fee Award |
|---|---|---|---|---|---|
| Berman DeValerio | $18,212,228.75 | $15,712,306.13 | 1.9196 | 1.36784 | $21,491,920.82 |
| Cohen Milstein | $1,555,128.75 | $1,216,704.38 | 1.61 | 1.244 | $1,513,580.25 |
| Cohen Placitella | $254,405.00 | $233,860.75 | 1.61 | 1.244 | $290,922.77 |
| Kohn Swift | $1,680,367.00 | $1,481,834.00 | 1.61 | 1.244 | $1,843,401.50 |
| Lieff Cabraser | $964,430.00 | $940,463.00 | 1.61 | 1.244 | $1,169,935.97 |
| Schnader Harrison | $264,038.00 | $248,671.88 | 1.32 | 1.128 | $280,501.88 |
| Wolf Haldenstein | $857,860.00 | $823,952.88 | 1.61 | 1.244 | $1,024,997.38 |
| Zwerling Schachter | $779,912.00 | $764,535.25 | 1.32 | 1.128 | $862,395.76 |
| **Total** | **$24,568,369.50** | **$21,422,328.27** | **1.83 (blended)** | **1.33 (blended)** | **$28,477,656.33** |

**Table 2: Approved Award of Fees and Expenses**

| Firm | Approved Fee Award | Approved Reimbursements | Total Award of Fees and Expenses |
|---|---|---|---|
| Berman DeValerio | $21,491,920.82 | $2,413,853.36 | $23,905,774.18 |
| Cohen Milstein | $1,513,580.25 | $41,593.31 | $1,555,173.56 |
| Cohen Placitella | $290,922.77 | $25,047.37 | $315,970.14 |
| Kohn Swift | $1,843,401.50 | $215,734.79 | $2,059,136.29 |
| Lieff Cabraser | $1,169,935.97 | $167,036.55 | $1,336,972.52 |
| Schnader Harrison | $280,501.88 | $689.75 | $281,191.63 |
| Wolf Haldenstein | $1,024,997.38 | $117,430.23 | $1,142,427.61 |
| Zwerling Schachter | $862,395.76 | $10,447.92 | $872,843.68 |
| **Total** | **$28,477,656.33** | **$2,991,833.28** | **$31,469,489.61** |